**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|  |  |  |
|---|---|---|
| PEN AMERICAN CENTER, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. <u>18-9433</u> |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, in his official capacity | ) | |
| as President of the United States, | ) | |
| | ) | |
| Defendant. | ) | |

_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This complaint arises out of official acts by the President of the United States, Donald J. Trump, intended to stifle exercise of the constitutional protections of free speech and a free press.  Through retaliatory directives to officials in his Administration and credible public threats to use his government powers against news organizations and journalists who have reported on his statements, actions, and policies in ways he does not welcome, the President has violated the First Amendment and his oath to uphold the Constitution.  President Trump has First Amendment rights and is free to criticize the press vehemently, but he is not free to use the power and authority of the United States government to punish and stifle it.

2.      President Trump has directed his threats and retaliatory actions at specific outlets whose content and viewpoints he views as hostile.  As a result, journalists who report on the President or his Administration reasonably believe they face a credible threat of government retaliation for carrying out the duties of their profession.  President Trump has thus intentionally hung a sword of Damocles over the heads of countless writers, journalists, and media entities,

including members of Plaintiff PEN American Center, Inc. (hereinafter, "PEN America"). His actions seek to accomplish indirectly what the President cannot do directly: impede professional and investigative journalism, and silence criticism.

3.      Plaintiff seeks a specific and narrow—but important—remedy for the President's unconstitutional actions aimed at suppressing speech. It seeks the entry of an Order (a) declaring that Defendant Trump's retaliatory acts violate the First Amendment, and (b) enjoining Defendant Trump from directing any officer, employee, agency, or other agent or instrumentality of the United States government to take any action against any person or entity in retaliation for speech that the President or his Administration do not like.

4.      Defendant Trump has made eminently clear his disdain for the press and the legal protections the First Amendment affords it. He has frequently referred to journalists covering his rallies as "disgusting" and has stated, more generally, that it is "frankly disgusting the way the press is able to write whatever they want to write" and that "people should look into that." Defendant Trump has decried reporting critical of him or his Administration as "fake news" and has repeatedly labeled journalists "the enemy of the American people," an epithet used by Joseph Stalin and other authoritarian and repressive rulers to denigrate and endanger their critics.

5.      These ongoing verbal attacks on the press and others exercising their own First Amendment rights, while troubling and anti-democratic, are not the basis upon which Plaintiff PEN America seeks relief. As disturbing as it is for President Trump to disparage publicly the freedoms provided by the First Amendment, and as indefensible as it may be for the President to denounce in the way he has those whose reporting he dislikes, he too is protected by the First Amendment. His opinions about the press, however odious, cannot be the basis for legal limitations and are not themselves the basis for this lawsuit. But Defendant Trump has done

2

more than to exercise his right to denounce his critics.  He has threatened to engage, and has

engaged, in conduct intended to retaliate against specific news organizations and journalists

whose content and viewpoints displease him.  Through his actions, Defendant Trump has

intentionally conveyed to all writers and journalists that if he objects to their their coverage, they

may be subject to retaliation by the federal government.  That conduct violates the Constitution.

6.     For example, Defendant Trump has repeatedly called for action to punish the

online retailer Amazon because Jeff Bezos, its chief shareholder and CEO, owns the *Washington

Post*, whose accurate coverage of his Administration the President finds objectionable.  The

President's threats of government action, alone, caused a pronounced dip in Amazon's stock

value in July 2018.  The President then followed through on his threats and issued an executive

order directing the U.S. Postal Service ("Postal Service") to review its financial practices,

including the shipping rates it offers companies like Amazon.  On information and belief, he then

personally directed U.S. Postmaster General Megan Brennan to double the rate the Postal

Service charges Amazon and other firms to ship packages.  On October 11, 2018, the Postal

Service announced proposed rate increases, including a proposed 12-percent increase for the

Parcel Select service used by Amazon.

7.     Defendant Trump similarly has threatened and taken action to retaliate against

CNN because he objects to its coverage of him.  When Defendant Trump first learned during the

2016 campaign that CNN's parent company, Time Warner, planned to merge with AT&T, he

publicly threatened to use the Justice Department's antitrust merger-review process to retaliate

against CNN for its news coverage.  Following Defendant Trump's election, the Justice

Department sued to block the merger, despite a long track record of not opposing vertical

mergers like the one proposed between Time Warner and AT&T.  While that lawsuit did not

succeed in the District Court, the litigation cost CNN's parent significant resources, including money, time, and opportunity costs.  Those litigation costs continue as the President's Administration pursues an appeal.

8.      Defendant Trump's use and threatened use of official authority to punish critical reporting takes other forms as well.  For example, he has threatened to take away White House press credentials of reporters whose coverage displeases him and has threatened to challenge NBC's and other television stations' broadcast licenses in retaliation for coverage he disliked.  In July 2018, the White House banned CNN reporter Kaitlan Collins from a Rose Garden press conference for asking questions the White House deemed "inappropriate."

9.      The President's intent to deter criticism through credible threats of punishment by the government is unmistakable and seeks to shape the landscape in which all coverage and commentary about the President is carried out.  His conduct is designed to intimidate not just the specific targets of the President's retaliatory actions and threats of action, but all who write or speak critically about the President or his Administration, including members of Plaintiff PEN America.  Based on the President's threats and the follow-up actions described above, journalists reasonably perceive a credible threat of government retaliation if the President is displeased by their reporting.

10.      Many media outlets and individual journalists, including members of Plaintiff PEN America, have braved the President's threats and have continued to do the reporting and writing necessary to hold the government to account.  But they must do so against the backdrop of Defendant Trump's credible threats of government retaliation that is intended to deter them. The fortitude of Plaintiff and the American media in the face of these threats does not render Defendant Trump's actions any less calculated to chill their speech, nor less unconstitutional.

4

11.     Defendant Trump's actions infringe two of our most coveted liberties, the freedom of speech and freedom of the press.  Freedom of speech is an essential component of a functioning democracy.  Benjamin Franklin identified freedom of speech as the "principal pillar" of a free society and the primary bulwark against tyranny.  A leader with "the power to punish for words," he wrote, "would be armed with a weapon the most destructive and terrible."

12.     To ensure no American leader would wield such destructive power, and because they viewed it as vital to maintaining a democracy, our founders guaranteed freedom of the press in our Constitution and created a court system to protect it.  As the Supreme Court said in 1936, "[t]he newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern."  *Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936).

13.     Together, the First Amendment's protections of free speech and a free press reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

14.     It is also "well established that the Constitution protects the right to receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972), and that the government cannot "orchestrate public discussion through content-based mandates," *United States v. Alvarez*, 567 U.S. 709, 728 (2012).  Together, these protections prohibit the government

from attempting to restrict or otherwise improperly influence the news coverage of government activities through retaliatory acts and threats.

15.     Defendant Trump has violated these First Amendment rights through his acts that cause reasonable journalists to believe that there are instances in which government power will be used to retaliate against critical speech.  These acts cause Plaintiff PEN America's members reasonably to fear that their reporting or writing may elicit governmental retaliation if the President deems it too critical.  These acts also prevent Plaintiff's members from receiving speech of investigative journalists, writers and commentators who operate free from the President's efforts to chill and intimidate.

16.     Plaintiff comes to this Court for relief because our constitutional system assigns to the courts the power and duty to remedy such an ongoing violation of the First Amendment rights of speakers and listeners.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this action arise under the Constitution and laws of the United States, specifically the First Amendment to the United States Constitution.

18.     Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendant is an officer or agency of the United States and Plaintiff PEN America resides in the District.

## PARTIES

19.     Plaintiff PEN America, a section 501(c)(3) organization headquartered in New York City, is an association of writers and other literary and media professionals, including journalists and publishers of information about the President and his Administration.  Plaintiff's mission is to unite writers and their allies to celebrate creative expression and defend the liberties

that make it possible.  PEN America's bedrock work is long-term advocacy on behalf of individual writers who are being punished because of their work.  PEN America monitors the government's interactions with writers and journalists and produces informational content related to its advocacy work.

20.     Plaintiff's members write about, report on, and produce media content related to American government and politics.  Plaintiff's members produce, and plan to produce in the future, work that is held to the highest standards of accuracy, but that is often critical of the actions of politicians and governments, including the President and his Administration.  This reporting informs the public about the workings of the government, promotes government transparency and enables the public to hold their representatives accountable.  Plaintiff's members also rely on information produced by a free and unchilled press to do their work.

21.     Plaintiff's members work for a wide variety of media entities, including organizations whose mission is to gather and report the news.  Many of Plaintiff's members work for, contribute to, and consume the work of media organizations that have been directly threatened by Defendant Trump for the content of their speech, including the *Washington Post*, CNN, NBC, the White House Press Corp, ESPN, and Univision.  Plaintiff's membership includes individuals who possess, or work for entities that possess, White House press credentials and broadcast licenses.

22.     Defendant Donald J. Trump is the 45th President of the United States, a position in which he has served since January 20, 2017.

# FACTS

### A. President Trump's Unconstitutional Acts

23.     As President, Defendant Trump exercises ultimate authority over the Executive Branch, controlling agencies' actions through Executive Orders and the Appointments Clause. President Trump has repeatedly threatened to use the levers of government power that he oversees to retaliate against journalists and media companies for the content of their coverage. In some cases, he has followed through on those threats.  Defendant Trump has thus far engaged in at least four categories of retaliatory actions targeting unfavorable news reporting: initiating a government review to raise postal rates; directing Department of Justice enforcement actions; threatening to revoke broadcast licenses; and interfering with White House press access.

### *Government Review to Raise Postal Rates*

24.     Defendant Trump has repeatedly threatened to use the U.S. Postal Service ("Postal Service") and its rate structure to retaliate against Jeff Bezos, the owner of the *Washington Post* (also referred to as "the *Post*"), whose coverage he dislikes.

25.     On April 12, 2018, he followed through on his threats by signing an Executive Order directing the Postal Service to review its rates.  This Order, on information and belief, was aimed at Bezos's company, Amazon, and was motivated by Defendant Trump's displeasure at the reporting of Bezos's other company, the *Washington Post*.

26.     From the beginning of his campaign for President, Defendant Trump has repeatedly attacked the *Post* for its coverage of him, calling it biased, fictitious, and "a disgrace to journalism."  In a 2016 interview, he called the *Post* "a political instrument" that was writing "bad" and "wrong" stories "with no proper information," and accused its reporters of writing a "false" book about him.  He has routinely called the *Washington Post* "fake news" and personally attacked its writers.

8

27.     During his presidency, when the *Washington Post* published unflattering stories about the inner workings of his Administration, Defendant Trump frequently responded with pointed denunciations of the accuracy of the *Post*'s work.  On April 8, 2018, for example, after the *Post* ran a story about John Kelly's frustrations as Chief of Staff, Defendant Trump tweeted:

"The Washington Post is far more fiction than fact.  Story after story is made up garbage - more like a poorly written novel than good reporting.  Always quoting sources (not names), many of which do not exist.  Story on John Kelly isn't true, just another hit job!"

28.     Defendant Trump has turned his ire over the *Washington Post*'s coverage into a vendetta against its owner Bezos, targeting Bezos's main asset, Amazon, by issuing a series of threats to take governmental action that would harm Bezos and Amazon, and which were eventually acted upon.

29.     During his campaign, Defendant Trump repeatedly threatened future action against Amazon, regularly tied to objections over the *Post*'s coverage.  On information and belief, he did this to signal to Bezos and Amazon shareholders that he could – and would – use his official powers to adversely impact Amazon's tax status and subject it to antitrust enforcement.  As candidate Trump put it at a rally on February 26, 2016, while referring to Bezos and Amazon: "If I become president, oh do they have problems.  They're going to have such problems."

30.     In a May 12, 2016 interview, following a series of *Washington Post* reports that critically scrutinized Defendant Trump's business and financial dealings, and that later culminated in two *Washington Post* reporters publishing a book, *Trump Revealed*, Defendant Trump accused Bezos of "using the Washington Post for power so that the politicians in

Washington don't tax Amazon like they should be taxed." He also declared that "Amazon is getting away with murder, tax-wise."

31.     During the same interview, Defendant Trump denigrated the *Washington Post* reporters' then-forthcoming book, *Trump Revealed*, calling it "all false stuff because the stories are so wrong," and claiming that Bezos is "worried about me" because "he's got a huge antitrust problem because he's controlling so much. Amazon is controlling so much of what they're doing."

32.     Once in office, Defendant Trump continued to threaten the use of governmental power to harm Bezos and the *Washington Post* in retaliation for the paper's reporting. In July 2017, Defendant Trump twice consulted billionaire investor Leon Cooperman about challenging Amazon's status as a monopoly. On information and belief, Defendant Trump was motivated to challenge Amazon's status by his animus toward the *Post* for its critical coverage of him and by his desire to use his regulatory powers to influence and shape media coverage of his Administration.

33.     On June 27, 2017, *Washington Post* journalist David Fahrenthold reported that the Trump Organization had displayed a fake depiction of Trump on the cover of Time Magazine at several of its clubs. The next day, Defendant Trump tweeted, "The #AmazonWashingtonPost, sometimes referred to as the guardian of Amazon not paying internet taxes (which they should) is FAKE NEWS!"

34.     On July 24, 2017, Defendant Trump complained on Twitter about the *Washington Post*'s coverage of his Syria policy, accusing the *Post* of "fabricat[ing] the facts." He then posted a second tweet suggesting that the "Fake News Washington Post" was "being used as a lobbyist weapon against Congress to keep Politicians from looking into Amazon no-tax monopoly."

35.     On December 29, 2017, following a *Washington Post* story on the

Administration's internal deliberations on how to handle "worries of a tough year ahead," and a

satirical end-of-year piece entitled "Was 2017 the end of something or just the beginning,"

Defendant Trump tweeted that the Postal Service should be charging more to deliver Amazon's

packages: "Why is the United States Post Office [sic], which is losing many billions of dollars a

year, while charging Amazon and others so little to deliver their packages, making Amazon

richer and the Post Office dumber and poorer? Should be charging MUCH MORE!"

36.     On information and belief, Defendant Trump has since repeatedly been told by his

staff that his assertions about Amazon's harmful impact on the Postal Service are incorrect, but

he continues to repeat them.

37.     Defendant Trump recently renewed and escalated his threats of action against

Amazon following unflattering reporting in the *Washington Post* detailing the damage done to

Trump's family businesses by allegations involving adult film actress Stormy Daniels and Robert

Mueller's investigation into the 2016 election.  Defendant Trump repeated his false claims about

costs to the Postal Service and his threats to raise Amazon's shipping rates.  Once again, he left

no doubt that his motivation was animus against the *Post*, again calling it a "lobbyist" and

"weapon" for Bezos.

38.     In a series of tweets from March 29, 2018 to April 3, 2018, Defendant Trump

made repeated false statements about Amazon and issued repeated threats to raise its postal

shipping rates.  Over the course of these threats from President Trump, Amazon sustained a $60

billion dip in market value.

39.     On information and belief, Defendant Trump's attacks on Amazon were

motivated by animus toward Bezos and the *Washington Post* on account of its coverage of him

and his Administration.  For example, in an April 13, 2018 article by Maya Kosoff, *Vanity Fair*
quoted White House sources as saying that President Trump "has zero respect" for the
*Washington Post* and wants to "[f--k] with" Bezos as a result.

40.     On April 12, 2018, Defendant Trump followed through on his retaliatory threats,
issuing an Executive Order directing a review of the Postal Service's "unsustainable financial
path."  The order included several provisions directed at Amazon, including an order to review
the "expansion and pricing of the package delivery market."

41.     On information and belief, President Trump had by this time repeatedly and
personally directed the Postmaster General to raise Amazon's rates.

42.     Even during the pendency of the review, Defendant Trump continued to threaten
further action against Bezos and Amazon and linked his motivation clearly to the *Washington
Post*'s coverage.  On July 23, 2018, immediately following reports in the *Post* that President
Trump was unhappy with the progress of talks with North Korea, the President tweeted that
"[t]he Amazon Washington Post has gone crazy against me ever since they lost the Internet Tax
Case in the U.S. Supreme Court," *i.e. South Dakota v. Wayfair, Inc*.  He then renewed his threats
to take antitrust action against Amazon and to raise its postal delivery rates. President Trump
tweeted "Next up is the U.S. Post Office [sic] which they use, at a fraction of real cost, as their
'delivery boy' for a BIG percentage of their packages. . . In my opinion the Washington Post is
nothing more than an expensive (the paper loses a fortune) lobbyist for Amazon.  Is it used as
protection against antitrust claims which many feel should be brought?"

43.     On October 11, 2018, the Postal Service announced proposed rate hikes for its
services, to include rate increases of up to 12 percent for the Parcel Select service used by
Amazon.  On information and belief, this action by the Postal Service would not have been taken

but for the President's clearly expressed desire to punish Amazon for the reporting of the *Washington Post*.

### DOJ Enforcement Actions

44.     Defendant Trump has repeatedly threatened Department of Justice ("DOJ") antitrust enforcement actions against media companies he views as unacceptably critical of him, taking particular aim at CNN.

45.     Defendant Trump has long made known his deep-seated animus toward CNN for the content of its reporting.  He repeatedly attacks CNN on Twitter, in speeches, interviews, and press conferences, calling it "fake news" and "garbage," and has refused to answer questions from CNN reporters during press conferences, calling its coverage "terrible."  On information and belief, President Trump's son-in-law, Jared Kushner, met with CNN leadership in early 2017 and demanded that "20 percent of its staff" be fired for their coverage of the 2016 election.

46.     Defendant Trump has done far more than exercise the right to make known his dislike of CNN's reporting.  At a rally during the 2016 campaign, Defendant Trump threatened to block a proposed merger between Time Warner, CNN's parent company, and AT&T, once he gained control of the DOJ, and made clear his retaliatory motive for doing so.  On October 22, 2016 in Gettysburg, Pennsylvania, he denounced the AT&T–Time Warner merger, telling his audience that CNN was part of the media "power structure" trying to suppress his votes.  "AT&T is buying Time Warner and thus CNN," Defendant Trump said, declaring it "a deal we will not approve in my administration."

47.     Once in office, Defendant Trump followed through on this threat.  On information and belief, during the pendency of the AT&T–Time Warner merger review process, advisers to

President Trump discussed using the merger approval application as "a potential point of leverage over [CNN]."

48.     On information and belief, DOJ demanded the sale of CNN as a condition of its approval of the merger, leading a source close to the merger process to opine that "[t]his has become political . . . It's all about CNN."

49.     On October 28, 2017, Defendant Trump's close associate, Roger Stone, threatened CNN reporters on Twitter that if the merger were approved "the house cleaning at CNN of human excrement like @donlemon @jaketapper & dumb[f--k] @ananavarro will be swift."

50.     Because AT&T and Time-Warner are not content competitors, their proposed merger was a so-called "vertical" merger that federal government regulators have not sought to block since the Nixon Administration.  Nonetheless, on November 20, 2017, the Antitrust Division filed a lawsuit to block the Time Warner–AT&T merger despite its decades-long practice of permitting such vertical mergers.

51.     The lawsuit marked a stark turnabout by Makan Delrahim, the head of the DOJ's Antitrust Division.  Before joining the Trump Administration, on October 24, 2016, Delrahim gave an interview to Bloomberg, during which he said that he saw no problem with the Time Warner–AT&T merger.  After working in the White House Counsel's Office with President Trump, however, and upon taking charge of the Antitrust Division, Delrahim authorized the lawsuit.

52.     On June 12, 2018, U.S. District Court Judge Richard Leon, overseeing the federal antitrust trial, found against the government and ruled that the AT&T-Time Warner merger should go through without conditions.  In rejecting the government's case, Judge Leon

questioned why it had ever been brought, given the overwhelming precedent permitting similar

mergers and noted the "staggering" cost of the litigation to both the defendants and the

government.  Following the verdict, Time Warner's Executive Vice President Gary Ginsberg

said the government's case was "political in its motivation."

53.     On July 12, 2018, DOJ appealed the District Court's decision and the case is

currently pending before the D.C. Circuit Court of Appeals.

54.     While there is nothing inherently wrong with the United States government

deciding to shift policy to pursue antitrust enforcement actions in cases of vertical mergers, the

President may not cause such enforcement actions to be brought in retaliation for protected

speech.

55.     Defendant Trump's threats to use the DOJ to influence the flow of information to

the public is not limited to CNN.  On August 28, 2018, he complained, via Twitter, that:

> Google search results for 'Trump News' shows only the viewing/reporting
> of Fake News Media.  In other words, they have it RIGGED, for me &
> others, so that almost all stories & news is BAD.  Fake CNN is prominent.
> Republican/Conservative & Fair Media is shut out.  Illegal?  96% of . . .
> results on 'Trump News' are from National Left-Wing Media, very
> dangerous.  Google & others are suppressing voices of Conservatives and
> hiding information and news that is good.  They are controlling what we
> can & cannot see.  This is a very serious situation-will be addressed!

56.     Hours later, White House economic advisor Larry Kudlow, standing outside the

White House, threatened that the Trump Administration is "taking a look" at imposing

regulations on Google.

57.     On September 5, 2018, Attorney General Jeff Sessions announced his intention to

convene a meeting of Republican state attorneys general to discuss a possible federal

investigation of whether Google, Facebook, and other social media companies are violating

antitrust and free speech laws.

58.     On September 22, 2018, the White House leaked a draft Executive Order that
would instruct federal law enforcement and antitrust agencies to open investigations into social
media companies.  This leak was intended to, and did, have a negative market impact on these
companies.  The intent of leaking this information was to show these companies and other
speakers the President dislikes that his White House has the power to significantly injure them
with a simple leak if it dislikes their content.  The intent of leaking this information was also to
incentivize investors to pressure these companies to modify their content to be more to the liking
of the President in order to avoid retaliatory actions that could impact the investors' bottom line.

59.     Some of the intended targets of this "warning shot" are the owners of companies
at which Plaintiff members are employed or for whom they write.  These actions were intended
to chill the content created by Plaintiff's members and have cast a chill that Plaintiff's members
must overcome in order to do their jobs.

60.     Of course, the President may seek the adoption of otherwise constitutional
legislation affecting or relating to social media, but he may not seek to regulate social media for
the purpose of retaliating against it or to otherwise affect the content of what appears on it.

### *Threats to Revoke Broadcast Licenses*

61.     Defendant Trump has also threatened to revoke the broadcast licenses of media
entities that he views as critics.

62.     On October 11, 2017, he lashed out at NBC on Twitter for its reporting on
statements the President had made about nuclear weapons at a Pentagon meeting.  "Fake
@NBCNews made up a story that I wanted a "tenfold" increase in our U.S. nuclear arsenal.
Pure fiction, made up to demean. NBC = CNN!"

63.     Minutes later, Defendant Trump followed that tweet with another threatening NBC's broadcast license.  "With all of the Fake News coming out of NBC and the Networks, at what point is it appropriate to challenge their License?  Bad for country!"

64.     Later the same day, Defendant Trump broadened his threat to more outlets: "Network news has become so partisan, distorted and fake that licenses must be challenged and, if appropriate, revoked.  Not fair to public!"

65.     Although networks do not hold federal licenses, their individual affiliates do. Those licenses are subject to regulation by the Federal Communications Commission. Revocation of a federal license is a death sentence for a broadcast station.

### Actions to Limit the Access of White House Reporters

66.     Defendant Trump and his Administration have also acted to selectively deny journalist critics access to information from the White House.

67.     Defendant Trump's behavior in denying journalist critics access to information from the White House and about his Administration is a pattern dating back to his campaign. Prior to the election, on August 25, 2015, Defendant Trump had Jorge Ramos, Univision's lead anchor, removed from a press conference after Ramos tried to ask Defendant Trump a question about immigration policy.

68.     While on the campaign trail, Defendant Trump barred reporters from several news organizations, including the *Washington Post*, from obtaining press credentials at his rallies, news conferences, and other events.

69.     As President, Defendant Trump has continued to threaten journalists whose coverage or questioning he found unfavorable to him or his Administration with revoking their access to official Administration and White House events.

70.     On information and belief, Defendant Trump has repeatedly directed White House staff to ban reporters critical of his Administration from covering official events or to take away their press credentials.  This included reporters from the *Washington Post*, CNN, and NBC News, and Defendant has specifically told his staff to consider blacklisting Jim Acosta of CNN and April Ryan of the American Urban Radio Networks in retaliation for their coverage, of which he disapproves.

71.     On February 24, 2017, Defendant Trump's then-White House Press Secretary Sean Spicer held an off-camera question-and-answer session before only an "expanded pool" of journalists in Spicer's office rather than the press briefing room.  The White House denied requests for access to the session from *The New York Times*, *Politico*, CNN, *The Guardian*, BBC, and others, based on its disapproval of their coverage.

72.     On December 12, 2017, White House Press Secretary Sarah Huckabee Sanders told CNN's Jim Acosta that she would block him from having future access if he attempted during President Trump's bill signing to ask the President a question about one of his tweets attacking Senator Kirsten Gillibrand.

73.     On May 9, 2018, Defendant Trump threatened to revoke the credentials of all reporters whose coverage he finds negative.

74.     Eventually, the President's staff acted on these directives.  On July 25, 2018, White House Press Secretary Sarah Huckabee Sanders and Communications Director Bill Shine barred CNN reporter Kaitlan Collins from a Rose Garden press conference because Collins had earlier asked the President questions that the White House deemed "inappropriate."

75.     The Defendant's intent in having staff bar Collins from this event was to make clear to all other reporters that they too might be barred from events or have their credentials revoked if they produced coverage critical of the President or his Administration.

**B. The Harm to Plaintiff's Members from Defendant Trump's Unconstitutional Acts**

76.     Defendant Trump's credible threats and retaliatory directives to use government power to retaliate against critics improperly seek to suppress speech and influence the content of news reporting.  Defendant's use of the power and machinery of government to punish his media critics creates an atmosphere in which journalists must work under the threat of government retaliation.  This environment, underscored by Defendant Trump's campaign of intimidation against critical reporting, casts a chill on speech that – *even if braved and overcome by diligent and courageous reporters* – constitutes an ongoing First Amendment violation.

77.     Plaintiff's members cover and write about President Trump and his Administration and intend to continue to do so.  In doing their work, they also rely on the reporting of others.  But journalists write about the President and his Administration today with a reasonable recognition of a credible threat that Defendant Trump will use the levers of government power to punish them or their employers for critical speech.  The First Amendment protects the press from having to work under such conditions.

78.     Members of Plaintiff PEN America work for, or with, the *Washington Post*, Time Warner, CNN, NBC, the White House press corps, and other entities against whom Defendant Trump has used, or threatened to use, the machinery of government to retaliate for or suppress their critical speech.  Plaintiff's members are directly harmed by Defendant Trump's actions even if they or their employers have not specifically been threatened with retaliatory action.  In

order to do their jobs and speak, write and listen freely, they are forced to surmount the chill cast by the President's conduct.

79.     Defendant Trump's threats and retaliatory actions directed at the *Washington Post*, Amazon, Time Warner, CNN, NBC, the White House press corps, and other news organizations and journalists are designed to unduly influence the content and tenor of news reporting on the President and his Administration, and to control public discussion.

80.     Defendant Trump has also directed his ire towards countless other journalists and media outlets.  Prior to assuming office, he singled out Megyn Kelly of Fox News for repeated criticism and attack.  After assuming office, and after ESPN reporter Jemele Hill called him a "white supremacist," Defendant Trump called for her to be fired.  Hill was eventually suspended by ESPN and later left the network.  White House staff reportedly collected dossiers of negative information about April Ryan and others for the purpose of intimidating them.  And Ryan has spoken out about an atmosphere that she has described as placing "targets" on journalists who are viewed as critics of the Administration, subjecting them to online and other harassment. While these verbal attacks and other actions are not the subject of this legal action, they have created a dynamic in which no reporter or media outlet knows if they will also be the subject of Defendant's attacks and whether that attack will be accompanied by unlawful retaliatory action by the federal government.

81.     Many of the reporters and outlets that have been the direct targets of Defendant Trump's attacks and retaliatory actions are, or work for, sizable companies.  Although the First Amendment protects them from having to do so, they have significant resources with which to defend themselves and vindicate their rights.  But for smaller outlets, independent media, freelancers, or other more vulnerable populations of writers who do not have those same

resources, continuing to write and report freely in the face of Defendant's threats of retaliatory government action can require overcoming even greater risks.

82.     Even if some news organizations and reporters directly threatened by Defendant Trump continue to cover him and his Administration exactly as they always have, the Defendant's actions cast a chill and create a reasonable risk that some will not.

83.     Plaintiff's members are also listeners and recipients of speech, both from other members, as well as from other press and media organizations.  Such speech gives Plaintiff's members access to "social, political, esthetic, moral, and other ideas and experiences," and allows Plaintiff's members to engage in discussion and debate about matters of public interest.

84.     Plaintiff's members rely on uncensored and unchilled coverage from news outlets that is free from government-imposed chill in their own work, and they rely upon a media environment that is safeguarded from intentional efforts to deter critical coverage through the credible threat of government retaliation.

85.     Defendant Trump's credible threats of government retaliation, and his retaliatory uses of government power, harm Plaintiff's members because his actions jeopardize their access to information and their right to receive information.  Again, it is Defendant Trump's intentional interference and actions with the aim of exerting improper influence that creates the First Amendment harm.

## FIRST CLAIM

### Violation of the First Amendment—Freedoms of Speech and the Press

### (Declaratory and Injunctive Relief)

86.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

87.     The First Amendment prohibits government officials from taking punitive acts against disfavored journalists and media entities in retaliation for their speech.

88.     Defendant Trump does not intend his threats to invoke government regulatory powers against journalists and media entities to be empty, hollow threats.

89.     Defendant Trump does not intend for the officers implementing policy in his Administration to ignore these threats.

90.     Defendant Trump expects the officers implementing policy in his Administration to carry out his will.

91.     Defendant Trump intends the writers, journalists and media outlets he has attacked to think twice before writing critically of him or his Administration.

92.     Defendant Trump intends the writers, journalists and media outlets he has attacked to conform their coverage to what he would consider "fair."

93.     Defendant Trump unlawfully violated the First Amendment by using and threatening to use the power and machinery of the federal government to punish and intimidate perceived press critics through:

(a)     issuing an Executive Order to review raising postal rates;

(b)     conducting law enforcement investigations and initiating enforcement actions;

(c)     threatening to rescind broadcast licenses; and

22

(d)     restricting access and threatening to revoke credentials for members of the White House press corps.

94.     Defendant Trump's credible threats and retaliatory actions violate the First Amendment because they are content- and viewpoint-based restrictions on speech and cast a chill on a reasonable person of ordinary firmness to deter them from engaging in speech critical of the President.

95.     Defendant Trump's credible threats and retaliatory actions violate the First Amendment because they are content- and viewpoint-based restrictions on speech and Plaintiff's members own speech has in fact been chilled because they are forced to do their work in the face of a credible threat of retaliation.

96.     Defendant Trump's infringements of the First Amendment are subject to strict scrutiny, and there is no legitimate compelling government interest that justifies Defendant's threats and retaliatory actions.  And even there were such an interest, Defendant's actions are not the least restrictive means of achieving it.

97.     Plaintiff's members work for or with the specific press entities that Defendant has used or threatened to use government retaliatory actions to punish and were within the scope of the intended target of Defendant Trump's threats as writers who write about the President and his Administration, regardless of whether they were specifically named in threats.  As a result of Defendant's unconstitutional actions, Plaintiff's members have suffered and continue to suffer harm caused by the President's deliberate efforts to chill protected speech, which warrants immediate relief.

## SECOND CLAIM

## Violation of the First Amendment—Right to Receive Information

### (Declaratory and Injunctive Relief)

98. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

99. The First Amendment protects the right to receive information and ideas. It prohibits the government from arbitrarily or vindictively limiting the stock of information from which members of the public may draw. The public, including Plaintiff PEN America's members, has a right to receive information from press and media organizations free from undue government influence.

100. Defendant Trump unlawfully violated the First Amendment by using and threatening to use the power and machinery of the federal government to punish and intimidate:

    (a)    The *Washington Post* and Amazon;

    (b)    CNN and Time Warner;

    (c)    NBC;

    (d)    The White House press corps; and

    (e)    Other entities, publishers, and writers who cover the President and his Administration.

101. Defendant Trump's credible threats and retaliatory actions violate Plaintiff's First Amendment rights. Those unlawful actions are content- and viewpoint-based restrictions on speech intended to unduly affect the content and tenor of the news and to orchestrate public discussion. Plaintiff and Plaintiff's members rely on each of the sources threatened or punished by the President to receive information. The President's unconstitutional actions violate the right

of Plaintiff and Plaintiff's members to receive information free from undue government influence.

102.    Defendant's infringements of the First Amendment are subject to strict scrutiny, and there is no legitimate, compelling government interest that justifies Defendant's prevention of Plaintiff's members from receiving information and ideas.  Even if there were such an interest, Defendant's actions are not the least restrictive means of achieving it.

103.    As a result of Defendant's unconstitutional actions, Plaintiff's members have suffered and continue to suffer harm, which warrants immediate relief.

### PRAYER FOR RELIEF

**WHEREFORE** Plaintiff requests that this Court:

1.    Enter judgment pursuant to 28 U.S.C. § 2201(a) declaring that Defendant Donald J. Trump violated the First Amendment to the Constitution of the United States when he used his Presidential powers or the power of the federal government with intent to retaliate against or otherwise constrain speech critical of him or his Administration.

2.    Enjoin Defendant Donald J. Trump from directing or ordering any officer, employee, agency, or other agent or instrumentality of the United States government to take any action against any person or entity with intent to retaliate against, intimidate, or otherwise constrain speech critical of him or his Administration.

3.    Award Plaintiff its costs, including attorneys' fees, and enter such other and further relief as the Court deems just and proper.

Dated: October 16, 2018

Respectfully submitted,

THE PROTECT DEMOCRACY PROJECT, INC. and
MEDIA FREEDOM & INFORMATION ACCESS
CLINIC

By: /s/ Kristy Parker

David A. Schulz (DS-3180)
MEDIA FREEDOM AND INFORMATION
      ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
      FOR FREEDOM OF EXPRESSION
Yale Law School
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

John Langford (JL-2367)
MEDIA FREEDOM AND INFORMATION
      ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
      FOR FREEDOM OF EXPRESSION
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Telephone: (203) 436-5831
Facsimile: (203) 432-3034
john.langford@yale.edu

Kristy Parker (*pro hac vice* filed herewith)
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue., NW, #163
Washington, DC 20006
Telephone: (202) 849-9307
Facsimile: (929) 777-8428
kristy.parker@protectdemocracy.org

Ian Bassin (N.Y. Reg. No. 4683439)
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 599-0466
ian.bassin@protectdemocracy.org

Laurence M. Schwartztol (LS-1978)
Justin Florence (*pro hac vice* forthcoming)
THE PROTECT DEMOCRACY PROJECT, INC.
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 599-0466
larry.schwartztol@protectdemocracy.org
justin.florence@protectdemocracy.org

Steven A. Hirsch, consultant with
THE PROTECT DEMOCRACY PROJECT, INC.
(*pro hac vice* forthcoming)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 676-2286
sahirsch2@gmail.com

*Counsel for Plaintiff*

26