### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

_____

)
PEN AMERICAN CENTER, INC.,          )
                                             )
               Plaintiff,           )
                                             )     Civil Action No. 18-cv-9433-LGS
          v.                      )
                                             )
DONALD J. TRUMP, in his official capacity   )
as President of the United States,            )
                                           )
               Defendant.         )

_____

### AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     This complaint by Plaintiff PEN American Center, Inc. (hereinafter, "PEN America") arises out of official acts by the President of the United States, Donald J. Trump, intended to stifle exercise of the constitutional protections of free speech and a free press.  The President has violated the First Amendment, and his oath to uphold the Constitution, through directives to Administration officials to take retaliatory actions and credible public threats to use his government powers against those who report the news in ways he does not welcome.  Although the President is free to criticize the press, he cannot use the power and authority of the United States government to punish and stifle it.

2.     President Trump has intentionally hung a sword of Damocles over the heads of countless writers, journalists, and media entities, including Plaintiff's members, many of whom work for the organizations President Trump has targeted.  He has directed retaliatory actions and threats at specific news outlets and journalists whose content and viewpoints he views as hostile to him or his Administration, directly harming those organizations and their employees, including Plaintiff's members.  As a result, Plaintiff's members who work for those

organizations or who have themselves been targeted, and all journalists who report on the President or his Administration, reasonably believe they face a credible threat of government retaliation for carrying out the duties of their profession.  Defendant Trump's actions seek to accomplish indirectly what he cannot do directly: impede professional and investigative journalism, and silence criticism.

3.      From the earliest days of his presidential campaign to the present, Defendant Trump has called the press the "enemy of the people," an epithet used by Joseph Stalin; has labeled any unfavorable coverage "fake news"; has singled out news organizations and individual reporters for particular abuse; and has said it is "frankly disgusting the way the press is able to write whatever they want to write," adding "people should look into that."  The President has declared war on all but the most fawning news organizations, exhibiting his antagonism in an almost daily barrage of tweets, press statements, and directives.  Threats by the President against newspapers, networks, news sources, and individual journalists have become the norm.  According to a database compiled by the Committee to Protect Journalists, since announcing his candidacy through his second year in office, President Trump has sent 1,339 tweets about the media that were critical, insinuating, condemning, or threatening.  These communications frequently single out news organizations or individual journalists who the President believes have criticized his Administration.

4.      As disturbing as it is for President Trump to disparage the exercise of freedoms protected by the First Amendment, his opinions about the press are not the basis for this lawsuit. Trump's attacks on the press, however, have not been limited to talk. The President and officials acting at his direction have undertaken a variety of retaliatory acts intended to punish or intimidate news organizations whose coverage has displeased him, including:

- suspending the White House press credentials of reporters who the President believes failed to show him sufficient "respect";

- revoking and threatening to revoke security clearances from former government officials who have engaged in public commentary, including on CNN and NBC, because they expressed criticism of the current Administration;

- issuing an executive order to raise postal rates to punish online retailer Amazon.com because Jeff Bezos, its chief shareholder and CEO, owns the *Washington Post*, whose coverage of his Administration the President finds objectionable;

- directing the Department of Justice to challenge a vertical merger between Time Warner and AT&T because of his antagonism to Time Warner subsidiary CNN and its news coverage of his Administration; and

- threatening to revoke NBC's and other television stations' broadcast licenses in retaliation for coverage the President dislikes.

Plaintiff PEN's members include journalists and other media personnel who hold White House press credentials, and who work for the *Washington Post*, CNN, and NBC, who have thus been injured by Defendant Trump's retaliation against them and their employers.

5.      Defendant Trump's actions infringe two of our most coveted liberties, the freedom of speech and freedom of the press.  Freedom of speech is an essential component of a functioning democracy.  Benjamin Franklin identified freedom of speech as the "principal pillar" of a free society and the primary bulwark against tyranny.  A leader with "the power to punish for words," he wrote, "would be armed with a weapon the most destructive and terrible."

6.      To ensure no American leader would wield such destructive power, and because they viewed it as vital to maintaining a democracy, our Founders guaranteed freedom of the press in our Constitution and entrusted our court system with protecting it.  As the Supreme Court said in 1936, "[t]he newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by

a free press cannot be regarded otherwise than with grave concern." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

7.     Together, the First Amendment's protections of free speech and a free press reflect "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

8.     It is also "well established that the Constitution protects the right to receive information and ideas," *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972), and that the government cannot "orchestrate public discussion through content-based mandates," *United States v. Alvarez*, 567 U.S. 709, 728 (2012).  Together, these protections prohibit the government from attempting to restrict or otherwise improperly influence the news coverage of government activities through retaliatory acts and threats.

9.      Defendant Trump, whose retaliatory actions and threats cast a discernible chill on the free press and those who rely on it for information, presents an extreme case, but American history has seen other attempts by both federal and state executives to use the power of their offices to infringe the First Amendment.  When such abuses have been discovered, and when given the opportunity to do so, courts have not hesitated to enforce the First Amendment and prevent the abuse of power.

10.     The Supreme Court first addressed constitutional limits on the government's authority to suppress criticism of public officials in *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931).  The Court held that the First Amendment barred a state law that authorized suppression of malicious, scandalous, and defamatory newspapers, magazines, or other periodicals.  The case involved an injunction barring the publication of a "scandal sheet" called

*The Saturday Press*, in which "[m]any of the statements so highly improbable as to compel a finding that they are false," and "[i]n every edition slanderous and defamatory matter predominates to the practical exclusion of all else." *Id*. at 724 (Butler, J., dissenting). Among other things, *Near* set a constitutional baseline that the government has no authority to define what it thinks is "fake news" and use the machinery of government to suppress it.

11. As First Amendment doctrine evolved, officials periodically sought to evade constitutional review by using informal tools or by using neutral laws in a retaliatory way. Governor Huey Long of Louisiana, whose tenure was criticized by the state's leading newspapers, punished big city newspapers for their coverage while at the same time attempted to avoid judicial scrutiny by having the legislature enact a seemingly neutral tax targeting only those publications with a weekly circulation exceeding 20,000 copies. The Supreme Court struck down the measure as a type of tax "with a long history of hostile misuse against the freedom of the press." *Grosjean*, 297 U.S. at 250. It declared the scheme "a deliberate and calculated device in the guise of a tax to limit the circulation of information to which the public is entitled." *Id.* at 250.

12. Presidents from across the political spectrum have used surreptitious methods to abuse their government powers to punish or discipline members of the press they believed treated them unfairly. Franklin D. Roosevelt had the FBI wiretap reporters from what he considered to be "unfriendly" newspapers, denied press credentials to critics of his foreign policy, and subjected hostile publishers to tax audits. The Kennedy Administration initiated, and the Johnson Administration continued, a plan to coordinate FCC Fairness Doctrine complaints to target radio stations that aired right-wing editorials, and to focus on small market stations that could not afford to respond. The Nixon Administration was particularly antagonistic to the press and subjected those on an "enemies list" to illegal wiretaps, tax audits, and office searches. It

threatened to take action against broadcast licenses owned by the *Washington Post* in retaliation for its coverage of the Watergate scandal, proposed an official monitoring system through the FCC, and manipulated tax and antitrust enforcement efforts to punish the press.

13.     Many of these efforts to muzzle the press through misuse of governmental power escaped judicial scrutiny because they were not discovered until years – often decades – after the fact.  More savvy presidents took pains to conceal their efforts to subvert the press because they accepted  – publicly, at least – the limitations imposed by the First Amendment and thus sought to avoid disclosure of illegal behavior.  Not so with this Administration.  President Trump shows open contempt for freedom of the press and the right to dissent, and reveals his illegitimate censorial motives almost daily; he announces who he plans to punish and crows about it after he has done so.  The President's tweets are a confession; his boasts at innumerable rallies confirm his illicit intent.

14.     Defendant Trump's statements, whether made as a candidate or once in office, illustrate his purpose to use executive power to suppress and retaliate against what he perceives to be unfair or unfavorable press coverage.  They reveal the "official" explanations for governmental actions targeting the press are pretextual, and show the actual purpose is to punish or intimidate those who question the Administration's policies.

15.     The President's statements are relevant to assess the constitutionality of his actions.  Even when acting in areas of expansive executive authority, such as control over immigration, an area considered "largely immune from judicial control," *Trump v. Hawaii*, 138 S. Ct. 2392, 2402 (2018) (citation omitted), the Supreme Court has permitted reviewing courts to consider such statements and to "look behind the face" of an official action to determine the President's actual purpose, *id*. at 2420.  But while the President's initiatives may survive scrutiny in areas where executive authority is at its zenith and is subject only to rational basis review,

such is not the case where his primary purpose is to retaliate against an adversarial press protected by the First Amendment.

16.     Using governmental authority to retaliate against the exercise of free speech or press is never legitimate. *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016).  "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998) (brackets in original)).  The First Amendment thus "prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Id.*  Even seemingly neutral actions violate this constitutional rule where circumstantial evidence demonstrates those actions were taken because of speech's content or a speaker's viewpoint. *See Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).  This constitutional principle prohibits the government from denying or revoking even privileges to which a person does not necessarily have a "right," such as a tax exemption, a security clearance, or access to White House briefings, when the denial is motivated by a retaliatory purpose. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

17.     Where the President's own words and actions reveal a manifest intent to intimidate and punish the press, it is the government's burden to show its actions were not for a retaliatory purpose. *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–87 (1977).  When such criticism "transforms into an attempt to use the powers of a governmental office to intimidate or to discipline the press or one of its members because of what appears in print, a compelling governmental interest that cannot be served by less restrictive means must be shown for such use to meet Constitutional standards." *Borreca v. Fasi*, 369 F. Supp. 906, 910 (D. Haw. 1974).

18.     This is the natural province for judicial action – to constrain executive power when it exceeds constitutional bounds.  It is particularly vital when the President seeks to undermine the independence of the press, because "[o]nly a free and unrestrained press can effectively expose deception in government."  *New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

19.     Defendant Trump has violated the First Amendment through his direct punishment of individual journalists and media organizations and their employees – including Plaintiff's members – and acts that cause reasonable journalists to believe that the Defendant will use his government powers to retaliate against critical speech.  These acts also prevent Plaintiff and its members from receiving speech of investigative journalists, writers and commentators who operate free from the President's efforts to chill and intimidate.

20.     Defendant Trump has adopted the language and the tactics of authoritarians who bolster their power by quashing dissent.  But the Framers of our Constitution foresaw, and designed a system that could withstand, such an assault on our basic freedoms and our democracy.  Our institutions, and especially our courts, exist precisely to check such abuses of power.

21.     Plaintiff therefore respectfully requests that this Court maintain the constitutional balance the Framers envisioned, and issue orders (a) declaring that Defendant Trump's retaliatory actions violate the First Amendment, and (b) enjoining Defendant Trump from directing any officer, employee, agency, or other agent or instrumentality of the United States government to take any action intended to retaliate against disfavored speech.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the claims in this action arise under the Constitution and laws of the United States, specifically the First Amendment to the United States Constitution.

23.     Venue is proper pursuant to 28 U.S.C. § 1391(e) because Defendant is an officer or agency of the United States and Plaintiff PEN America resides in the District.

## PARTIES

24.     Plaintiff PEN America, a section 501(c)(3) organization headquartered in New York City, is an association of writers and other literary and media professionals, including journalists and publishers of information about the President and his Administration.  Plaintiff's mission is to unite writers and their allies to celebrate creative expression and defend the liberties that make it possible.  PEN America's bedrock work is long-term advocacy on behalf of individual writers who are being punished because of the content of their speech.  PEN America monitors the government's interactions with writers and journalists and produces informational content related to its advocacy work.

25.     Plaintiff PEN America has a traditional voluntary membership structure and includes members who work for journalistic organizations that have been subjected to threats and retaliatory acts from the Trump Administration.  Its membership includes at least six members who work for, and whose work is published through CNN; at least eleven members who work for, and whose work is published through, the *Washington Post*; and at least six members who work for, and whose work is published through, NBC.  These members, in some cases individually and otherwise through their employers, have been direct targets of Defendant Trump's threats and retaliatory acts to punish their own and their employers' speech.

26.     Plaintiff PEN America includes members who themselves hold White House press credentials, and many others who work for seventeen organizations that hold White House press credentials.  These members, in some cases individually and otherwise through their employers, have been direct targets of Defendant Trump's threats and retaliatory acts to punish their own and their employers' speech.

27.     Plaintiff's members work for a wide variety of media entities, including organizations whose mission is to gather and report the news.  In addition to the organizations identified above, Plaintiff's members work for the following organizations, among others: the Associated Press, *The New York Times*, *The Atlantic*, *Daily Beast*, *Los Angeles Times*, *Politico*, *The Boston Globe*, and *The Guardian*.  Plaintiff's members write about, report on, and produce media content related to American government and politics.  Plaintiff's members produce, and plan to produce in the future, work that is held to the highest standards of accuracy, but that is often critical of the actions of politicians and governments, including the President and his Administration.  This reporting informs the public about the workings of the government, promotes government transparency and enables the public to hold their representatives accountable.  Plaintiff's members also rely on information produced by journalists, news analysts, and opinion contributors who work for CNN, the *Washington Post*, NBC, and journalists who hold White House press credentials, to do their work.

28.     Defendant Donald J. Trump is the 45th President of the United States, a position in which he has served since January 20, 2017.

## FACTS

**A.     President Trump's Unconstitutional Acts**

29.     As President, Defendant Trump exercises authority over the Executive Branch, controlling agencies' actions through Executive Orders and the Appointments Clause.  President

Trump has repeatedly threatened to use, and has used, government power to retaliate against media companies, journalists, and their sources for the content of their commentary and coverage. Defendant Trump has taken action to disrupt White House press access by disfavored reporters, ordered the revocation of security clearances held by critics of his Administration, ordered an increase in postal rates as punishment for critical coverage by the *Washington Post*, directed a merger review in retaliation for news coverage by CNN, and threatened to revoke broadcast licenses held by television stations owned by or affiliated with the NBC network.

### *Actions to Limit the Access of White House Reporters*

30.     Defendant Trump and members of the Administration under his direction have acted to selectively deny disfavored journalists access to information from the White House.

31.     The Defendant's practice of denying press access based on reporters' perceived viewpoints dates back to his presidential campaign. Prior to the election, on August 25, 2015, Defendant Trump had Jorge Ramos, Univision's lead anchor, removed from a press conference after Ramos tried to ask Defendant Trump a question about immigration policy. During the campaign, Defendant Trump also barred reporters from several news organizations, including the *Washington Post*, from obtaining press credentials at rallies, news conferences, and other events.

32.     Once in office, Defendant Trump threatened journalists whose coverage or questioning he perceived as unfavorable with revocation of their access to official Administration and White House events.

33.     On information and belief, Defendant Trump repeatedly directed White House staff to ban reporters critical of his Administration from covering official events or to revoke press credentials. This included reporters from the *Washington Post*, CNN, and *NBC News*. Defendant specifically told his staff to consider blacklisting Jim Acosta of CNN, a PEN member,

and April Ryan of the American Urban Radio Networks in retaliation for their coverage of which he disapproves.

34.    On February 24, 2017, Defendant Trump's then-White House Press Secretary Sean Spicer held an off-camera question-and-answer session before only an "expanded pool" of journalists in Spicer's office rather than on camera in the press briefing room.  The White House denied requests for access to the session from *The New York Times*, *Politico*, CNN, *The Guardian*, BBC, and others, based on Defendant Trump's disapproval of their coverage.

35.    On December 12, 2017, White House Press Secretary Sarah Huckabee Sanders told PEN member Jim Acosta that she would block him from future access if he attempted to ask the President questions during a bill signing that day.

36.    On May 9, 2018, Defendant Trump threatened to revoke the credentials of all reporters whose coverage he finds negative, tweeting "The Fake News is working overtime. Just reported that, despite the tremendous success we are having with the economy & all things else, 91% of the Network News about me is negative (Fake). Why do we work so hard in working with the media when it is corrupt? Take away credentials?"

37.    On July 25, 2018, White House Press Secretary Sarah Huckabee Sanders and Communications Director Bill Shine barred CNN reporter Kaitlan Collins from a Rose Garden press event because Collins had earlier asked the President questions that the White House deemed "inappropriate."  One purpose of this action was to send a message to other reporters that they too might be barred from events or have their credentials revoked if they produced coverage critical of the President or his Administration.

38.    On November 7, 2018, CNN reporter and PEN member Jim Acosta asked a series of questions of President Trump concerning a migrant caravan that was then moving toward the U.S.-Mexico border.  Defendant Trump responded by telling Acosta "you should let me run the

country . . . and if you did . . . , your ratings would be much better."  When Acosta attempted to ask a follow-up question, the President called him "a rude, terrible person" and said he "shouldn't be working for CNN."  Later that day, White House Press Secretary Sarah Huckabee Sanders announced that the White House had suspended "the hard pass of the reporter involved until further notice."

39.     A so-called "hard pass" gives the holder access to designated areas for journalists in the White House, on Air Force One, and in other locations.  This credential is necessary for members of the White House press corps to do their work.

40.     The White House attempted to justify revocation of Acosta's press credential by falsely accusing Acosta of "plac[ing] his hands" on a White House intern who tried to take the microphone from him and because of a breach of decorum.  However, an undoctored video of the event contradicted this justification.  Subsequently, the White House revised its justification to be that Acosta failed "to treat the White House with respect."

41.     On November 9, 2018, Defendant Trump threatened to revoke the credentials of other journalists who failed to show him "respect."  While doing so, Defendant Trump singled out April Ryan, White House correspondent for the American Urban Radio Networks, calling her "a loser" who "doesn't know what the hell she is doing."  On information and belief, Ryan subsequently received threats of physical harm and hate mail, and felt compelled to hire a personal bodyguard.

42.     On November 13, 2018, CNN and Jim Acosta sued Defendant Trump, Sanders, Shine, then-White House Chief of Staff John Kelly, and others, alleging that the revocation of Acosta's pass was content-based suppression of speech in violation of the First Amendment, and that the revocation violated the Fifth Amendment's Due Process Clause.

43.     On November 16, 2018, Judge Timothy Kelly issued a preliminary injunction restoring Acosta's pass on the grounds that CNN and Acosta were likely to prevail on at least their due process claim and that they were suffering irreparable harm from the loss of Acosta's White House access.  Judge Kelly did not reach the First Amendment claim.

44.     On November 19, 2018, the White House restored Acosta's press credentials, and CNN and Acosta dismissed their lawsuit.

45.     Also on November 19, 2018, Press Secretary Sanders informed the White House press corps that Acosta's hard pass had been restored, but that "[w]e have also notified him of certain rules that will govern White House press conferences going forward."  The email listed the following rules:

> 1)  A journalist called upon to ask a question will ask a single question and then will yield the floor to other journalists;
>
> 2)  At the discretion of the President or other White House official taking questions, a follow-up question or questions may be permitted; and where a follow up has been allowed and asked, the questioner will then yield the floor;
>
> 3)  "Yielding the floor" includes, when applicable, physically surrendering the microphone to White House staff for use by the next questioner;
>
> 4)  Failure to abide by any of rules (1)–(3) may result in suspension or revocation of the journalist's hard pass.

46.     The White House expressly acknowledged it implemented these restrictions because of "behavior Mr. Acosta displayed at the November 7, 2018 press conference" and "the position taken by CNN."

47.     The November 19, 2018 email from Press Secretary Sanders added that "a more elaborate and comprehensive set of rules might need to be devised . . . for journalist conduct in the open (non-press room) areas inside and outside the White House and for Air Force One."  It added that such restrictions could be adopted "[i]f unprofessional behavior occurs in those settings, or if a court should decide that explicit rules are required to regulate conduct there."

48.     These rules are a pretext for future content-based restrictions on the speech of journalists who seek to cover the White House and a limitation on the ability of listeners to hear that speech.  They place all members of the White House press corps at greater risk of retaliation, including Plaintiff's members who hold White House credentials, and chill the speech of those journalists.

### *Revocation of Security Clearances*

49.     On July 23, 2018, White House Press Secretary Sanders announced that Defendant Trump was considering stripping six former national security officials of their security clearances, citing the officials' public commentary regarding the Russia investigation. These six officials included former CIA Director John Brennan, former Director of National Intelligence James Clapper, former FBI Director James Comey, former National Security Adviser Susan Rice, former FBI Deputy Director Andrew McCabe, and former National Security Agency Director Michael Hayden.

50.     Former top government officials traditionally retain security clearances after leaving office so they can advise their successors and continue to assist the government. Clearances are typically revoked for cause—for example, due to security concerns such as financial distress, alcoholism, or mishandling of classified information.  The issuing agency, not the President, traditionally initiates the process for revoking a security clearance—a process that usually involves memoranda explaining why the clearance is being withdrawn and sometimes an opportunity for appealing the revocation.

51.     Brennan, Clapper, Comey, and Hayden are frequent contributors to the press whose commentary and contributions are sources of information for Plaintiff's members, and each had publicly criticized Defendant Trump's actions prior to Sanders' announcement.

52.     Brennan served as a contributor to MSNBC and had repeatedly challenged Defendant Trump's actions in office both on television and via Twitter.  In particular, his comments concerned alleged collusion between Trump's campaign and Russia during the 2016 presidential election.  Clapper joined CNN as a contributor in mid-2017, and vocally challenged Trump's actions on numerous occasions.  Comey, McCabe, and Hayden had all likewise criticized Defendant Trump's Administration in the press or on social media.

53.     On August 15, 2018, Defendant Trump acted on his threat to revoke the security clearance of former CIA Director and MSNBC contributor John Brennan because of Brennan's critical speech.  Defendant Trump's action against Brennan appears to be the first time in history that a U.S. president has ever issued or revoked a security clearance outside of the established process or for reasons other than security concerns.

54.     The revocation of Brennan's security clearance was purely retaliatory. As a result of Defendant Trump's retaliatory act against Brennan, Plaintiff's members and other contributors to the press—particularly those who hold security clearances—have an actual and well-founded fear that Defendant Trump may retaliate against them for speech that he dislikes.

### *Executive Order to Raise Postal Rates*

55.     Defendant Trump has repeatedly threatened to use the U.S. Postal Service ("Postal Service") and its rate structure to retaliate against Jeff Bezos, who is chief shareholder and CEO of the online retailer Amazon.com, Inc. ("Amazon"), whose business model is dependent upon reasonable shipping rates, and also the owner of the *Washington Post* (also referred to herein as "the *Post*"), a frequent target of the President's wrath.

56.      From the beginning of his campaign for President, Defendant Trump repeatedly attacked the *Washington Post* for its coverage, calling it biased, fictitious, and "a disgrace to journalism."  In a 2016 interview, he called the *Post* "a political instrument" that was writing

"bad" and "wrong" stories "with no proper information," and accused its reporters of writing a "false" book about him.  He routinely has called the *Washington Post* "fake news" and personally attacked its writers.

57.    Since taking office Defendant Trump has frequently denounced the accuracy of the *Post*'s reporting when it published unflattering stories about his Administration.  On April 8, 2018, for example, after the *Post* ran a story about John Kelly's frustrations as Chief of Staff, Defendant Trump tweeted: "The Washington Post is far more fiction than fact.  Story after story is made up garbage - more like a poorly written novel than good reporting.  Always quoting sources (not names), many of which do not exist.  Story on John Kelly isn't true, just another hit job!"

58.    By the end of 2018, Defendant Trump and John Kelly were no longer on speaking terms, and Kelly had resigned as White House Chief of Staff.

59.    Defendant Trump acted on his displeasure at the *Post*'s coverage by directly threatening the newspaper's owner Bezos through his main asset, Amazon.  During the presidential campaign, Defendant Trump repeatedly tied threatened future action against Amazon to his objections over the *Post*'s coverage.  As Defendant Trump put it at a rally on February 26, 2016, while referring to Bezos and Amazon: "If I become president, oh do they have problems.  They're going to have such problems."  On information and belief, candidate Trump intended this as a message to Bezos and Amazon shareholders that he could – and would – use his official powers to adversely affect Amazon's tax status and subject it to antitrust enforcement.

60.    In a May 12, 2016, interview, following a series of *Washington Post* reports that critically scrutinized Defendant Trump's business and financial dealings, and that later culminated in two *Washington Post* reporters publishing a book, *Trump Revealed*, Defendant

Trump accused Bezos of "using the Washington Post for power so that the politicians in Washington don't tax Amazon like they should be taxed."  He also declared that "Amazon is getting away with murder, tax-wise."

61.     During the same interview, Defendant Trump denigrated the *Washington Post* reporters' then-forthcoming book, *Trump Revealed*, calling it "all false stuff because the stories are so wrong," and claiming that Bezos is "worried about me" because "he's got a huge antitrust problem because he's controlling so much. Amazon is controlling so much of what they're doing."

62.     Once in office, Defendant Trump continued to threaten the use of governmental power to harm Bezos and the *Washington Post* in retaliation for the paper's reporting.  In July 2017, Defendant Trump twice consulted billionaire investor Leon Cooperman about targeting Amazon using antitrust law.  On information and belief, Defendant Trump was motivated to challenge Amazon's status primarily by animus toward the *Post* for its critical coverage and his desire to use his regulatory powers to influence and shape media coverage of his Administration.

63.     On June 27, 2017, the *Washington Post* reported that the Trump Organization had displayed fabricated copies of *Time* magazine depicting Donald Trump on the cover at several of its clubs.  The next day, Defendant Trump tweeted, "The #AmazonWashingtonPost, sometimes referred to as the guardian of Amazon not paying internet taxes (which they should) is FAKE NEWS!"

64.     On July 24, 2017, Defendant Trump complained on Twitter about the *Washington Post*'s coverage of his Syria policy, accusing the *Post* of "fabricat[ing] the facts."  He then posted a second tweet suggesting that the "Fake News Washington Post" was "being used as a lobbyist weapon against Congress to keep Politicians from looking into Amazon no-tax monopoly."

65.     On December 29, 2017, following a *Washington Post* story on the Administration's internal deliberations on how to handle "worries of a tough year ahead," and a satirical end-of-year piece entitled "Was 2017 the end of something or just the beginning?," Defendant Trump tweeted that the Postal Service should be charging more to deliver Amazon's packages: "Why is the United States Post Office [sic], which is losing many billions of dollars a year, while charging Amazon and others so little to deliver their packages, making Amazon richer and the Post Office dumber and poorer? Should be charging MUCH MORE!"

66.     On information and belief, Defendant Trump has repeatedly been told by his staff that his assertions about Amazon's adverse impact on the Postal Service are incorrect. Nevertheless, the President has continued to repeat these false claims and to advocate that higher postal rates be imposed on Amazon.

67.     Defendant Trump escalated his threats of action against Amazon following unflattering reports in the *Washington Post* detailing the adverse negative impact on Trump's family businesses caused by allegations involving adult film actress Stormy Daniels and Robert Mueller's investigation of the Defendant.  The President called the *Post* a "lobbyist" and "weapon" for Bezos, and once again threatened to raise Amazon's shipping rates.

68.     In a series of tweets between March 29 and April 3, 2018, Defendant Trump repeated the same false claims about Amazon and again threatened to raise its postal shipping rates.  As a result of these threats, Amazon sustained a $60 billion decline in market value.

69.     On April 12, 2018, Defendant Trump followed through on his retaliatory threats, issuing an Executive Order creating a Task Force on the United States Postal Service (the ("USPS Task Force") and directing it to review the Postal Service's "unsustainable financial path."  The order included several provisions directed at Amazon, including an order to review the "expansion and pricing of the package delivery market."  On information and belief,

President Trump had by this time repeatedly and personally directed the Postmaster General to raise Amazon's rates.

70.     Defendant Trump's attacks on Amazon were motivated primarily by animus toward Bezos and the *Washington Post* arising from of unflattering news coverage of him and his Administration.  An April 13, 2018, article in *Vanity Fair* quoted White House sources as saying that President Trump "has zero respect" for the *Post* and wants to "fuck with" Bezos as a result.

71.     Defendant Trump continued to threaten further action against Bezos and Amazon and identified his motivation as the *Washington Post*'s coverage of his Administration.  On July 23, 2018, immediately following *Post* reports that President Trump was unhappy with the progress of talks with North Korea, the President tweeted that "[t]he Amazon Washington Post has gone crazy against me ever since they lost the Internet Tax Case in the U.S. Supreme Court," referring to *South Dakota v. Wayfair, Inc*., 138 S. Ct. 2080 (2018).  He then renewed his threats to take antitrust action against Amazon and to raise its postal delivery rates.  President Trump tweeted, "Next up is the U.S. Post Office [sic] which they use, at a fraction of real cost, as their 'delivery boy' for a BIG percentage of their packages. . . .  In my opinion the Washington Post is nothing more than an expensive (the paper loses a fortune) lobbyist for Amazon.  Is it used as protection against antitrust claims which many feel should be brought?"

72.     On October 11, 2018, the Postal Service announced proposed rate increases, including a proposed twelve-percent increase for the Parcel Select service used by Amazon.  This action by the Postal Service would not have been taken but for the President's clearly expressed desire to punish Amazon for the reporting of the *Washington Post*.

73.     On December 4, 2018, the USPS Task Force recommended increases in rates for "purely commercial use of package delivery services" and "mail products that are not deemed an

essential service," which could encompass the majority of Amazon's deliveries through the Postal Service.  The USPS would not have reviewed package rates that impact Amazon's business but for Defendant's expressed intent to punish Amazon for the reporting of the *Washington Post*.

### DOJ Enforcement Actions and Threatened Regulation

74.     Defendant Trump has repeatedly threatened Department of Justice ("DOJ") antitrust enforcement actions against media companies he views as critical of him, taking particular aim at CNN.

75.     Defendant Trump has frequently expressed animus toward CNN for the content of its reporting.  He has attacked CNN on Twitter, in speeches, interviews, and press conferences, calling it "fake news" and "garbage," and has refused to answer questions from CNN reporters during press conferences, calling its coverage "terrible."

76.     On information and belief, President Trump's son-in-law, Jared Kushner, met with CNN leadership in early 2017 and demanded that "20 percent of its staff" be fired for their coverage of the 2016 election.

77.     Defendant Trump has threatened specific regulatory actions targeting CNN. During the 2016 campaign, Defendant Trump said that once he gained control of the DOJ he planned to block a proposed merger between Time Warner, CNN's parent company, and AT&T, and made clear his retaliatory motive for doing so.  On October 22, 2016, at a rally in Gettysburg, Pennsylvania, he denounced the AT&T–Time Warner merger, telling his audience that CNN was part of the media "power structure" trying to suppress his votes.  "AT&T is buying Time Warner and thus CNN," Defendant Trump said, declaring it "a deal we will not approve in my administration."

78.     Once in office, Defendant Trump followed through on this threat.  On information and belief, during the pendency of the AT&T–Time Warner merger review process, advisers to President Trump discussed using the merger approval application as a potential point of leverage over CNN.  DOJ demanded the sale of CNN as a condition of its approval of the merger, leading a source close to the merger process to state that "[t]his has become political . . . .  It's all about CNN."

79.     On November 20, 2017, the Antitrust Division filed a lawsuit to block the Time Warner–AT&T merger.  On information and belief, the asserted antitrust theories the government advanced were pretextual.  Because AT&T and Time-Warner are not content competitors, their proposed merger was a "vertical" merger, a form of merger that federal government regulators have not sought to block since the Nixon Administration.

80.     Makan Delrahim, the head of the DOJ's Antitrust Division, had publicly stated before joining the Trump Administration that he saw no problem with the Time Warner–AT&T merger, noting it was a typical "vertical merger" and saying: "I think it'll get a lot of attention, but I don't see this as a major antitrust problem." After working in the White House Counsel's Office with President Trump, however, and upon taking charge of the Antitrust Division, Delrahim authorized the lawsuit to block the merger.

81.      On June 12, 2018, Judge Richard Leon rejected the antitrust claims and approved the AT&T-Time Warner merger without conditions. The District Court's decision is currently on appeal before the D.C. Circuit Court of Appeals.

82.     Defendant Trump's threats to use the DOJ to influence the flow of information to the public are not limited to CNN.  On August 28, 2018, he complained, via Twitter, that:

> Google search results for 'Trump News' shows only the viewing/reporting of Fake News Media.  In other words, they have it RIGGED, for me & others, so that almost all stories & news is BAD.  Fake CNN is prominent.  Republican/Conservative & Fair

> Media is shut out.  Illegal?  96% of . . . results on 'Trump News'
> are from National Left-Wing Media, very dangerous.  Google &
> others are suppressing voices of Conservatives and hiding
> information and news that is good.  They are controlling what we
> can & cannot see.  This is a very serious situation-will be
> addressed!

83.     Within hours of President Trump's tweet, White House economic advisor Larry

Kudlow announced that the Trump Administration is "taking a look" at imposing regulations on

Google.

84.     On September 5, 2018, then-Attorney General Jeff Sessions announced his

intention to convene a meeting of Republican state attorneys general to discuss a possible federal

investigation of whether Google, Facebook, and other social media companies are limiting the

flow of speech and violating antitrust laws.

85.     On September 22, 2018, the White House leaked a draft Executive Order that

would instruct federal law enforcement and antitrust agencies to open investigations into social

media companies.  On information and belief, this leak was intended to, and did, have a negative

market impact on these companies.  The information was leaked as a "warning shot" to

intimidate the companies named because of the information they transmit.

86.     Members of PEN America are employed by companies that were targets of this

"warning shot."  Plaintiff's membership includes employees of CNN, Google, Facebook, and

other companies that have been adversely affected by Defendant Trump's retaliatory acts.

Defendant's actions were intended to chill the content created by Plaintiff's members and have

had the intended effect.

### *Threats to Revoke Broadcast Licenses*

87.     Defendant Trump has also threatened to revoke the broadcast licenses of media

entities that he views as critics in an attempt to punish and suppress their lawful speech and

reporting activities.

88.   On October 11, 2017, the President lashed out at NBC on Twitter for its reporting on statements the President made about nuclear weapons at a Pentagon meeting.  "Fake @NBCNews made up a story that I wanted a "tenfold" increase in our U.S. nuclear arsenal. Pure fiction, made up to demean. NBC = CNN!"

89.   Minutes later, Defendant Trump followed that tweet with another threatening broadcast licenses of television stations owned and operated by NBC.  "With all of the Fake News coming out of NBC and the Networks, at what point is it appropriate to challenge their License?  Bad for country!"

90.   The same day, Defendant Trump broadened his threat to more outlets: "Network news has become so partisan, distorted and fake that licenses must be challenged and, if appropriate, revoked.  Not fair to public!"

91.   On December 16, 2018, Defendant Trump criticized NBC again on Twitter, claiming the network's coverage and programming is illegal: "A REAL scandal is the one sided coverage, hour by hour, of networks like NBC & Democrat spin machines like Saturday Night Live. It is all nothing less than unfair news coverage and Dem commercials. Should be tested in courts, can't be legal? Only defame & belittle! Collusion?"

92.   Members of PEN America are employed by NBC.

**B.     The Harm to Plaintiff's Members from Defendant Trump's Unconstitutional Acts**

*Harm to Plaintiff's Members' Right to Speak and Cover the News*

93.   Defendant Trump's retaliatory directives and credible threats to use government power to punish CNN, the *Washington Post*, NBC, and White House correspondents for the content of their coverage have inflicted financial and reputational harm on those news organizations, and created the future threat of retaliation for their ongoing coverage of the Defendant and his Administration.  These retaliatory acts and threats have adversely affected

Plaintiff's members who work for CNN, the *Washington Post*, NBC, and those who hold or work for entities that hold White House press credentials.

94.     Plaintiff's members who work for other news organizations or otherwise write about the Defendant and his Administration have also been affected.  Defendant Trump's retaliatory directives and threats to use government power against his critics improperly seek to suppress speech and influence the content of news reporting.  Defendant's use of government power to punish his media critics creates an atmosphere in which all journalists must work under the threat of government retaliation.  This environment, underscored by Defendant Trump's campaign of intimidation against critical reporting, casts a chill on speech that – even if braved and overcome by diligent and courageous reporters – has reshaped the environment in which our media operates and constitutes an ongoing First Amendment violation.

95.     Plaintiff's members are aware that Defendant Trump has directed his ire towards countless journalists and media outlets and have acted in accordance with their reasonable belief that he could do the same to them.

96.     A research firm surveyed Plaintiff's members and found that 1 percent had been fired or laid off because of the Defendant's actions; 2 percent had been demoted, replaced, or denied an assignment because of the Defendant's actions; 4 percent had been asked to make changes to a piece because their editor or publisher wanted to avoid controversy arising from Defendant's reaction; 31 percent had "avoided posting, writing, or speaking on a particular topic due to concern about personal or professional repercussions" that would result from Defendant's retaliatory acts; and 52 percent of  respondents believed public criticism of the current Administration might put them at risk.

97.     Many of the reporters and outlets that have been the direct targets of Defendant Trump's retaliatory actions are, or work for, sizable companies.  Such large companies have

significant resources with which to defend themselves and can afford to assert their First

Amendment rights, but such entities also provide the Defendant with more opportunities for

using regulatory measures as a form of retaliation.  All media outlets and journalists covering the

White House and this Administration must factor in the President's threats and acts of retaliation

against critical coverage as they do their work.  All are aware that a prominent article, novel

critique or new relevation may provoke reprisals from the President.  Smaller outlets,

independent media, freelancers, or other more vulnerable populations of writers—many of whom

are Plaintiff's members or employ Plaintiff's  members—do not have the same resources and are

particularly vulnerable to Defendant's retaliatory actions and threats.

98.     Defendant's retaliatory actions are sufficient to cause journalists and news

organizations of reasonable firmness, including Plaintiff's members, to alter their coverage of

this Administration.

### Harm to Plaintiff's Members' Right to Receive Speech

99.     Plaintiff's members are also listeners and recipients of speech, both from other

members, as well as from news sources and commentators and other media organizations.  Such

speech communicates "social, political, esthetic, moral, and other ideas and experiences," *Red

Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969), that informs reporting by Plaintiff's

members and facilitates discussion and debate about matters of public interest.

100.     Defendant Trump's retaliatory actions and threats directed at the *Washington

Post*, Amazon, Time Warner, CNN, NBC, security clearance holders, the White House press

corps, and other news organizations and journalists, are designed to unduly influence the content

and tenor of news reporting on the President and his Administration, and to control public

discussion.  Journalists at CNN, the *Washington Post*, NBC, and other organizations targeted by

the Defendant are willing speakers whose ability to provide news coverage unaffected by

government retaliation and threats has been harmed by Defendant's actions.  Plaintiff's members

rely on uncensored and independent coverage from news outlets that is free from government-

imposed chill in their own work, and on a media environment free from governmental efforts to

deter critical coverage through retaliation.

101.    Defendant Trump's retaliatory uses of government power, and his ongoing threats

to use such power, harm Plaintiff's members by jeopardizing their access to information and

commentary about the Administration.  Plaintiff's members are thereby deprived of their right to

receive speech by Defendant's actions.

### C.    Harm to Plaintiff's Organization from Defendant's Unconstitutional Acts

#### *Direct Harm to Plaintiff as an Organization*

102.    Defendant Trump's retaliatory directives and credible threats to punish journalists

and media companies for the content of their speech have caused a perceptible impairment of

Plaintiff's organizational activities, forcing Plaintiff to divert monetary and non-monetary

resources in response, and impeding Plaintiff from fully carrying out other facets of its mission.

103.    Plaintiff's primary mission is to defend the liberties that make creative expression

possible.  Its work consists of long-term advocacy on behalf of individual writers who are being

punished because of their work both internationally and in the United States.

104.    Defendant's illegal acts have forced Plaintiff to divert resources previously

directed to advocating for free expression overseas to responding to Defendant's First

Amendment violations.

105.    Immediately following the 2016 election, Plaintiff's Board of Directors

determined that members of the media who covered Defendant Trump in a way he perceived to

be critical would likely be targeted for punishment by the government at the Defendant's

direction.  This conclusion was based on Defendant's credible threats during his campaign to use government power to punish media critics once he became President.

106.    Plaintiff has expended capital and resources in response to Defendant Trump's retaliatory directives and threats to harm journalists and media companies.  Plaintiff hired a full-time Senior Director of Free Expression Programs, a significant percentage of whose work is devoted to defending the American free press against the Defendant's retaliatory actions. Plaintiff also hired a First Amendment Attorney to serve as Director of U.S. Free Expression Programs to focus on defending the American press against the Defendant's actions.  In doing so, Plaintiff created two positions with full or partial responsibility of focusing on the threats Defendant Trump poses to journalists and their free expression, expending several hundred thousand dollars in organizational funds.

107.    As a result of the Defendant's retaliatory directives and credible threats to media organizations and journalists, Plaintiff established and staffed, for the first time, a Washington, D.C. office with a significant expenditure of organizational funds. Plaintiff did so to enhance its ability to be in close proximity to the nation's capital to defend the freedom of the American press against the Defendant's actions.

108.    Responding to Defendant's threats and retaliatiory acts have absorbed a large percentage of Plantiff's staff's time, particularly for the CEO, Senior Director of Free Expression Programs, Washington Director, Deputy Director of Free Expression Policy & Research, Communications Director, External Relations Manager, Online Editor, and Social Media Manager.

109.    At substantial expense, Plaintiff commissioned a research firm to survey Plaintiff's members in order to monitor the impact of Defendant's retaliatory directives and threats to suppress media criticism on its members.

110.    Directly in response to Defendant's threats and retaliatiory acts against members of the press, Plaintiff has held large events and protests, initiated widely circulated petitions, released detailed research reports, and published a number of blog posts, articles, and statements.

111.    Plaintiff has been forced to divert organizational resources away from other mission-critical activities to counter Defendant's retaliatory directives and credible threats against journalists.  Before Defendant's election, U.S.-focused advocacy represented a smaller percentage of Plaintiff's free expression work.  Under the Trump Administration it has essentially come to equal, and at times exceed, Plaintiff's internationally-focused activities. Initiatives undertaken by Plaintiff in response to actions of the Defendant and his Administration include: (1) creation and publication of a daily email newsletter highlighting developmens in free expression, launched in November 2016; (2) organization of "Writers Resist," a major public protest and march to "defend free expression, reject hatred, and uphold truth in the face of lies and misinformation," held on January 15, 2017; (3) launch of "Trump the Truth Timeline," a running tally of incidents in the categories of "Attacks on the Truth," "Undermining the Press," "Intolerance of Dissenting Viewpoints," "Government Transparency," and "Other Infringements on Free Expression" by members of the Administration, which ran from January 20, 2017 through January 22, 2018; (4) release of a report entitled "Trump the Truth: Free Expression in the President's First 100 Days," published April 27, 2017, which analyzed areas of serious concern under President Trump based on the "Trump the Truth Timeline"; and (5) publication of more than two dozen press statements, op-eds, and commentary pieces throughout 2017 and 2018 on the free expression effects of President Trump and his Administration.

### Harm to Plaintiff's Organizational Right to Receive Speech

112.    While Plaintiff's mission is to defend press freedom as a constitutional right, Plaintiff's advocacy work and much of its research and analysis relies heavily on the quality

reporting by others.  It is critical that Plaintiff have access to credible information on which to base its arguments and actions.  This information comes primarily from the work of trustworthy, professional media outlets, including those subject to the Defendant's retaliatory acts.

113.    Defendant has attempted to hamper the news Plaintiff receives by excluding, and threatening to exclude, media outlets and journalists from White House briefings based on viewpoint.  White House correspondents are restricted in their ability to ask questions and face expulsion if they fail to show the Defendant sufficient "respect."  Former government officials who serve as news commentators have had security clearances revoked or threatened because they criticized the Administration.  Plaintiff and its members are adversely affected when government retaliation and threats by the Defendant reduce the flow of information.

114.    Defendant has likewise attempted to dampen the content or tenor of the news by issuing retaliatory directives and threats to punish CNN, the *Washington Post*, and NBC.  Journalists at CNN, the *Washington Post*, NBC, and other organizations targeted by the Defendant, are willing speakers whose ability to provide news coverage unaffected by government retaliation and threats has been harmed by Defendant's actions.  Plaintiff is thereby deprived of its right to receive speech by Defendant's actions.

## FIRST CLAIM

### Violation of the First Amendment—Retaliation for Critical Reporting
(Declaratory and Injunctive Relief)

115.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

116.    The First Amendment prohibits government officials from punishing disfavored journalists and media entities in retaliation for their speech.  "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

117.     The President has taken actions to retaliate against specific news organizations and journalists whose content and viewpoints he dislikes.  Retaliatory actions taken under the Defendant's direction include:

(a)     restricting access and threatening to revoke credentials for members of the White House press corps for asking critical questions;

(b)     revoking and threatening to revoke security clearances held by former government officials who have criticized the current Administration as news commentators;

(c)     ordering an increase in postal rates to punish the owner of the *Washington Post* for news coverage critical of the current Administration;

(d)     using antitrust enforcement actions to punish CNN for coverage critical of the current Administration; and

(e)     threatening to rescind broadcast licenses for coverage critical of the current Administration.

118.     Defendant Trump has taken action to intimidate writers, journalists, and media outlets to deter criticism of him or his Administration.

119.     Defendant Trump intends the writers, journalists, and media outlets he has attacked, and all other journalists, to conform their coverage to what he would consider "fair."

120.     Defendant Trump has openly described the retaliatory purpose underlying his actions targeting press organizations in public statements, speeches at rallies, and in myriad tweets.  Where the President's own words and actions reveal a manifest intent to intimidate and punish the press, it is the government's burden to show its actions were not for a retaliatory purpose.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977).

121.     Defendant Trump's retaliatory actions violate the First Amendment because they are content- and viewpoint-based restrictions on speech and cast a chill on reasonable persons of ordinary firmness intended to deter them from engaging in speech critical of the President.

122.     Defendant Trump's retaliatory actions toward news organizations and journalists are subject to strict scrutiny.  No legitimate compelling government interest justifies Defendant's

retaliatory actions and they are not the least restrictive means of achieving any legitimate governmental objective.

123.     Plaintiff's members work for or with the news organizations that Defendant has subjected to retaliatory acts.  As a result of Defendant's unconstitutional actions, Plaintiff and Plaintiff's members have suffered and continue to suffer harm caused by the President's deliberate efforts to chill protected speech, which warrants immediate relief.

## SECOND CLAIM

### <u>Violation of the First Amendment—Retaliatory Threats</u>
**(Declaratory and Injunctive Relief)**

124.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

125.     Any public official "who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (quoting *Am. Family Ass'n v. City & Cty. of San Francisco*, 277 F.3d 114, 1125 (9th Cir. 2002)); *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64–72 (1963).

126.     Restrictions on the press that are accomplished by threat of official retaliation are considered to be informal prior restraints.  Informal prior restraints are far more destructive of constitutional rights than formal procedures because they are entirely beyond the rule of law, affording no substantive or procedural protections whatsoever.  The Supreme Court has explained that when censorship is achieved by intimidating threats of governmental action. "[t]here is no provision whatever for judicial superintendence before notices issue or even for judicial review," and censorship turns on officials' discretionary "determinations of objectionableness" with "no safeguards whatever against the suppression of . . . constitutionally protected[] matter." *Bantam Books, Inc.*, 372 U.S. at 70–71.

127.     Informal censorship undermines essentially all substantive First Amendment protections, including the government's obligation to prove its actions burdening speech serve a compelling interest using the least restrictive means possible, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000), and the requirement that speech restrictions be narrowly-tailored and precisely defined, *see, e.g.*, *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874–79 (1997).  Similarly, it is antithetical to First Amendment doctrine for a government official to abuse his discretion and target or seek to eliminate particular speech based on his distaste for the speech.  *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988).

128.     Defendant's constant, credible threats to use the powers of his office to punish disfavored news organizations and his penchant for singling out individual reporters for abuse has had a chilling effect on the press.  The fact that the Defendant has been willing to act on such threats magnifies their censorial impact.

129.     Defendant Trump does not intend his threats to invoke government regulatory powers against journalists and media entities to be empty, hollow threats.  Defendant Trump expects the officers implementing policy in his Administration to carry out his will.

130.     As a result of Defendant's unconstitutional threats, Plaintiff and Plaintiff's members have suffered and continue to suffer harm caused by the President's deliberate efforts to chill protected speech, which warrants immediate relief.

## THIRD CLAIM

### <u>Violation of the First Amendment—Right to Receive Information</u>
**(Declaratory and Injunctive Relief)**

131.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

132.     The First Amendment protects the right to receive information and ideas.  It prohibits the government from arbitrarily or vindictively limiting the stock of information from

which members of the public may draw.  The public, including Plaintiff PEN America's members and PEN America as an organization, has a right to receive information from press and media organizations free from undue government interference.

133.    Defendant Trump unlawfully violated the First Amendment by using and threatening to use the power and machinery of the federal government to punish and intimidate various news organizations, including the *Washington Post* and Amazon, CNN and Time Warner, NBC, the White House press corps, and other entities, publishers, writers, and commentators who cover the President and his Administration.

134.    Defendant Trump's credible threats and retaliatory actions violate Plaintiff's and Plaintiff's members' First Amendment rights.  Those unlawful actions are content- and viewpoint-based restrictions on speech intended to unduly affect the content and tenor of the news and to orchestrate public discussion.  Plaintiff and Plaintiff's members rely on each of the sources threatened or punished by the President to receive information.  The President's unconstitutional actions violate the right of Plaintiff and Plaintiff's members to receive information from those sources free from undue government influence.

135.    Defendant Trump's retaliatory actions toward news organizations and journalists are subject to strict scrutiny.  No legitimate compelling government interest justifies Defendant's retaliatory actions and they are not the least restrictive means of achieving any legitimate governmental objective.

136.    As a result of Defendant's unconstitutional actions, Plaintiff and Plaintiff's members have suffered and continue to suffer harm, which warrants immediate relief.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff requests that this Court:

1.      Enter judgment pursuant to 28 U.S.C. § 2201(a) declaring that Defendant Donald J. Trump violated the First Amendment to the Constitution of the United States when he used Presidential powers or the power of the federal government to retaliate against or otherwise constrain speech critical of him or his Administration.

2.      Enjoin Defendant Donald J. Trump from directing or ordering any officer, employee, agency, or other agent or instrumentality of the United States government to take any official action against any person or entity for the purpose of retaliating against, intimidating, or otherwise constraining speech critical of him or his Administration.

3.      Award Plaintiff its costs, including attorneys' fees, and enter such other and further relief as the Court deems just and proper.


Dated: February 6, 2019                                Respectfully submitted,

                                                       THE PROTECT DEMOCRACY PROJECT, INC.,
                                                       MEDIA FREEDOM & INFORMATION ACCESS
                                                       CLINIC, AND DAVIS WRIGHT TREMAINE LLP


                                                       By: /s/ Kristy Parker
Robert Corn-Revere (RC-0359)                           Kristy Parker (*pro hac vice*)
Ronald G. London (RL-8734)                             THE PROTECT DEMOCRACY PROJECT, INC.
Chelsea T. Kelly                                       2020 Pennsylvania Avenue., NW, #163
DAVIS WRIGHT TREMAINE LLP                              Washington, DC 20006
1919 Pennsylvania Ave., N.W., Suite 800                Telephone: (202) 849-9307
Washington, D.C.  20006                                Facsimile: (929) 777-8428
Telephone:  (202) 973-4200                             kristy.parker@protectdemocracy.org
BobCornRevere@dwt.com
RonnieLondon@dwt.com
ChelseaKelly@dwt.com

35

David A. Schulz (DS-3180)
MEDIA FREEDOM AND INFORMATION
ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
FOR FREEDOM OF EXPRESSION
Yale Law School[1]
1675 Broadway, 19th Floor
New York, NY 10019-5820
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

John Langford (JL-2367)
Francesca Procaccini
Catherine Martinez, *law student intern*
George Wang, *law student intern*
Wendy Serra, *law student intern*
MEDIA FREEDOM AND INFORMATION
        ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
FOR FREEDOM OF EXPRESSION
Yale Law School
P.O. Box 208215
New Haven, CT 06520
Telephone: (203) 436-5831
Facsimile: (203) 432-3034
john.langford@yale.edu

Ian Bassin (IB-2417)
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY 10038
Telephone: (202) 599-0466
ian.bassin@protectdemocracy.org

Laurence M. Schwartztol (LS-1978)
Justin Florence (*pro hac vice* pending)
THE PROTECT DEMOCRACY PROJECT, INC.
10 Ware Street
Cambridge, MA 02138
Telephone: (202) 599-0466
larry.schwartztol@protectdemocracy.org
justin.florence@protectdemocracy.org

Steven A. Hirsch (SH-8188), consultant with
THE PROTECT DEMOCRACY PROJECT, INC.
(SH-8188)
633 Battery Street
San Francisco, CA 94111-1809
Telephone: (415) 676-2286
sahirsch2@gmail.com

*Counsel for Plaintiff*

---

[1] This amended complaint has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.