**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————

PEN AMERICAN CENTER, INC.,

    Plaintiff,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States,

    Defendant.

———————————————————

18 Civ. 9433 (LGS)

**MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................1

SUMMARY OF ALLEGATIONS AND ARGUMENT....................................................3

LEGAL STANDARD............................................................................................................5

ARGUMENT .........................................................................................................................6

I.     THE COMPLAINT SETS FORTH DETAILED FACTUAL ALLEGATIONS OF
DEFENDANT'S ACTIONS THAT VIOLATE THE FIRST AMENDMENT ................ 6

     A.     The First Amendment Prohibits Government Officials from
Threatening or Directing Government Actions to Punish Lawful
Speech That the Government Dislikes....................................................6

     B.     The Allegations Set Forth in the Complaint Satisfy the Elements of a
First Amendment Violation ..................................................................8

          1.     The Complaint Plausibly Alleges Unconstitutional Informal
Censorship........................................................................................8

          2.     The Complaint Plausibly Alleges Unconstitutional Retaliation
that Furthers Defendant's Informal Censorship Scheme ........................... 9

II.     THE FIRST AMENDMENT VIOLATION ALLEGED IS JUSTICIABLE................... 11

     A.     Plaintiff Has Article III Standing .........................................................11

          1.     PEN America Has Associational Standing on Behalf of Its
Members .........................................................................................11

          2.     PEN America Has Organizational Standing On Its Own Behalf...............17

     B.     This Court Has Proper Authority to Impose a Remedy for the
Violation of Plaintiff's First Amendment Rights...................................21

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amaya v. Ballyshear LLC*,
    340 F. Supp. 3d 215 (S.D.N.Y. 2018)......................................................................................6

*American Acad. of Religion v. Napolitano*,
    573 F.3d 115 (2d Cir. 2009)..............................................................................................19

*American Family Ass'n v. City & Cty. of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002) ...........................................................................................2

*Art & Antique Dealers League of America, Inc. v. Seggos*,
    2019 WL 416330 (S.D.N.Y. Feb. 1, 2019)...........................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................................5

*Backpage.com, LLC v. Dart*,
    807 F.3d 229 (7th Cir. 2015) ..................................................................................... *passim*

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)................................................................................................... *passim*

*Blumenthal v. Trump*,
    ___ F. Supp. 3d ___, 2019 WL 1923398 (D.D.C. Apr. 30, 2019)...........................................23

*Building & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006)..........................................................................................12, 15

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017).......................................................................................17, 18, 20

*Centro Presente v. Dep't of Homeland Sec.*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ..............................................................................22, 23

*Citizens for Responsibility and Ethics in Washington v. Trump*,
    276 F. Supp. 3d 174 (S.D.N.Y. 2017), *appeal filed*, No. 18-474
    (2d Cir. Feb. 16, 2018)...............................................................................................20, 21

*City of Lakewood v. Plain Dealer Publ'g Co.*,
    486 U.S. 750 (1988)........................................................................................................10

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).....................................................................................................13, 14

*Clinton v. New York*,
  524 U.S. 417 (1998)..................................................................................................24

*CNN v. Trump*,
  No. 18-cv-2610 (TJK) (D.D.C. 2018)......................................................................15

*Common Cause/N.Y. v. Brehm*,
  344 F. Supp. 3d 542 (S.D.N.Y. 2018)......................................................................14

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006).......................................................................5

*Connecticut Bar Ass'n v. United States*,
  620 F.3d 81 (2d Cir. 2010).......................................................................................19

*Cooksey v. Futrell*,
  721 F.3d 226 (4th Cir. 2013) ...................................................................................12

*Crawford-El v. Britton*,
  523 U.S. 574 (1998)....................................................................................................2

*D.C. v. Trump*,
  291 F. Supp. 3d 725 (D. Md. 2018)...................................................................22, 23

*D.C. v. Trump*,
  344 F. Supp. 3d 828 (D. Md. 2018).........................................................................21

*Davis v. Goord*,
  320 F.3d 346 (2d Cir. 2003).....................................................................................12

*Deshawn E. ex rel. Charlotte E. v. Safir*,
  156 F.3d 340 (2d Cir. 1998).....................................................................................15

*Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*,
  675 F.3d 149 (2d Cir. 2012).....................................................................................11

*Dorsett v. Cty. of Nassau*,
  732 F.3d 157 (2d Cir. 2013).......................................................................................7

*Engel v. Scully & Scully, Inc.*,
  279 F.R.D. 117 (S.D.N.Y. 2011) ...............................................................................5

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).....................................................................................16, 22, 24

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990).................................................................................................15

*Galper v. JP Morgan Chase Bank, N.A.*,
   802 F.3d 437 (2d Cir. 2015)................................................................................5

*Hartman v. Moore*,
   547 U.S. 250 (2006)................................................................................2, 6, 7

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)................................................................................19

*Heffernan v. City of Paterson*,
   136 S. Ct. 1412 (2016)................................................................................2, 6, 7, 16

*Hunt v. Wash. State Apple Advertising Comm'n*,
   432 U.S. 333 (1977)................................................................................11, 17

*In re Application of Dow Jones & Co.*,
   842 F.2d 603 (2d Cir. 1988)................................................................................12, 19

*Int'l Union, UAW. v. Brock*,
   477 U.S. 274 (1986)................................................................................11

*Jewel v. NSA*,
   673 F.3d 902 (9th Cir. 2011) ................................................................................13

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
   302 F. Supp. 3d 541 (S.D.N.Y. 2018),
   *appeal filed*, No. 18-1691 (2d Cir. June 5, 2018) ........................................... *passim*

*Kottler v. Deutsche Bank AG*,
   607 F. Supp. 2d 447 (S.D.N.Y. 2009)................................................................................5

*Laird v. Tatum*,
   408 U.S. 1 (1972)................................................................................12, 14

*Lozman v. City of Riviera Beach*,
   138 S. Ct. 1945 (2018)................................................................................2

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)................................................................................21

*Marbury v. Madison*,
   5 U.S. (1 Cranch) 137 (1803)................................................................................3

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)................................................................................24

*Mississippi v. Johnson*,
   71 U.S. 475 (1866)................................................................................22, 23

*N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*,
   684 F.3d 286 (2d Cir. 2012).............................................................................11, 17, 18, 19

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964)...........................................................................................................9

*NAACP v. Alabama ex rel. Patterson*,
   357 U.S. 449 (1958).........................................................................................................15

*Nat. Res. Def. Council, Inc. v. Wheeler*,
   ___ F. Supp. 3d ___, 2019 WL 1299938 (S.D.N.Y. Mar. 21, 2019)......................................15

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974)..........................................................................................22

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019), *appeal filed*, No. 19-212
   (2d Cir. Jan. 22, 2019), *cert. granted before judgment*, 139 S. Ct. 953 (2019) ......................14

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)........................................................................................17, 18

*NRA v. Cuomo*,
   350 F. Supp. 3d 94 (N.D.N.Y. 2018).........................................................................1, 4, 7, 10

*Ohio v. Wyandotte Chems. Corp.*,
   401 U.S. 493 (1971).........................................................................................................22

*Okwedy v. Molinari*,
   333 F.3d 339 (2d Cir. 2003).................................................................................... *passim*

*Perry v. Sindermann*,
   408 U.S. 593 (1972)...........................................................................................................5

*Ragin v. Harry Macklowe Real Estate Co.*,
   6 F.3d 898 (2d Cir. 1993).................................................................................................17

*Rattner v. Netburn*,
   930 F.2d 204 (2d Cir. 1991)..........................................................................................7, 8

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013)...............................................................................................15

*Saget v. Trump*,
   ___ F. Supp. 3d ___, 2019 WL 1568755 (E.D.N.Y. Apr. 11, 2019)................................22, 23

*Saget v. Trump*,
   345 F. Supp. 3d 287 (E.D.N.Y. 2018) ...............................................................................23

*Sirica v. Nixon*,
    487 F.2d 700 (D.C. Cir. 1973) ................................................................................24

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .................................................................................11, 15, 21

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...............................................................................................15

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996) ...........................................................................................11, 17

*United Presbyterian Church in U.S.A. v. Reagan*,
    738 F.2d 1375 (D.C. Cir. 1984) ............................................................................13

*United States v. Lee*,
    106 U.S. 196 (1882) ..................................................................................................3

*United States v. Richardson*,
    418 U.S. 166 (1974) ...............................................................................................13

*Vermont Right to Life Comm. v. Sorrell*,
    221 F.3d 376 (2d Cir. 2000) ..................................................................................13

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................................6

*Zieper v. Metzinger*,
    474 F.3d 60 (2d Cir. 2007) .............................................................................6, 7, 10

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................... *passim*

**Federal Statutes**

28 U.S.C. § 1651 ...........................................................................................................24

**Rules**

Fed. R. Civ. P. 12 ..........................................................................................................14

Fed. R. Civ. P. 12(b)(1) ...................................................................................................5

Fed. R. Civ. P. 12(b)(6) ...................................................................................................5

**Other Authorities**

Dana Milbank, *The White House Has Revoked My Press Pass*, Wash. Post, May 9, 2019 .........4

Jerry L. Mashaw, Federal Administration and Administrative Law in the Gilded Age,
119 Yale L.J. 1362 (2010) ......................................................................................................22

## INTRODUCTION

President Donald Trump is engaging in "a cohesive censorship-and-retaliation campaign" against the press through a combination of "threatened and actual regulatory reprisals" that target particular news organizations and journalists. *NRA v. Cuomo*, 350 F. Supp. 3d 94, 112 (N.D.N.Y. 2018). Plaintiff PEN American Center, Inc. ("PEN America") is an organization of journalists, writers, and literary professionals that defends free expression. Its Amended Complaint ("Complaint") alleges that President Trump is misusing the power of the federal government to violate its First Amendment rights and those of its members.

As set forth in the Complaint, the President routinely threatens to take myriad regulatory actions because of news coverage he perceives as unflattering, directs subordinates to take retaliatory actions (some of which have been carried out), and targets reporters or news sources for denial of access or security clearances for failure to show sufficient "respect." This censorship and retaliation campaign injures the President's direct targets that include Plaintiff's members and their employers, but also strikes broadly at writers and journalists by creating a credible risk of government retaliation that Plaintiff's members must consider and overcome in order to do their work of holding the President and his administration to account. This campaign also necessarily injures Plaintiff, which has diverted substantial resources to combat the Defendant's First Amendment violations.

Defendant does not dispute that the President's use of threats and retaliation to punish the press for the content of its reporting violates the First Amendment. Defendant instead argues that Plaintiff has failed to plausibly allege that *its* rights have been violated; that the President's alleged actions are discrete past events that have not injured Plaintiff or its members; and that, even if the President's actions violate the First Amendment, this Court can do nothing about it. MTD at 4-22 (Dkt. #46). Defendant is wrong.

1

Any public official "who tries to shut down an avenue of expression of ideas and opinions through 'actual or threatened imposition of government power or sanction' is violating the First Amendment." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230 (7th Cir. 2015) (Posner, J.) (quoting *American Family Ass'n v. City & Cty. of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002)). "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (brackets in original).  In this regard, a government official's motivation to suppress speech is decisive, regardless of whether he has accomplished his illicit purpose, because "the First Amendment begins by focusing upon the activity of the Government." *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016).

President Trump's argument that Plaintiff and its members lack standing to sue him fundamentally mischaracterizes the nature of Defendant's First Amendment violations, which are neither discrete nor in the past.  As alleged in the Complaint, Defendant has instituted an ongoing informal policy of threatening and retaliating against the press through a variety of regulatory tools. Such a scheme "is a particularly troubling and potent form of retaliation;" and "when retaliation against protected speech is elevated to the level of official policy, there is a compelling need for adequate avenues of redress." *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018).

Defendant's claims that this Court lacks jurisdiction to impose a remedy against the President are equally misdirected.  When it comes to violating the First Amendment, as in any other context, the President "must act in compliance with the Constitution," because "[n]o governmental official … possesses the discretion to act unconstitutionally." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 578–79 (S.D.N.Y. 2018) ("*Knight Inst.*"), *appeal filed*, No. 18-1691 (2d Cir. June 5, 2018).  And "[i]t is emphatically the province

and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). To hold otherwise, as Defendant requests, would contravene the fundamental principle that "[n]o [person] in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882).

As demonstrated below, this Court should deny Defendant's motion in all respects.

## SUMMARY OF ALLEGATIONS AND ARGUMENT

A hallmark of the Trump presidency has been actual and threatened use of government power to intimidate and silence independent news reporting. Even as a candidate, Mr. Trump announced his intentions to use executive power to damage particular news organizations and to punish certain journalists. Compl. ¶¶ 3–4. He continues these threats in office, and has made good on a number of them. Defendant Trump and officials acting at his direction have undertaken a variety of retaliatory and threatening acts intended to punish or intimidate those whose news coverage has displeased him, including:

- suspending the White House press credentials of reporters who the President believes failed to show him sufficient "respect";

- revoking and threatening to revoke security clearances from former government officials who have engaged in public commentary, including on CNN and NBC, because they expressed criticism of the current Administration;

- issuing an executive order to raise postal rates to punish online retailer Amazon.com because Jeff Bezos, its chief shareholder and CEO, owns the *Washington Post*, whose coverage of his Administration the President finds objectionable; and

- directing the Department of Justice to challenge a vertical merger between Time Warner and AT&T because of his antagonism to Time Warner subsidiary CNN and its news coverage of his Administration.

Compl. ¶ 4.

Defendant tries to minimize the constitutional significance of these threats and actions by mischaracterizing them as a few random, discrete and unrelated acts. *See* MTD at 2 ("Plaintiff

alleges four retaliatory actions taken or encouraged by defendant.").  He distinguishes individual actions from more general pronouncements, characterizing the Complaint as alleging "in broad terms that defendant has criticized the press and threatened—although not followed through on— various possibly retaliatory actions." *Id*. at 3–4.  Defendant then argues the specific examples of retaliation do not support PEN America's standing, either because they happened in the past as one-off events (that was then, this is now) or because they lack direct connection to Plaintiff's members.  *Id*. at 6–8.  For the more general threats, Defendant argues that any alleged chilling effects are too diffuse and subjective to give Plaintiff standing.  *Id*. at 9–12.

This attempt at separating the President's ceaseless barrage of threats from instances in which he has gotten subordinates to follow through on particular unconstitutional orders mischaracterizes the Complaint, and leads the government to misidentify applicable law.  The combination of more general threats with targeted actions define what it means to engage in "a cohesive censorship-and-retaliation campaign."  *NRA*, 350 F. Supp. 3d at 112.  Contrary to the government's effort to rewrite the Complaint, PEN America has alleged that Defendant Trump is executing an ongoing campaign, using and threatening to use the machinery of government to retaliate against media companies and individuals whose journalism he dislikes.  The fact that President Trump has shown a propensity to disregard constitutional limits and to follow through on certain of his threats only gives his overall campaign its potency.

As this brief was being finalized, it came to light that PEN America member Dana Milbank of the *Washington Post* had his White House press credentials revoked under a new policy that has affected dozens of other journalists.  The new policy terminated access for most members of the

White House press corps,[1] but allowed credentials to be restored for many under subjective and poorly-defined exemptions for "senior journalists" and those who meet "special circumstances." Milbank, who has held a White House press pass for the past 21 years but has been a critic of the President, was denied an exemption.  Dana Milbank, *The White House Has Revoked My Press Pass*, WASH. POST, May 9, 2019, at A19.  Such selective denial of an exemption based on the exercise of freedom of expression is an obvious First Amendment violation, and an example of the President's ongoing retaliatory conduct.  *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); Compl. ¶ 16.

## LEGAL STANDARD

Motions to dismiss for failure to state a claim are disfavored and seldom granted, as the movant's burden is substantial.  *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 817 (S.D.N.Y. 2006).  Under Federal Rule of Civil Procedure 12(b)(6), the complaint's facts are construed as true and all inferences are drawn in the light most favorable to the plaintiff, *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 443 (2d Cir. 2015), including those relating to the intent and effect of government actors' speech and conduct.  *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (*per curiam*).  Plaintiffs need only "state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and a Rule 12(b)(6) motion must be denied unless it appears beyond doubt that plaintiff can prove no set of facts which would entitle the plaintiff to relief. *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 464 (S.D.N.Y. 2009).

Rule 12(b)(1) motions are decided under a parallel standard, but the Court assumes the validity of Plaintiff's claim and legal theory.  *Engel v. Scully & Scully, Inc.*, 279 F.R.D. 117, 124

---

[1] Plaintiff's members include journalists who work for at least seventeen organizations that hold—or held—White House press credentials.  Compl. ¶ 26.

(S.D.N.Y. 2011); *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Facial subject matter jurisdiction challenges, such as here, place no evidentiary burden on the plaintiff and require only that the Court evaluate whether the Complaint "allege[s] facts that affirmatively and plausibly suggest … standing." *Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 219 (S.D.N.Y. 2018) (citation omitted).

## ARGUMENT

### I.  THE COMPLAINT SETS FORTH DETAILED FACTUAL ALLEGATIONS OF DEFENDANT'S ACTIONS THAT VIOLATE THE FIRST AMENDMENT

#### A.  The First Amendment Prohibits Government Officials from Threatening or Directing Government Actions to Punish Lawful Speech That the Government Dislikes

The First Amendment prohibits the actual or threatened use of government power to intimidate or censor freedom of speech or of the press.  *Heffernan*, 136 S. Ct. at 1418; *Hartman*, 547 U.S. at 256; *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–68 (1963); *Backpage.com,* 807 F.3d at 230; *Okwedy*, 333 F.3d at 343–44.  This constitutional protection operates through two separate but related doctrines: a prohibition on threats intended to chill the exercise of free expression and a prohibition on retaliatory acts designed to sanction groups or individuals for their First Amendment activities.  This case involves both types of unconstitutional conduct.  Defendant Trump has broadly threatened adverse action against perceived critics in the press and has engaged in retaliatory acts to punish the press.  Taken together, his actions merge to form an ongoing scheme of unlawful informal censorship.

Government officials—like Defendant—violate the First Amendment when they "encourage[] the suppression of speech in a manner which 'can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request.'"  *Zieper v. Metzinger*, 474 F.3d 60, 65–66 (2d Cir. 2007) (citation omitted).  A government official "who threatens to employ coercive state power to stifle protected

speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Okwedy*, 333 F.3d at 344.  Such a threat "is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent." *Dart*, 807 F.3d at 231.  An unconstitutional scheme of informal censorship arises when: (1) the official's statements may reasonably be viewed as an implicit threat, and (2) the official has regulatory or other direct decisionmaking authority over the targeted entities or the power to direct or encourage others to take such action. *Bantam Books*, 372 U.S. at 66–68; *Okwedy*, 333 F.3d 343–44; *Zieper*, 474 F.3d at 65–66; *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991).

A government official engages in unconstitutional retaliation by using government power to penalize a person or entity for the exercise of their First Amendment rights. *Heffernan*, 136 S. Ct. at 1418–19.  It is well-settled that the First Amendment "prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman*, 547 U.S. at 256.  A plausible claim for retaliation exists when a plaintiff alleges (1) he or she has a right protected by the First Amendment, (2) the defendant's actions were motivated or substantially caused by the exercise of that right, and (3) the defendant's actions caused some injury. *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

In this case, President Trump has employed a combination of threats targeting future speech, as well as retaliation to punish past speech as part of "a cohesive censorship-and-retaliation campaign." *NRA*, 350 F. Supp. 3d at 112.  The formula for such a campaign "consists of coupling threats with denunciations of the activity that the official wants stamped out." *Dart*, 807 F.3d at 237–38.  As explained below, Defendant's retaliatory acts further his unconstitutional scheme and

drive home the credibility of his ongoing threats to punish and intimidate the press.  The Complaint pleads facts sufficient to establish both types of First Amendment violation.

**B.**     **The Allegations Set Forth in the Complaint Satisfy the Elements of a First Amendment Violation**

**1.**     **The Complaint Plausibly Alleges Unconstitutional Informal Censorship**

Plaintiff plausibly alleged facts that meet the two prongs of the informal censorship test.

First, the Complaint sets forth numerous statements of the Defendant that "may reasonably be viewed as an implicit threat."  *Rattner*, 930 F.2d at 210.  Defendant routinely threatens to retaliate against news organizations and social-media platforms, including Time Warner (and CNN), Google, Facebook, and *The Washington Post* (via Amazon.com).  *See* Compl. ¶¶ 77–79, 82–85, 89–90.  Defendant attacks the business viability of various news entities, including NBC, CNN, and *The Washington Post*, signaling to press outlets and their employees that their jobs may depend on the tenor and content of their reporting.  *Id.* ¶¶ 89–90.  Defendant threatens individuals as well, suggesting that he may "[t]ake away credentials" from reporters working for the "corrupt" media and "Fake News" networks, putting various journalists on notice that their access to critical White House briefings is contingent upon favorable coverage.  *Id.* ¶ 36; *see also id.* ¶¶ 37–38.  For example, Defendant has threatened to revoke the credentials of all reporters whose coverage he finds negative.  *Id.* ¶ 36.

Second, the President commands significant regulatory authority that can be used against members of the press and news organizations, including Plaintiff's members and their employers. Even the indirect or illegitimate use of official power meets the test for what constitutes an unconstitutional threat.  *Bantam Books*, 372 U.S. at 67; *Dart*, 807 F.3d at 236–37.  As the Second Circuit observed in *Okwedy*, 333 F.3d at 343, "[a]lthough the existence of regulatory or other direct decisionmaking authority is certainly relevant to the question of whether a government official's

comments were unconstitutionally threatening or coercive, a defendant without such direct regulatory or decisionmaking authority can also exert an impermissible type or degree of pressure." The extraordinary power of the presidency easily satisfies this element.  Defendant can revoke credentials of White House reporters, *see id.* ¶¶ 33–35, 38; revoke the security clearances of former government officials, *see id.* ¶ 53; direct review of U.S. Postal Service package rates, *see id.* ¶ 69; and direct federal law-enforcement and antitrust agencies to open investigations, *see id.* ¶¶ 78–79, 85.  Through these and myriad other regulatory powers, Defendant can use coercive governmental authority to harm journalists and news organizations, including Plaintiff and its members.

### 2. The Complaint Plausibly Alleges Unconstitutional Retaliation that Furthers Defendant's Informal Censorship Scheme

The Complaint sets forth a variety of instances in which the President has already directed regulatory reprisals against networks, newspapers, and individual journalists out of animus toward the press.  Compl. ¶¶ 69, 70, 72, 73, 78, 79, 80.  Each of these retaliatory acts meets the elements of an independent violation of the First Amendment and furthers the scheme of informal censorship the President is waging against the press.  First*,* the targets of the President's ire—journalists and news organizations—unquestionably are engaged in activities protected by the First Amendment.  *E.g.*, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Second*,* the threats and retaliatory acts set forth in the Complaint were substantially, and plainly, motivated by Defendant's desire to suppress critical news reports.  Indeed, President Trump voices his animus as if it were a virtue and forcefully proclaims his retaliatory intentions.  Compl. ¶¶ 33–35, 37–38, 49, 53–82. Third, the President's threats and retaliatory acts have injured PEN America and its members.  *Id.* ¶¶ 37, 93–114.  *See infra* at pp. 11–14; 16–20.

It is not necessary to demonstrate that Defendant has acted on his threats to state a First Amendment claim.  However, the fact that he *has* done so confirms that Defendant's threats and

regulatory actions are conjoined in a scheme of censorship and retaliation.  *See Bantam Books*, 372 U.S. at 68–69 (explaining that the fact that the defendant's notices were "invariably followed up by police visitations" was one factor relevant to determining that the notices "serve[d] as instruments of regulation"); *Okwedy*, 333 F.3d at 344; *Zieper*, 474 F.3d at 67; *NRA*, 350 F. Supp. 3d at 116.  For example, on May 9, 2018, Defendant threatened to revoke the credentials of all reporters whose coverage he finds negative.  Compl. ¶ 36.  The subsequent barring of CNN reporter Kaitlin Collins from a press event on July 25, 2018, and revocation of Jim Acosta's press credentials on November 7, 2018, demonstrate why Defendant's November 9, 2018, statement about revoking the credentials of other journalists who fail to show him "respect" is reasonably viewed as part of a censorship campaign.  *Id.* ¶¶ 37–38, 41.  The same goes for Defendant's retaliatory acts against CNN analyst John Brennan, Jeff Bezos, Time Warner, and NBC.  *Id.* ¶¶ 49–92, 115–23.  Each retaliatory act lends credibility to Defendant's continuing threats and serves to enforce his unconstitutional scheme of censorship.

* * *

Taken together, Plaintiff plausibly alleges that Defendant's threats and regulatory actions amount to an ongoing censorship-and-retaliation scheme that targets journalists and news organizations perceived as critical of Defendant and his Administration.  This scheme is not aimed simply at suppressing the speech of any one journalist or news organization, but rather intends to chill the speech of all journalists, including PEN America's members.  The scope of the First Amendment injury caused by Defendant's scheme is thus greater than the sum of its parts.  *Cf. City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756–62 (1988).  Plaintiff has plausibly stated a First Amendment claim based on the totality of Defendant's threatening statements and suppressive regulatory actions.  *See Zieper*, 474 F.3d at 66.

## II.   THE FIRST AMENDMENT VIOLATION ALLEGED IS JUSTICIABLE

### A.   Plaintiff Has Article III Standing

Organizations like PEN America may establish standing to sue in a representational capacity ("associational standing") or in an individual capacity ("organizational standing"). *E.g.*, *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("*NYCLU*").  In this case, Plaintiff has done both.

#### 1.   PEN America Has Associational Standing on Behalf of Its Members

"[A]n organization may sue to redress its members' injuries, even without a showing of injury to the association itself." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996) ("*UFCW*").  This doctrine "recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Int'l Union, UAW. v. Brock*, 477 U.S. 274, 290 (1986).  An organization's standing to sue on behalf of its members exists when: (a) at least one of its members would otherwise have standing to sue; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 156–57 (2d Cir. 2012).

*At least one PEN America member has individual standing.*

The first requirement of *Hunt*'s associational-standing test—that at least one member have individual standing—is met if any member "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  The Complaint satisfies these requirements easily.

**a. Injury-in-fact.** Plaintiff's members have suffered, and continue to suffer, injury in fact. Cognizable injury includes "constitutional violations … aris[ing] from the deterrent, or 'chilling,' effect of government regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 11 (1972). To demonstrate such an injury for Article III standing, an individual need not allege she or anyone else actually was deterred, but only that defendant's conduct "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey v. Futrell*, 721 F.3d 226, 235–36 (4th Cir. 2013) (citation omitted); *see also Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). Cognizable injury also includes government interference with the right to receive information. *E.g.*, *In re Application of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988). For both chilling injuries and right-to-receive injuries, "[t]he question is not whether *any* of the allegations of injury [to any of Plaintiff's members] are speculative, but whether *all* of them are, therefore requiring the complaint's dismissal." *Building & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 146 (2d Cir. 2006) ("*Trades Council*").

Plaintiff's members who are journalists have been, and continue to be, injured by Defendant's conduct toward their speech. *See* Compl. ¶¶ 93–98. Some of Plaintiff's members have been direct targets of Defendant's informal scheme of censorship and have endured retaliatory acts. *Id.* ¶¶ 38–48, 93. Others work for employers who have been subjected to Defendant's informal scheme of censorship, *id.* ¶¶ 27, 93, 123, and some have suffered the consequences of their employers' self-censorship in response to Defendant's scheme, *id.* ¶ 96. And even if others have not yet endured direct attacks or consciously censored themselves, Defendant's actions are likely to deter similarly situated journalists of ordinary firmness from exercising their First Amendment rights. *Id.* ¶¶ 93–98, 121, 123, 128, 130. Many of Plaintiff's

12

members also rely on information from those who have been direct targets of Defendant's scheme or have self-censored, and who have thus suffered due to Defendant's interference with those sources. *Id.* ¶¶ 99–101, 134–36.

In view of these harms, Defendant cannot demonstrate that "all" of Plaintiff's allegations of injury are speculative. *Trades Council*, 448 F.3d at 146. Defendant has inflicted multiple concrete injuries on journalists and media companies through press-pass suspensions and restrictions, security-clearance suspensions, merger interference, and directives to raise postal rates. Plaintiff's members who have been targeted directly or who work for targeted media organizations thus have a "personal stake in the outcome" of the lawsuit and "more than 'generalized grievances.'" *United States v. Richardson*, 418 U.S. 166, 179–80 (1974) (internal citations omitted). The Complaint's detailed allegations demonstrate that PEN America members harbor "actual and well-founded" fear that Defendant will retaliate against them if they step out of line, *Vermont Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000), and that they are both "presently or prospectively subject to the … proscriptions or compulsions that [PEN] is challenging." *Laird*, 408 U.S. at 11 (quoted in MTD at 10).

Defendant counters this showing with arguments based on inapposite cases involving challenges to dragnet surveillance programs. *See* MTD at 9–10.[2] Those cases allege chilling effect based on the idea that the over-collection of data by the government may result in surveillance of

---

[2] *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *Laird*, 408 U.S. 1; *United Presbyterian Church in U.S.A. v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984). Defendant's reliance on *United Presbyterian* is especially weak, given that it concerned a "generalized challenge to the constitutionality of the entire national intelligence-gathering system, not the alleged actual impact of a specific program or protocol on the plaintiff." *Jewel v. NSA*, 673 F.3d 902, 911 (9th Cir. 2011) (distinguishing *Clapper*) (internal quotation marks and citation omitted). Indeed, "no part of the challenged scheme" in *United Presbyterian* "impose[d] or even relate[d] to any direct governmental constraint upon the plaintiffs," let alone direct threats to punish core political speech based on its content. *United Presbyterian*, 738 F.2d at 1380.

the plaintiffs which may then lead to acts of suppression, and are not based on any "present objective harm or [] threat of specific future harm," unlike this case. *Laird*, 408 U.S. at 13–14. Such claims often fail because only a highly attenuated and "speculative chain of possibilities" connects the challenged surveillance program with some ultimate harm to a plaintiff's speech. *Clapper*, 568 U.S. at 410, 414; *Laird*, 408 U.S. 1. They are not relevant to cases involving deliberate governmental threats and acts of retaliation that have no purpose other than to deter critical speech. And, as the Court observed in *Clapper*, "[o]ur cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about." *Id*. at 414 n.5. Standing may be found where there is "a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." *Id*. In this case, Plaintiff and its members have been, and continue to be, directly harmed by Defendant's ongoing censorship and retaliation scheme.

Defendant also claims PEN America must "name names" of members to establish standing, MTD at 6–8; but the Second Circuit has made clear that organizations need not name individual members with standing to defeat a Rule 12 motion. In *Trades Council*, the court rejected the same claim, made here, that the Complaint must be dismissed on lack of standing for "not contain[ing] names of those who have been particularly injured." 448 F.3d at 144. It held that, while the point "might have some validity … at the summary judgment stage," it is "unpersuasive on a motion to dismiss, where standing is challenged [] on the pleadings alone." 448 F.3d at 144–45. The court was emphatic that it was "no[t] … aware of any [authority] that … an association must 'name names' in a complaint … to allege injury in fact to its members." *Id*. at 145.[3]

---

[3] *See also New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 606 (S.D.N.Y. 2019), *appeal filed*, No. 19-212 (2d Cir. Jan. 22, 2019), *cert. granted before judgment*, 139 S. Ct. 953 (2019); *accord Common Cause/N.Y. v. Brehm*, 344 F. Supp. 3d 542, 560 (S.D.N.Y. 2018)

Even if the government could invoke what it calls the "*Summers* naming requirement,"[4] MTD at 6–7, PEN America satisfied this requirement by naming Jim Acosta, a member who has been targeted specifically by the President's retaliatory acts.  The government argues that standing cannot be based on a "past injury," and that Acosta successfully sued the President to have his White House press credentials restored.  *Id.* (citing *CNN v. Trump*, No. 18-cv-2610 (TJK) (D.D.C. 2018)).  But this argument fails to grasp that Acosta's mistreatment was part of an ongoing campaign to intimidate the press.  As detailed in the Complaint, even as the White House restored Acosta's credentials, it adopted new restrictions—mentioning Acosta by name—that threaten future revocations in the event of any transgressions that may include "unprofessional conduct." Compl. ¶¶ 43–48.  Standing is established in such circumstances, where the threat of governmental misconduct is ongoing.  *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

   **b.  Traceability.**  Plaintiff's individual members also satisfy traceability for Article III standing, *Spokeo*, 136 S. Ct. at 1547, which simply requires demonstrating "a causal nexus between the defendant's conduct and the injury."  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (citation omitted).  This burden at the pleading stage is "relatively modest," such that a linkage not strong enough to establish probable cause on the merits may suffice.  *Id.* at 92 (citation

---

("Defendants cite no law suggesting [] Plaintiff's … failure to identify the specific individuals burdened by New York election law, is fatal … at this phase."); *Nat. Res. Def. Council, Inc. v. Wheeler*, ___ F. Supp. 3d ___, 2019 WL 1299938, at *5 (S.D.N.Y. Mar. 21, 2019) ("[An] organization need not identify any member with standing … by name" but only "establish that 'at least one identified member ha[s] suffered or would suffer harm.'") (citation omitted).

   [4] The one post-*Trades Council* Supreme Court decision on which Defendant relies, *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990), and *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 459 (1958)), was not a pleadings-stage case but an appeal from a final post-trial judgment, and in turn relied on cases that proceeded well past the pleading stage to final judgment.  *See id.* at 491–92.  This Court's decision in *Art & Antique Dealers League of America, Inc. v. Seggos*, 2019 WL 416330 (S.D.N.Y. Feb. 1, 2019), was a summary-judgment ruling and is thus inapposite.

omitted).  Here, a strong causal connection exists between the White House's conduct—limiting the ability of reporters to ask questions, threatening to revoke credentials, and attacking news organizations through regulatory actions—and PEN America members' alleged injury:  chilling of their First Amendment rights as reporters.

Defendant erroneously asserts that the Complaint fails to meet the traceability requirement because only Acosta is alleged to have been directly targeted.   This is an inaccurate characterization of the Complaint for the reasons stated *supra*.  Threat-based censorship cases teach that standing can exist even if the threat is not made directly to the plaintiff but to a third party that facilitates the plaintiff's speech—such as her employer.  *See*, *e.g.*, *Bantam Books*, 372 U.S. at 64–72; *Dart*, 807 F.3d at 231.  And making an example of Acosta was meant to, and did, have an *in terrorem* effect on other PEN members.  *See Heffernan*, 136 S. Ct. at 1419 (acknowledging that "[t]he discharge of one" employee for engaging in constitutionally protected activity "tells the others that they engage in protected activity at their peril").   In any event, Defendant admits traceability with respect to Acosta, MTD 11–12 (raising traceability arguments as to Plaintiff's members "[e]xcept for Acosta"), who, for reasons explained above, is a PEN America member with standing.  *See also supra* 4-5 (discussing Dana Milbank).

**c.  Redressability.**  Plaintiff's members satisfy the redressability element because the requested declaratory and injunctive relief will remedy their injuries in two ways.  First, it will reduce the likelihood of future governmental attempts to censor PEN members and their employers because the President and other executive officials presumably "would abide by an authoritative interpretation of [a] … constitutional provision."  *Knight Inst.*, 302 F. Supp. 3d at 579 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (plurality opinion)); *see id*. (collecting cases).  Second, the requested relief will set forth what actions Defendant may not take in response to

critical speech, enabling PEN America's members whom the President threatens or retaliates against in the future to resist illicit pressure and, if necessary, seek judicial enforcement. *See also infra* § II.B.

*Plaintiff PEN America is seeking to support interests germane to its purpose.*

The second *Hunt* factor requires that the plaintiff-organization seek to enforce interests germane to its purpose. PEN America's mission is to "defend the liberties that make [creative expression] possible," and its "bedrock work is long-term advocacy on behalf of individual writers who are being punished because of their work." Compl. ¶ 19. This lawsuit seeks to further exactly those purposes.

*Plaintiff's lawsuit does not require participation of individual PEN America members.*

The third and final *Hunt* factor prudentially instructs that the suit not require participation of individual members. Individual participation "is not normally necessary when an association seeks prospective or injunctive relief for its members," *UFCW*, 517 U.S. at 546, as the Complaint does here.

### 2.    PEN America Has Organizational Standing On Its Own Behalf

PEN America also has organizational standing because it has (a) suffered an injury that is (b) fairly traceable to the challenged conduct and is (c) likely to be redressed by a favorable decision. *NYCLU*, 684 F.3d at 294. PEN America satisfies the injury-in-fact requirement because "only a perceptible impairment of an organization's activities is necessary," *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ("*Centro*")—a standard that the Second Circuit repeatedly has characterized as a low bar. *E.g.*, *id*.; *NYCLU*, 684 F.3d at 294; *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *Ragin v. Harry*

*Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993).[5]  Perceptible impairment requires only that Defendant's actions either led the organization to divert or expend its resources, *see Centro*, 868 F.3d at 111, or otherwise "impeded" its mission, *NYCLU*, 684 F.3d at 295; *see also Centro*, 868 F.3d at 110.  The Complaint plausibly alleges precisely that as a result of Defendant Trump's ongoing scheme of informal censorship.

PEN America's work includes long-term advocacy on behalf of individual writers punished because of their writing, both internationally and in the United States.  Compl. ¶ 103.  Prior to Defendant's unlawful conduct, Plaintiff's U.S.-focused advocacy and press freedom work represented a significantly smaller portion of its overall activities.  *See id.* ¶ 111.  However, in response to Defendant's First Amendment violations, Plaintiff has been forced to divert significant resources previously dedicated to advocating for free expression overseas to responding to Defendant's actions at home.  *See id.* ¶¶ 104, 111.  As a result, Plaintiff's efforts to combat Defendant's unlawful conduct has come to equal and at times eclipse its international initiatives.  *See id.* ¶ 111.  Plaintiff also has hired new senior-level staff, *see id.* ¶ 106; established and staffed, for the first time, a Washington, D.C. office, *see id.* ¶ 107; commissioned research to study the impact of Defendant's actions on members, *see id.* ¶ 109; mobilized its members in cities across the country to recognize and defend press freedom; held large events and protests; initiated petitions; released reports; and published statements, blog posts, and articles in response to the Defendant's actions.

---

[5] Defendant cites *Nnebe*, MTD at 16, but it is hard to see why.  There, the Second Circuit held that an organization need only allege "some perceptible opportunity cost" to its activities to establish an injury-in-fact, "because the expenditure of resources that could be spent on other activities constitutes far more than simply a setback to [the organization's] abstract social interests."  644 F.3d at 157 (internal quotation marks omitted and citation omitted).  Despite characterizing the evidence supplied by the plaintiff as "scant," the Court held that a taxi workers' organization had standing to challenge New York City's policy of suspending the licenses of certain taxi drivers without a hearing.  *Id.*

*See id.* ¶¶ 110–11.  Defendant's actions forced Plaintiff to spend at least "several hundred thousand dollars in organizational funds."  *Id.* ¶ 106.  Together, these diversions of Plaintiff's resources perceptibly impair Plaintiff's activities; and as Plaintiff's allegations and reasonable inferences from them must be accepted at this stage, those allegations fully negate Defendant's arguments that "Plaintiff has not alleged any violation of its right to free speech."  MTD at 14.

Defendant's unlawful conduct also has "impeded" Plaintiff from carrying out its mission by interfering with its right to receive information.  Compl. ¶¶ 113–14.  The Second Circuit has routinely held that organizations "must certainly be permitted" to have standing to vindicate the First Amendment's "unwavering[] protect[ion of] the right to receive information and ideas."  *In re Application of Dow Jones & Co.*, 842 F.2d at 607; *see also Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 90–91 (2d Cir. 2010); *American Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).  In *NYCLU*, for example, the Court held that a civil-liberties organization had standing to challenge a city policy that excluded members of the public from a government hearing because the policy impeded the organization's access to information that it wanted in order to carry out its professional responsibilities.  684 F.3d at 295.  Plaintiff has standing here for the same reason, and Defendant's insistence that Plaintiff identify specific sources or speakers from whom it has been denied information, MTD 18, 19, like the purported "naming of names" requirement, *see supra* 14-15, is unnecessary at this stage of the case.

Defendant seeks to impose overly stringent requirements unsupported by law in attempting to distinguish Plaintiff's injuries from those held sufficient to establish standing in *Centro*.  *See* MTD at 14–15.  Defendant suggests that Plaintiff's diversion and expenditure of resources are simply a part of its "established activities," MTD 15; but as shown above, those diversions and expenditures of resources were made in order to address Defendant's scheme of informal

censorship.  Compl. ¶¶ 107, 109.  Even if *some* of Plaintiff's activities are part of its established activities, any increase in the cost of those activities caused by Defendant's unlawful actions suffices for injury-in-fact.  *E.g.*, *Centro*, 868 F.3d at 110.  Defendant seeks to extract from *Centro* and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), a requirement that Plaintiff show "a practical obstacle" or "practical interference with its established activities," MTD at 15–16, but neither case supports nor mandates doing so.  In *Havens Realty*, for example, the Supreme Court held that Article III injury-in-fact required only that the nonprofit equal housing organization "broadly allege" conduct by defendant that "frustrated … efforts to assist equal access to housing through counseling and other referral services."  455 U.S. at 379.  This was satisfied by allegations of having to "devote significant resources to identify and counteract the [] racially discriminatory [] practices" at issue.  *Id*.

*Citizens for Responsibility and Ethics in Washington v. Trump*, 276 F. Supp. 3d 174 (S.D.N.Y. 2017) ("*CREW*"), *appeal filed*, No. 18-474 (2d Cir. Feb. 16, 2018) (cited MTD 16–17), likewise fails to support Defendant's position.  Defendant seeks to equate the injuries of CREW, which the court held lacked standing, with those of Plaintiff, but they differ in key respects.  First, "nearly *all* of the resources" that CREW allegedly expended "were either in anticipation or direct furtherance of [the] litigation" at issue, "raising the prospect of manufactured standing," *id.* at 192, while Plaintiff's alleged injuries do not spring from this (or any other) litigation.  Further, CREW failed to identify any conduct that "caused … legally cognizable adverse consequences, tangible or otherwise, necessitating the expenditure of organizational resources."  *Id.* at 190–91.  CREW alleged that it was forced to divert resources to vindicate the Emoluments Clauses injuries of individual business operators, like CREW's co-plaintiffs.  *Id.*  But the court held that those individuals' injuries fell "outside the Emoluments Clauses' zone of interests" and were therefore

not legally cognizable, so that CREW's diversion of resources to vindicate those non-cognizable injuries could not result in a legally cognizable injury to CREW. *Id.* at 191 n.5. Here, by contrast, Defendant's conduct has caused Plaintiff, its members, and other journalists to suffer legally cognizable adverse consequences within the First Amendment's zone of interests, and Plaintiff's resultant expenditures constitute a legally cognizable injury to PEN.

Plaintiff also satisfies the second and third organizational-standing elements because its injuries are "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547. Plaintiff would not have diverted resources absent Defendant's constitutional violations, *see* Compl. ¶¶ 106–11, and its inability to receive information from journalists and news organizations likewise results directly from Defendant's unconstitutional interference, *see id.* ¶¶ 113–14. As explained in greater detail at § II.B below, Plaintiff's injuries are redressable through the relief sought. These straightforward points also eliminate the need for the "heightened burden" that Defendant seeks to impose on the asserted ground that Plaintiff "challeng[es] Executive actions allegedly taken or threatened against third parties," MTD 14 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992)), because the harms alleged in the Complaint, and outlined above, fall directly on Plaintiff.

### B.    This Court Has Proper Authority to Impose a Remedy for the Violation of Plaintiff's First Amendment Rights

Defendant claims that even if the President is using the powers of his office to violate Plaintiff's First Amendment rights this Court lacks the power to do anything about that. That is not how our Constitution works. It is no longer "open to debate among courts whether equitable relief can be granted against a sitting president"; rather, there is "ample authority suggesting that even the President—in his official capacity—can be the subject of equitable relief," and that is "especially" so when constitutional violations are alleged. *D.C. v. Trump*, 344 F. Supp. 3d 828,

841–42 (D. Md. 2018).  Defendant ignores that authority and crucially fails to distinguish between ministerial and nonministerial duties when arguing that the Court lacks jurisdiction to grant injunctive or declaratory relief against him.  MTD § I.B (citing *Mississippi v. Johnson*, 71 U.S. 475 (1866); *Franklin v. Massachusetts*, 505 U.S. 788).

"[E]njoining the President to ensure executive officials operate in accordance with the law is … well within the Court's power."  *Saget v. Trump*, ___ F. Supp. 3d ___, 2019 WL 1568755, at *35 (E.D.N.Y. Apr. 11, 2019).  Where, as here, the relief sought involves "not directing the President … to reach a certain policy conclusion but rather to abide by the mandates of … the Constitution," a court does not (and is not asked to) run afoul of the Constitution, *Mississippi*, or *Franklin*.  *Id*. at *34-35.[6]  Correction of an unlawful act "far more closely resembles … a [] ministerial duty" than "a purely executive and political duty requiring the exercise of discretion vested in the President."  *Id*. at *34 (citation omitted).  Thus, "enjoining the President … from violating [the law] is akin to [enforcing] a ministerial duty and ensuring [that] executive officials follow the laws," *id*. at *35,[7] and is "well within the Court's power."  *Id*.  That is especially so

---

[6] Further, *Mississippi v. Johnson* is best understood as an early application of the political-question doctrine, not a bar to awarding injunctive relief against the President.  Later Supreme Court decisions have read that case as dismissed on the ground that it presented a political question. *See Ohio v. Wyandotte Chems. Corp*., 401 U.S. 493, 496 (1971) (citing Johnson as an example of a case that sought "to embroil [the Court] in 'political questions'"); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 614 (D.C. Cir. 1974) ("[Johnson] was dismissed on the ground that it presented a political question …."); Jerry L. Mashaw, Federal Administration and Administrative Law in the Gilded Age, 119 YALE L.J. 1362, 1401 n.123 (2010) ("[Johnson] was, in essence, a political question case …. [T]he Court imagined that action of the sort requested would involve it in a political imbroglio.").

[7] *See also D.C. v. Trump*, 291 F. Supp. 3d 725, 750 (D. Md. 2018); *Centro Presente v. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018) ("Injunctive relief against the President is an 'extraordinary' remedy, but one that may be available in limited circumstances."); *Knight Inst.*, 302 F. Supp. 3d at 578 (court may enjoin President to undo unconstitutional action of blocking Twitter users); *cf. Knight Inst.*, 302 F. Supp. 3d at 578 (an "injunction directing the

where, as here, the President allegedly violated a "'sweeping and unqualified' Constitutional mandate" like the First Amendment's free-speech guarantee. *Blumenthal v. Trump*, ___ F. Supp. 3d ___, 2019 WL 1923398, at *15 (D.D.C. Apr. 30, 2019).[8]  This Court "should be extremely reluctant in light of the fundamental constitutional reasons for subjecting Executive actions to the purview of judicial scrutiny to hold that [it] lacks power to compel the President to perform … in accordance with the law." *Saget*, 2019 WL 1568755, at *34.  That is particularly true where, as here, the President "has not identified [which of his Presidential] duties would be impaired" if injunctive relief were granted—unlike in *Mississippi v. Johnson. Blumenthal*, 2019 WL 1923398, at *14.

To the extent the government has objections to the specific features of an injunction that has yet to be tailored to the facts of record, such details can be addressed at the appropriate time. It is no basis for preventing the Court from considering the case. *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018) (citing *Centro Presente*, 332 F. Supp. 3d at 419).  All that is required on a motion to dismiss is that injunctive relief against the President "could be appropriate." *Id*. Dismissal is improper where it is "plausible [] that an appropriate injunction of some sort could be fashioned, were Plaintiffs to succeed on the merits." *D.C. v. Trump*, 291 F. Supp. 3d at 752.

Even if, despite the foregoing, the Court had qualms about granting injunctive relief or about the form it may need to take, declaratory relief is another available remedy.  The Court unquestionably has jurisdiction to impose the declaratory relief that Plaintiff seeks, even against

---

performance of a ministerial duty represents a minimal danger of intrusion on the authority and functions of the Executive Branch") (internal quotation marks and citation omitted).

[8] Given this, Defendant's crabbed view of what constitutes "ministerial" action, based on the order to unblock individuals on Twitter, MTD at 21-22 (citing *Knight Inst.*, 302 F. Supp. 3d at 577–79), is unduly narrow and must be rejected.

sitting government officials, including the President.   In *Knight Institute*, the court granted a declaratory judgment that President Trump violated the First Amendment by blocking plaintiffs on Twitter based on their political views.  302 F. Supp. 3d at 579.  It rejected his argument that it lacked power to enter such relief and held that such a declaration—even without a corresponding injunction—was likely to remedy the plaintiffs' harms, because courts may assume that the President is substantially likely to abide by a district court's interpretation of the constitution, "even though [he] would not be directly bound by such a determination."  *Id.* at 562 (citing *Franklin*, 505 U.S. at 803).  "This substantial likelihood, though not a mathematical certainty, is more than sufficient to establish the redressability of plaintiffs' injuries."  *Id.*[9]  The court went on to award declaratory relief on this basis, because "we must assume that the President … will remedy the [conduct] … held to be unconstitutional."  *Id.* at 580.[10]

Additionally, a constitutional ruling against the President is enforceable as to subordinate officials via the All Writs Act, 28 U.S.C. § 1651, even if they are not named as defendants here. *Knight Inst.*, 302 F. Supp. 3d at 562 n.13.  The same arguments apply here.  This Court therefore has well-established powers to remedy the constitutional violation set forth in the Complaint.

---

[9] *See also D.C. v. Trump*, 291 F. Supp. 3d at 752 ("[T]he Supreme Court expressly stated that a declaratory judgment against the President could redress the plaintiff's injuries.") (citing *Clinton v. New York*, 524 U.S. 417, 433 n.22 (1998)).  *Cf. id.* ("see[ing] no barrier to [the] authority to grant either injunctive or declaratory relief" and noting "the Supreme Court reiterated … [that] if the injury can be 'reduced to some extent,' then a plaintiff has met the redressability prong for standing") (citing *Massachusetts v. EPA*, 549 U.S. 497, 525-26 & n.23 (2007)).

[10] Issuing relief against Defendant himself is necessary because he has taken the "unusual step" of personally perpetrating the scheme of informal censorship that is harming Plaintiffs' speech. *Sirica v. Nixon*, 487 F.2d 700, 709 (D.C. Cir. 1973).

## CONCLUSION

No institution is more crucial to maintaining a democratic system of government than a free press.  Our First Amendment makes that clear.  Plaintiff has plausibly alleged that the Defendant is actively engaged in a scheme to use government power to punish the press for its coverage, and that its members and its organization have been injured by the Defendant's actions.  Plaintiff has come to this Court seeking redress for the constitutional injury it has suffered.  This Court can provide that relief.  Plaintiff therefore requests that Defendant's motion to dismiss be denied.

Date: May 10, 2019

Respectfully submitted,

THE PROTECT DEMOCRACY PROJECT, INC. and MEDIA FREEDOM & INFORMATION ACCESS CLINIC

By:_____/s/ Kristy Parker_____

Robert Corn-Revere (RC-0359)
Ronald G. London (RL-8734)
Chelsea T. Kelly (CK-2016)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Ave., N.W., Suite 800
Washington, DC  20006
Telephone:  (202) 973-4200
bobcornrevere@dwt.com
ronnielondon@dwt.com
chelseakelly@dwt.com

David A. Schulz (DS-3180)
John Langford (JL-2367)
Francesca Procaccini
Catherine Martinez, *law student intern*
George Wang, *law student intern*
Wendy Serra, *law student intern*
MEDIA FREEDOM AND INFORMATION
  ACCESS CLINIC
FLOYD ABRAMS INSTITUTE
  FOR FREEDOM OF EXPRESSION
Yale Law School*
1675 Broadway, 19th Floor
New York, NY  10019-5820
Tel: (212) 850-6103
Fax: (212) 223-1942
david.schulz@yale.edu

Kristy Parker (*pro hac vice*)
THE PROTECT DEMOCRACY PROJECT, INC.
2020 Pennsylvania Avenue, NW, #163
Washington, DC  20006
Telephone: (202) 849-9307
Facsimile: (929) 777-8428
kristy.parker@protectdemocracy.org

Ian Bassin (IB-2417)
THE PROTECT DEMOCRACY PROJECT, INC.
222 Broadway, 19th Floor
New York, NY  10038
Telephone: (202) 599-0466
ian.bassin@protectdemocracy.org

Laurence M. Schwartztol (LS-1978)
Justin Florence (*pro hac vice* pending)
THE PROTECT DEMOCRACY PROJECT, INC.
10 Ware Street
Cambridge, MA  02138
Telephone: (202) 599-0466
larry.schwartztol@protectdemocracy.org
justin.florence@protectdemocracy.org

Steven A. Hirsch (SH-8188), consultant with
THE PROTECT DEMOCRACY PROJECT, INC.
(SH-8188)
633 Battery Street
San Francisco, CA  94111-1809
Telephone: (415) 676-2286
sahirsch2@gmail.com

***Counsel for Plaintiff PEN America Center, Inc.***

* This memorandum of law has been prepared in part by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School, but does not purport to present the school's institutional views, if any.