# WILLKIE FARR & GALLAGHER LLP

787 Seventh Avenue
New York, NY 10019-6099
Tel: 212 728 8000
Fax: 212 728 8111

May 10, 2019

**VIA ECF**

The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007-1312

Re:   Civil Action No. 18-cv-9433-LGS, *PEN American Center, Inc. v. Donald J. Trump*

Dear Judge Schofield:

Pursuant to Rule III.A.1 of Your Honor's Individual Rules, we respectfully write on behalf of a group of law professors with expertise in the First Amendment ("*Amici*") to request a pre-motion conference for leave to file a brief *amicus curiae* ("Proposed Amicus Brief") in support of Plaintiff. Counsel for both Plaintiff and Defendant have informed us that they do not oppose Amici's filing of the Proposed Amicus Brief, which we enclose herewith for the Court's convenience.

## I.      Interests Of The *Amici*

*Amici* are law professors who teach, research, publish, and speak on First Amendment law. Their scholarship addresses, among other topics, the First Amendment's guarantee of freedom of the press and the role of the courts in safeguarding that freedom. *Amici*'s expertise is germane to certain issues raised in Defendant's motion to dismiss (the "Motion"), and, for that reason, *Amici* seek to share their perspective and experience with the Court at this juncture.

Plaintiff alleges that Defendant has pursued a pattern and practice of retaliation against press organizations and individual journalists who publish reporting critical of Defendant or otherwise contrary to Defendant's own views. Plaintiff alleges that Defendant's conduct is part of a strategy to intimidate both the direct targets of Defendant's retaliation and the broader press community in order to prevent future adverse reporting, and that this strategy already has succeeded in causing Plaintiff's members to desist from, or otherwise alter, negative press coverage of Defendant. The Motion seeks dismissal of Plaintiff's Amended Complaint on the ground (among others) that Plaintiff lacks standing to pursue an action for injunctive relief. In *Amici*'s view, the Motion ignores case law from the Supreme Court and this Circuit establishing that a more flexible approach to Article III and prudential

May 10, 2019
Page 2

standing obtains in the context of First Amendment litigation, based on the recognition that a more rigid application of standing doctrine would impede the ability of the press to obtain prospective relief against First Amendment violations in their incipiency. The Proposed Amicus Brief provides an overview of scholarship and jurisprudence addressing the critical role of a free press in our nation's constitutional structure, addresses the importance of granting relief against the cognizable injury known as the "chilling effect," and argues that the long-recognized flexible approach to standing in First Amendment cases is essential in this case given the credible threat that Defendant's persistent and pernicious conduct poses to the right and ability of Plaintiff's members and other journalists to report on matters of significant public concern.

## II.   Argument

"A district court has broad discretion in deciding whether to accept an *amicus* brief." *See, e.g.*, *City of New York v. United States*, 971 F. Supp. 789, 791 n.3 (S.D.N.Y. 1997). "Federal courts have discretion to permit participation of amici where such participation will not prejudice any party and may be of assistance to the court." *Strougo v. Scudder, Stevens & Clark, Inc.*, No. 96 CIV. 2136 (RWS), 1997 WL 473566, at *3 (S.D.N.Y. Aug. 18, 1997) (citing *Vulcan Society of New York City Fire Dep't, Inc. v. Civil Service Comm'n*, 490 F.2d 387, 391 (2d Cir. 1973)). "Participation as amicus curiae . . . is appropriate when the party cares only about the legal principles of the case" and can "assist the Court in reaching the right decision in a case affected with the interest of the general public." *Russell v. Bd. of Plumbing Exam'rs of Cty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999). "Leave may be granted where the information from the amicus is 'timely and useful.'" *United States v. Heleniak*, No. 14CR42A, 2015 WL 4208622, at *4 (W.D.N.Y. July 10, 2015) (quoting *Waste Mgmt. of Pa. v. City of York*, 162 F.R.D. 34 (M.D. Pa. 1995)).

*Amici* respectfully submit that the Proposed Amicus Brief meets these standards in every respect. Accepting the Proposed Amicus Brief will not prejudice the parties, neither of which opposes filing the brief. Moreover, *Amici* have dedicated much of their scholarship to the legal issues at the heart of this case, and the Proposed Amicus Brief presents information and a perspective that is both timely and useful to the Court in its consideration of the important matters addressed in the Motion, which are of keen interest to the general public.

## III.   Conclusion

For the foregoing reasons, *Amici* respectfully request that the Court grant their request for a pre-motion conference or, in the alternative, grant leave for *Amici* to file the Proposed Amicus Brief.

May 10, 2019
Page 3

Respectfully submitted,

By: _____

Mary Eaton, Esq.
Wesley R. Powell, Esq.
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY  10019-6099
Tel:  (212) 728-8000
Fax: (212) 728-8111
E-mail:  meaton@willkie.com
         wpowell@willkie.com

CC: All Counsel of Record (via ECF)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x
                                     :

PEN AMERICAN CENTER, INC.,          :
                                       :

                       Plaintiff,          :
                                       :

                - against -          :      Civil Action No. 18-cv-9433-LGS
                                       :

DONALD J. TRUMP, in his official capacity          :
as President of the United States,                    :

                                       :

                     Defendant.          :
------------------------------------------------------------- x


**BRIEF OF FIRST AMENDMENT SCHOLARS**
**AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF**

# TABLE OF CONTENTS

Page

INTEREST OF *AMICI CURIAE* ..........................................................................1

INTRODUCTION .................................................................................................2

ARGUMENT .......................................................................................................5

I.    RIGOROUS PROTECTION OF FREEDOM OF SPEECH AND OF THE PRESS
      IS A CORE CONSTITUTIONAL AND DEMOCRATIC VALUE ...................................5

II.   GOVERNMENTAL TARGETING OF PARTICULAR MEMBERS OF THE
      PRESS EFFECTS A BROAD CHILLING EFFECT THAT IS A COGNIZABLE
      LEGAL INJURY .........................................................................................9

III.  COURTS HAVE TAKEN A BROAD, FLEXIBLE APPROACH TO
      STANDING IN FIRST AMENDMENT CASES ...............................................13

      A.    The Press Has Standing To Challenge Future First Amendment Violations
            By Government Actors Based On The Chilling Effect Of Prior Violations .........13

      B.    Third Parties Have Standing To Seek Relief For First Amendment
            Violations Where, As Here, Practical Barriers Prevent Journalists From
            Pursuing Judicial Relief Directly ..................................................17

IV.   PLAINTIFF HAS STANDING TO PURSUE CLAIMS FOR INJUNCTIVE
      RELIEF ON BEHALF OF ITS MEMBERS AND OTHER MEMBERS OF THE
      PRESS WHOSE EXERCISE OF FIRST AMENDMENT FREEDOMS HAVE
      BEEN CHILLED BY DEFENDANT'S WIDELY REPORTED RETALIATION
      AGAINST DISFAVORED JOURNALISTS AND PRESS ORGANIZATIONS ...........22

CONCLUSION ....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                           <u>Page(s)</u>

*Alliance for Open Society Int'l, Inc. v. U.S. Agency for Int'l. Dev.*,
   651 F.3d 218 (2d Cir. 2011) ................................................................. 12

*Amato v. Wilentz*,
   952 F.2d 742 (3d Cir. 1991) .................................................................. 19

*Arnett v. Kennedy*,
   416 U.S. 134 (1974) .............................................................................. 12

*Ayyad v. Holder*,
   No. 05-CV-02342-WYD-MJW, 2012 WL 4838667 (D. Colo. Oct. 10, 2012) ..................... 4

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ......................................................................... 13, 16

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) .......................................................................... 10, 11

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982) ............................................................................... 9

*Branzburg v. Hayes*,
   408 U.S. 665 (1972) ............................................................................... 7

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) .............................................................................. 18

*Buckley v. Am. Constitutional Law Found., Inc.*,
   525 U.S. 182 (1999) ............................................................................... 3

*Camacho v. Brandon*,
   317 F.3d 153 (2d Cir. 2003) .......................................................... 21, 22, 23

*Campbell v. Louisiana*,
   523 U.S. 392 (1998) .............................................................................. 22

*Cicchetti v. Davis*,
   No. 07-cv-01546, 2008 WL 619013 (S.D.N.Y. Mar. 5, 2008) ...................... 21

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................................. 15

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
   412 U.S. 94 (1973) ................................................................................. 8

*Connick v. Myers*,
   461 U.S. 138 (1983) ................................................................................................ 6

*Cooksey v. Futrell*,
   721 F.3d 226 (4th Cir. 2013) .............................................................................. 13

*Craig v. Boren*,
   429 U.S. 190 (1976) .............................................................................................. 18

*Dangler v. Yorktown Central Sch.*,
   771 F. Supp. 625 (S.D.N.Y. 1991) ........................................................ 20, 21, 22

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ................................................................................ 3

*Eisenstadt v. Baird*,
   405 U.S. 438 (1972) ........................................................................................ 13, 18

*El Dia, Inc. v. Rossello*,
   30 F. Supp. 2d 160 (D.P.R. 1998) .................................................... 19, 20, 21, 22

*Evans v. William Penn Sch. Dist.*,
   No. 01-cv-2270, 2002 WL 1001068 (E.D. Pa. May 14, 2002) .......................... 21

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ................................................................................................ 5

*Ginorio v. Contreras*,
   No. 03-CV-2317, 2008 WL 11424136 (D.P.R. June 13, 2008) ......................... 21

*Grosjean v. Am. Press Co.*,
   297 U.S. 233 (1936) .............................................................................................. 6

*Kucher v. Domino's Pizza, Inc.*,
   No. 16-cv-2492, 2017 WL 2987214 (S.D.N.Y. Feb. 13, 2017) .......................... 4

*Laird v. Tatum*,
   408 U.S. 1 (1972) ................................................................................................ 15

*Lamont v. Postmaster General*,
   381 U.S. 301 (1965) ............................................................................................ 11

*Leathers v. Medlock*,
   499 U.S. 439 (1991) .............................................................................................. 3

*Miami Herald Publishing Co. v. Tornillo*,
   418 U.S. 241 (1974) .................................................................................... 7, 11, 12

*Mills v. Alabama,*
    384 U.S. 214 (1966) ................................................................6, 8

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
    460 U.S. 575 (1983) ..................................................................3

*MTACC, Inc. v. New York State Dep't of Fin. Servs.,*
    No. C14-617 RSM, 2015 WL 300779 (W.D. Wash. Jan. 21, 2015) .......................4

*NAACP v. Button,*
    371 U.S. 415 (1963) ................................................................10

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013).................................................12, 13, 16

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ............................................................5, 8, 11

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.,*
    475 U.S. 1 (1986) ..................................................................8

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 555 (1980) ................................................................7

*Romano v. Harrington,*
    664 F. Supp. 675 (E.D.N.Y. 1987).........................................20, 21, 22

*Roth v. United States,*
    354 U.S. 476 (1957) ................................................................8

*Secretary of State of Maryland v. Joseph H. Munson Co.,*
    467 U.S. 947 (1984) .............................................................17, 18

*Stanley v. Georgia,*
    384 U.S. 557 (196) ..................................................................9

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ................................................................14

*Stromberg v. California,*
    283 U.S. 359 (1931) ................................................................5

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) .............................................................13, 14, 16

*Talley v. California,*
    362 U.S. 60 (1960) .................................................................10

*Thomson v. Cty. of Franklin*,
   15 F.3d 245 (2d Cir. 1994) ...................................................................................................... 3

*United Presbyterian Church in the U.S.A. v. Reagan*,
   738 F.2d 1375 (D.C. Cir. 1984) ............................................................................................. 15

*Virginia v. Am. Booksellers Ass'n Inc.*,
   484 U.S. 383 (1988) ....................................................................................................... 14, 18

**Other Sources**

4 Elliot's Debates on the Federal Constitution 570 (1876) ............................................................ 6

9 Writings of James Madison 103 (G. Hunt ed. 1910) ................................................................... 9

Vincent Blasi, *The Checking Value in First Amendment Theory*,
   1977 Am. B. Found. Res. J. 521 (1977) ................................................................................... 7

Sam Ervin, Jr., *Controlling Executive Privilege*,
   20 Loyola L. Rev. 11 (1974) .................................................................................................... 9

Benjamin Franklin, *On Freedom of Speech and the Press*,
   Pennsylvania Gazette, Nov. 17, 1737 ..................................................................................... 5

Leslie Kendrick, *Speech, Intent, and the Chilling Effect*,
   54 Wm. & Mary L. Rev. 1633 (2013) ............................................................................... 6, 19

Dana Milbank, *The White House revoked my press pass. It's not just me—it's curtailing access
   for all journalists*, The Washington Post (May 8, 2019 5:00 PM),
   https://www.washingtonpost.com/opinions/the-white-house-has-revoked-my-press-pass-
   its-not-just-me--its-curtailing-access-for-all-journalists/2019/05/08/bb9794b4-71c0-11e9-
   8be0-ca575670e91c .............................................................................................................. 17

Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"*
   58 B.U. L. Rev. 685 (1978) ........................................................................................ 5, 10, 12

Julianne Schultz, *Reviving the Fourth Estate: Democracy, Accountability and the Media*
   49 (1998) .................................................................................................................................. 6

Robert A. Sedler, *The First Amendment in Litigation: The "Law of the First Amendment,"* 48
   Wash. & Lee L. Rev. 457 (1991) ........................................................................................... 10

Sonja R. West, *The "Press," Then & Now*,
   77 Ohio State L.J. 49 (2016) ................................................................................................... 7

Monica Youn, *The Chilling Effect and the Problem of Private Action*,
   66 Vand. L. Rev. 1473 (2013) ............................................................................................... 10

## INTEREST OF *AMICI CURIAE*

*Amici* law professors are experts on First Amendment law who have dedicated their academic careers to First Amendment scholarship.[1]  Through their teaching, research, and publishing, *amici* seek to educate the legal community, policymakers, and the public about First Amendment history and precedent and the critical role of the First Amendment in the formation and preservation of American democracy.  Through this brief, *amici* seek to aid this Court's consideration of the critical role of First Amendment litigation in securing freedom of the press, and the threat to democratic values and process posed by Defendant's cabined approach to standing set forth in his motion to dismiss (the "Motion")[2].  In particular, *amici* seek to highlight the harms to democratic values and process that would stem from endorsing Defendant's proposed test for standing to assert First Amendment claims, which—if adopted—would allow the government to silence its critics, stymie the press's ability to play its critical role in our constitutional system, and deprive the American public of the benefit of hearing a variety of perspectives on matters of public concern and debate.  *Amici* are listed in the Appendix to this brief.[3]

---

[1]    Counsel for both Plaintiff and Defendant have informed Amici that they do no oppose the filing of this brief.

[2]    "Motion" or "Mot." refers to Defendant's Memorandum of Law in Support of His Motion to Dismiss Plaintiff's Amended Complaint (ECF 46), filed April 10, 2019.

[3]    *Amici*'s employment and titles are listed in the Appendix for identification purposes only.

# INTRODUCTION

This case presents important issues with respect to the vital role of a free press in our democratic process and the power of the judiciary to enforce the First Amendment's guarantee of freedom of the press.

The Amended Complaint[4] alleges that Defendant, the President of the United States, has sought to chill press reporting critical of him through a deliberate pattern and practice of attacking the press and retaliating against high-profile journalists and media organizations that express views on public issues contrary to those that he expresses himself.  Defendant's assault on the press has been sweeping, trenchant and unprecedented.  Among other things, he has declared that the press is the "enemy of the people" (echoing the words of Joseph Stalin, the infamous Soviet dictator), sent over 1300 tweets critical of the press by the end of his second year in office, an average of two per day since his swearing in, and revoked the press credentials of disfavored reporters.  (Am. Compl. ¶ 3.)  The intended targets of Defendant's strategy are not merely specific individuals and organizations who have been the subject of particular attacks—of which there have been several—but *all* journalists, press organizations, and others who, by Defendant's design, are meant to conclude that any critical reporting of their own will draw an equally swift and harsh rebuke from the President, exposing them to threats against their personal safety and putting their professional careers in jeopardy.[5]  Unsurprisingly, that strategy

---

[4]   "Amended Complaint" and "Am. Compl." refer to Plaintiff's Amended Complaint for Declaratory and Injunctive Relief (ECF 38), filed February 6, 2019.

[5]   *See* Am. Compl. ¶¶ 31 (removal of journalist Jorge Ramos from press conference during campaign); ¶¶ 33–41 (revocation of White House press credentials of Jim Acosta of CNN and threats to do likewise to April Ryan—who received death threats thereafter—and other reporters from *The Washington Post*, CNN, and *NBC News*); ¶¶ 49–54 (revocation of security clearances for six former national security officials for adverse public commentary about Defendant); ¶¶ 55–73 (threatened executive order setting special postal rate applicable to Amazon shipments, in retaliation for critical press coverage by *The Washington Post*, also

has been successful:  almost one-third of Plaintiff's members reported "avoiding posting, writing, or speaking on a particular topic due to concern about personal or professional repercussions" resulting from Defendant's retaliatory acts.  (Am. Compl. ¶ 96.)

The allegations of the Amended Complaint—which must be taken as true for the purposes of the Motion[6]—describe governmental conduct and its resulting negative impact on the press that the First Amendment was specifically designed to prevent.  Indeed, First Amendment jurisprudence has long recognized the central role of the press in reporting the facts on governmental activity that form the basis of the public's democratic decision-making and the concomitant threat to the democratic process posed by governmental interference with the work of the free press.  *See, e.g., Leathers v. Medlock*, 499 U.S. 439, 447 (1991) (a free press "plays a unique role as a check on government abuse"); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (a free press serves "as an important restraint on government").  As such, the First Amendment's protection of "freedom of speech, and of the press," is at its "zenith" when members of the press report on government officials' conduct in the course of their official duties.  *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 187 (1999).  This First Amendment protection extends not just to the journalist directly targeted by an act of governmental retaliation, but also to those who witness such retaliation and stop or compromise their reporting in response to a credible threat of similar treatment—*i.e.*, those who

---

owned by Jeff Bezos); ¶¶ 74–86 (commencement of Department of Justice enforcement action to enjoin AT&T/Time Warner merger in retaliation for CNN news coverage and threats of other regulatory action against social media companies); and ¶¶ 87–92 (threatened revocation of NBC's broadcast license in response to alleged "Fake News").

[6] *Thomson v. Cty. Of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) ("When considering a party's standing, we 'accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'") (citation omitted); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (same).

experience a "chilling effect."  From the perspective and experience of *amici*, one would be hard pressed to find in First Amendment jurisprudence a pattern and practice of executive branch assault on the free press more deleterious to democratic norms or more likely to impose a chilling effect on journalists than that alleged in the Amended Complaint.

By constitutional design, the federal judiciary stands as the ultimate bulwark against governmental action imposing a chilling effect on freedom of speech and freedom of the press. In the Motion, however, Defendant argues that Plaintiff and its members should be denied the opportunity to seek relief from the courts unless and until they become specific targets of Defendant's wrath because they allegedly lack "standing" to sue.  (Def.'s Mem. 5-13.)[7]  But the Motion studiously ignores the federal courts' actual, flexible approach to standing in the First Amendment context, an approach specifically developed to avoid the erosion of constitutional values that would result if those suffering from a chilling effect were prevented from mounting a legal challenge by the application of rigid standing rules.

If the First Amendment's prohibition against the chilling of political speech is to have any meaning, the Court must apply those flexible standing rules here and allow this case to proceed.[8]

---

[7]  "Def.'s Mem." refers to Defendant's Memorandum In Support of His Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 46), filed April 10, 2019.

[8]  At a minimum, the Court should permit Plaintiff to obtain jurisdictional discovery before ruling on any dismissal motion.  *See Kucher v. Domino's Pizza, Inc.*, No. 16-cv-2492, 2017 WL 2987214, at *13 (S.D.N.Y. Feb. 13, 2017) (holding that "it would be inappropriate to dismiss the Complaint without an opportunity for jurisdictional discovery" when the allegations in the Complaint sufficiently demonstrate that the defendants "may be" subject to personal jurisdiction); *MTACC, Inc. v. New York State Dep't of Fin. Servs.*, No. C14-617 RSM, 2015 WL 300779 (W.D. Wash. Jan. 21, 2015) (ordering jurisdictional discovery on the existence of a threat that could satisfy the injury in fact requirement); *Ayyad v. Holder*, No. 05-CV-02342-WYD-MJW, 2012 WL 4838667, at *9 (D. Colo. Oct. 10, 2012) (authorizing "discovery on the disputed jurisdictional facts at issue regarding his First Amendment claims").

In *amici*'s respectful submission, any other approach would effectively insulate Defendant's First Amendment violations from judicial review and place Defendant above the law.

## ARGUMENT

I.  RIGOROUS PROTECTION OF FREEDOM OF SPEECH AND OF THE PRESS IS A CORE CONSTITUTIONAL AND DEMOCRATIC VALUE.

"Freedom of speech is a principal pillar of a free government; when this support is taken away, the constitution of a free society is dissolved, and tyranny is erected on its ruins." Benjamin Franklin, *On Freedom of Speech and the Press*, Pennsylvania Gazette, Nov. 17, 1737. This sentiment has guided the Supreme Court's First Amendment jurisprudence from its inception through to today:  "[t]he maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system."  *Stromberg v. California*, 283 U.S. 359, 369 (1931); *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government"); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (highlighting the nation's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open").

The First Amendment's role as "principal pillar" of American democracy goes beyond a mere prohibition on governmental restrictions on free speech.  Rather, freedom of speech is itself an "affirmative value."  Frederick Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"* 58 B.U. L. Rev. 685, 691 (1978).  This means that, "we are concerned with encouraging speech almost as much as with preventing its restriction by the government," because, if "no one was willing to discuss public issues, express new opinions, or exchange ideas

and information, society would no doubt suffer." *Id.* To preserve this "affirmative value," courts have recognized that other "legal rules must show special solicitude" toward free expression. Leslie Kendrick, *Speech, Intent, and the Chilling Effect*, 54 Wm. & Mary L. Rev. 1633, 1650 (2013), citing *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal citations omitted). Accordingly, when freedom of speech "conflicts with other state values—such as the interest in regulating unprotected expression—it must receive more weight." Kendrick, 54 Wm. & Mary L. Rev. at 1650.

Since the dawn of the Republic, the press has played a uniquely important role in our constitutional scheme. For example, Edmund Burke is credited with first identifying the press as a fourth branch of government requiring protection: "there were three Estates . . . but, in the Reporters' Gallery yonder, there sat a *Fourth Estate* more important far than they all." Julianne Schultz, *Reviving the Fourth Estate: Democracy, Accountability and the Media* 49 (1998). James Madison sounded a similar theme in protesting President Adams's proposal regarding the Alien and Sedition Act, noting that "[i]n every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description . . . . On this footing the freedom of the press has stood; on this foundation it yet stands." 4 Elliot's Debates on the Federal Constitution 570 (1876). For these reasons, the courts have been particularly vigilant in enforcing First Amendment rights of the press to gather and report the news and are particularly skeptical of efforts to block, curtail, or censor those rights. *See, e.g.*, *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("A free press stands as one of the great interpreters between the government and the people. To allow it to be fettered is to fetter ourselves."); *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (noting "the Framers of our Constitution thoughtfully and deliberately" sought to protect "the right of the press to praise or

criticize governmental agents"). That protection forms a key part of the public's constitutional protections, because:

> the most well-known structural role of the press is the checking function. Through the checking function of the press, as described by Professor Vincent Blasi in his influential 1977 article, the public protects itself from "the inherent tendency of government officials to abuse the power entrusted to them." The checking function is, according to Blasi, most likely "the single value that was uppermost in the minds of the persons who drafted and ratified the First Amendment."

Sonja R. West, *The "Press," Then & Now*, 77 Ohio State L.J. 49, 68-69 (2016) (citing Vincent Blasi, *The Checking Value in First Amendment Theory*, 1977 Am. B. Found. Res. J. 521, 527, 538 (1977)).

The First Amendment extends its protections to multiple dimensions of the work of the press. For example, in *Richmond Newspapers, Inc. v. Virginia*, the Supreme Court overruled a Virginia trial court's decision to close a trial to the public, holding that the First and Fourteenth Amendments guarantee the right of the public and the press to attend a criminal trial absent an overriding and opposing interest. 448 U.S. 555, 589 (1980). In so holding, the Court affirmed that the right to publish implies the right to gather information, reasoning that, "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 576–77 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 679 (1972)).

First Amendment protection likewise extends to issues of editorial discretion, such as which topics to cover and which journalists to task with coverage of particular topics or events. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 243 (1974), for instance, the Court held that a Florida right-to-reply statute "granting a political candidate a right to equal space to reply to criticism and attacks on his record by a newspaper" violated the First Amendment guarantee of a free press. Writing for a unanimous Court, Chief Justice Burger explained that,

> [t]he choice of material to go into a newspaper, and the decisions
> made as to the limitations on the size and content of the paper, and
> treatment of public issues and public officials — whether fair or
> unfair — constitute the exercise of editorial control and judgment.
> It has yet to be demonstrated how governmental regulation of this
> crucial process can be exercised consistent with First Amendment
> guarantees of a free press as they have evolved to this time.

*Id.* at 258.  *See also Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94 (1973)

(reversing the lower court's decision imposing a constitutional right of access on the broadcast

media and holding that, pursuant to the First Amendment, the broadcast media is not required to

accept editorial advertisements); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of Cal.*, 475

U.S. 1 (1986) (holding the California Public Utilities Commission's order that the plaintiff

electric utility include third-party newsletters in its billing envelopes impermissibly burdened the

utility company's First Amendment rights).

The right of the press to write and publish on matters of public concern is similarly

protected under the First Amendment "to assure unfettered interchange of ideas for the bringing

about of political and social changes desired by the people." *Sullivan*, 376 U.S. at 269 (quoting

*Roth v. United States*, 354 U.S. 476, 484 (1957)).  For this reason, restraints on press

organizations' publication of reports on matters of public concern are subject to close scrutiny.

*See, e.g., id.* at 279 (defamation claim based on press reporting on matters of public concern

cognizable only where defendant can be shown to have acted with actual malice); *Mills*, 384 U.S.

at 219 ("Thus the press serves and was designed to serve as a powerful antidote to any abuses of

power by government officials and as a *constitutionally chosen* means for keeping officials

elected by the people responsible to all the people whom they were selected to serve." (emphasis

added)).

Finally, the public's right to receive information is also well settled under the First

Amendment.  In *Stanley v. Georgia*, a unanimous Court held that the freedom of speech and the

press "necessarily protects" the right to receive information and ideas.[9]  394 U.S. 557, 564

(1969).  This is because "[i]t is an uncontestable pre-condition of democratic government that the

people have information about the operation of their government in order to make informed

choices at the polls."  Sam Ervin, Jr., *Controlling Executive Privilege*, 20 Loyola L. Rev. 11

(1974).

Taken together, this First Amendment scholarship and jurisprudence stands for the

proposition that the work of a free press—news gathering, publication, and exercise of editorial

discretion—and the public's free access to it are more than merely freedoms to be enjoyed.  They

are essential ingredients of a constitutional democracy, requiring vigilant protection by the

courts.

II.   GOVERNMENTAL TARGETING OF PARTICULAR MEMBERS OF THE PRESS
      EFFECTS A BROAD CHILLING EFFECT THAT IS A COGNIZABLE LEGAL
      INJURY.

When a government actor takes action directed at an individual journalist or press

organization—by imposing conditions on its right to cover events, exacting retribution for

adverse press coverage, or otherwise seeking to restrict its activity—he or she impairs the

target's First Amendment right to freely report on matters of public concern.  But that sanction

often has a broader and more pernicious impact:  it deters future expressive activity by other

---

[9]   The Supreme Court later emphasized the connection between these freedoms and political
freedom, quoting James Madison:  "A popular Government, without popular information, or
the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.
Knowledge will forever govern ignorance:  And a people who mean to be their own
Governors, must arm themselves with the power which knowledge gives."  *Bd. of Educ.,
Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (quoting 9
Writings of James Madison 103 (G. Hunt ed. 1910)).  That warning was worth remembering,
in the Court's opinion, because "the right to receive ideas is a necessary predicate to the
recipient's meaningful exercise of this own rights of speech, press, and political freedom."
*Id.*

members of the press who, in an effort to avoid similar censure, modify their own reporting accordingly.  This impact, known as a chilling effect, occurs "when a governmental action creates a consequence that deters an individual from exercising expressive rights."  Monica Youn, *The Chilling Effect and the Problem of Private Action*, 66 Vand. L. Rev. 1473, Introduction (2013).

First Amendment jurisprudence has long recognized the importance of the chilling effect, with it being described as "[p]erhaps the most fundamental and pervasive concept in the law of the First Amendment . . . ."  Robert A. Sedler, *The First Amendment in Litigation:  The "Law of the First Amendment,"* 48 Wash. & Lee L. Rev. 457, 463 (1991).[10]  Government actions that chill free speech violate the Constitution because "[t]he threat of sanctions may deter the[] exercise [of First Amendment rights] almost as potently as the actual application of sanctions."  *NAACP v. Button*, 371 U.S. 415, 433 (1963); *see also Talley v. California*, 362 U.S. 60, 65 (1960) (striking down law requiring identification of speakers based on alleged chilling effects: "identification and fear of reprisal might deter perfectly peaceful discussions of public matters of importance").

Critically, even generalized expression of government disapproval can produce a chilling effect and violate the First Amendment.  In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that the plaintiff book publishers' First Amendment rights had been injured when a state

---

[10]  Such consequences can be direct, occurring "where one is deterred from undertaking a certain action X as a result of some possible consequence Y" and also indirect, occurring "when the deterrence does not stem from the direct restriction, but as an indirect consequence of the restriction's application."  Youn, *The Chilling Effect*, 66 Vand. L. Rev. at 1481. Indeed, a chilling effect can occur "when individuals seeking to engage in activity protected by the [F]irst [A]mendment are deterred from so doing by governmental regulation not specifically directed at that protected activity."  Schauer, *Fear, Risk and the First Amendment: Unraveling the "Chilling Effect,"* 58 B.U. L. Rev. at 693.

commission issued notices of objection to the publishers' exclusive distributor.  372 U.S. 58, 61

(1963).  The effect of the notices was "clearly to intimidate the various book and magazine

wholesale distributors and retailers and to cause them by reason of such intimidation and threat of

prosecution" to limit the distribution of publications targeted by the notice.  *Id.* at 62–64.

Recognizing that "the freedoms of expression in general . . . are vulnerable to gravely damaging

yet barely visible encroachments," the Court found that "informal censorship may sufficiently

inhibit the circulation of publications to warrant injunctive relief."  *Id.* at 66–68 (noting the

Commission "[was] limited to informal sanctions").  Similarly, in *Lamont v. Postmaster General*,

the Supreme Court enjoined enforcement of a statute requiring the United States Postal Service to

detain foreign communist political mailings and deliver such mailings only upon request of

addressees on First Amendment grounds.  381 U.S. 301 (1965).  The Court reasoned that future

recipients of such mailings would be unlikely to come forward to receive mail that had been

explicitly disapproved of by the government, and thus expression would be chilled.  *Id.* at 307

("[A]ny addressee is likely to feel some inhibition in sending for literature which federal officials

have condemned as 'communist political propaganda.'" (quoting *Sullivan*, 376 U.S. at 270)).

Likewise, the mere threat of a consequence for publication may be enough to produce a

chilling effect on the press, as the Supreme Court has also recognized.  In *Miami Herald*, for

instance, the Court unanimously held that a "right of access" law requiring that subjects of a

newspaper's critical editorials be given the opportunity to publish a response in the same paper

was an unconstitutional infringement on speech because of its potential to deter future

publication of critical editorials out of fear of the right of reply penalty.  418 U.S. at 257.  The

Court reasoned that:

> "[f]aced with the penalties that would accrue to any newspaper that published news or commentary arguably within the reach of the right-of-access statute, editors might well conclude that the safe course is to avoid controversy. Therefore, under the operation of the Florida statute, political and electoral coverage would be blunted or reduced."

*Id.*

As the Court has repeatedly recognized, specifically targeting members of the press can stifle journalistic activity at its incipiency. "[T]he value of a sword of Damocles is that it hangs—not that it drops. For every [person] who risks his job by testing the limits of the statute, many more will choose the cautious path and not speak at all." *Arnett v. Kennedy*, 416 U.S. 134, 231 (1974) (Marshall, J., dissenting). First Amendment scholars have echoed this concern:

> "[d]eterred by the fear of punishment, some individuals refrain from saying or publishing that which they lawfully could, and indeed, should. This is to be feared not only because of the harm that flows from the non-exercise of a constitutional right, but also because of general societal loss which results when the freedoms guaranteed by the first amendment are not exercised."

Schauer, 58 B.U. L. Rev. at 693. The fundamental teaching of this jurisprudence and scholarship is that governmental targeting of specific members of the press can broadly stifle reporting on matters of public concern, to the detriment of our core democratic values.

Consistent with these authorities recognizing that a credible threat of adverse consequences for publication can inhibit free speech, courts within this Circuit and elsewhere have found that the imposition of a chilling effect—and in particular the act of self-censorship—constitutes cognizable injury in the First Amendment context. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) (allegation of "self-censorship" is a "harm that can be realized even without an actual prosecution" for prohibited speech); *Alliance for Open Society Int'l, Inc. v. U.S. Agency for Int'l. Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (Defendant's alleged policy requiring funding recipients to oppose prostitution effectively forced them to "self-censor

- 12 -

[] prostitution-related speech at conferences," constituting "actual or imminent harm."); *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship" (citation omitted)).

## III. COURTS HAVE TAKEN A BROAD, FLEXIBLE APPROACH TO STANDING IN FIRST AMENDMENT CASES.

Because courts have recognized the critical importance of curtailing the chilling of free speech in its incipiency, standing rules in First Amendment cases are relaxed, including (and especially) in the context of pre-enforcement challenges. *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech."); *Nat'l Org. for Marriage*, 714 F.3d at 689 ("Despite the language of *Lujan* and similar cases, however, we assess pre-enforcement First Amendment claims, such as the ones NOM brings, under somewhat relaxed standing and ripeness rules.").

### A. The Press Has Standing To Challenge Future First Amendment Violations By Government Actors Based On The Chilling Effect Of Prior Violations.

It is a matter of black letter constitutional law that courts "have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (holding that a plaintiff satisfies the injury-in-fact requirement where she has alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder"). Furthermore, past enforcement action is probative of the likelihood of future constitutional violations of a similar nature; the Court "ha[s] observed that past enforcement against the same conduct is good evidence that the threat of

enforcement is not chimerical." *Susan B. Anthony List*, 573 U.S. at 164 (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)) (quotations omitted).  *See also Virginia v. Am. Booksellers Ass'n Inc.*, 484 U.S. 383 (1988) (holding plaintiffs established standing on the basis of threatened injury in the form of costly compliance measures they would need to implement to avoid risking criminal prosecution).

 *Steffel v. Thompson* is instructive.  There, the Court found standing where the petitioner had been threatened with arrest by police officers and had left to avoid arrest while his companion remained at the site and was arrested.  415 U.S. 452, 459 (1974).  The Court recognized that the petitioner had been threatened with adverse consequences as a result of engaging in constitutionally protected activity and, although only his companion was arrested, "[t]he prosecution of petitioner's handbilling companion is ample demonstration that petitioner's concern with arrest has not been chimerical."  *Id.* ("In these circumstances, it is not necessary that petitioner first expose himself to actual arrest or prosecution to [bring a claim challenging government conduct] he claims deters the exercise of his constitutional rights.").  Completing the chilling effect imposed by the prosecution of his companion, the petitioner had self-censored in response to a credible threat—by discontinuing distributing handbills and leaving the area where the events had occurred.  *Id.*

 In other words, it is sufficient for purposes of Article III standing to satisfy "injury-in-fact" in First Amendment cases by establishing a well-founded fear of enforcement and some sort of self-censorship as a result of that fear.  Defendant argues nonetheless that the injuries alleged by Plaintiff are insufficient "first because any such chilling is subjective and, second, because it is

insufficiently imminent." (Def.'s Mem. 9.)[11] Defendant insists that the Supreme Court has rejected allegations of "subjective chill" as insufficient to establish standing for the purposes of a First Amendment claim against the Executive branch, citing *Laird v. Tatum*, 408 U.S. 1 (1972), and *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), in support. (Def.'s Mem. 9.)

Defendant's arguments, however, ignore the substantial differences between the allegations of the Amended Complaint and the claims asserted in *Laird* and *Clapper*. In *Laird*, plaintiffs' allegations of a chilling effect resulted from "the mere existence, without more, of a governmental investigative and data-gathering activity," which lacked the necessary nexus between the harm asserted to the governmental actions challenged and the plaintiffs bringing suit. 408 U.S. at 10. Similarly, in *Clapper*, plaintiffs' "argument rest[ed] on their highly speculative fear" and their "theory of standing . . . relies on a highly attenuated chain of possibilities." 568 U.S. at 410.[12]

By contrast, Plaintiff does not allege a mere "subjective chill." To the contrary, Plaintiff alleges in painstaking detail a pattern and practice by Defendant of (i) closely monitoring press coverage of himself, (ii) identifying journalists and news organizations that publish coverage critical of him, and (iii) exacting swift and harsh retribution by either threatening or actually taking adverse action. (*See* n.3, *supra*.) The many, and extreme, public examples of presidential retribution are more than sufficient to demonstrate to Plaintiff and other third-party members of the press that there is an objective, "credible threat" of enforcement against any others who

---

[11] "Def.'s Mem." refers to Defendant's Memorandum In Support Of His Motion To Dismiss Plaintiff's Amended Complaint (ECF No. 46), filed April 10, 2019.

[12] Defendant also cites *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378–80 (D.C. Cir. 1984), for this same proposition. (Def.'s Mem. 9.) That case, however, involved a challenge to an executive order addressing foreign intelligence collection procedures and limitations, and the court found "no part of the challenged scheme imposes or even relates to any direct governmental constraint upon the plaintiffs."

likewise publish critical coverage of Defendant, not a mere "subjective" fear of such action.  *See*

*Susan B. Anthony*, 573 U.S. at 152 (finding plaintiffs had alleged a sufficiently imminent injury

for Article III standing purposes where plaintiffs alleged a "credible threat" of enforcement but

no action had yet been taken against them); *Nat'l Org. for Marriage*, 714 F.3d at 689 ("[W]e

assess pre-enforcement First Amendment claims, such as the ones [plaintiff] brings, under

somewhat relaxed standing and ripeness rules.  A plaintiff must allege something more than an

abstract, subjective fear that his rights are chilled in order to establish a case or controversy.  But

a real and imminent fear of such chilling is enough.") (finding standing for plaintiffs alleging the

threat of falling under an election law would chill their political speech) (internal citations

omitted).  Moreover, the Amended Complaint specifically alleges acts of self-censorship by

Plaintiff, its members, and other journalists.  (*See, e.g.*, Am. Compl. ¶ 96 (describing survey

results reporting that over one-third of Plaintiff's members have self-censored in response to

Defendant's conduct) and ¶¶ 102–11 (describing Plaintiff's diversion of resources to respond to

Defendant's prior and prospective attacks on the press).)

Defendant also misses the mark in asserting that any potential threat of future

enforcement directed at Plaintiff, its members, and other press organizations is insufficiently

"imminent" to support standing.  Again, the well-pleaded allegations of the Amended Complaint

lay bare any possible claim that Defendant's potential future enforcement directed at Plaintiff or

other members of the press community is "imaginary or wholly speculative."  *Babbitt*, 442 U.S.

at 302.  Indeed, Defendant's clear pattern and practice—with regular episodes of critical

coverage met by a swift and harsh response—alone is sufficient to demonstrate a credible fear of imminent enforcement against any future publication of adverse coverage.[13]

Ultimately, Defendant's arguments are inconsistent with the Constitution's commands and would permit the government to immunize from judicial review repeatable, highly predictable violations of the First Amendment's protections for members of the press.  Contrary to Defendant's arguments, a plaintiff who faces a credible threat of retaliatory action in response to the exercise of protected expressive activity (as here) has standing under Article III to seek relief.

> **B.    Third Parties Have Standing To Seek Relief For First Amendment Violations Where, As Here, Practical Barriers Prevent Journalists From Pursuing Judicial Relief Directly.**

In the Motion, Defendant also relies on the general rule that a plaintiff must assert its own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties.  (Def.'s Mem. 5–6.)  However, the Supreme Court has long recognized an important exception to this rule in "situations where competing considerations outweigh any prudential rationale against third-party standing . . . ."  *Secretary of State of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 956 (1984).  This doctrine, known as *jus tertii*, applies in circumstances in which "practical obstacles prevent a party from asserting rights on behalf of itself."  *Id.*  In such cases, the "Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can

---

[13]  Most recently, the White House changed its press credentialing standards in a manner that "designated as unqualified almost the entire White House press corps, including all seven of The [Washington] Post's White House correspondents."  Dana Milbank, *The White House revoked my press pass.  It's not just me—it's curtailing access for all journalists*, The Washington Post (May 8, 2019 5:00 PM), https://www.washingtonpost.com/opinions/the-white-house-has-revoked-my-press-pass-its-not-just-me--its-curtailing-access-for-all-journalists/2019/05/08/bb9794b4-71c0-11e9-8be0-ca575670e91c.

reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Id.* (citing *Craig v. Boren*, 429 U.S. 190, 193–94 (1976) (permitting a shopkeeper to assert the constitutional rights of prospective customers)).

Courts and scholars also generally recognize that *jus tertii* standing may be especially appropriate in First Amendment litigation as "[w]ithin the context of the First Amendment the Court has enunciated other concerns that justify a lessening of prudential limitations on standing." *Munson*, 467 U.S. at 956; *see also Am. Booksellers Ass'n*, 484 U.S. at 393 (noting an exception to third-party standing doctrine in First Amendment cases "applies here, as plaintiffs have alleged an infringement of the First Amendment rights of bookbuyers"). First Amendment cases demand this special solicitation because, "[e]ven where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity." *Munson*, 467 U.S. at 956. In such cases, the Court has recognized that, "[s]ociety as a whole then would be the loser," and therefore "when there is a danger of chilling free speech," constitutional avoidance concerns may be outweighed by society's interest in judicial review of the offending governmental activity. *Id.* at 956–57 (citing *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)); *see also Baird*, 405 U.S. at 445 (permitting litigant to assert rights of third parties to enable enforcement of First Amendment rights).

The flexible approach taken to third-party standing in the First Amendment context has its roots in the First Amendment doctrine of overbreadth, which governs judicial review of laws that are purportedly intended to regulate activity that is not protected by the First Amendment, but which nonetheless reach—and therefore chill—protected expression. Under the overbreadth doctrine, an individual or entity whose speech is unprotected and

> who would have been reached by a properly drawn law [] nevertheless may challenge the overbroad law. They may do so . . . because the law is chilling would-be speakers of protected expression who stay silent to avoid prosecution but thereby lose the opportunity to challenge the law. The overbroad law essentially exerts a chilling effect on its own appropriate judicial review, the remedy to which is a special standing rule.

Kendrick, 54 Wm. & Mary L. Rev. at 1653.

Following this reasoning, and to guard against a chill of protected rights, courts have relaxed standing rules outside of overbreadth challenges. *See Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991) ("We too will consider the potential chilling in this case even though [the] claim is not a conventional one of statutory overbreadth."). Numerous courts have applied this doctrine of third-party prudential standing in First Amendment retaliation cases.

For example, in *El Dia, Inc. v. Rossello*, 30 F. Supp. 2d 160 (D.P.R. 1998), the district court found that a cement company, which was owned in substantial part by a newspaper publisher, had standing to sue for damages arising from allegedly retaliatory actions undertaken by Puerto Rico's governor and his administration in violation of the publisher's free speech rights. Similar to the instant case, the publisher of *El Nuevo Dia* brought a First Amendment retaliation claim alleging that Governor Rossello had retaliated directly for critical news coverage by withdrawing advertising contracts in the newspaper. *Id.* at 164. Plaintiffs also alleged that defendants retaliated against the business interests of the owners of *El Nuevo Dia* in targeting the cement company for reprisals by revoking government approvals as well as threatening to levy administrative fines among other incidents. *Id.* The district court found that the cement company "has allegedly been retaliated against because *El Dia*, a large shareholder, has publicly criticized the Rossello administration," and "[b]oth cases concern alleged retaliation against a third party based on a closely-related party's expression of free speech." *Id.* at 171.

Critically, the district court noted that while *El Dia* "could vindicate its own free-speech rights," without third-party standing, "an avenue for retaliation" would remain "wide open, with impunity." This circumstance would deprive *El Dia* of the "full protection of its constitutional rights." *Id.* at 172. In this regard, "[t]he purpose of the third-party standing doctrine in First Amendment law is not primarily for the benefit of the litigant but for the benefit of society—to prevent the [action] from chilling the First Amendment rights of other parties." *Id.* (quoting *Munson*, 467 U.S. at 957) (internal quotation marks omitted).

In *Romano v. Harrington*, 664 F. Supp. 675 (E.D.N.Y. 1987), the plaintiff was a high school faculty advisor who sought third-party standing to challenge his termination in retaliation for the publication of a controversial article written by a student. In applying the "standing test for *jus tertii* claims," the district court recognized that the school's principal's actions "could result in inhibiting free speech." *Id.* at 678. The alleged unconstitutional retaliatory actions "may chill another advisor's willingness to give student writers the level of constitutional freedom to which they are entitled and may circumscribe the student editors' decisions regarding what to publish because of their concerns of indirect retaliation against their advisor or direct retaliation against a member of the student body." *Id.* Thus, the district court concluded, "[b]ased on the relaxation of the First Amendment standing requirements," the "students' enjoyment of their First Amendment rights [was] inextricably bound up with plaintiff's role as faculty advisor . . . ." *Id.* at 681.

And in *Dangler v. Yorktown Central Sch.*, 771 F. Supp. 625 (S.D.N.Y. 1991), this Court examined a claim brought by a high school student that involved the denial of his admittance into the National Honor Society in alleged retaliation for his father's protected free-speech activity. The district court held that the student had standing, notwithstanding the father's ability to

defend his own rights, so as to "discourage the subtle type of retaliation for exercising first amendment rights which may have been in operation in this case." *Id.* at 630–31. *Accord Camacho v. Brandon*, 317 F.3d 153, 159 (2d Cir. 2003) (finding political aide had standing to bring retaliation claim on the basis of votes made by his legislator-employer); *Ginorio v. Contreras*, No. 03-CV-2317, 2008 WL 11424136, at *9 (D.P.R. June 13, 2008) (citing *Romano, Dangler,* and *El Dia* to find standing for a political discrimination claim); *Cicchetti v. Davis*, No. 07-cv-01546, 2008 WL 619013, at *5 (S.D.N.Y. Mar. 5, 2008) (finding standing to hear a First Amendment retaliation claim from a municipal commissioner who had been fired in retaliation for associating with the publisher of a local newspaper which had published negative news articles and editorials about the defendant-mayor); *Evans v. William Penn Sch. Dist.*, No. 01-cv-2270, 2002 WL 1001068, at *2 (E.D. Pa. May 14, 2002) (finding standing where plaintiff-student asserted retaliation claim on the basis of a relative's exercise of her First Amendment rights). In *Camacho*, the Second Circuit upheld the District Court's finding that a legislative aide who was fired in retribution for a city councilor's legislative vote had third-party standing to sue for the violation of that city councilmember's First Amendment rights. 317 F.3d at 153. The Second Circuit found that the city councilmember might be hindered in pursuing an action for the violation of his rights due to the absence of direct economic harm to him from his legislative aide's firing, and "the possibility that instituting litigation on his own behalf may only incur further retribution." *Id.* at 160.

IV.   PLAINTIFF HAS STANDING TO PURSUE CLAIMS FOR INJUNCTIVE RELIEF ON
BEHALF OF ITS MEMBERS AND OTHER MEMBERS OF THE PRESS WHOSE
EXERCISE OF FIRST AMENDMENT FREEDOMS HAVE BEEN CHILLED BY
DEFENDANT'S WIDELY REPORTED RETALIATION AGAINST DISFAVORED
JOURNALISTS AND PRESS ORGANIZATIONS.[14]

For cases such as these, this Circuit has articulated a three-part test for third-party

standing that requires the plaintiff to demonstrate:  (1) injury to the plaintiff; (2) a close

relationship between the plaintiff and the third party that would cause plaintiff to be an effective

advocate for the third party's rights; and (3) "some hindrance to the third party's ability to

protect his or her own interests."  *Camacho*, 317 F.3d at 159 (quoting *Campbell v. Louisiana*,

523 U.S. 392 (1998)).  The Amended Complaint adequately pleads each element of the Second

Circuit's test, qualifying Plaintiff for *jus tertii* standing here for the same reasons the plaintiffs

had standing to assert third-party claims in *El Dia*, *Romano*, and *Dangler*.

First, Plaintiff has alleged direct and cognizable harms suffered as a result of Defendant's

retaliatory actions—*e.g.*, having to divert significant resources in response to retaliatory actions

and threats of retaliatory actions undertaken by Defendant.  (*See* Am. Compl. ¶¶ 102–11.)

Moreover, Plaintiff has alleged direct harm to its members, namely Jim Acosta at CNN.  (*Id.* ¶¶

38–42.)

Second, the injuries of non-member journalists whose exercise of press freedoms have

been chilled by Defendant's conduct are inextricably linked to Plaintiff's institutional mission of

protecting and advocating for journalists:  "PEN America monitors the government's interactions

with writers and journalists and produces informational content related to its advocacy work,"

and its members "work for a wide variety of media entities, including organizations whose

---

[14]   *Amici* support, but do not address herein, Plaintiff's claim of direct and associational standing
to pursue the claims in the Amended Complaint.

mission it is to gather and report the news." (Am. Compl. ¶¶ 24–27.)  Thus the harms to Plaintiff are entwined with the harms to the broader press community.

Third, Plaintiff focuses on "long-term advocacy on behalf of individual writers who are being punished because of the content of their speech." (Am. Compl. ¶ 24.)  This alignment with the interests of writers and journalists whose activities have been chilled ensures that Plaintiff would be an effective third-party advocate for the broader press community.

And fourth, as the Second Circuit recognized in *Camacho*, a victim of a First Amendment infringement may be hindered in bringing a direct claim as "the possibility that instituting litigation on his own behalf may only incur further retribution."  *Camacho*, 317 F.3d at 160. This circumstance makes Plaintiff's *jus tertii* standing all the more critical.

**<u>CONCLUSION</u>**

For these reasons, *amici* respectfully request that this Court deny Defendant's motion to dismiss.

Dated:  May 10, 2019
New York, New York.

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

By: _____

Mary Eaton, Esq.
Wesley R. Powell, Esq.
787 Seventh Avenue
New York, NY 10019-6099
Tel: (212) 728-8000
Fax: (212) 728-8111

## Appendix

### *Amici*

**Erwin Chemerinsky** is the Dean of the School of Law at the University of California at Berkeley and Jesse H. Choper Distinguished Professor of Law. His scholarship includes leading casebooks and treatises about constitutional law and federal jurisdiction.

**RonNell Andersen Jones** is the Lee E. Teitelbaum Endowed Chair and Professor of Law at the University of Utah S.J. Quinney College of Law. Her scholarship focuses on legal issues affecting the press and on the intersection between media and the courts. She is an Affiliated Fellow at Yale Law School's Information Society Project.

**Heidi Kitrosser** is the Robins Kaplan Professor of Law at the University of Minnesota Law School. Her scholarship focuses on the constitutional law of federal government secrecy and on separation of powers and free speech law more broadly.

**Genevieve Lakier** is an Assistant Professor of Law at the University of Chicago Law School. Her scholarship explores the connections between culture and law, including a long-term project exploring the cultural history of the First Amendment.

**Lyrissa Lidsky** is the dean of the University of Missouri School of Law and Judge C.A. Leedy Professor of Law. Her scholarship focuses on the intersection of torts and the First Amendment, with a particular emphasis on defamation and other free speech issues in social media contexts.

**Greg Magarian** is the Thomas and Karole Green Professor of Law at the Washington University in St. Louis School of Law. His scholarship focuses on U.S. constitutional law with an emphasis on the freedom of expression.

**Helen Norton** holds the Rothgerber Chair in Constitutional Law at the University of Colorado School of Law.  Her scholarship focuses on First Amendment law and antidiscrimination law.

**Jonathan Peters** is a media law professor at the University of Georgia, with appointments in the Grady College of Journalism and Mass Communication and the School of Law.

**Sonja West** is the Otis Brumby Distinguished Professor in First Amendment Law at the University of Georgia School of Law.  Her scholarship focuses on constitutional law, media law, and the U.S. Supreme Court.