WILMERHALE

May 17, 2019

**Alan E. Schoenfeld**

+1 212 937 7294 (t)
+1 212 230 8888 (f)
alan.schoenfeld@wilmerhale.com

**Via ECF**

The Honorable Lorna G. Schofield
United States District Judge
40 Foley Square
New York, NY 10007

  Re: *PEN American Center, Inc. v. Trump*, No. 18-cv-9433 (LGS)

Dear Judge Schofield:

  We write on behalf of the Reporters Committee for Freedom of the Press, The Authors Guild Inc., the Freedom to Read Foundation, the National Coalition Against Censorship, the National Press Photographers Association, the Online News Association, Reporters Without Borders, and the Society of Professional Journalists ("proposed *amici*") to respectfully request to enter our appearances on their behalf and to seek a pre-motion conference for leave to file the accompanying *amicus curiae* brief in support of Plaintiff.  Counsel for both Plaintiff and Defendant have informed us that they do not oppose the filing of the proposed *amicus* brief.[1]

  "Federal courts have discretion to permit participation of amici where such participation will not prejudice any party and may be of assistance to the court."  *Strougo v. Scudder*, No. 96-cv-2136, 1997 WL 473566, at *3 (S.D.N.Y. Aug. 18, 1997).  The proposed *amici* submit that acceptance of their brief is appropriate here.  Neither party will be prejudiced by its submission; indeed, neither party opposes its filing.  Moreover, *amici* seek to offer a perspective that may assist the Court's consideration of the issues presented in this case.

  The proposed *amici* are organizations dedicated to defending the First Amendment rights of journalists and news organizations.  In their brief, they seek to emphasize the concrete and demonstrable way in which organizations are injured when illegal conduct causes them to divert resources from their existing activities.  They further wish to underscore the practical import of allowing press freedom organizations to litigate First Amendment suits when they suffer such diversion-of-resources injuries.  In particular, the proposed *amici* wish to highlight the practical obstacles that individual journalists and news organizations face in seeking to mount First Amendment challenges and the increasing role that press freedom organizations play in vindicating the press's First Amendment rights.  The brief notes that allowing press freedom organizations to challenge First Amendment violations where their activities have been impaired as a result of having to respond to such violations may therefore be not only proper as a matter of

---

[1] The proposed *amici* submit this request for a pre-motion conference pursuant to Section III.A of Your Honor's Individual Rules.  In the alternative, the proposed *amici* request leave to file the proposed brief.

Wilmer Cutler Pickering Hale and Dorr LLP, 7 World Trade Center, 250 Greenwich Street, New York, New York 10007

Beijing Berlin Boston Brussels Denver Frankfurt London Los Angeles New York Palo Alto Washington

WILMERHALE

May 17, 2019
Page 2

standing doctrine but also necessary to ensure that encroachments on journalists and news outlets' First Amendment rights are redressed.

Respectfully submitted,

/s/ *Alan Schoenfeld*
Alan Schoenfeld
Wilmer Cutler Pickering
    Hale and Dorr LLP
7 World Trade Center
New York, NY 10007
T: (212) 230-8800
F: (212) 230-8888
Alan.Schoenfeld@wilmerhale.com

Patrick Carome (*pro hac vice* pending)
Paul Wolfson (*pro hac vice* pending)
Emma Simson (*pro hac vice* pending)
Wilmer Cutler Pickering
    Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
T: (202) 663-6000
F: (202) 663-6363
Patrick.Carome@wilmerhale.com
Paul.Wolfson@wilmerhale.com
Emma.Simson@wilmerhale.com

*Counsel for Amici Curiae*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PEN AMERICAN CENTER, INC.

                    Plaintiff,

    vs.

DONALD J. TRUMP, in his official capacity as
President of the United States

                    Defendant.

Civil Action No. 18-cv-9433 (LGS)

---

**BRIEF OF *AMICI CURIAE*
REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS,
THE AUTHORS GUILD INC., FREEDOM TO READ FOUNDATION, NATIONAL
COALITION AGAINST CENSORSHIP, NATIONAL PRESS PHOTOGRAPHERS
ASSOCIATION, ONLINE NEWS ASSOCIATION, REPORTERS WITHOUT
BORDERS, AND SOCIETY OF PROFESSIONAL JOURNALISTS IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
T: (212) 230-8800
F: (212) 230-8888

Patrick J. Carome
  (*pro hac vice* pending)
Paul R.Q. Wolfson
  (*pro hac vice* pending)
Emma P. Simson
  (*pro hac vice* pending)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
T: (202) 663-6000
F: (202) 663-6363

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 7.1, *amici curiae* each certify that they have no parent corporations and no publicly held company owns 10% of any's stock.

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURES ................................................................................................. i

TABLE OF CONTENTS ..................................................................................................... ii

TABLE OF AUTHORITIES .............................................................................................. iii

INTERESTS OF *AMICI CURIAE* ...................................................................................1

INTRODUCTION ..................................................................................................................2

ARGUMENT ..........................................................................................................................3

I.      PEN America Has Amply Pled The First Element of Organizational Standing................ 3

      A.     PEN America Has Adequately Alleged A Diversion-of-Resources Injury .............3

      B.     The Government's Arguments Ignore Controlling Precedent ................................9

II.     Due To The Changing Economics Of The News Business, Smaller And Nonprofit Media Outlets Increasingly Rely On Organizations Like *Amici* To Vindicate First Amendment Rights ........................................................................................... 11

CONCLUSION .....................................................................................................................12

APPENDIX .........................................................................................................................1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brooklyn Center for Independence of the Disabled v. Bloomberg*,
290 F.R.D. 409 (S.D.N.Y. 2012) ...............................................................8

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
868 F.3d 104 (2d Cir. 2017)........................................................... *passim*

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)...........................................................3, 4, 6, 8

*Mental Disability Law Clinic, Touro Law Center v. Hogan*,
519 F. App'x 714 (2d Cir. 2013) ...............................................................6

*New York Civil Liberties Union v. New York City Transit Authority*,
684 F.3d 286 (2d Cir. 2012).......................................................................3

*Nnebe v. Daus*,
644 F.3d 147 (2d Cir. 2011)........................................................... *passim*

*Olsen v. Stark Homes, Inc.*,
759 F.3d 140 (2d Cir. 2014)..........................................................5, 6, 9, 10

*Ragin v. Harry Macklowe Real Estate Co.*,
6 F.3d 898 (2d Cir. 1993)...........................................................................6

*Restaurant Law Center v. City of New York*,
360 F. Supp. 3d 192 (S.D.N.Y. 2019), *appeal docketed*, No. 19-601 (2d Cir.
Mar. 8, 2019)..................................................................................7, 10

**Other Authorities**

Knight Foundation, *In Defense of the First Amendment* 4 (Apr. 2016),
https://knightfoundation.org/reports/defense-first-amendment .............................11

Pew Research Center, *State of the News Media 2016* (June 2016),
https://www.pewresearch.org/wp-content/uploads/sites/8/2016/06/state-of-the-
news-media-report-2016-final.pdf ..........................................................................11

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* are eight organizations that represent the interests of journalists and news outlets.  They include the Reporters Committee for Freedom of the Press, The Authors Guild Inc., the Freedom to Read Foundation, the National Coalition Against Censorship, the National Press Photographers Association, the Online News Association, Reporters Without Borders, and the Society of Professional Journalists.  Lead *amicus*, the Reporters Committee for Freedom of the Press (the "Reporters Committee"), is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.[1]  Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of working journalists and news organizations.  Descriptions of the remaining *amici* are included in the Appendix.

*Amici*, as organizations devoted to defending First Amendment freedoms, have a powerful interest in ensuring that reporters and media outlets are not subject to retaliation for their questioning of government officials or for the content of their coverage.  In line with this interest, lead *amicus* the Reporters Committee frequently files *amicus* briefs in cases raising important issues related to First Amendment retaliation claims.  *See, e.g.*, *Lozman v. City of Riviera Beach*, No. 17-21 (U.S. Dec. 29, 2017); *United States v. AT&T, Inc.*, 916 F.3d 1029 (D.C. Cir. 2019); *Cable News Network, Inc. v. Trump*, No. 18-cv-2610 (D.D.C. Nov. 13, 2018).

---

[1]     No counsel for a party authored this brief in whole or in part.  No party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amici curiae* or their counsel made a monetary contribution to the preparation of submission of this brief.

1

*Amici* file this brief to address the government's argument that an organization cannot establish injury to itself where a defendant has caused the organization to divert resources from its existing activities, if the diversion supports other activities falling within the scope of the organization's mission.  That position contravenes Supreme Court and Second Circuit standing doctrine.  Moreover, if accepted, it would have significant and deleterious consequences for the ability of press freedom groups to bring suits to vindicate important First Amendment interests— and ultimately, would undermine enforcement of the First Amendment.

## INTRODUCTION

PEN America alleges in its Amended Complaint that President Donald J. Trump has violated the First Amendment by using and threatening to use the levers of government power to punish journalists and news organizations who report unfavorably on his administration.  *See, e.g.*, Am. Compl. ¶¶ 29-91.  It further alleges that he has created an environment in which members of the press reasonably fear adverse government action for asking tough questions and publishing stories the President dislikes.  *See, e.g.*, *id.* ¶¶ 93-96.

*Amici* submit this brief to underscore that PEN America has amply met the first requirement for organizational standing (*i.e.*, a cognizable injury) by pleading that it has diverted resources from its overseas projects to address the President's alleged unconstitutional conduct. *Amici* additionally submit this brief to emphasize the practical significance that would follow from accepting the government's argument to the contrary.  In recent years, shrinking budgets have limited the ability of regional, local, and nonprofit news media to file suit to vindicate First Amendment rights.  Press freedom organizations like the Reporters Committee have increasingly had to try to fill this void.  Where such organizations divert resources to respond to illegal conduct—to the detriment of other of the organizations' activities—the organizations suffer concrete and demonstrable injuries.  They, like any other plaintiff that suffers a concrete and

demonstrable injury, must be permitted to seek judicial relief.  The Court should therefore hold

that PEN America has alleged injury-in-fact sufficient to meet the first element of organizational

standing.[2]

## ARGUMENT

## I.     PEN America Has Amply Pled The First Element of Organizational Standing

### A.     PEN America Has Adequately Alleged A Diversion-of-Resources Injury

"An organization can have standing to sue in one of two ways."  *New York Civil Liberties*

*Union v. New York City Transit Authority*, 684 F.3d 286, 294 (2d Cir. 2012).  First, it can have

"associational" or "representational" standing to sue on behalf of its members.  *See id.*  Second,

it can have "organizational" standing to sue on its own behalf.  *See id.*  To sue in its own right, an

organization must satisfy "the same standing test that applies to individuals."  *Id.* (quotation

marks omitted).  That is, an organization must establish that it has suffered a "distinct and

palpable" injury that is "fairly traceable" to the defendant's challenged conduct and that would

be redressed by a favorable decision.  *Centro de la Comunidad Hispana de Locust Valley v.*

*Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted).

PEN America plausibly alleges that it meets the first element of organizational standing

(*i.e.*, a cognizable injury) because it has had to divert resources away from other of its activities

to challenge the President's allegedly unconstitutional conduct.  The government contends that

this diversion of resources is insufficient to confer organizational standing, but its arguments are

contrary to controlling precedent.

Nearly forty years ago, in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the

Supreme Court held that an organization suffers a cognizable injury where a defendant's conduct

---

[2]     *Amici* do not address the other elements of standing, which are addressed in PEN
America's opposition to the government's motion to dismiss.

"perceptibly impair[s]" the organization's activities.  *Id.* at 379.  The Court further determined

that an organization can establish such impairment by demonstrating that a defendant's conduct

has created a "drain on the organization's resources."  *Id.*  Applying these principles in the case

before it, the Court concluded that a fair housing organization had standing to sue the owner of

an apartment complex for racial steering.  *Id.* at 368.  The organization had alleged that the

apartment complex's racial steering practices had "frustrated" its efforts to advance equal

housing opportunities "through counseling and other referral services" and had caused it to

"devote significant resources to identify[ing] and counteract[ing]" the illegal practices.  *Id.* at

379 (quotation marks omitted).  The Court held that, based on the facts alleged, there could "be

no question that the organization ha[d] suffered [an] injury in fact."  *Id.*  The alleged impairment

of the organization's "counseling and referral services" along with "the consequent drain on the

organization's resources" gave rise to a "concrete and demonstrable" injury that "constitute[d]

far more than simply a setback to the organization's abstract social interests."  *Id.*

Since *Havens Realty*, the Second Circuit has repeatedly held that "only a 'perceptible

impairment' of an organization's activities is necessary for there to be an 'injury in fact.'"

*Centro*, 868 F.3d at 110 (internal quotation marks omitted).  It has also repeatedly reaffirmed that

a "perceptible impairment" occurs where an organization diverts resources away from some of

its activities in order to respond to a defendant's conduct—that is, where an organization suffers

a "perceptible opportunity cost" as a result of responding to the defendant's conduct.  *Nnebe v.*

*Daus*, 644 F.3d 147, 157 (2d Cir. 2011).

Several Second Circuit cases are illustrative of these principles.  In *Nnebe v. Daus*, the

court concluded that the New York Taxi Workers Alliance had standing to challenge New York

City's procedures for suspending some taxi drivers' licenses following an arrest because the

organization had expended resources counseling and assisting drivers whose licenses were suspended via the challenged procedures. 644 F.3d at 157. The fact that the Alliance had expended relatively "scant" resources on such counseling and assistance made no difference. *Id.* The court explained: "Even if only a few suspended drivers are counseled by NYTWA in a year, there is some perceptible opportunity cost expended by the Alliance." *Id.* And where an organization "expend[s] … resources that could be spent on other activities," the organization suffers a real injury—not "simply a setback to [its] abstract social interests." *Id.* (quoting *Havens Realty*, 455 U.S. at 379).

In *Olsen v. Stark Homes, Inc.*, 759 F.3d 140 (2d Cir. 2014), the court found that Long Island Housing Services (LIHS) had standing to sue a residential community for discriminating against a couple whose son was disabled because LIHS had expended resources responding to the discrimination. In particular, after the community rejected the couple's request to purchase a home and the couple sought out LIHS's assistance, LIHS wrote a letter to the community on the couple's behalf, sent "testers" to investigate whether the community was discriminating against disabled individuals, and filed an administrative complaint. *Id.* at 143-144. LIHS noted that its resource expenditures on behalf of the couple required a diversion of resources "from its other advocacy and counseling activities." *Id.* at 158. The Second Circuit had no trouble concluding that LIHS's diversion of resources reflected a demonstrable "concrete and particularized injury" that conferred organizational standing. *Id.*

More recently, in *Centro de la Comunidad de Locust Valley v. Town of Oyster Bay*, the Second Circuit concluded that the Workplace Project, an organization dedicated to advancing the interests of day laborers, had standing to challenge a local ordinance that prohibited roadside employment solicitation, in part because the Project expended resources responding to the

5

ordinance.  868 F.3d at 110-111.  The Project had asserted that the ordinance's enforcement

would injure it in three distinct ways: (1) it would disperse and reduce the number of day

laborers in Oyster Bay, making it more difficult for the Project to organize laborers; (2) it would

require the Project to "divert resources from other … activities to combat the [ordinance's]

effects"; and (3) it would subject the Project's advocates to risk of arrest.  *Id.* at 110.  The Second

Circuit found each of these injuries independently sufficient to establish the Project's right to

sue.  *Id.* at 110-111.  With respect to the diversion-of-resources injury, the court reiterated once

again: "[W]here an organization diverts its resources away from its current activities, it has

suffered an injury that has been repeatedly held to be … sufficient to confer organizational

standing."  *Id.* at 111.[3]

Under the principles articulated in these cases, it is clear that PEN America has

adequately alleged a cognizable injury.  As did the plaintiffs in *Havens Realty*, *Nnebe*, *Olsen*,

and *Centro*, PEN America has alleged that it has suffered a "perceptible opportunity cost" as a

result of responding to the President's challenged conduct.  It states in its Amended Complaint

that its "bedrock work" includes "long-term advocacy on behalf of individual writers who are

being punished because of the content of their speech," Am. Compl. ¶ 24, both in the U.S. and

abroad, *id.* ¶ 103.  It further alleges that, because of the President's conduct, it has had to divert

resources away from its projects advocating for free expression overseas.  *Id.* ¶ 104.  It has

---

[3]       *See also, e.g.*, *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)
(fair housing organization had standing to challenge real estate company's discriminatory
advertisements because it had spent significant resources responding to the advertisements, "to
the detriment" of other of its activities); *Mental Disability Law Clinic, Touro Law Center v.
Hogan*, 519 F. App'x 714, 717 (2d Cir. 2013) (law clinic had standing to challenge the New
York State Office of Mental Health's practice of filing counterclaims against patients who sued
the Office, because the law clinic had "diverted resources from education and training" programs
to pursue affirmative litigation against the Office's practice).

reallocated those resources to establish an office in Washington, D.C., *id.* ¶ 107, and to create

two staff positions "with full or partial responsibility [for] focusing on the threats [President]

Trump poses to journalists and their free expression," *id.* ¶ 106.  The organization's existing staff

has also had to devote time to focusing on and responding to the President's conduct, rather than

other activities within the organization's mission.  *Id.* ¶ 108.  These facts, which at this stage of

the case must be taken as true, demonstrate that the President's conduct has perceptibly impaired

PEN America's activities by causing it to expend resources it "could have allocated …

elsewhere."  Def.'s Mot. to Dismiss 16.  Such impairment constitutes an injury in fact.  *See, e.g.*,

*Centro*, 868 F.3d at 111 (stating that "where an organization diverts its resources away from its

current activities, it has suffered an injury").

PEN America's claims of injury are at least as compelling as those found sufficient to

establish organizational injury by other courts in this District.  For instance, in *Restaurant Law*

*Center v. City of New York*, 360 F. Supp. 3d 192 (S.D.N.Y. 2019), *appeal docketed*, No. 19-601

(2d Cir. Mar. 8, 2019), Judge Gardephe found that the National Restaurant Association had

standing to challenge a city law requiring fast food employers to administer a payroll-deduction

scheme.  The Association offered evidence that it had diverted resources from other activities as

a result of the challenged law.  *Id.*  In particular, its Director of State and Local Government

Affairs had submitted a declaration stating that "both before and after [the law's] enactment, [he]

ha[d] spent time addressing member concerns specifically related to the [law] instead of

[addressing] questions regarding other jurisdictions or other … business or regulatory concerns."

*Id.* at 205 (some alterations omitted).  The Director elaborated on this point by noting that during

a particular conference call, he had responded to questions about the new law "in lieu of

speaking on several other planned topics," and that during a particular meeting of the

Association's members, the Association was required to "truncate [its] coverage [of] other topics

… to address the [Deductions Law's] effects." *Id.* at 205-206 (last alteration in original).  These

facts were "sufficient" because, "as in *Centro*," they demonstrated that "the Association ha[d]

had to redirect its time, money, and resources to … [respond] to the Deductions Law, to the

detriment of other priorities." *Id.* at 206.

Similarly, in *Brooklyn Center for Independence of the Disabled v. Bloomberg*, 290

F.R.D. 409 (S.D.N.Y. 2012), Judge Furman determined that two disability rights organizations

had standing to challenge whether New York City's emergency preparedness plans adequately

accounted for the needs of people with disabilities.  Both organizations indicated that, because of

concerns about the City's plans, they had "expended considerable resources counseling

constituents, gathering and coordinating information, and documenting problems with the City's

plans." *Id.* at 417.  Representatives of one organization stated, for instance, that they had

"visited shelters during Hurricane Irene to assess accessibility and [had] interviewed [shelter]

volunteers to determine their level of knowledge about issues related to people with disabilities."

*Id.*  "Weighed against the 'scant' evidence found sufficient to confer standing in *Nnebe*," Judge

Furman concluded that these facts were "plainly enough" for the organizations to establish

standing to sue in their own right.  *Id*.

These cases properly recognize the important role of organizations in vindicating rights in

our judicial system.  When governmental action effectively forces an organization to re-channel

its resources to respond to a threat to the rights that the organization is dedicated to securing, that

diversion of resources constitutes a "distinct and palpable injury" to the organization itself

sufficient to establish the injury-in-fact necessary for standing.  *Havens Realty*, 455 U.S. at 379.

That is exactly what PEN America has alleged in this case.

8

**B.     The Government's Arguments Ignore Controlling Precedent**

The government contends that an organization's diversion of resources is cognizable only where the organization has reallocated resources towards activities in which it is not normally engaged, in order to overcome a "practical obstacle" thrown in the way of its usual activities. Def.'s Mot. to Dismiss 15.  To illustrate the point, the government suggests that in *Centro*, the Workplace Project's expenditures gave rise to an injury only because Oyster Bay's solicitation ordinance was expected to make the Project's regular organizing efforts more difficult and costly and only because responding to local ordinances was not ordinarily part of the Project's activities.  *Id.* at 14-15.  The government asserts that PEN America cannot establish injury here because the President has not practically interfered with its normal activities of monitoring and responding to governments' interactions with writers in the U.S. and abroad.  On the contrary, the government says, PEN America's efforts to monitor and respond to the President's alleged conduct merely reflect an expansion of the type of activities in which the organization ordinarily engages.  *Id.* at 17.  And, as the government sees it, an organization does not suffer an injury where it carries out *more* of the type of activities typically falling within its core mission.

The government's argument is deeply flawed.  As an initial matter, the government misconstrues *Centro*.  The Second Circuit there concluded that the Workplace Project's reallocation of resources to combat Oyster Bay's solicitation ordinance independently gave rise to an injury that was sufficient to confer standing—separate and apart from any injury the organization also suffered as a result of the ordinance making it more difficult to organize day laborers.  *Centro*, 868 F.3d at 110-111.

More fundamentally, the government's argument finds no support in Second Circuit case law and fails to account for cases like *Olsen* and *Nnebe*.  In *Olsen*, for instance, there was no indication that the residential community's alleged discrimination established a practical obstacle

9

that LIHS needed to overcome in order to carry out its normal activities.  It also appears that

LIHS's advocacy efforts on behalf of the couple could be termed a "voluntary expansion" of the

organization's existing advocacy activities—certainly, the Second Circuit's decision in no way

suggests that combatting individual instances of discrimination somehow fell outside the scope

of LIHS's normal operations (or that such a fact would matter).  The Second Circuit simply

found a "concrete" injury because LIHS's resource expenditures on behalf of the couple meant

LIHS had to divert resources away from other of its advocacy and counseling activities.  759

F.3d at 158.  In other words, LIHS suffered a "perceptible opportunity cost."

Similarly, in *Nnebe*, there is no indication that the taxi-license-suspension procedures

somehow interfered with the NYTWA's ordinary activities such that NYTWA needed to expend

greater resources to continue carrying out those activities.  Nor is there any reason to believe that

counseling drivers facing license suspensions fell outside the scope of the NYTWA's typical

activities.  In finding that the NYTWA had organizational standing, the court noted only that the

NYTWA had expended resources counseling drivers when it could have devoted those resources

to something else.  The same is true for PEN America.  It has alleged that it has spent resources

responding to the President's conduct that it could have otherwise expended on other of its

activities.  *See also, e.g.*, *Restaurant Law Center*, 360 F. Supp. 3d at 205-206 (holding that the

National Restaurant Association's expenditure of resources on counseling members about a

payroll-deductions law gave rise to an injury in fact even though the Association's mission

included "helping [its] members navigate their legal and regulatory obligations").

In sum, PEN America has adequately pled the first element of organizational standing, as

construed by both the Supreme Court and the Second Circuit.

10

II.     **Due To The Changing Economics Of The News Business, Smaller And Nonprofit Media Outlets Increasingly Rely On Organizations Like *Amici* To Vindicate First Amendment Rights**

As explained above, PEN America has met the first element of organizational standing based on a diversion-of-resources theory.  Its ability to do so has important practical implications.  In particular, unless organizations like *amici* or PEN America are able to bring First Amendment suits on their own behalf where they have diverted resources to respond to First Amendment violations, many First Amendment violations might simply go unaddressed.

Individual journalists, particularly freelancers, are unlikely to have the resources to mount First Amendment challenges.  Many news organizations—most especially regional, local, and nonprofit news outlets—face practical obstacles to filing suit as well.  Over the last few decades, technological changes have radically reshaped and buffeted the news industry.  *See* Pew Research Center, *State of the News Media 2016*, at 4-8 (June 2016).  News outlets have been forced to grapple with declining circulation and advertising revenues.  *See id.* at 4-6, 9-13.  Confronted with shrinking budgets, many newspapers have closed.  *See id.* at 9, 19 (reporting that the Editor & Publisher's DataBook identified "126 fewer daily papers in 2014 than in 2004").  Others have had to make significant cuts.  Indeed, the newspaper industry lost over 20,000 jobs between 1994 and 2014, reflecting a 39% contraction.  *Id.* at 17.

Due to these resource constraints, journalists and news organizations appear increasingly less able to pursue affirmative litigation to protect First Amendment freedoms—including traditional information-access cases that are essential to robust newsgathering.  In a survey of editors at leading news companies, 65 percent said the news industry is less able to pursue legal claims related to the First Amendment than it was 10 years ago.  Knight Foundation, *In Defense of the First Amendment* 4 (Apr. 2016).  Over half also agreed with the statement that "[n]ews organizations are no longer prepared to go to court to preserve First Amendment freedoms." *Id.*

11

The survey respondents cited money as a major limiting factor.  *Id.*  In recognition of the fact that many news outlets and journalists now lack the capacity and resources to litigate even cases critical to their mission, organizations that represent the rights and interests of journalists are increasingly left to fill the void.

In short, many regional, local, and nonprofit news organizations and journalists may not have the resources necessary to litigate complex First Amendment cases.  Allowing organizations like *amici* and PEN America to pursue these claims may therefore be not only proper but necessary to ensure that the claims can be brought at all.

## CONCLUSION

The Court should hold that PEN America has adequately pled injury-in-fact because of its diversion of resources in response to allegedly unconstitutional conduct.

May 17, 2019                                    Respectfully submitted,

                                                /s/ *Alan Schoenfeld*
                                                Alan Schoenfeld
                                                WILMER CUTLER PICKERING
                                                    HALE AND DORR LLP
                                                7 World Trade Center
                                                250 Greenwich Street
                                                New York, NY 10007
                                                T: (212) 230-8800
                                                F: (212) 230-8888
                                                Alan.Schoenfeld@wilmerhale.com

                                                Patrick J. Carome
                                                    (*pro hac vice* pending)
                                                Paul R.Q. Wolfson
                                                    (*pro hac vice* pending)
                                                Emma P. Simson
                                                    (*pro hac vice* pending)
                                                WILMER CUTLER PICKERING
                                                    HALE AND DORR LLP
                                                1875 Pennsylvania Avenue, NW
                                                Washington, DC  20006
                                                T: (202) 663-6000
                                                F: (202) 663-6363
                                                Patrick.Carome@wilmerhale.com
                                                Paul.Wolfson@wilmerhale.com
                                                Emma.Simson@wilmerhale.com

                                                *Counsel for Amici Curiae*

### APPENDIX

**Reporters Committee for Freedom of the Press** is an unincorporated nonprofit association of reporters and editors dedicated to defending the First Amendment and newsgathering rights of the news media.  Founded by journalists and media lawyers in 1970, when the nation's press faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources, the Reporters Committee today serves as a leading voice for the legal interests of working journalists and news organizations.

**The Authors Guild Inc.** was founded in 1912, and is a national nonprofit association of more than 9,000 professional, published writers of all genres.  The Guild counts historians, biographers, academicians, journalists, and other writers of nonfiction and fiction as members. The Guild works to promote the rights and professional interests of authors in various areas, including defending their right of freedom of expression.  Many Guild members earn their livelihoods through their writing.  Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field.

**The Freedom to Read Foundation** is an organization established by the American Library Association to promote and defend First Amendment rights, foster libraries as institutions that fulfill the promise of the First Amendment, support the right of libraries to include in their collections and make available to the public any work they may legally acquire, and establish legal precedent for the freedom to read of all citizens.

**National Coalition Against Censorship ("NCAC")** is an alliance of more than 50 national nonprofit literary, artistic, religious, educational, professional, labor, and civil liberties groups that are united in their commitment to freedom of expression.  Since its founding, NCAC has worked to protect the First Amendment rights of artists, authors, students, readers, and the general public.  NCAC has a longstanding interest in opposing viewpoint-based censorship and is joining in this brief to urge the Court to preserve the protections of the First Amendment. The views presented in this brief are those of NCAC and do not necessarily represent the views of each of its participating organizations.

**National Press Photographers Association ("NPPA")** is a 501(c)(6) nonprofit organization dedicated to the advancement of visual journalism in its creation, editing and distribution.  NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry.  Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism.  The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

**Online News Association** is the world's largest association of digital journalists.  ONA's mission is to inspire innovation and excellence among journalists to better serve the public. Membership includes journalists, technologists, executives, academics, and students who produce news for and support digital delivery systems.  ONA also hosts the annual Online News Association conference and administers the Online Journalism Awards.

**Reporters Without Borders** has been fighting censorship and supporting and protecting journalists since 1985.  Activities are carried out on five continents through its network of over 130 correspondents, its national sections, and its close collaboration with local and regional press freedom groups.  Reporters Without Borders currently has 15 offices and sections worldwide.

**Society of Professional Journalists** ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital to a well-informed citizenry, works to inspire and educate the next generation of journalists, and protects First Amendment guarantees of freedom of speech and press.