

1919 Pennsylvania Avenue NW
Suite 800
Washington, DC  20006-3401

**Robert Corn-Revere**
202.973.4225 tel
202.973.4499 fax
bobcornrevere@dwt.com

July 11, 2019

**By ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY  10007

Re:   *PEN American Cntr., Inc. v. Trump*, 18 Civ. 9433 (LGS)
       PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Dear Judge Schofield,

Plaintiff submits as supplemental authority in the above-captioned matter, with respect to Defendant's Motion to Dismiss (ECF 45) and Plaintiff's Opposition thereto (48), the recent decision of the United States Court of Appeals for the Second Circuit in *Knight First Amendment Institute at Columbia University v. Trump*, --- F.3d ---, 2019 WL 2932440 (2d Cir. July 9, 2019) (copy attached).  The parties cited this court's decision in *Knight First Amendment Institute*, which the Second Circuit has now affirmed, in the Opposition to Motion to Dismiss at pages 2, 16, and 22-24, and in the Motion to Dismiss at pages 21-22.

In *Knight First Amendment Institute*, the courts adjudicated plaintiffs' challenge under the First Amendment to the President's blocking them from his official Twitter account after they posted replies to the President's tweets in which they criticized his policies.  *See* 2019 WL 2932440 at *3.  The Second Circuit affirmed that once the President chooses a platform and opens it to participation by others, "he may not selectively exclude those whose views he disagrees with."  *Id*. at *4.  The court held this is unconstitutional because in so "acting in a governmental capacity," the President "may not discriminate based on viewpoint."  *Id*. at *5.  Exclusions such as the Twitter blocking at issue, the court explained, is "something the First Amendment prohibits."  *Id*. at *7; *see also id*. at *8.  The President "is not entitled to censor selected users because they express views with which he disagrees," *id*. at *7, and the fact that those censored "retain some ability to 'work around' the [exclusion] does not cure the constitutional violation."  *Id*. *8.

Defendant argued that this Court cannot impose a remedy on behalf of Plaintiff PEN America against the President for violating the rights of PEN members chilled by the President's ongoing pattern of threats and retaliatory acts.  In *Knight First Amendment Institute*, the Second Circuit affirmed the District Court's declaratory ruling that President Trump's blocking of dissenting posters from his Twitter feed violates the First Amendment, which the District Court "assumed"

would suffice to "remedy the blocking ... held to be unconstitutional." *See Knight First Amendment Inst. at Col. Univ. v. Trump*, 302 F. Supp. 3d 541, 580 (S.D.N.Y. 2018). *See also* 2019 WL 2932440, at *4 n.3 (Second Circuit's reporting that "[a]fter the District Court granted declaratory relief, the defendants unblocked the [] Plaintiffs").

The holdings above are relevant to issues discussed at pages 1-5, 12-13, 23-24 and §§ I.A-B of Plaintiff's Opposition to Motion to Dismiss.

Respectfully submitted,

Robert Corn-Revere
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006
Ph: 202-973-4200; Fax: 202-973-4499
bobcornrevere@dwt.com

cc: All Counsel of Record via ECF

2019 WL 2932440
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.
KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, REBECCA BUCKWALTER, PHILIP COHEN, HOLLY FIGUEROA, EUGENE GU, BRANDON NEELY, JOSEPH PAPP, and NICHOLAS PAPPAS,
Plaintiffs–Appellees,
v.
DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES and DANIEL SCAVINO, WHITE HOUSE DIRECTOR OF SOCIAL MEDIA AND ASSISTANT TO THE PRESIDENT,
Defendants–Appellants,
SARAH HUCKABEE SANDERS, WHITE HOUSE PRESS SECRETARY, Defendant.*

\* The Clerk of Court is respectfully directed to amend the official caption as indicated above.

No. 18-1691-cv
|
Argued: March 26, 2019
|
Decided: July 9, 2019

Appeal from the United States District Court for the Southern District of New York

No. 17 Civ. 5205 (NRB), Naomi R. Buchwald, District Judge, Presiding.

Plaintiffs Buckwalter, Cohen, Figueroa, Gu, Neely, Papp, and Pappas ("Individual Plaintiffs") are social media users who were blocked from accessing and interacting with the Twitter account of President Donald J. Trump because they expressed views he disliked. The Knight First Amendment Institute at Columbia University is an organization alleging a right to hear the speech that the Individual Plaintiffs would have expressed had they not been blocked. The Plaintiffs sued President Trump along with certain White House officials, contending that the blocking violated the First Amendment. The United States District Court for the Southern District of New York (Buchwald, *J.*) found that the "interactive space" in the account is a public forum and that the exclusion from that space was unconstitutional viewpoint discrimination. We agree, and, accordingly, we affirm the judgment of the District Court.

**AFFIRMED.**

**Attorneys and Law Firms**

Jameel Jaffer (Katherine Fallow, Caroline DeCell, Alexander Abdo, Knight First Amendment Institute at Columbia University, New York, NY, Jessica Ring Amunson, Tali R. Leinwand, Jenner & Block, Washington, D.C., on the brief), Knight First Amendment Institute at Columbia University, New York, NY, for Plaintiffs–Appellees.

Jennifer Utrecht, Attorney, Appellate Staff, Civil Division (Scott McIntosh, Attorney, Appellate Staff, on the brief), for Chad A. Readler, Acting Assistant Attorney General, Hashim M. Mooppan, Deputy Assistant Attorney General, Washington, D.C., for Defendants–Appellants.

David Greene, Electronic Frontier Foundation, San Francisco, CA, for amicus curiae, Electronic Frontier Foundation, in support of Plaintiffs–Appellees.

Amy L. Marshak, Joshua A. Geltzer, Mary B. McCord, Institute for Constitutional Advocacy and Protection at Georgetown University Law Center, Washington, D.C., for amici curiae, Ashutosh Bhagwat, Erwin Chemerinksy, Genevieve Lakier, Lyrissa Lidsky, Helen Norton, Amanda Shanor, Geoffrey R. Stone, Laurence H. Tribe, and Rebecca Tushnet, in support of Plaintiffs–Appellees.

Dan Backer, Political.Law PLLC, Alexandria, VA, for amicus curiae, Coolidge–Reagan Foundation, in support of Defendants–Appellants.

Donald B. Verrilli, Jr., Chad I. Golder, Rachel G. Miller–Ziegler, Munger, Tolles & Olson LLP, Washington, D.C., for amicus curiae, Internet Association, in support of neither party.

Before: PARKER, HALL, and DRONEY, Circuit Judges.

**Opinion**

BARRINGTON D. PARKER, Circuit Judge:

**\*1** President Donald J. Trump appeals from a judgment of the United States District Court for the Southern District of New York (Buchwald, *J.*) concluding that he engaged in unconstitutional viewpoint discrimination by utilizing Twitter's "blocking" function to limit certain users' access to his social media account, which is otherwise open to the public at large, because he disagrees with their speech. We hold that he engaged in such discrimination and, consequently, affirm the judgment below.

The salient issues in this case arise from the decision of the President to use a relatively new type of social media platform to conduct official business and to interact with the public. We do not consider or decide whether an elected official violates the Constitution by excluding persons from a wholly private social media account. Nor do we consider or decide whether private social media companies are bound by the First Amendment when policing their platforms. We do conclude, however, that the First Amendment does not permit a public official who utilizes a social media account for all manner of official purposes to exclude persons from an otherwise–open online dialogue because they expressed views with which the official disagrees.[1]

[1] The facts in this case are not in dispute as the case was resolved below on stipulated facts.

Twitter is a social media platform that allows its users to electronically send messages of limited length to the public. After creating an account, a user can post their own messages on the platform (referred to as tweeting). Users may also respond to the messages of others (replying), republish the messages of others (retweeting), or convey approval or acknowledgment of another's message by "liking" the message. All of a user's tweets appear on that user's continuously–updated "timeline," which is a convenient method of viewing and interacting with that user's tweets.

When one user replies to another user's tweet, a "comment thread" is created. When viewing a tweet, this comment thread appears below the original tweet and includes both the first–level replies (replies to the original tweet) and second–level replies (replies to the first–level replies). The comment threads "reflect multiple overlapping 'conversations' among and across groups of users" and are a "large part" of what makes Twitter a " 'social' media platform." App'x at 50.

The platform also allows users to directly interact with each other. For example, User A can "mention" User B in User A's tweet, prompting a notification to User B that he or she has been mentioned in a tweet. Twitter users can also "follow" one another. If User A follows User B, then all of User B's tweets appear in User A's "feed," which is a continuously–updated display of content mostly from accounts that User A has chosen to follow. Conversely, User A can "block" User B. This prevents User B from seeing User A's timeline or any of User A's tweets. User B, if blocked by User A, is unable to reply to, retweet, or like any of User A's tweets. Similarly, User A will not see any of User B's tweets and will not be notified if User B mentions User A.[2] The dispute in this case exclusively concerns the President's use of this blocking function. The government has conceded that the account in question is not itself "independent of [Trump's] presidency," but contends that the act of blocking was private conduct that does not implicate the First Amendment. Oral Arg. R. at 1:00 – 1:15.

[2] All of these features are part of the platform set up by Twitter, a private company. Use of the platform is governed by terms of service which users agree to when they use the platform. *See generally Twitter Terms of Service*, Twitter, https://twitter.com/en/tos (last visited June 6, 2019). A Twitter user cannot choose to have an account that has a subset of these features. For example, a user cannot obtain from Twitter an account that prohibits certain other users from blocking them. Nor can a user obtain from Twitter an account with the ability to disable the comment thread.

**\*2** President Trump established his account, with the handle @realDonaldTrump, (the "Account") in March 2009. No one disputes that before he became President the Account was a purely private one or that once he leaves office the Account will presumably revert to its private status. This litigation concerns what the Account is now. Since his inauguration in January 2017, he has used the Account, according to the parties, "as a channel for communicating and interacting with the public about his administration." App'x at 54. The President's tweets from the Account can be viewed by any member of the public without being signed into a Twitter account. However, if a user has been blocked from the Account, they cannot view the Account's tweets when logged in to their account. At the time of the parties' stipulation, the Account had more than 50 million followers. The President's tweets produce an extraordinarily high level of public engagement, typically generating thousands of replies, some of which, in turn, generate hundreds of thousands of additional replies. The President has not generally sought to limit who can follow the Account, nor has he sought to limit the kind of speech that users can post in reply to his tweets.

The public presentation of the Account and the webpage associated with it bear all the trappings of an official, state–run account. The page is registered to Donald J. Trump "45th President of the United States of America, Washington D.C." *Id.* at 54–55. The header photographs of the Account show the President engaged in the performance of his official duties such as signing executive orders, delivering remarks at the White House, and meeting with the Pope, heads of state, and other foreign dignitaries.

The President and multiple members of his administration have described his use of the Account as official. The President has stipulated that he, with the assistance of Defendant Daniel Scavino, uses the Account frequently "to announce, describe, and defend his policies; to promote his Administration's legislative agenda; to announce official decisions; to engage with foreign political leaders; to publicize state visits; [and] to challenge media organizations whose coverage of his Administration he believes to be unfair." Id. at 56. In June 2017, then–White House Press Secretary Sean Spicer stated at a press conference that President Trump's tweets should be considered "official statements by the President of the United States." Id. at 55–56. In June 2017, the White House responded to a request for official White House records from the House Permanent Select Committee on Intelligence by referring the Committee to a statement made by the President on Twitter.

Moreover, the Account is one of the White House's main vehicles for conducting official business. The President operates the Account with the assistance of defendant Daniel Scavino, the White House Director of Social Media and Assistant to the President. The President and his aides have characterized tweets from the Account as official statements of the President. For example, the President used the Account to announce the nomination of Christopher Wray as FBI director and to announce the administration's ban on transgender individuals serving in the military. The President used the Account to first announce that he had fired Chief of Staff Reince Priebus and replaced him with General John Kelly. President Trump also used the Account to inform the public about his discussions with the South Korean president concerning North Korea's nuclear program and about his decision to sell sophisticated military hardware to Japan and South Korea.

Finally, we note that the National Archives, the agency of government responsible for maintaining the government's records, has concluded that the President's tweets are official records. The Presidential Records Act of 1978 established public ownership of the President's official records. 44 U.S.C. § 2202. Under that Act, "Presidential records" include documentary materials created by the President "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory or other official or ceremonial duties of the President." Id. § 2201. The statute authorizes the Archivist of the United States to "maintain and preserve Presidential records on behalf of the President, including records in digital or electronic form." Id. § 2203. Accordingly, the National Archives and Records Administration has advised the White House that the President's tweets are "official records that must be preserved under the Presidential Records Act." App'x at 57.

**\*3** In May and June of 2017, the President blocked each of the Individual Plaintiffs (but not the Knight First Amendment Institute) from the Account. The government concedes that each of them was blocked after posting replies in which they criticized the President or his policies and that they were blocked as a result of their criticism. The government also concedes that because they were blocked they are unable to view the President's tweets, to directly reply to these tweets, or to use the @realDonaldTrump webpage to view the comment threads associated with the President's tweets.

The Individual Plaintiffs further contend that their inability to view, retweet, and reply to the President's tweets limits their ability to participate with other members of the public in the comment threads that appear below the President's tweets. The parties agree that, without the context of the President's original tweets (which the Individual Plaintiffs are unable to view when logged in to their accounts), it is more difficult to follow the conversations occurring in the comment threads. In addition, the parties have stipulated that as a consequence of their having been blocked, the Individual Plaintiffs are burdened in their ability to view or directly reply to the President's tweets, and to participate in the comment threads associated with the President's tweets.

While various "workarounds" exist that would allow each of the Individual Plaintiffs to engage with the Account, they contend that each is burdensome. For example, blocked users who wish to participate in the comment thread of a blocking user's tweet could log out of their accounts, identify a first–level reply to which they would like to respond, log back into their accounts, locate the first–level reply on the author's timeline, and then post a message in reply. The blocked users' messages would appear in the comment thread of the blocking user's tweet, although the blocking user would be unable to see it. Blocked users could also create a new Twitter account. Alternatively, blocked users could log out of their accounts, navigate to the blocking user's timeline, take a screenshot of the blocking user's tweet, then log back into their own accounts and post that screenshot along with their own commentary.

In July 2017, the Individual Plaintiffs and the Knight Institute sued Donald Trump, Daniel Scavino, and two other White House staff members alleging that blocking them from the Account violated the First Amendment.

The parties cross–moved below for summary judgment. The District Court granted summary judgment in favor of the plaintiffs and entered a declaratory judgment that "the blocking of the individual plaintiffs from the [Account] because of their expressed political views violates the First Amendment." *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018). The District Court held that the "interactive space" associated with each tweet constituted a public forum for First Amendment purposes because it was a forum "in which other users may directly interact with the content of the tweets by ... replying to, retweeting or liking the tweet." *Id.* at 566. The Court reasoned that: (1) "there can be no serious suggestion that the interactive space is incompatible with expressive activity," and (2) the President and his staff hold the Account open, without restriction, to the public at large on a broadly–accessible social media platform. *Id.* at 574–75. As to the government control requirement of the public forum analysis, the court found that "the President presents the @realDonaldTrump account as being a presidential account as opposed to a personal account and ... uses the account to take actions that can be taken only by the President as President." *Id.* at 567. The court concluded that "because the President and Scavino use the @realDonaldTrump account for governmental functions" they exercise government control over the relevant aspects of the Account, including the blocking function. *Id.* at 569. The court also rejected the idea that speech within the interactive space on the platform is government speech not subject to First Amendment restrictions, concluding that "replies to the President's tweets remain the private speech of the replying user." *Id.* at 572.

**\*4** After concluding that the defendants had created a public forum in the interactive space of the Account, the court concluded that, by blocking the Individual Plaintiffs because of their expressed political views, the government had engaged in viewpoint discrimination. *Id.* at 577. Finally, the court held that the blocking of the Individual Plaintiffs violated the Knight Institute's right to read the replies of the Individual Plaintiffs which they cannot post because they are blocked. *Id.* at 563–64.[3]

[3] The District Court concluded that all plaintiffs had standing to sue, a conclusion the government does not challenge on this appeal and with which we agree. After the District Court granted declaratory relief, the defendants unblocked the Individual Plaintiffs from the Account. This does not render the case moot. *Walling v. Helmerich & Payne*, 323 U.S. 37, 43 (1944) ("Voluntary discontinuance of an alleged illegal activity does not operate to remove a case from the ambit of judicial power.").

This Court reviews a grant of summary judgment *de novo*, applying the same standards that governed the district court's resolution of the motion. *Summa v. Hofstra Univ.*, 708 F.3d 115, 123 (2d Cir. 2013). All questions presented on this appeal, including questions of constitutional interpretation, are ones of law which we review *de novo*. All. for *Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev.*, 911 F.3d 104, 109 (2d Cir. 2018). Because we agree that in blocking the Individual Plaintiffs the President engaged in prohibited viewpoint discrimination, we affirm.

### DISCUSSION

The President's primary argument in his brief is that when he blocked the Individual Plaintiffs, he was exercising control over a private, personal account. At oral argument, however, the government conceded that the Account is not "independent of [Trump's] presidency," choosing instead to argue only that the act of blocking was not state action. Oral Arg. R. at 1:00 – 1:15. The President contends that the Account is exclusively a vehicle for his own speech to which the Individual Plaintiffs have no right of access and to which the First Amendment does not apply. Secondarily, he argues that, in any event, the Account is not a public forum and that even if the Account were a public forum, blocking the Individual Plaintiffs did not prevent them from accessing the forum. The President further argues that, to the extent the Account is government–controlled, posts on it are government speech to which the First Amendment does not apply. We are not persuaded. We conclude that the evidence of the official nature of the Account is overwhelming. We also conclude that once the President has chosen a platform and opened up its interactive space to millions of users and participants, he may not selectively exclude those whose views he disagrees with.

### I.

The President concedes that he blocked the Individual Plaintiffs because they posted tweets that criticized him or his policies. He also concedes that such criticism is protected speech. The issue then for this Court to resolve is whether, in blocking the Individual Plaintiffs from the interactive features of the Account, the President acted in

a governmental capacity or as a private citizen.

The President maintains that Twitter is a privately owned and operated social media platform that he has used since 2009 to share his opinions on popular culture, world affairs, and politics. Since he became President, he contends, the private nature of the Account has not changed. In his view, the Account is not a space owned or controlled by the government. Rather, it is a platform for his own private speech and not one for the private expression of others. Because the Account is private, he argues, First Amendment issues and forum analysis are not implicated. Although Twitter facilitates robust public debate on the Account, the President contends that it is simply the means through which he participates in a forum and not a public forum in and of itself.

**\*5** No one disputes that the First Amendment restricts government regulation of private speech but does not regulate purely private speech.[4] If, in blocking, the President were acting in a governmental capacity, then he may not discriminate based on viewpoint among the private speech occurring in the Account's interactive space. As noted, the government argues first that the Account is the President's private property because he opened it in 2009 as a personal account and he will retain personal control over the Account after his presidency. However, the fact that government control over property is temporary, or that the government does not "own" the property in the sense that it holds title to the property, is not determinative of whether the property is, in fact, sufficiently controlled by the government to make it a forum for First Amendment purposes. *See Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547–52 (1975) (holding privately–owned theater leased to and operated by city was public forum).[5] Temporary control by the government can still be control for First Amendment purposes.

[4]  *See, e.g., Harris v. Quinn*, 573 U.S. 616, 629 n.4 (2014); *Loce v. Time Warner Entm't Advance/Newhouse P'ship*, 191 F.3d 256, 266 (2d Cir. 1999); *see also Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (stating that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out").

[5]  *See also Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 749 (1996) (plurality opinion) (stating that "public forums are places that the government has opened for use by the public as a place for expressive activity" (internal quotation marks omitted)); *U.S. Postal Serv. v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 132 (considering "question of whether a particular piece of personal or real property owned *or controlled* by the government" is a public forum (emphasis added)).

The government's contention that the President's use of the Account during his presidency is private founders in the face of the uncontested evidence in the record of substantial and pervasive government involvement with, and control over, the Account. First, the Account is presented by the President and the White House staff as belonging to, and operated by, the President. The Account is registered to "Donald J. Trump, '45th President of the United States of America, Washington, D.C.' " App'x at 54. The President has described his use of the Account as "MODERN DAY PRESIDENTIAL." *Id.* at 55. The White House social media director has described the Account as a channel through which "President Donald J. Trump ... [c]ommunicat[es] directly with you, the American people!" *Id.* The @WhiteHouse account, an undoubtedly official Twitter account run by the government, "directs Twitter users to 'Follow for the latest from @POTUS @realDonaldTrump and his Administration." *Id.* Further, the @POTUS account frequently republishes tweets from the Account.[6] As discussed earlier, according to the National Archives and Records Administration, the President's tweets from the Account "are official records that must be preserved under the Presidential Records Act." *Id.* at 57.

[6]  The President and the White House operate two other Twitter accounts: @POTUS and @WhiteHouse. Both accounts are official government accounts. Those accounts belong strictly to the government, in the sense that the President and members of the White House administration will not retain control over those accounts upon leaving office. The @POTUS account is the official account of the U.S. President. The @WhiteHouse account is the official account for the White House administration.

Second, since becoming President he has used the Account on almost a daily basis "as a channel for communicating and interacting with the public about his administration." *Id.* at 54. The President utilizes White House staff to post tweets and to maintain the Account. He uses the Account to announce "matters related to official government business," including high–level White House and cabinet–level staff changes as well as changes to major national policies. *Id.* at 56. He uses the Account to engage with foreign leaders and to announce foreign policy decisions and initiatives. Finally, he uses the "like," "retweet," "reply," and other functions of the Account to understand and to evaluate the public's

reaction to what he says and does. In sum, since he took office, the President has consistently used the Account as an important tool of governance and executive outreach. For these reasons, we conclude that the factors pointing to the public, non–private nature of the Account and its interactive features are overwhelming.

**\*6** The government's response is that the President is not acting in his official capacity when he blocks users because that function is available to all users, not only to government officials. However, the fact that any Twitter user can block another account does not mean that the President somehow becomes a private person when he does so. Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him. Here, a public official and his subordinates hold out and use a social media account open to the public as an official account for conducting official business. That account has interactive features open to the public, making public interaction a prominent feature of the account. These factors mean that the account is not private. *See generally Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995) (applying the same principles to "metaphysical" forums as to those that exist in "a spatial or geographic sense"); *see also Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019) (holding that a public official who used a Facebook Page as a tool of her office exercised state action when banning a constituent); *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 447 (5th Cir. 2019) (finding that a government official's act of banning a constituent from an official government social media page was unconstitutional viewpoint discrimination). Accordingly, the President excluded the Individual Plaintiffs from government–controlled property when he used the blocking function of the Account to exclude disfavored voices.

Of course, not every social media account operated by a public official is a government account. Whether First Amendment concerns are triggered when a public official uses his account in ways that differ from those presented on this appeal will in most instances be a fact–specific inquiry. The outcome of that inquiry will be informed by how the official describes and uses the account; to whom features of the account are made available; and how others, including government officials and agencies, regard and treat the account. But these are concerns for other cases and other days and are ones we are not required to consider or resolve on this appeal.

II.

Once it is established that the President is a government actor with respect to his use of the Account, viewpoint discrimination violates the First Amendment. *Manhattan Community Access Corp. et al. v. Halleck et al.*, 587 U.S. __ (2019) ("When the government provides a forum for speech (known as a public forum), the government may be constrained by the First Amendment, meaning that the government ordinarily may not exclude speech or speakers from the forum on the basis of viewpoint ...."); *see also Pleasant Grove*, 555 U.S. at 469–70 (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums).

The government makes two responses. First, it argues that the Account is not a public forum and that, even if it were a public forum, the Individual Plaintiffs were not excluded from it. Second, the government argues that the Account, if controlled by the government, is government speech not subject to First Amendment restrictions.

A.

As a general matter, social media is entitled to the same First Amendment protections as other forms of media. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (holding a state statute preventing registered sex offenders from accessing social media sites invalid and describing social media use as "protected First Amendment activity"). "[W]hatever the challenges of applying the Constitution to ever–advancing technology, 'the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary' when a new and different medium for communication appears." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952)). A public forum, as the Supreme Court has also made clear, need not be "spatial or geographic" and "the same principles are applicable" to a metaphysical forum. *Rosenberger*, 515 U.S. at 830.

To determine whether a public forum has been created, courts look "to the policy and practice of the government" as well as "the nature of the property and its compatibility with expressive activity to discern the government's intent." *Cornelius*, 473 U.S. at 802. Opening an instrumentality of communication "for indiscriminate use

by the general public" creates a public forum. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983). The Account was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the Account as an official vehicle for governance and made its interactive features accessible to the public without limitation. We hold that this conduct created a public forum.

**\*7** If the Account is a forum—public or otherwise—viewpoint discrimination is not permitted. *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); *see also Pleasant Grove*, 555 U.S. at 469–70 (viewpoint discrimination prohibited in traditional, designated, and limited public forums); *Cornelius*, 473 U.S. at 806 (viewpoint discrimination prohibited in nonpublic forums). A blocked account is prevented from viewing any of the President's tweets, replying to those tweets, retweeting them, or liking them. Replying, retweeting, and liking are all expressive conduct that blocking inhibits. Replying and retweeting are messages that a user broadcasts, and, as such, undeniably are speech. Liking a tweet conveys approval or acknowledgment of a tweet and is therefore a symbolic message with expressive content. *See, e.g.*, *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632–33 (1943) (discussing symbols as speech). Significantly, the parties agree that all of this expressive conduct is communicated to the thousands of users who interact with the Account. By blocking the Individual Plaintiffs and preventing them from viewing, retweeting, replying to, and liking his tweets, the President excluded the Individual Plaintiffs from a public forum, something the First Amendment prohibits.

The government does not challenge the District Court's conclusion that the speech in which Individual Plaintiffs seek to engage is protected speech; instead, it argues that blocking did not ban or burden anyone's speech. *See Knight First Amendment*, 302 F. Supp. 3d at 565. Specifically, the government contends that the Individual Plaintiffs were not prevented from speaking because "the only material impact that blocking has on the individual plaintiffs' ability to express themselves on Twitter is that it prevents them from speaking directly to Donald Trump by replying to his tweets on the @realDonaldTrump web page." Appellants Br. at 35.

That assertion is not well–grounded in the facts presented to us. The government is correct that the Individual Plaintiffs have no right to require the President to listen to their speech. *See Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283 (1984) (a plaintiff has "no constitutional right to force the government to listen to their views"). However, the speech restrictions at issue burden the Individual Plaintiffs' ability to converse on Twitter with others who may be speaking to or about the President.[7] President Trump is only one of thousands of recipients of the messages the Individual Plaintiffs seek to communicate. While he is certainly not required to listen, once he opens up the interactive features of his account to the public at large he is not entitled to censor selected users because they express views with which he disagrees.[8]

[7] If, for example, the President had merely prevented the Individual Plaintiffs from sending him direct messages, his argument would have more force.

[8] The government extends this argument to suggest that the Individual Plaintiffs are claiming a right to "amplify" their speech by being able to reply directly to the President's tweets. The government can choose to "amplify" the speech of certain individuals without violating the rights of others by choosing to listen or not listen. *See Minnesota State Bd.*, 465 U.S. at 288 (stating that "[a]mplification of the sort claimed is inherent in government's freedom to choose its advisers. A person's right to speak is not infringed when government simply ignores that person while listening to others."). That is not what occurred here; the Individual Plaintiffs were not simply ignored by the President, their ability to speak to the rest of the public users of the Account was burdened. In any event, the government is not permitted to "amplify" favored speech by banning or burdening viewpoints with which it disagrees.

The government's reply is that the Individual Plaintiffs are not censored because they can engage in various "workarounds" such as creating new accounts, logging out to view the President's tweets, and using Twitter's search functions to find tweets about the President posted by other users with which they can engage.

**\*8** Tellingly, the government concedes that these "workarounds" burden the Individual Plaintiffs' speech. *See* App'x 35–36, 66. And burdens to speech as well as outright bans run afoul of the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (stating that government "may no more silence unwanted speech by burdening its utterance than by censoring its content"); *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000) ("The distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content–based burdens must satisfy the same rigorous scrutiny as its content–based bans."). When the government has discriminated against a

speaker based on the speaker's viewpoint, the ability to engage in other speech does not cure that constitutional shortcoming. *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez,* 561 U.S. 661, 690 (2010). Similarly, the fact that the Individual Plaintiffs retain some ability to "work around" the blocking does not cure the constitutional violation. Neither does the fact that the Individual Plaintiffs can post messages elsewhere on Twitter. Accordingly, we hold that the President violated the First Amendment when he used the blocking function to exclude the Individual Plaintiffs because of their disfavored speech.

B.

Finally, the government argues that to the extent the Account is controlled by the government, it is government speech. Under the government speech doctrine, "[t]he Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak" about governmental endeavors. *Matal v. Tam,* 137 S. Ct. 1744, 1757 (2017). For example, when the government wishes to promote a war effort, it is not required by the First Amendment to also distribute messages discouraging that effort. *Id.* at 1758; *see also Pleasant Grove,* 555 U.S. at 467 ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

It is clear that if President Trump were engaging in government speech when he blocked the Individual Plaintiffs, he would not have been violating the First Amendment. Everyone concedes that the President's initial tweets (meaning those that he produces himself) are government speech. But this case does not turn on the President's initial tweets; it turns on his supervision of the interactive features of the Account. The government has conceded that the Account "is generally accessible to the public at large without regard to political affiliation or any other limiting criteria," and the President has not attempted to limit the Account's interactive feature to his own speech. App'x at 55.

Considering the interactive features, the speech in question is that of multiple individuals, not just the President or that of the government. When a Twitter user posts a reply to one of the President's tweets, the message is identified as coming from that user, not from the President. There is no record evidence, and the government does not argue, that the President has attempted to exercise any control over the messages of others, except to the extent he has blocked some persons expressing viewpoints he finds distasteful. The contents of retweets, replies, likes, and mentions are controlled by the user who generates them and not by the President, except to the extent he attempts to do so by blocking. Accordingly, while the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation. The Supreme Court has described the government speech doctrine as "susceptible to dangerous misuse." *Matal,* 137 S. Ct. at 1758. It has urged "great caution" to prevent the government from "silenc[ing] or muffl[ing] the expression of disfavored viewpoints" under the guise of the government speech doctrine. *Id.* Extension of the doctrine in the way urged by President Trump would produce precisely this result.

The irony in all of this is that we write at a time in the history of this nation when the conduct of our government and its officials is subject to wide–open, robust debate. This debate encompasses an extraordinarily broad range of ideas and viewpoints and generates a level of passion and intensity the likes of which have rarely been seen. This debate, as uncomfortable and as unpleasant as it frequently may be, is nonetheless a good thing. In resolving this appeal, we remind the litigants and the public that if the First Amendment means anything, it means that the best response to disfavored speech on matters of public concern is more speech, not less.

CONCLUSION

**\*9** The judgment of the District Court is **AFFIRMED**.

**All Citations**

--- F.3d ----, 2019 WL 2932440

**End of Document**                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA..., --- F.3d ---- (2019)**
2019 WL 2932440

WESTLAW  © 2019 Thomson Reuters. No claim to original U.S. Government Works.    9