

1919 Pennsylvania Avenue NW
Suite 800
Washington, DC  20006-3401

**Robert Corn-Revere**
202.973.4225 tel
202.973.4499 fax
bobcornrevere@dwt.com

September 4, 2019

**By ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY  10007

Re:    *PEN American Cntr., Inc. v. Trump*, 18 Civ. 9433 (LGS)
        PLAINTIFF'S THIRD NOTICE OF SUPPLEMENTAL AUTHORITY

Dear Judge Schofield,

Plaintiff submits as supplemental authority in the above-captioned matter, with respect to Defendant's Motion to Dismiss (ECF 45) and Plaintiff's Opposition thereto (48), the recent decision of the United States District Court for the District of Columbia in *Karem v. Trump*, 2019 WL 4189624 (D.D.C. Sept. 3, 2019) (copy attached).  Plaintiff PEN America filed an *amicus* brief in that case. *Karem v. Trump*, Brief of *Amicus Curiae* PEN American Cntr., Inc., No. 19-cv-2514, ECF 21-1 (D.D.C. Aug. 26, 2019).  The case involves the temporary suspension of the White House press pass of PEN America member Brian Karem, who is a White House correspondent for *Playboy* and a CNN contributor.  The district court enjoined the suspension of Karem's "hard pass" to White House press facilities, finding that "even [its] temporary suspension … inflicts irreparable harm on … First Amendment rights" when imposed in violation of constitutional limits. *Karem*, 2019 WL 4189624, at *1, *5-6, *8-9, *10.

The White House had notified Karem of the 30-day suspension for supposedly "fail[ing] to abide by" previously unspecified "norms ensuring decorum and order." *Id*. at *3, *7.  It asserted the action was necessary "to deter Karem and other members of the press from disrupting White House events." *Id*. at *4 (internal quotation marks omitted).  However, the court noted the "uncontroversial point" that "government acts intended to punish … are subject to exacting scrutiny to ensure … fair notice in a manner consistent with due process," *id*. at *7, 11, and held that Karem is likely to succeed on his claim.  Thus, it preliminarily enjoined the 30-day suspension of his press pass to prevent the imposition of further irreparable harm pending full litigation of the case. *Id*. at *10-11.

The Honorable Lorna G. Schofield
September 4, 2019
Page 2

The holdings above are relevant to issues discussed at §§ I.A, II.A.1.c, and II.B of Plaintiff's Opposition to Motion to Dismiss.

                                        Respectfully submitted,

                                        Robert Corn-Revere
                                        DAVIS WRIGHT TREMAINE LLP
                                        1919 Pennsylvania Avenue, NW
                                        Suite 800
                                        Washington, DC  20006
                                        Ph: 202-973-4200; Fax: 202-973-4499
                                        bobcornrevere@dwt.com

cc:  All Counsel of Record via ECF

2019 WL 4169824
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

BRIAN J. KAREM, Plaintiff,
v.
DONALD J. TRUMP and STEPHANIE A. GRISHAM, Defendants.

Civil Action No.: 19-2514
|
September 3, 2019

Re Document No.: 2

MEMORANDUM OPINION

RUDOLPH CONTRERAS United States District Judge

GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I. INTRODUCTION

*1 For decades, and across many presidential administrations, the White House has made long-term press passes available to any Washington-based journalist who regularly covers the President and can clear a Secret Service background check. In light of that decision to make White House press facilities widely accessible, the D.C. Circuit has held that reporters have a First Amendment liberty interest in possessing a long-term so-called "hard pass"—an interest that, under the Fifth Amendment, may not be deprived without due process. See *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977). This case involves an alleged violation of that due process right. Plaintiff Brian Karem, a White House correspondent for Playboy magazine, claims that White House Press Secretary Stephanie Grisham unlawfully suspended his hard pass as a punishment following his involvement in a brief verbal altercation in the Rose Garden that was captured on video and shared widely on the internet. As the Court will explain below, Karem has, at this early stage of the proceedings, shown that he is likely to succeed on this due process claim, because the present record indicates that Grisham failed to provide fair notice of the fact that a hard pass could be suspended under these circumstances. Meanwhile, Karem has shown that even the temporary suspension of his pass inflicts irreparable harm on his First Amendment rights. The Court therefore grants Karem's motion for a preliminary injunction and orders that his hard pass be restored while this lawsuit is ongoing.

II. BACKGROUND

On July 11, 2019, President Trump hosted a number of internet influencers and personalities at the White House grounds at what the administration called a Social Media Summit. At the Summit's conclusion, the attendees were invited to the Rose Garden to watch the President deliver prepared remarks with the Attorney General. Unlike the Summit itself, the remarks were open to the White House press corps, so Brian Karem decided to go. Upon arrival in the Rose Garden, Karem and other members of the press were directed to a roped-off, standing-room-only press area that had been set up around the rows of chairs where the Summit attendees were permitted to sit. Some Summit attendees were already in their seats, and the atmosphere became, in the words of one press member, "unusually tense." McAteer Decl. ¶ 12, ECF No. 2-9. Certain Summit attendees began photographing the members of the press and calling them "fake news." *Id.* Among those attendees participating was former presidential advisor Sebastian Gorka, who at one point stood up to take a wide-frame picture of the press—calling it a "Fake News panorama." *Id.*; Ex. 70 at 0:05–0:08.[1]

[1] Citations to numbered exhibits refer to exhibits to the First Declaration of Theodore J. Boutrous and can be found at ECF Nos. 3–5. Citations to lettered exhibits refer to exhibits to Boutrous's Second Declaration and can be found at ECF No. 18.

Ultimately, the President gave his remarks without incident, and when he finished, he turned to walk back

into the White House. Karem called out in an attempt to ask the President a question, but the President ignored it and went inside. Ex. 60 at 0:00–0:09. Karem's question did, however, draw a reaction from some of the Summit attendees. One shouted, "He talked to us, the real news." *Id.* at 0:10–0:12. Another said sarcastically, "Don't be sad, don't be sad." *Id.* at 0:13–0:15. Karem responded by smiling and making what was apparently a joke. Gesturing toward the seated Summit attendees, he said, "This is a group eager for demonic possession," before saluting and turning away. Ex. 61 at 0:01–0:06.

**\*2** Karem's statement drew laughter from several of the attendees, but Gorka took it differently. Seated a number of rows in front of Karem's position in the press area, Gorka turned around in his chair and yelled, "And you're a 'journalist,' right?"—making air quotes with his hands. Ex. 60 at 0:21–0:25. With the event having concluded, Gorka and other seated attendees began to stand, and as they did so, Karem said, "Hey come on over here and talk to me, brother, or we can go outside and have a long conversation." Ex. 61 at 0:10–0:14. Karem simultaneously motioned backward with his right thumb over his shoulder and raised his eyebrows. *Id.*

By the time Karem had finished his sentence, Gorka was walking briskly toward him across the Rose Garden—shouting, "Are you threatening me now in the White House? In the Rose Garden? You are threatening me in the Rose Garden?" Ex. 60 at 0:29–0:36. As Gorka approached, Karem took a few steps forward himself, but remained within the roped-off press area. Ex. 61 at 0:16–0:21. Karem, his voice now slightly quieter, explained "I said I'd be happy to *talk* to you." *Id.* at 0:17–0:19. Gorka, still yelling, responded, "You are a punk! You're not a journalist! You're a punk!" *Id.* at 0:20–0:24. Gorka then turned and walked away, at which time some of the Summit attendees began chanting, "Gorka! Gorka! Gorka!" Ex. 62 at 0:01–0:08. While Gorka walked away and the crowd's chant was ongoing, Karem raised the volume of his voice again, and twice said to Gorka, "Go home," before shouting "Hey Gorka, get a job!" Ex. 61 at 0:23–0:29.

Moments later, another one of the Summit attendees, who was filming the scene on his phone, said loudly to Karem, "Hey, just for the record he'd kick your punk ass" ("he" meaning Gorka). *Id.* at 0:31–0:37; Ex. 62 at 0:09–0:11. From others in the crowd, this remark prompted a mixture of laughs and groans—and even an exasperated "Oh my God." Ex. 62 at 0:11–0:14. Karem, meanwhile, responded to the remark by taking a couple of steps to his right and saying, "And that's the measure of everything, isn't it?" Ex. 60 at 0:48–0:53. By this time, Karem was (perhaps inadvertently) standing on the other side of the press-area's demarcating rope, which had at some point fallen to the ground. *Id.* A Secret Service agent quickly noticed and approached Karem, who stepped back into the press area. *Id.* at 0:54–1:01. Karem and the agent then spoke for a few seconds, but the substance of their conversation is not audible in the various video recordings. *E.g.*, *id.* at 0:54–1:01.

A few minutes later, after leaving the Rose Garden, Karem saw Gorka again—this time in the White House's Palm Room. Karem walked over, put his left hand on Gorka's right arm, and tried to explain that, in making his earlier comment, he had only meant that he wanted to talk. *See* Ex. 63 at 2:59–3:02. Gorka, however, disagreed, which prompted Karem to raise his right index finger and repeat, "I said 'talk.' " *Id.* at 3:04–3:05. Gorka, who noticed that a White House staffer was trying to usher all press out of the room, responded by repeatedly saying to Karem, "You're done." *Id.* at 3:02–3:12. Recognizing that he had to leave, Karem tried to shake hands, but Gorka refused, so Karem walked away. *Id.* at 3:12–3:26.

Karem subsequently did not hear anything from the White House about the incident for three weeks, and during that time period, he continued to attend press events on White House grounds. *See* Karem Decl. ¶¶ 37–38, ECF No. 2-5. On Friday, August 2, though, he received a letter from White House Press Secretary Stephanie Grisham informing him that she had "made a preliminary decision to suspend [his] hard pass for 30 days due to [his] conduct at the press event in the Rose Garden on July 11, 2019." Ex. 4 at 1. That letter acknowledged that the White House "had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events," but Grisham reasoned that there "had previously been a widely shared understanding that (1) members of the press, at all times at White House press events, must act professionally, maintain decorum and order, and obey instructions from White House staff, and (2) disruptive behavior that interferes with the conduct of a press event or is otherwise a breach of professional decorum—including but not limited to taunting other members of the press, White House officials, or guests in an effort to provoke a confrontation—is prohibited." *Id.*

**\*3** Karem, Grisham's letter explained, had "failed to abide by these basic norms ensuring decorum and order" by making "an apparent attempt to escalate ... verbal taunts to a physical confrontation." *Id.* That kind of "disruptive behavior violated the basic standards governing such events and" was, in Grisham's "preliminary judgment, sufficient factual basis to suspend

[Karem's] hard pass for 30 days." *Id.* at 2. The letter gave Karem a deadline of 5:00 pm on Monday, August 5—one business day—to respond in writing and with any additional material he wished Grisham to consider. *Id.*

In a letter delivered that following Monday, Karem disputed Grisham's factual characterization of the July 11 incident, argued that revoking his pass would be unconstitutional, and asked Grisham to reconsider her decision. *See* Ex. 5. Karem's counsel also requested the chance to meet with Grisham "to discuss these issues prior to [her] making a final decision." *Id.* at 1 n.1. Grisham granted that request and met with Karem's lawyers at the White House on Thursday, August 8. *See* Karem Decl. ¶ 45. Though Karem chose not to attend the meeting, Grisham allowed him to submit a supplemental, written version of his story the following day, August 9. *See* Exs. 8, 9.

One week later, on Friday, August 16, Grisham sent Karem a thirteen-page letter confirming that she had "now made a final determination to suspend [his] hard pass for 30 days." Ex. 10 at 1. The letter began by laying out the process that Grisham had followed in making her decision and the evidence she had considered. That evidence was limited to: (1) seven publicly available online videos, "which show[ed] multiple angles of the incidents"; (2) "[t]he observations of the U.S. Secret Service agent" who had spoken to Karem in the Rose Garden; (3) Karem's initial August 5 response; (4) the August 8 in-person meeting with Karem's lawyers; and (5) Karem's supplemental response provided on August 9. *Id.* at 3. Grisham confirmed that she "ha[d] not conducted, and ha[d] not relied on, interviews with any other witnesses." *Id.*

The letter then provided a detailed recitation of Grisham's factual findings, beginning with the conclusion of the President's remarks in the Rose Garden and ending with Karem and Gorka's discussion in the Palm Room. *Id.* at 3–8. In recounting the events, Grisham found that Karem's "demonic possession" comment could not "credibly be understood as mere light-hearted comedy" because it "denigrated the mental state of the gathered audience." *Id.* at 5–6. Regardless of subjective intent, the comment was therefore "inappropriate and unprofessional." *Id.* at 6. Grisham also rejected Karem's contention that his "invitation ... to 'go outside and have a long conversation' " was "an effort to de-escalate by making a genuine invitation for a conversation in another forum." *Id.* at 6. Rather, according to Grisham, Karem's body language and the contemporaneous reactions of those around him indicated that the comment was "an invitation to a physical altercation." *Id.* Finally, Grisham credited Karem's assertion that he approached Gorka in the Palm Room in order to make peace with him. *See id.* at 5. But she stressed that "Karem ignored a White House staffer's repeated directions to leave," and she explained that, when "Gorka made clear that he would not shake ... Karem's hand," Karem "turned this exchange into a confrontation as well" by "wagg[ing] his finger in ... Gorka's face." *Id.*

In light of these findings, Grisham reached the conclusion that "Karem's actions, as viewed by a reasonable observer, (1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with ... Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instruction to leave." *Id.* at 8. Citing as authority only her preliminary decision letter sent to Karem on August 2, Grisham deemed Karem's conduct, when "taken as a whole," violative of the "widely-shared understanding that at all times at White House press events, members of the press must act professionally, maintain decorum and order, and obey instructions from White House staff." *Id.*

**\*4** As a result, Karem's behavior "require[d] a response to ensure that it [did] not happen again." *Id.* Grisham explained that she had "carefully considered a range of potential responses ..., including permanently revoking [Karem's] hard pass, temporarily suspending his hard pass, providing a written warning, and taking no action." *Id.* But permanent revocation, she decided, "would be too great a punishment for the conduct involved," while taking no action or issuing a warning "would be insufficient to deter ... Karem and other members of the press from disrupting White House events." *Id.* Thus, a temporary thirty-day suspension was "an appropriate response," as it "impose[d] no greater a restriction than [was] necessary for an effective sanction." *Id.*

Grisham's decision went into effect immediately on August 16, so Karem brought this lawsuit against the President and Grisham the following Tuesday, August 20. The same day, he filed the present motion for temporary restraining order ("TRO") and preliminary injunction, seeking the immediate restoration of his hard pass. The Court held a hearing on both the TRO and the preliminary injunction on August 27, 2019, and both matters are now ripe for consolidated disposition.

### III. ANALYSIS

"A party seeking a preliminary injunction must make a 'clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest.' " *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Courts in this circuit used to weigh these four factors through application of a "sliding-scale" analysis, under which "a strong showing on one factor could make up for a weaker showing on another." *Id.* at 7 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). But the validity of that approach is now in question following the Supreme Court's decision in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). *See, e.g.*, *Sherley*, 644 F.3d at 392–93. The D.C. Circuit has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing *Sherley*, 644 F.3d at 392–93; *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)).

#### A. Likelihood of Success on the Merits

In his preliminary injunction motion here, Karem argues that he is likely to succeed on both a Fifth Amendment due process claim and an independent First Amendment free speech claim. He focuses primarily on the due process issue, though, so the Court begins there.

Karem's due process claim appears to be grounded in two related doctrines, which he contends converge or intersect under the facts of this case. The first is the vagueness doctrine, which instructs that "[a] conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.' " *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). The second doctrine is procedural due process, which prohibits the government from depriving "an individual of a liberty or property interest without providing appropriate procedural protections"—usually in the form of notice and some kind of opportunity to contest the decision. *E.g.*, *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009).

**\*5** As the Court will eventually explain, the first doctrine is alone sufficient to show that Karem is likely to succeed on the merits of his due process claim in this case. But before getting there, it makes sense to first review the decision in *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), on which Karem relies heavily in support of both his vagueness and procedural due process arguments. *Sherrill* involved a challenge to the same White House press pass system at issue here: the plaintiff (Sherrill) applied for a hard pass, but his application was denied without notice and without any explanation as to why. *Id.* at 126. When Sherrill inquired about his application, the Secret Service refused to provide any additional information or disclose the standard it used for considering applications, so Sherill sued, alleging that denial of the pass under those circumstances was unconstitutional. *Id.* at 127–28.

In ultimately ruling for Sherrill, the D.C. Circuit began its analysis by concluding that reporters have a First Amendment liberty interest in White House hard passes, which triggers due process protections. In its opinion, the circuit acknowledged that the public has no general right of access to the White House, *see id.* at 129 & n.15 (citing *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965)), and that the President certainly has the "discretion ... to grant interviews or briefings with selected journalists" without giving the "opportunity to all," *id.* at 129. Indeed, the circuit stressed that Sherrill's claim was "not premised upon the assertion that the White House must open its doors to the press, conduct press conferences, or operate press facilities." *Id.* The hard pass system, however, presented "a situation where the White House ha[d] voluntarily decided to establish press facilities for correspondents who need to report therefrom." *Id.* And the circuit reasoned that, because "White House press facilities have been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press, requires that ... access not be denied arbitrarily or for less than compelling reasons." *Id.* (internal citations and footnote omitted). "This first amendment interest," the circuit said, "undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth amendment." *Id.* at 130–31.

Having concluded "that both first and fifth amendment concerns [were] heavily implicated," the court in *Sherrill* then proceeded to make what appear to be two

independent, alternative holdings. *Id.* at 128. *First*, although the circuit accepted that protection of the President was a compelling interest that could permissibly justify the denial of a pass, the court took issue with the fact that the "standard for denial of a press pass ha[d] never been formally articulated or published." *Id.* at 130. And it reasoned that the phrase that the Secret Service first put forward during litigation—"reasons for security"—was "unnecessarily vague and subject to ambiguous interpretation." *Id.* As a result, the phrase did "not inform the public or other potential applicants of the basis for exclusion of journalists from White House press facilities." *Id.* To resolve that problem, the Court ordered the Secret Service to "publish or otherwise make publicly known the actual standard employed in determining whether an otherwise eligible journalist [would] obtain a White House press pass." *Id.* That published standard did not need to be a "detailed articulation of narrow and specific standards or [a] precise identification of all the factors which [could] be taken into account." *Id.* It did, however, need to "specify in a meaningful way the basis upon which the persons [would] be deemed security risks," so as to "allow meaningful judicial review of decisions to deny press passes." *Id.*

**\*6** *Second*, the circuit went on to address the question of "what process [was] due" under the Fifth Amendment before an application could be formally denied. *Id.* at 131 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The court concluded that applicants were entitled to "notice of the factual bases for denial, an opportunity for the applicant to respond to these, and a final written statement of the reasons for denial." *Id.* at 130. The first two of these procedural protections provided "a minimum prerequisite for ensuring that the denial" was not "based on arbitrary or less than compelling reasons." *Id.* at 131. And a final written statement was "necessary in order to assure that the agency ha[d] neither taken additional, undisclosed information into account, nor responded irrationally to matters put forward by way of rebuttal or explanation." *Id.*

As Karem seems to see it, the first of *Sherrill*'s alternative holdings was grounded in vagueness and the second in procedural due process. He argues that either holding entitles him to relief. With respect to vagueness, Karem contends that Grisham's decision was not based on any meaningful standard that was articulated or publicly known before July 11. Thus, he claims to have had no fair notice that his conduct was sanctionable through revocation of his hard pass. As for procedural due process, Karem acknowledges that he was informed of the factual basis for the revocation before his pass was formally suspended on August 16, but he argues that such notice was nonetheless defective. And he contends that he was provided insufficient opportunity to respond before Grisham issued her final decision.

Defendants, for their part, question whether *Sherrill* applies at all to this case—arguing briefly that *Sherrill* has no relevance outside the context of the Secret Service denying a hard pass application for security reasons. *See* Defs.' Opp'n at 15–16, ECF No. 15. But Defendants fail to explain why the due process concerns are any different on these facts, involving the same kind of liberty interest in a hard pass. Plus, another district court in this jurisdiction recently found that *Sherrill* did apply to the revocation of a pass by White House personnel. *See* Transcript of Mot. Hr'g at 6, *Cable News Network, Inc. v. Trump*, No. 18 Civ. 2610 (D.D.C. Nov. 16, 2018), ECF No. 22. Absent a more developed argument from Defendants, this Court sees no reason to differ from that court's conclusion.

Defendants then appear to argue that even if *Sherrill* does apply, it does not provide the basis for a vagueness or fair notice challenge like the one Karem has brought. *See* Defs.' Opp'n at 16, 23–24; Hrg. Tr. at 43, ECF No. 24. Although the rationale underlying this contention is not entirely clear, the Court's best guess is that Defendants view *Sherrill*'s vagueness language as non-binding dicta. As the Court noted above, though, *Sherill* indicates that the circuit made two independent and alternative holdings. The opinion's conclusion references both the need for explicit standards and the need for procedural protections. *Sherrill*, 569 F.2d at 131 ("Having determined that appellants' failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons, and to afford procedural protections to those denied passes, violates the first and fifth amendments, we affirm."). This distinction matters because it is well-established that an alternative holding is not dicta but rather binding precedent. *See, e.g.*, *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 673 (D.C. Cir. 2013); *Hitchcock v. Sec'y, Fla. Dep't of Corr.*, 745 F.3d 476, 484 n.3 (11th Cir. 2014) (citing *Massachusetts v. United States*, 333 U.S. 611, 623 (1948); *Richmond Screw Anchor Co. v. United States*, 275 U.S. 331, 340 (1928); *United States v. Title Ins. & Trust Co.*, 265 U.S. 472, 486 (1924)). The Court is therefore obligated to follow *Sherrill* in its entirety.

**\*7** In any event, *Sherrill* is not the only case on which Karem relies for his fair notice and vagueness argument—a fact that makes for a good segue into the specifics of Karem's claim. Citing *FCC v. Fox*, 567 U.S. 239, and a number of other cases involving vagueness

challenges and challenges to punitive damages awards, Karem makes what is in the abstract an uncontroversial point: government acts intended to punish, he says, are subject to exacting scrutiny to ensure that regulated parties are provided fair notice in a manner consistent with due process. And pointing to Grisham's August 16 final decision letter, Karem contends that the revocation of his hard pass was precisely such an act intended to punish. The letter states that Karem's conduct "warrant[ed] a significant sanction," Ex. 10 at 13, in order to "deter[ ] ... Karem and other members of the press from disrupting White House events," *id.* at 8. *See also id.* at 8–9, 10 n.44, 12 (further references to "punishment," "sanction," and deterrence). Karem then directs the Court to Grisham's August 2 preliminary decision letter, which he says concedes that "no set of explicit rules" had existed before the July 11 incident in the Rose Garden. *See* Ex. 4 at 1 ("The White House ... had not previously thought that a set of explicit rules was necessary to govern behavior by members of the press at White House press events."). That August 2 letter instead cites "a widely shared understanding" of appropriate conduct, *id.*, which Karem says plainly contravenes *Sherrill*'s instruction that an "explicit and meaningful standard" regulating hard passes must be "articulate[d] and publish[ed]," 569 F.2d at 131, as well as the more general principle that a regulatory punishment does not comply with due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," *Fox*, 567 U.S. at 253 (quoting *Williams*, 553 U.S. at 304).

In response, Defendants do not dispute that Grisham's aim was punitive, but they argue that the White House had provided reporters prior notice of what would be acceptable. Defendants point to a separate letter issued to the press corps in November 2018 in the aftermath of a different lawsuit involving the revocation of CNN reporter Jim Acosta's hard pass. *See* Press Statement from Sarah Sanders, White House Press Secretary (Nov. 19, 2018).[2] That letter, which the parties refer to as the "Acosta Letter," provides a list of three rules to govern reporter conduct at formal White House press conferences, and it states that "[f]ailure to abide" by those rules "may result in suspension or revocation of the journalist's hard pass." *Id.* at 1–2. Defendants concede, however, that those rules did not apply at the July 11 event in the Rose Garden because that event was not a press conference. Instead, Defendants cite to other language further down in the letter, which states:

> We are mindful that a more elaborate and comprehensive set of rules might need to be devised, including, for example, for journalist conduct in the open (non-press room) areas inside and outside the White House and for Air Force One. At this time however, we have decided not to frame such rules in the hope that professional journalistic norms will suffice to regulate conduct in those places. If unprofessional behavior occurs in those settings, or if a court should decide that explicit rules are required to regulate conduct even there, we will be forced to reconsider this decision.
>
> The White House's interaction with the press is, and generally should be, subject to a natural give-and-take.... It would be a great loss for all if, instead of relying on the professionalism of White House journalists, we were compelled to devise a lengthy and detailed code of conduct for White House events.

*Id.* at 2. Such extensive language, Defendants say, should have made Karem and other reporters aware that they had to behave professionally or risk losing their hard pass.

[2] This specific document was entered into the record at the August 27 hearing on Karem's motion, but a nearly identical document was filed as an exhibit to Defendants' opposition. *See* Defs.' Opp'n Ex. 2, ECF No. 15-2.

As an initial matter, the Court notes that Grisham herself did not reference the Acosta Letter in either her August 2 preliminary decision or August 16 final decision letters, which casts some doubt on whether she thought that the Acosta Letter provided any meaningful notice. But setting that aside, there are at least two additional, more fundamental problems with the Acosta Letter, each of which renders the letter insufficient for due process purposes.

First, the letter's language, taken in its entirety, is ambiguous as to whether the White House even intended to regulate events other than formal press conferences. Indeed, by expressly limiting the scope of the promulgated rules—including the warning about the "suspension or revocation of ... hard pass[es]"—to formal press conferences, the White House arguably suggested that it was not going to police reporter behavior at other events, unless "unprofessional behavior occur[red]" and it was "forced to reconsider [its] decision" by publishing explicit rules. *Id.* Likewise, the Acosta Letter's use of the word "norms"—which are typically considered non-binding—could be read to mean that the White House did not, at the time of the letter, contemplate the imposition of punishments for purportedly unprofessional conduct at events other than press conferences. *Cf. BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) (stating, in context of holding punitive damages award excessive under Due Process Clause, that "[e]lementary notions of

fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also the severity of the penalty that a State may impose"). Is this the only way to interpret the letter? Maybe not, but the relevant language is, at a minimum, open to interpretation. And on the issue of whether fair notice was provided, such ambiguity works against Defendants as the regulating party. See Fox, 567 U.S. 239 at 256–57 (concluding that agency's prior statement that particular conduct "might well raise a serious question" under relevant statutory prohibition did not suffice for fair notice).

**\*8** Second, even if the Acosta Letter was clear that certain conduct outside of press conferences could be punishable through revocation of a hard pass, the standard it provides is "unnecessarily vague and subject to ambiguous interpretation." Sherrill, 569 F.2d at 130. The letter refers only to "professional journalistic norms," Acosta Letter at 2, which is just as amorphous as the "reasons for security" language that the D.C. Circuit found insufficient in Sherrill, 569 F.2d at 130. Though "professionalism" has a well-known common meaning, it is inherently subjective and context-dependent. Such abstract concepts may at times indicate what is allowed and disallowed at the furthest margins, but they do not clearly define what is forbidden or permitted in common practice within those margins. The vagueness doctrine guards against this danger by ensuring that regulated parties are able to discern, as a practical matter, "what is required of them so they may act accordingly." Fox, 567 U.S. at 253.

Defendants' initial response is that similarly broad standards are often enforced in other environments, including courtrooms. See, e.g., D.D.C. Local Rules, App'x B, D.C. Bar Voluntary Standards for Civility in Professional Conduct (Lawyers may "not engage in conduct that offends the dignity and decorum of judicial proceedings, brings disorder or disruption to the courtroom, or undermines the image of the legal profession"). The rules to which Defendants cite, however, are tailored to discrete, identifiable, and objectively testable goals—like preventing the disruption of judicial proceedings. In this sense, the rules that Defendants cite actually help illustrate a chief problem with the Acosta Letter's standard: it did not identify with any degree of precision the scope of its applicability with respect to context. The Acosta Letter merely referred to "White House events" in "the open (non-press room) areas inside and outside the White House and ... Air Force One." Acosta Letter at 2. But unlike judicial proceedings, which are consistent in their solemnity, "White House events" appear to vary greatly in character. Thus, without any contextual guideposts, "professionalism," standing alone, remains too murky to provide fair notice here. Cf. United States v. Bronstein, 849 F.3d 1101, 1108–09 (D.C. Cir. 2017) (using context of statute to conclude that statute's use of "harangue" and "oration" referred to "public speeches that tend to disrupt the [Supreme] Court's operations, and no others"). What is deemed "professional" behavior in the context of a state dinner may be very different from what is considered "professional" behavior during a performance by James Brown.

Next, Defendants appear to argue that, even if the meaning of "professionalism" may be debatable in certain instances, Karem's behavior was clearly unprofessional in this instance. This contention appears to be grounded in the notion that "a plaintiff who 'engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " Kadi v. Geithner, 42 F. Supp. 3d 1, 39 (D.D.C. 2012) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)). Again, though, "professionalism" is context-dependent, and Karem has provided some evidence that White House press events are often freewheeling and that aggressive conduct has long been tolerated without punishment. That evidence includes a characterization of the White House press corps as "an unruly mob of reporters." Ex. C at 5. It includes stories of how journalists have "rudely interrupted" presidents and "berated" press secretaries, Ex. D at 1; have "breach[ed] etiquette" by "heckling" during presidential remarks, Ex. I at 1; and have shouted questions at the conclusion of Rose Garden events, drawing the ire of honored guests in attendance, see Ex. E at 2; Ex. C at 4. The evidence even includes an account of how two reporters once "engaged in a shoving match over positions in the briefing room." Ex. C at 5. This kind of behavior may have occasionally led the White House to speak with reporters' employers, see Donaldson Decl. ¶ 4, ECF No. 2-6, but it apparently never resulted in the revocation or suspension of a hard pass,[3] see id. ¶ 5; Gillman Decl. ¶ 8, ECF No. 2-8. And, as noted above, the Acosta Letter does not unambiguously signal a departure from that regime. In fact, the letter could reasonably be read to mean that the pre-existing regime would be maintained for the time being.

[3]  It should be noted that this evidence will be by no means conclusive as this case moves forward. But "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); see also Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) ("[S]ix of our sister circuits have permitted district courts to rely on hearsay evidence for the

limited purpose of determining whether to award a preliminary injunction."). Also, the Court notes that much of Karem's evidence on this issue was submitted with his reply brief. The Court finds this evidence to be proper rebuttal evidence because it responds to the argument in Defendants' opposition that Karem had "actual notice of the basic prohibition against shouting at guests or starting fights in the White House." Defs.' Opp'n at 23. And consideration of the evidence in this case is not unjust because Defendants had the opportunity to respond to the new evidence either at the hearing on Karem's motion, or by seeking leave to file a sur-reply. *See* Ben-Kotel v. Howard Univ., 319 F.3d 532, 536 (D.C. Cir. 2003).

**\*9** Defendants, meanwhile, have submitted no evidence in support of their contention that Karem's conduct was clearly proscribed under the existing "professionalism" policy. They instead rest entirely on Grisham's August 16 letter and its conclusions that "Karem's actions, as viewed by a reasonable observer, (1) insulted invited guests of the White House, (2) threatened to escalate a verbal altercation into a physical one to the point that the Secret Service deemed it prudent to intervene, and (3) re-engaged with ... Gorka in what quickly became a confrontational manner while repeatedly disobeying a White House staffer's instruction to leave." Ex. 10 at 8. But in light of the evidence that Karem has presented the first and third conclusions do not seem *clearly* sanctionable in the context of the White House press corps. And the second conclusion is not supported by the various video recordings of the July 11 incident. No doubt, Karem's remark that he and Gorka could "go outside and have a long conversation," *id.* at 3, was an allusion to a physical altercation, but the videos make clear that it was meant as an irreverent, caustic joke and not as a true threat. And the videos belie the notion that a Secret Service agent had to intervene to prevent a fight: the agent walks right past Karem as the exchange with Gorka is concluding (before returning upon hearing someone call Karem a "punk ass"). *See* Ex. 63 at 0:30–0:36; Ex. 61 at 0:23–0:27. Rather, Karem and Gorka each had ample opportunity to initiate a physical altercation, and they each made the decision not to.[4] Plus, Karem's interaction with Gorka in the Rose Garden was brief—about twenty seconds, *see* Ex. 63 at 0:09–0:31—and it came after the President's remarks had concluded. This event was also one where jocular insults had been flying from all directions. *See, e.g.*, Ex. 60 at 0:10–0:15; Ex. 61 at 0:31–0:37; Ex. 70 at 0:05–0:08; McAteer Decl. ¶ 12. There is no indication in the record that other offenders were reprimanded, or even told to stop.

[4]  *Sherrill* does not articulate a precise standard of review that courts should apply to hard pass determinations, but it states that access should "not be denied arbitrarily or for less than compelling reasons" and that courts should "be appropriately deferential to the Secret Service's determination of what justifies the inference that an individual constitutes a potential risk to the physical security of the President or his family." 569 F.2d at 129–30. Even if the use of the word "arbitrary" meant a particularly deferential standard, the Court does not find the evidence to support the conclusion that a reasonable person would have believed Karem to be genuinely threatening a physical altercation.

This is not to say, necessarily, that Karem or any of the other July 11 guests were constitutionally entitled to engage in this conduct in the Rose Garden; the Court does not reach, and takes no position, on Karem's independent First Amendment free speech claim. As the Court has said, though, this context matters in determining what was deemed acceptable. Taking into account all of the evidence in the present record, the Court cannot conclude that Karem's behavior was clearly proscribed by the Acosta Letter's standard, or even by any widely understood standard of "professionalism" or "decorum" within the context of such an unruly event.

Finally, the Court should briefly take note of *Sherrill*'s instruction that due process does not require a "detailed articulation of narrow and specific standards" governing hard passes, or "a precise identification of all the factors" that could "be taken into account." 569 F.2d at 130. The Court's conclusion here, based on a preliminary record, imposes no such requirement. Indeed, just as the *Sherrill* court recognized that there was a meaningful difference between a "reasons for security" standard and "the principle of whether the applicant presents a potential source of physical danger to the President and/or his immediate family," *id.* at 130, this Court recognizes that there could be a significant difference between the Acosta Letter's "professionalism" standard and the guidelines provided in Grisham's August decision letters. Those August letters avoid "narrow and specific standards" and still provide more guidance than the Acosta Letter: they reference, in addition to professionalism, "obey[ing] instructions from White House staff," "taunting," "provok[ing] confrontation[s]," "disruptive behavior," and "decorum and order," Ex. 4 at 2; *see also* Ex. 10 at 8.

Of course, the Court need not decide whether those guidelines would survive a vagueness or First Amendment challenge, because they had not been promulgated at the time Karem's conduct occurred. And for purposes of the vagueness doctrine, the time the

relevant conduct occurred matters, because due process requires that "regulated parties ... know what is required of them so they may act accordingly." *Fox*, 567 U.S. at 253. On the present record, the Court concludes that Karem is likely to succeed on his claim that he was not provided such fair notice in this case.

### B. Irreparable Harm

**\*10** Having demonstrated a likelihood of success on the merits, Karem must next show that he is likely to suffer "irreparable harm in the absence of preliminary relief." *League of Women Voters*, 838 F.3d at 6 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 505). That harm "must be unrecoverable; it must be 'both certain and great; [and] it must be actual and not theoretical.' " *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (alteration in original) (quoting *Wis. Gas. Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). To make the harm showing here, Karem contends that each day that goes by without his hard pass constitutes a concrete injury to his First Amendment rights. And he stresses the practical effect of stripping a reporter of a hard pass: without access to the building, Karem says, he effectively cannot perform the duties of a White House correspondent because he lacks the ability to observe events firsthand and to ask questions of White House officials. *See, e.g.*, Gillman Decl. ¶¶ 9–16; Karem Decl. ¶¶ 49–50. In response, Defendants argue that any injury that Karem has suffered is procedural in nature—the implication seeming to be that such injury is not "unrecoverable" in a manner that requires immediate restoration of Karem's hard pass. *See* Defs.' Opp'n at 44; Hrg. Tr. at 40.

Defendants' argument cannot be squared with *Sherrill*, though, which makes clear that while the constitutional *violation* here may have been procedural in nature, the constitutional *injury* has substantive components rooted in the First Amendment. *See* 569 F.2d at 131 ("[T]he interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the first amendment."). And "[t]he loss of First Amendment 'freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Pursuing Am.'s Greatness*, 831 F.3d at 511 (internal quotation marks omitted) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)); *see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976).

It is not merely an abstract, theoretical injury, either. As *Sherrill* recognized, "where the White House has voluntarily decided to establish press facilities" that are "open to all bona fide Washington-based journalists," the First Amendment requires "that individual newsmen not be arbitrarily excluded from sources of information." 569 F.2d at 129–30. Such exclusion is precisely what Karem is suffering here. His First Amendment interest depends on his ability to freely pursue "journalistically productive conversations" with White House officials. Gillman Decl. ¶ 12. Yet without his hard pass, he lacks the access to pursue those conversations—even as an eavesdropper. And given that the news is time-sensitive and occurs spontaneously, that lack of access cannot be remedied retrospectively. *See* Transcript of Mot. Hr'g at 13, *Cable News Network, Inc.*, No. 18 Civ. 2610, ECF No. 22 ("Each day that [the reporter] is deprived of that interest without the process prescribed by the court in *Sherrill*, he suffers a harm that cannot be remedied in retrospect."). Indeed, the only way to remedy the injury is to return the hard pass and the access that comes with it. Under those circumstances, Karem's First Amendment injury undoubtedly constitutes a concrete, unrecoverable harm sufficient to warrant preliminary relief.

### C. The Balance of the Equities and the Public Interest

Typically, Karem would need to make two additional showings in order to establish that a preliminary injunction is warranted. The first would be a "balance of the equities in [his] favor," *League of Women Voters*, 838 F.3d at 6 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 505), meaning a showing that the requested relief would "not substantially injure other interested parties," *id.* at 12 (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). The second would be a showing that the requested relief would "accord with the public interest." *Id.* at 6 (quoting *Pursuing Am.'s Greatness*, 831 F.3d at 505). These two considerations merge into one, however, when the government is the non-moving party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

**\*11** Here, Karem contends that the equities and public interest tilt in his favor because his First Amendment interest outweighs any interest the White House has in enforcing Karem's punishment immediately. Defendants, meanwhile, argue that Karem has asked for an unusually intrusive form of judicial relief: "a decree ordering

access" to the White House. Defs.' Opp'n at 45.

Beginning with Karem's argument, the Court need not recount the significance of his constitutional interests, and the Court agrees that those interests outweigh the White House's interest in maintaining order. *See* Transcript of Mot. Hr'g at 13, *Cable News Network, Inc.*, No. 18 Civ. 2610, ECF No. 22 ("[T]he harm to [the reporter] from sustaining an ongoing violation of his Fifth Amendment due process rights outweighs the government's interest in orderly, respectful press conferences."). That Grisham's preliminary decision was not made until three weeks after the July 11 incident, a period of time during which Karem actively participated in questioning during press conferences, also suggests that the White House can afford to wait to enforce this sanction. Indeed, if Defendants were to ultimately prevail in this case (as unlikely as that may be), the delayed imposition of Karem's suspension would, in the Court's view, achieve the same deterrent effect.

Having said that, Defendants' argument with respect to intrusiveness is certainly worth addressing. The Court understands the White House's desire to maintain a degree of control over access and decorum, and at first glance, some might think the temporary suspension of a single reporter's press pass to be a relatively modest exercise of such control. But as *Sherrill* makes clear, the conferral of White House hard passes is no mere triviality. And the need for regulatory guidance is at its highest where constitutional rights are implicated. *See, e.g.*, *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982) ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). In granting Karem relief, the Court finds only that the White House likely did not provide the requisite guidance in this specific case—nothing more. And, as noted earlier, the Court does not reach Karem's independent free speech claim.

## IV. CONCLUSION

For the foregoing reasons, Karem's motion for a temporary restraining order and preliminary injunction is granted. Defendants are ordered to restore Karem's hard pass. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

**All Citations**

Slip Copy, 2019 WL 4169824

**End of Document**  © 2019 Thomson Reuters. No claim to original U.S. Government Works.