

1919 Pennsylvania Avenue NW
Suite 800
Washington, DC  20006-3401

**Robert Corn-Revere**
202.973.4225 tel
202.973.4499 fax
bobcornrevere@dwt.com

September 13, 2019

**By ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY  10007

Re:    *PEN American Cntr., Inc. v. Trump*, 18 Civ. 9433 (LGS)
       PLAINTIFF'S FOURTH NOTICE OF SUPPLEMENTAL AUTHORITY

Dear Judge Schofield,

Plaintiff submits as supplemental authority in the above-captioned matter, with respect to Defendant's Motion to Dismiss (ECF 45) and Plaintiff's Opposition thereto (48), the Second Circuit's decision in *Citizens for Responsibility and Ethics in Washington v. Trump*, 2019 WL 4383205 (2d Cir. Sept. 13, 2019) ("*CREW*") (copy attached).  In *CREW*, the Second Circuit vacated a decision of this court dismissing plaintiffs' Emoluments Clause claims for lack of standing, ripeness, and justiciability.  Defendant cited the now-vacated district court *CREW* decision in the Motion to Dismiss at pp.16-17 and in the supporting Reply at p.5; Plaintiff discussed the case, noting that it did not support Defendant's position, and had been appealed, at pp.20-21 of the Opposition.

In *CREW*, the Second Circuit held the appealing plaintiffs had standing to challenge the President's asserted violation of the Emoluments Clause, by sufficiently alleging injury-in-fact, traceability, and redressability.  2019 WL 4383205, at *5-18.  It vacated the decision below on grounds that (among others) the district court erred by "effectively requir[ing] plaintiffs to prove, pre-discovery, the facts necessary to win at trial."  *Id*. at *6.  With respect to redressability in particular, the Second Circuit held that "[w]here the injury alleged is caused by [alleged] illegal conduct, in many instances (at least where continuation of the … conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury."  *Id*. at * 8  Where plaintiffs "successfully allege[] a plausible likelihood that President Trump's conduct caused their injuries, and the injury is ongoing, it logically follows that relief would redress their injury—at least to some extent, which is all that Article III requires."  *Id*.  The Second Circuit also rejected attempts to "deny that any injunctive relief can be fashioned that would help," as even "a remedy that will not by itself reverse the alleged injury would still satisfy the redressability requirement if it reduced th[e] injury to some extent," especially where "[i]njunctive relief could

The Honorable Lorna G. Schofield
September 13, 2019
Page 2

be fashioned along many different lines" to provide a remedy.  *Id*. at *12 (internal quotation marks and brackets omitted; brackets supplied).

The Second Circuit disagreed with the Fourth Circuit's July 10, 2019 decision in *In re Trump*, 928 F.3d 360 (4th Cir. 2019), which was the subject of Defendant's July 12, 2019 notice of supplemental authority here.  Among other things, it rejected the Fourth Circuit's holding on traceability that the Emoluments Clause claims in the respective cases were based on "speculation," because the fact "[t]hat Plaintiffs' theory of harm results from decisions of third parties does not preclude finding the cognizable link between the challenged action and the alleged harm that Article III requires."  *Id*. at *11.

The holdings above are relevant to issues discussed throughout § II of Plaintiff's Opposition to Motion to Dismiss.

Respectfully submitted,

Robert Corn-Revere
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
Ph: 202-973-4200; Fax: 202-973-4499
bobcornrevere@dwt.com

cc:  All Counsel of Record via ECF

2019 WL 4383205
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Citizens for Responsibility and Ethics in
Washington, Restaurant Opportunities Centers
United, Inc., Jill Phaneuf, and Eric Goode,
Plaintiffs-Appellants,
v.
Donald J. Trump, in his official capacity as
President of the United States of America,
Defendant-Appellee.

Docket No. 18-474
|
Argued: October 30, 2018
|
Decided: September 13, 2019

Plaintiffs, who own and operate businesses in the hospitality industry, appeal from the dismissal of their lawsuit by the United States District Court for the Southern District of New York (George B. Daniels, *J.*). The district court dismissed Plaintiffs' suit on the grounds that Plaintiffs lack Article III standing, they fall outside the zone of interests of the Emoluments Clauses, their claims do not present a ripe case or controversy within the meaning of Article III, and the case presents a non-justiciable "political question."

VACATED AND REMANDED.

**Attorneys and Law Firms**

DEEPAK GUPTA, Gupta Wessler PLLC, Washington, D.C. (Jonathan E. Taylor, Joshua Matz, and Daniel Townsend, Gupta Wessler PLLC, Washington, D.C.; Joseph M. Sellers, Daniel A. Small, Cohen Milstein Sellers & Toll PLLC, Washington, D.C.; Norman L. Eisen, Stuart C. McPhail, Adam J. Rappaport, Citizens for Responsibility and Ethics in Washington, Washington, D.C.; Laurence H. Tribe, Harvard Law School, Cambridge, MA, on the brief), for Plaintiffs-Appellants.

HASHIM M. MOOPPAN, Department of Justice, Washington, D.C., (Chad A. Readler, Michael S. Raab, Megan Barbero, Department of Justice, Washington, D.C., on the brief), for Defendant-Appellee.

Before: JOHN M. WALKER, PIERRE N. LEVAL, CHRISTOPHER F. DRONEY, Circuit Judges.

**Opinion**

LEVAL, Circuit Judge:

**\*1** Plaintiffs—Eric Goode, a restaurateur and hotelier, and Restaurant Opportunities Center United ("ROC"), a non-partisan, member-based organization of restaurants and restaurant workers—appeal from the judgment of the United States District Court for the Southern District of New York (Daniels, J.) dismissing their complaint against Defendant Donald J. Trump, the President of the United States, for lack of subject matter jurisdiction. The complaint seeks declaratory and injunctive relief for the President's alleged violations of the Domestic and Foreign Emoluments Clauses of the United States Constitution. The President moved to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Plaintiffs did not have standing to sue. The district court granted the motion, concluding that Plaintiffs lack Article III standing, they fall outside the zone of interests of the Emoluments Clauses, their claims do not present a ripe case or controversy within the meaning of Article III, and their suit is barred by the political question doctrine. For the reasons below, we vacate the judgment and remand for further proceedings.

A. BACKGROUND

Plaintiffs are in the hospitality industry.[1] Plaintiff Goode owns high-end hotels, restaurants, and event spaces in the New York City area. Plaintiff ROC counts among its members over 200 establishments, including high-end restaurants and event spaces in New York City and Washington, D.C. The Plaintiff establishments cater to foreign and domestic government clientele, and allege that they are direct competitors of hospitality properties owned by the President in Washington D.C. and New York City.

[1]   In proceedings before the district court, plaintiffs included Jill Phaneuf, who worked in the hospitality industry, and Citizens for Responsibility and Ethics in Washington (CREW), a non-profit government watchdog. In Plaintiffs' appellate briefing, CREW notified the court it is "no longer appealing the district court's judgment" that CREW lacks standing. Additionally, Phaneuf left the job wherein she allegedly competed with Defendant's businesses for diplomatic

clientele, and Plaintiffs acknowledge that she "no longer has Article III standing to pursue her claims, which sought only prospective relief."

The complaint alleges that President Trump, operating through corporations, limited-liability companies, limited partnerships, and other business structures, is effectively the sole owner of restaurants, hotels, and event spaces, which are patronized by foreign and domestic government clientele. The President has announced that, since assuming office, he has turned over day-to-day management of his business empire to his children and established a trust to hold his business assets.[2] However, he maintains sole ownership, receives business updates at least quarterly,[3] and has the ability to obtain distributions from the trust at any time.[4] The facts alleged by Plaintiffs, together with those acknowledged by the President, support the inference that the revenues of the Trump establishments are substantially (or are convertible into) personal revenues of the President.

[2]   *Donald Trump's News Conference: Full Transcript and Video*, N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8.

[3]   Jennifer Calfas, *Eric Trump Says He'll Give the President Quarterly Updates on Business Empire*, Fortune (March 24, 2017), http://for.tn/2n2MRXa.

[4]   Derek Kravitz & Al Shaw, *Trump Lawyer Confirms President Can Pull Money From His Businesses Whenever He Wants*, ProPublica (April 4, 2017, 5:53 PM), http://bit.ly/2o1OM1C.

### i. Plaintiffs' Allegations

**\*2** Stated generally, Plaintiffs allege that they have been and will be injured because foreign and domestic government entities that patronize Washington, D.C. and New York hotels, restaurants, and event spaces patronize Trump establishments (in preference to Plaintiffs' establishments) in the hope of enriching the President and earning a reward from him through official Presidential action favorable to their governments, and that such enrichment of the President by foreign and domestic government entities violates the Foreign and Domestic Emoluments Clauses. There are three principal categories

of allegations.

First, Plaintiffs allege that they directly compete with the President's establishments for foreign, state, and federal government clientele. Second Amended Complaint (the "Complaint") ¶¶ 13-20. Plaintiffs support this allegation with extensive declarations from hospitality industry experts.[5] Rachel Roginsky, a hospitality consultant and professor at the Boston University School of Hospitality Administration, asserts that certain of Goode's hotels and one ROC member's hotel-restaurant are "[p]rimary competitors" with Trump SoHo and Trump International New York because they "market to and attract customers from essentially the same pool" given their "similar ... location, facilities, services, amenities, class, image, and price." Roginsky Decl. ¶¶ 14-17. Dr. Christopher Muller, former Dean of the Boston University School of Hospitality Administration, identifies numerous of Plaintiffs' restaurants in the New York and Washington, D.C. areas that he asserts are "comparable" to various Trump establishments because they are within the same market "segment" and therefore directly compete with one another. Muller Decl. ¶¶ 24-29, 50-56, 67-75. Collectively, the two declarations identify more than a dozen of Plaintiffs' establishments, which, according to Roginsky and Muller, compete directly with roughly half a dozen Trump establishments over the same customer base, including foreign and domestic government customers. Owners of these establishments also submitted declarations attesting that their restaurants and hotels are frequented by foreign, state, and federal officials and that they compete directly with Trump establishments over this customer base. Goode Decl. ¶¶ 4, 23-24, 34, 36, 47-50; Colicchio Decl. ¶¶ 13-14, 20-21, 28-29. Plaintiffs' declarations include evidence of loss of government patronage from Plaintiffs' establishments after the presidential election. ROC alleges that its restaurant and restaurant-employee members have suffered injury due to "lost business, wages, and tips." Complaint ¶ 13. Specifically, James Mallios, managing partner at ROC-member restaurant Amali, testifies that Amali regularly hosts dinners and events for government officials, including foreign leaders, Mallios Decl. ¶¶ 9, 20, 24-27, and that its tax-exempt sales declined after November 2016, reflecting a decline in government business. *Id.* ¶ 28.

[5]   Where, as here, a defendant makes a "fact-based" 12(b)(1) motion to dismiss by "proffering evidence beyond the Pleading," the plaintiff may "need to come forward with evidence of [its] own to controvert that presented by defendant[.]" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (citing *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)). The President's motion to dismiss challenged not only the facial sufficiency of the

complaint, but also the factual assertion that Plaintiffs' restaurants directly compete with Trump establishments. Thus, we consider not only the allegations in the complaint but also the expert affidavits submitted in response to Defendant's fact-based motion to dismiss.

**\*3** Second, the Complaint cites statements by the President implicitly soliciting the patronage of government officials and apparently acknowledging that, in making governmental decisions, he favors governments that patronize his businesses. *See, e.g.,* Complaint ¶ 96 ("Trump said [of the Saudis, in the context of discussing trade negotiations], '... They spend $40 million, $50 million. Am I supposed to dislike them? I like them very much.' "); *id.* ¶ 52 (responding to a question about the U.S.'s dispute with China over the South China Sea, "I do deals with [China] all the time. [China's largest bank] is a tenant of mine ..."). The Complaint alleges that Trump businesses began investing in attracting foreign government business after the election, *id.* ¶¶ 60-63, and further that these efforts have succeeded in attracting post-election patronage from foreign governments. *Id.* ¶¶ 64–87.

Third, Plaintiffs allege that foreign governments have taken note of, and been influenced by, the message that enriching the President by giving patronage to his establishments earns his favor. Plaintiffs point to statements by foreign government officials quoted in newspaper articles, including one "Middle Eastern diplomat" who said, "Believe me, all the delegations will go [to Trump establishments]." *Id.* ¶ 62 (*quoting* Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, WASH. POST (Nov. 18, 2016), http://wapo.st/2oPYggX). Another diplomat reportedly stated, "Why wouldn't I stay at his hotel blocks from the White House[?] ... Isn't it rude to come to his city and say, 'I am staying at your competitor?' " *Id.* Plaintiffs also allege that foreign government official patronage of Trump establishments has increased since the President was elected. *Id.* ¶¶ 56, 60, 64, 68, 72, 79, 82. In particular, Plaintiffs point to one instance in which, shortly after the election, a foreign government switched the venue of an event from a competitor to a Trump establishment. *Id.* ¶ 74.

The Complaint asserts that the President's receipt of the revenues he derives from the patronage of foreign and domestic government entities violates the Foreign and Domestic Emoluments Clauses. *Id.* ¶ 1. The Foreign Emoluments Clause provides: "[N]o Person holding any Office of Profit or Trust under [the United States], shall,

without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const., Art. I, § 9, Cl. 8. Congress has not consented to Defendant's receipt of the emoluments at issue here. Complaint ¶ 2. The Domestic Emoluments Clause provides: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const., Art. II, § 1, Cl. 7.

The Complaint seeks both declaratory and injunctive relief. It seeks a declaration, *inter alia*, that, in these circumstances, the patronage of foreign and domestic government entities of the President's establishments violates the Foreign and Domestic Emoluments Clauses. Complaint ¶ 20. As to injunctive relief, the Complaint asks the court to "enjoin[ ] Defendant from violating both Emoluments Clauses" and to "requir[e] Defendant to release financial records sufficient to confirm that Defendant is not engaging in any further transactions that would violate either Emoluments Clause." *Id.*

ii. Defendant's Motion to Dismiss

The President moved to dismiss the Complaint, arguing that Plaintiffs lacked Article III standing and fell outside the zone of interests of the Emoluments Clauses. As to standing, the President argued that Plaintiffs' "allegations of future injuries are premised upon a speculative chain of possibilities, including the decisions of third parties [i.e., prospective government customers] not before the Court." Defendant's Memorandum of Law in Support of the Motion to Dismiss, at 18-19. With respect to the specific evidence of lost government patronage, the President argued that the declarations do not "show that the decline was attributable to" government customers choosing Trump establishments, because the decline could have a different cause. Reply Memorandum of Law in Support of the Motion to Dismiss, at 6. The President did not contest the substance of Plaintiffs' expert testimony that certain of Plaintiffs' establishments compete directly with Trump establishments. As to the zone of interests, President Trump argued that because the Clauses were "intended to guard against the corruption of and foreign influence on federal officials and to ensure the independence of the President," Plaintiffs' alleged injuries "bear no relation to the [Clauses'] core concerns," and thus Plaintiffs' claims should be dismissed. Defendant's Memorandum of Law in Support of the Motion to Dismiss, at 25-26.

iii. <u>District Court Decision</u>

**\*4** The district court granted the President's motion to dismiss for lack of jurisdiction under Rule 12(b)(1). While recognizing that Plaintiffs' allegations, supported by expert declarations, satisfied the injury prong of the Article III standing inquiry, the district court found "Plaintiffs have failed to properly allege that Defendant's actions *caused* Plaintiffs competitive injury and that such an injury is *redressable* by this Court." *CREW et al. v. Trump*, 276 F. Supp. 3d 174, 185 (S.D.N.Y. 2017) (emphasis in original). The district court called it "wholly speculative" whether any lost business was "fairly traceable to Defendant's 'incentives' or instead results from government officials' independent desire to patronize Defendant's businesses." *Id.* at 186. Hypothesizing alternative explanations for Plaintiffs' injury, the district court opined that "interest in [Trump] properties" could have "generally increased since he became President" or Plaintiffs may "face a tougher competitive market overall." *Id.* Given that Plaintiffs failed to rule out these alternative explanations for their injury at the pleading stage, the district court concluded the "connection between [ ] Plaintiffs' alleged injury and Defendant's actions is too tenuous to satisfy Article III's causation requirement." *Id.* For the same reasons, the district court found the injury was not likely to be redressed by any relief the district court could offer. *Id.*

The district court also found that Plaintiffs lacked "prudential" standing. Reasoning that standing to sue under the Emoluments Clauses is limited to those parties the Clauses were meant to protect, the district court found that Plaintiffs fell outside the "zone of interests" of the Clauses. *Id.* at 187–88. The district court reasoned that "[n]othing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition." *Id.* at 187. Rather, the district court found, the Emoluments Clauses are meant to prevent corruption and foreign influence, and ensure the President's independence. *Id.* at 188. Contrasting this suit with one brought under the "generous review provisions of the [Administrative Procedure Act]," the district court stated that the zone of interests test "is *more* strictly applied when a plaintiff is proceeding under a constitutional ... provision." *Id.* at 187 (emphasis in original) (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 469 (1992) (Scalia, J., dissenting)).[6] Because Plaintiffs are not vindicating an interest in uncorrupted, independent government, the district court reasoned, they do not have standing to sue under the

Emoluments Clauses.

[6]   The district court appeared to mistakenly rely on Justice Scalia's dissent in *Wyoming* as if it were a statement by the majority about the proper application of the zone of interests test. *See infra* n.13.

The district court also found that the suit must be dismissed on two additional grounds, neither of which was raised by the Defendant's motion. These were that the case presents a non-justiciable political question and that it is not ripe for adjudication. *Id.* at 193–95. Neither of these grounds is defended by the President on this appeal.

### B. DISCUSSION

A suit brought in federal court is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To the extent that a district court's dismissal for lack of subject matter jurisdiction was based on the application of a rule of law,[7] an appellate court construes the allegations of the complaint in the light most favorable to Plaintiffs and reviews the district court's ruling *de novo*, meaning that our inquiry focuses on whether the rules of law were correctly applied. We conclude that the district court did not apply the law correctly in finding that it lacked jurisdiction to decide the case.

[7]   In some instances, a district court's dismissal for lack of subject matter jurisdiction under Rule 12(b)(1) is based in part on factual findings. When such a dismissal is appealed, we review the relevant factual findings for clear error. *See Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993). In this case, although the parties presented disputed factual issues to the district court by evidentiary submissions, the court did not purport to resolve disputed issues of fact or make factual findings. Its rulings were based only on the application of rules of law. Accordingly, our review is *de novo. Id.* ("If the trial court dismissed on the basis of the complaint alone or the complaint supplemented by undisputed facts evidenced in the record, our standard is *de novo* review[.]").

i. Article III Standing

**\*5** Plaintiffs contend that the district court interpreted the law incorrectly in concluding that they lack standing to bring this action under Article III of the Constitution. There are three prongs to the standing inquiry under Article III. In order to successfully allege standing to bring a suit in federal court, a complaint must plausibly allege the following: *first*, that the plaintiff has suffered an "injury in fact," which the Supreme Court defines as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not [merely] conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted); *second*, that there is a "causal connection between the injury and the conduct complained of," which requires the injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" *id.* (internal quotation marks and alterations omitted); and *third*, that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks omitted). These three components of the Article III "case or controversy" requirement are designed to ensure that the "plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify [the] exercise of the court's remedial powers on his behalf." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1974) (internal quotation marks omitted).

We find that Plaintiffs satisfy all three prongs of Article III standing for the reasons set forth below.

*a. Injury*

The requirement that Plaintiffs adequately allege an *injury in fact* "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n.14 (1973) (*citing, inter alia*, Kenneth C. Davis, *Standing: Taxpayers and Others*, 35 U. CHI. L. REV. 601, 613 (1968) ("[A]n identifiable trifle is enough for standing to fight out a question of principle.")). Because this appeal arises at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations

embrace those specific facts that are necessary to support the claim." *Lujan, 504 U.S. at 561* (internal quotation marks omitted).

Plaintiffs' alleged injury meets the well-established Article III threshold for economic competitors who allege that, because of unlawful conduct, their rivals enjoy a competitive advantage in the marketplace. To make an adequate allegation of a competitive injury, plaintiffs must plausibly allege (1) that an illegal act bestows upon their competitors "some competitive advantage," *Fulani v. League of Women Voters Edu. Fund*, 882 F.2d 621, 626 (2d Cir. 1989); and (2) "that [they] personally compete[ ] in the same arena" as the unlawfully benefited competitor. *In re United States Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989). For standing purposes, it is not necessary to identify specific customers who switched to Plaintiffs' competitors; rather, competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the [defendant] acts in a way that increases competition or aids the plaintiff's competitors." *Canadian Lumber Trade Alliance v. United States,* 517 F.3d 1319, 1332 (Fed. Cir. 2008); *see also Cooper v. Tex. Alcoholic Beverage Comm'n,* 820 F.3d 730, 738 (5th Cir. 2016) ("It is a basic law of economics that increased competition leads to actual economic injury.'') (internal quotation marks omitted); *Sherley v. Sebelius,* 610 F.3d 69, 72 (D.C. Cir. 2010) ("[I]ncreased competition almost surely injures a seller in one form or another[.]"); *Kern Inc. v. FCC,* 353 F.3d 57, 60 (D.C. Cir. 2004) ("A party seeking to establish standing on this basis must demonstrate that it is a direct and current competitor whose bottom line *may be adversely affected* by the challenged [ ] action.") (emphasis added) (internal quotation marks omitted).

The Complaint sufficiently alleges that Plaintiffs compete directly with Trump establishments and that the President's allegedly illegal acts favor Plaintiffs' competitors. Specifically, it alleges that Plaintiffs' establishments are harmed in their competition with Trump establishments because, despite being comparable in other relevant respects, the President's establishments offer government patrons something that Plaintiffs cannot: the opportunity, by enriching the President, to obtain favorable governmental treatment from the President and the Executive branch. It alleges that the marketplace is thus skewed in favor of Trump businesses because of his unlawful receipt of payments from government patrons. The Complaint, supported by expert declarations, alleges that this unlawful market skew has caused Plaintiffs economic harm in the form of lost patronage from government entities, and that such harm will continue in the future. For competitor standing, that

**\*6** The President argues that Plaintiffs rely on a "boundless theory of standing" that the Supreme Court has rejected because it would find the Article III injury prong satisfied "*whenever* a competitor benefits from something allegedly unlawful ...." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 99 (2013). He argues that Plaintiffs' theory of injury is over-broad because it would "apply the presumption [of harm to competitors] *whenever* a party acts illegally and thereby distorts competition or the defendant's unlawful conduct confers a benefit on a plaintiff's competitor." Appellee's Br. at 31 (emphasis in original) (citing *Already*, 568 U.S. at 99). The Defendant, however, both mischaracterizes Plaintiffs' argument and misses the mark in analogizing the theory of injury in this case to the one the Supreme Court rejected in *Already*.

Plaintiffs do not argue that they are injured merely because a competitor benefits; rather, Plaintiffs allege that in competing over the *exact same customer base*, Trump establishments secure an unlawful advantage because giving patronage to Trump establishments offers, in addition to comparable services, the potential, by enriching the President, of securing his favor in governmental decisions. This unlawful market skew directly affects Plaintiffs' revenue and profits: Every dollar of government patronage drawn to Trump establishments by the hope of currying favor with the President is a lost dollar of revenue that might otherwise have gone to Plaintiffs.

These facts have little in common with *Already*. In *Already*, the Supreme Court considered whether Already, LLC could challenge the validity of Nike's "Air Force 1" trademark despite the fact that Nike had issued a covenant that it would refrain from making any claims against Already based on the Air Force 1 trademark, and despite the fact that Already did not plan to sell any product that "would arguably infringe Nike's trademark yet fall outside the scope of the covenant." 568 U.S. at 95. The Court clarified that it was insufficient for standing purposes for Already to claim that any gain to Nike was Already's loss; rather, Already had to show "an injury more particularized and more concrete than the mere assertion that something unlawful benefited [its] competitor." *Id.* Because Already did not face any liability for past conduct arguably infringing the Air Force 1 trademark, and because Already had not plausibly alleged any other way in which the trademark's continued validity injured Already, Already lacked an Article III injury. Here, by contrast, the nature of the injury from the allegedly unlawful conduct is clear and concrete: The Complaint plainly asserts that the Plaintiff establishments

are losing, and will continue to lose, business from government patrons based on the patrons' belief that they can obtain official Presidential favor by spending their money in a manner that enriches the President.

We conclude that Plaintiffs have satisfied the Article III requirement of alleging an injury in fact.

### b. Causation

Plaintiffs also adequately allege that their injury is fairly *traceable* to the challenged conduct of the Defendant. To satisfy the "traceability" or "causation" prong of the Article III standing test, allegations must provide more than "unadorned speculation" to "connect their injury to the challenged actions." *Simon*, 426 U.S. at 44–45. This, however, does not require ruling out all possible alternative explanations of a plaintiff's injury. The allegations of fact must plausibly support a "substantial likelihood" that the plaintiff's injury was the consequence of the defendant's allegedly unlawful actions (and that prospective relief could mitigate the harm).*Id.* at 45.

The district court demanded too much at the pleading stage by requiring allegations that dispel alternative possible explanations for Plaintiffs' injury. The district court identified various alternative theories that *could* explain a decline in Plaintiffs' business: a "general[ ] increase[ ]" of "interest in [Trump] properties ... since he became President," *CREW*, 276 F. Supp. 3d at 186; the possibility that Trump establishments provide better "service, quality, location, price and other factors related to individual preference," *id.*; or "an increase in competition in their respective markets for business from all types of customers[.]" *Id.* The district court found Plaintiffs' pleadings inadequate because they failed to dispel these alternative explanations. In so doing, the district court effectively required plaintiffs to prove, pre-discovery, the facts necessary to win at trial. This was error. *See Lujan*, 504 U.S. at 561 (explaining that less is required to support standing at the pleading stage compared to "successive stages of the litigation," when the burden increases). Under the standard applied by the district court, it would be virtually impossible to plead a competitive injury, because a defendant would defeat standing merely by pointing to the possibility that customers' preference for defendant's products or services was attributable to something other than the defendant's illegal conduct.[8]

8    We also note that there is no logic to the district court's proposition that, because *some* government patrons might be drawn to Trump establishments by curiosity, this means that *none* of them patronize his establishments in the hope of currying the President's favor by enriching him. In the course of a year, there are thousands of instances in which government representatives patronize hotels and restaurants in New York and Washington. Undoubtedly there are many factors that will influence their selections. The likelihood that some choices of government representatives will be influenced by other factors such as general curiosity in no way undermines Plaintiffs' altogether plausible allegation of a substantial likelihood that, in some significant number of instances, government officials will choose Trump hotels and restaurants in the hope that spending their dollars at Trump establishments will influence the President in their favor in governmental decisions.

**\*7** Our precedents, and those of the Supreme Court, make clear that Plaintiffs' allegations are sufficient to plausibly assert a substantial likelihood that their injury is the consequence of the challenged conduct. In *Fulani*, we upheld the standing of a fringe, third-party presidential candidate to challenge the continued grant of tax exemption by the IRS to the League of Women Voters on the ground that the League had engaged in impermissible partisan activities by limiting participation in its televised presidential debates to members of the Republican and Democratic parties. 882 F.2d at 625. The League's criteria for inclusion required, in addition to membership in one of the two major parties, that a candidate be "significant." *Id.* at 625–26.

Fulani alleged that she was a "significant" candidate, who would have been included if not for the requirement of membership in either the Republican or Democratic party. *Id.* at 626. In assessing her Article III standing, this court did not probe her allegation that she was a significant candidate despite its dubious merit. We ruled that she had established Article III standing, notwithstanding the obvious improbability that she would make it into the debates as a "significant" candidate. *Id.* ("For purposes of determining Fulani's standing to challenge whether the League's use of [the party membership] requirement was inconsistent with its section 501(c)(3) status, we accept Fulani's contention that she was a 'significant' candidate in this election ...."). To satisfy Article III standing, it was sufficient that she had plausibly alleged that she would have qualified. *See also Schulz v. Williams, 44 F.3d 48, 53 (2d Cir. 1994)* (finding that a would-be intervenor had Article III standing to prosecute the appeal, where "[t]he district court's decision *could have* caused [an] injury [to the intervenor], and [the] appeal *could have* afforded

relief that would have redressed that injury") (emphasis added).

The Supreme Court has repeatedly upheld the standing of a plaintiff-competitor who alleges a competitive injury caused by a defendant's unlawful conduct that skewed the market in another competitor's favor, notwithstanding other possible, or even likely, causes for the benefit going to the plaintiff's competition. The Supreme Court has explained that when, among competitors, an allegedly illegal "barrier [ ] makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier *need not allege that he would have obtained the benefit but for the barrier in order to establish standing.*" *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla., 508 U.S. 656, 666 (1993)* (emphasis added); *see also id.* (explaining that an economic competitor meets the standing requirement by plausibly alleging "the inability to compete on an equal footing" without needing to allege the loss of any identifiable piece of business); *Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 281 n.14 (1978)* (upholding standing, based on loss of chance to compete equally, of white male applicant to program that reserved 16 of 100 spots for minority applicants); *Schulz, 44 F.3d at 53* (finding that "under the well-established concept of competitors' standing," "the loss of opportunity to compete equally" is sufficient to establish standing) (internal citation and quotation marks omitted).

Plaintiffs satisfied this standard. The complaint adequately pleads a competitive injury of lost patronage directly traceable to the fact that the President's allegedly illegal conduct induces government patrons of the hospitality industry in Washington, D.C. and New York City to patronize Trump establishments in preference to Plaintiffs' establishments.

**\*8** The district court found, and President Trump argues on appeal, that this case is analogous to *Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38 (1974)*. *See CREW, 276 F. Supp. 3d at 185–86* ("The Court [in *Simon*] held that [the] alleged injury lacked traceability and redressability because of intervening causal factors .... [A]s in *Simon*, it is wholly speculative whether the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's 'incentives[.]' "). In *Simon*, indigent persons and their organizational representatives challenged an IRS revenue ruling that extended favorable tax treatment to non-profit hospitals that offered only emergency room services to indigents, rather than offering services to indigents to the extent of the

hospital's financial ability, alleging that "by extending tax benefits to such hospitals despite their refusals fully to serve the indigent, the defendants were 'encouraging' the hospitals to deny services." *Simon*, 426 U.S. at 33. This case is not analogous to *Simon*.

In *Simon*, the Court questioned whether the modification of the relevant tax rule actually influenced hospital policymaking regarding the scope of services provided to indigent patients, and therefore held that the plaintiffs had failed to establish a causal connection between the challenged IRS Ruling and the denials of service. Central to the Court's analysis was its skepticism that the previous IRS rule (or its modification) had a material, non-speculative effect on any given hospital's decision to offer non-emergency services to indigents, particularly when the "undetermined financial drain" arising from the costs of supplying such services may have outweighed the benefits of favorable tax treatment. *Id.* at 43. It was therefore "just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid" the costs of providing those services. *Id.* In view of the countervailing cost consideration which potentially offset the effects of the tax rules, and the plaintiff's failure to "establish ... that [the] hospitals are [categorically] dependent upon [charitable] contributions," the Court reasoned that the causal link between the IRS ruling and the hospitals' decisions to deny services to the plaintiffs was little more than "unadorned speculation." *Id.* at 43–44. Accordingly, the Court held that the plaintiffs had failed to establish that reinstatement of the previous rule would result in the change in hospital policy that would cure the plaintiffs' injury. *Id.* at 45–46.

Here, by contrast, the Complaint, supported by expert declarations, alleges that Plaintiffs' establishments offer services comparable to those offered at Trump establishments in every relevant respect, save one: Plaintiffs cannot offer government patrons the opportunity to obtain favorable treatment from the President and the Executive branch in governmental decisions. It is eminently plausible that if two establishments provide otherwise comparable services, but one establishment offers an inducement that the other cannot offer, then the inducement will attract at least some patronage that might otherwise have gone to the other establishment. The Complaint contains numerous factual allegations sufficient to support the conclusion that the President's receipt (and invitation) of allegedly illegal emoluments actually influences at least some government customers' purchasing decisions. And unlike in *Simon*, there is no reason to believe that the competitive skew caused by those patrons' desire to gain influence by patronizing the

Trump establishments is offset or annulled by some countervailing consideration. *Simon* thus sheds little light on this case.

### c. Redressability

We likewise find that Plaintiffs have adequately pleaded the redressability of their alleged injury, an issue that is closely related to the question of causation. When the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury. Because Plaintiffs have successfully pleaded a plausible likelihood that President Trump's conduct caused their injuries, and the injury is ongoing, it logically follows that relief would redress their injury—at least to some extent, which is all that Article III requires. *See* Larson v. Valente, 456 U.S. 228, 243 n.15 (1982) ("[A plaintiff] need not show that a favorable decision will relieve his *every* injury.") (emphasis in original); *see also* Massachusetts v. E.P.A., 549 U.S. 497, 526 (2007) (finding redressability is satisfied where "risk of catastrophic harm" could be "reduced *to some extent* if petitioners received the relief they seek") (emphasis added).

**\*9** The Complaint seeks injunctive relief requiring that the President cease the conduct that allegedly violates the Foreign and Domestic Emoluments Clauses. Plaintiffs have plausibly pleaded that the President's ownership of hospitality businesses that compete with them would induce government patrons of the hospitality industry to favor Trump businesses over those of the Plaintiffs so as to secure favorable governmental action from the President and Executive branch. This plausibly alleges that his cessation of the violation would eliminate the inducement to those patrons to favor his businesses, and would therefore eliminate, or at least diminish, the competitive injury that Plaintiffs suffer. These plausible allegations are sufficient to satisfy Article III's requirement of redressability.

### d. The Fourth Circuit's In re Trump Decision and Judge Walker's Dissent

We recognize that our colleague Judge Walker disagrees, and that a panel of the Fourth Circuit has also reached the opposite conclusion in a closely analogous case, *In re Donald J. Trump*, 928 F.3d 360 (4th Cir. 2019).[9] Judge Walker relies on substantially the same arguments as the Fourth Circuit panel in *In re Trump*. Respectfully, we do not find these arguments persuasive.

[9]   In that case, the District of Columbia and the State of Maryland brought similar claims against the President, alleging violations of the Foreign and Domestic Emoluments Clauses based on factual allegations almost identical to the allegations in this case. *Compare In re Trump*, 928 F.3d at 365–66 *with CREW*, 276 F. Supp. 3d at 182–83. The plaintiffs there argued that they had Article III standing based, *inter alia*, on their "interests in protecting the economic well-being of their residents, who, as competitors of the President, are injured by decreased business, wages, and tips resulting from economic and commercial activity diverted to the President's businesses," as well as based on their "interests as proprietors of businesses that compete with the President's businesses." *In re Trump*, 928 F.3d at 363 (internal quotation marks omitted).

As a preliminary note, both opinions seem to be influenced by their perception that these lawsuits are politically motivated. Judge Walker asserts that this case is "deeply political" and emphasizes that "President Trump was democratically elected by the American people ... with his business holdings and brand prominence in full view." *See infra*. The Fourth Circuit expressed skepticism as to "why [the plaintiffs] came to the court for relief in the first place," implying that their motivation was political and that this cast doubt on the federal court's jurisdiction. *In re Trump*, 928 F.3d at 377; *see also infra* (quoting *In re Trump*). While it is certainly possible that these lawsuits are fueled in part by political motivations, we do not understand the significance of that fact. It is true that a political motivation for a lawsuit, standing alone, is insufficient to confer Article III standing. *Cf. Flast v. Cohen*, 392 U.S. 83, 106 (1968) (noting that the "federal court[s] [cannot be used] as a forum in which to air [ ] generalized grievances about the conduct of government"). But while the existence of a political motivation for a lawsuit does not supply standing, nor does it defeat standing. "Standing under Article III ... [depends on] an injury [that is] concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010) (citing *Horne v. Flores*, 557 U.S. 433, 445 (2009)). Whether a lawsuit has political motivations is irrelevant to these determinative issues.

*1. Injury-in-Fact*

With respect to the "injury-in-fact" requirement, Judge Walker correctly states that to establish an injury through the competitor standing doctrine, a plaintiff must show that she is a "direct competitor" of the defendant and an "actual or imminent increase in competition." *See infra* (citations omitted). As we conclude above, Plaintiffs have clearly met these standards. Judge Walker relies on the Supreme Court's decision in *Already*, 568 U.S. 85, as demonstrating that "competing businesses [do not] have standing to challenge [ ] unlawful action simply by virtue of their status as a direct competitor." *See infra* (citing *In re Trump*, 928 F.3d at 377).

**\*10** We readily acknowledge that proposition, but we do not agree that it controls here. In their allegations, Plaintiffs go further than simply alleging that they directly compete with the Trump establishments; they plausibly allege precisely how the President's allegedly unlawful conduct harms their ability to attract patrons to their establishments. *See, e.g.*, Complaint ¶ 14 ("As a competitor of restaurants located in Defendant's hotels and other properties ... ROC United has been injured by these payments due to *lost business* ....") (emphasis added); *id.* ¶ 199 ("Officials of foreign states and of the United States and various state and local governments have purchased and will use their government's funds to purchase food and services from one or more restaurants owned by Defendant, instead of from competing restaurants that are members of ROC United."). And as we point out above, *Already* involved very different circumstances; the plaintiffs in that case were unable to plausibly allege that Nike's trademark harmed—or threatened to harm—their business prospects. *See* 568 U.S. at 99.[10]

[10]   The Fourth Circuit also criticized the plaintiffs for "rest[ing] on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met." *In re Trump*, 928 F.3d at 377. The Fourth Circuit rejected that "boundless theory of standing" based on the Supreme Court's holding in *Already*. *See id.* For the reasons expressed above, we do not believe that *Already* precludes Plaintiffs' theory of standing. *See supra*.

Judge Walker also "question[s] the expansive scope" of the competitor standing doctrine, and worries that our approach would confer standing, for example, on a

restaurant whose competitor illegally obtained a bank loan or a large tax refund and used its ill-gotten proceeds to hire a better chef or to lower its prices, thereby exposing the plaintiff–restaurant to increased competition. *See infra.* Those hypotheticals are far beyond the scope of our ruling. A plaintiff who establishes an injury-in-fact by alleging direct competition and an "inability to compete [with the defendant] on an equal footing," *City of Jacksonville,* 508 U.S. at 666, must also establish that such injury is "fairly traceable to the defendant's allegedly unlawful conduct" and "likely to be redressed by the requested relief." *Allen v. Wright,* 468 U.S. 737, 751 (1984). Here the connection between the alleged violations of law and Plaintiffs' harm is far more direct than in Judge Walker's hypothetical: It is precisely the President's receipt of allegedly illegal emoluments that constitutes Plaintiffs' competitive injury.

Lastly, Judge Walker seems to draw a rule that the competitor standing doctrine is limited to "three broad categories of cases"—agency cases, election cases, and unfair competition cases—and that this case "fits into none of [them]." *See infra.* He cites no authority for the proposition that the doctrine is limited to these three categories, and we see no reason why it should be. Even if it were, we note that Plaintiffs' theory of competitive injury in this case is structurally identical to the economic reasoning that often supports standing in the unfair competition context. *Id.* (noting that, in unfair competition cases, standing exists when the parties are "direct competitors" based on a presumption that "[s]ales gained by one are thus likely to come at the other's expense") (quoting *TrafficSchool.com, Inc. v. Edriver, Inc.,* 653 F.3d 820, 825 (9th Cir. 2011)).

*2. Traceability*

With respect to traceability, we agree with Judge Walker that "[u]nder the competitor-standing doctrine, ... traceability flows readily from a competitive injury" and that "if the violation would necessarily harm the plaintiff's competitive opportunities, then an unlawful edge to a competitor logically connects to that violation." *See infra* (citations omitted). But we do not understand Judge Walker's conclusion that traceability is lacking here because there are "simply too many variables at play ... to allow the plaintiffs to rest solely on the bare assertion that the President's acceptance of emoluments has caused them competitive injury." *See infra.* The fact that there are "many different factors [that] influence [government officials'] decision making" does not foreclose Plaintiffs' plausible theory—supported by clear

factual allegations—that the President's prior statements and his receipt of allegedly illegal emoluments unduly *influences* some government officials to patronize his establishments, thereby causing a competitive harm to Plaintiffs. *Id.* Judge Walker's suggestion that the existence of alternate explanations for the Plaintiffs' competitive injury defeats traceability would deny Article III standing to plaintiffs alleging antitrust, unfair competition, or trademark infringement claims who seek to enjoin conduct that unduly influences buyers in a marketplace. In each of these categories of cases, there exist "myriad reasons" why a consumer might favor a defendant's product, including, for example, "service, quality, location, price and other factors related to individual preference." *CREW,* 276 F. Supp. 3d at 186. But these bona fide competitive reasons do not bar a plaintiff from demanding that a court enjoin illegal conduct that skews the marketplace by inserting an additional unlawful competitive advantage.

**\*11** Similarly, the Fourth Circuit panel found that the *In re Trump* plaintiffs had failed to establish traceability because their "conclusion that government customers are patronizing the [Trump International] Hotel because the Hotel distributes profits or dividends to the President ... requires speculation into the subjective motives of independent actors who are not before the court." 928 F.3d at 375. Such speculation, the court held, "undermin[es] a finding of causation." *Id.*[11] We respectfully disagree. That Plaintiffs' theory of harm results from decisions of third parties does not preclude finding the cognizable link between the challenged action and the alleged harm that Article III requires. *Block v. Meese,* 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) ("It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third parties."); *see also Dep't of Commerce v. New York,* 139 S.Ct. 2551, 2566 (2019) (holding that plaintiffs had Article III standing where their "theory of standing ... relies [ ] on the predictable effect of Government action on the decisions of third parties") (citing, *inter alia,* *Block,* 793 F.2d at 1309)); *Bennett v. Spear,* 520 U.S. 154, 168–69 (1997) (warning against "wrongly equat[ing] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation"). Virtually every suit for trademark infringement, unfair competition, or violation of the antitrust laws involves harm that results from the decisions of third-party customers. *See TrafficSchool,* 653 F.3d at 825 (noting that "[i]n a false advertising suit, a plaintiff establishes Article III injury if 'some consumers who bought the defendant['s] product under [a] mistaken belief' fostered by the defendant 'would have otherwise

bought the plaintiff['s] product," and that such an injury may be proven by the "probable market behavior" of independent third parties) (quoting *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 177 (3d Cir. 2001); *Adams v. Watson*, 10 F.3d 915, 923 (1st Cir. 1993)).

[11]    The President makes the same argument on appeal in this case. *See* Appellee's Br. at 15–17 ("[P]laintiffs cannot establish traceability and redressability where the alleged injury-in-fact depends on the decisions of independent third parties whose actions the court can neither predict nor control.").

When the "injury hinges on the reactions of [ ] third parties [to the challenged conduct]," the plaintiff "need not prove a cause-and-effect relationship with absolute certainty; substantial likelihood of the alleged causality meets the test." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104 (2d Cir. 2018). For example, "common sense and basic economics," along with admissions from the third parties in question that the challenged action would "affect [their] business decisions," are generally enough to establish the requisite third-party causation. *Id.* at 105 (internal quotation marks and citations omitted).

Accordingly, to establish traceability, Plaintiffs need only establish a substantial likelihood that the President's receipt of emoluments—and his statements and actions impliedly soliciting such emoluments, *see, e.g.,* Complaint ¶¶ 52, 96—has some favorable effect on government officials' demand for the Trump establishments (and, by extension, some unfavorable effect on their demand for Plaintiffs' competing properties). Plaintiffs need not prove that *every* government official who chooses a Trump establishment does so to curry favor with the President by enriching him, nor need Plaintiffs prove that a particular government official chose or will choose a Trump establishment for the sole or even the primary reason of earning the President's favor. *Dep't of Commerce*, 139 S.Ct. at 2566 (holding that "traceability is satisfied" when plaintiffs established that the third-party action leading to the alleged harm was "likely attributable *at least in part*" to the challenged action, noting that "Article III requires no more than *de facto* causality") (emphasis added) (internal quotation marks omitted). Plaintiffs need only plausibly allege that the President's receipt of emoluments generates an unlawful competitive advantage for the Trump establishments.

The allegations in the Complaint are sufficient to meet this burden. Plaintiffs point to statements by foreign diplomats that they and others in their position have been

or will be motivated to choose Trump establishments to earn the President's favor, or to avoid his disfavor. *See, e.g.,* Complaint ¶¶ 62, 74. Moreover, the President's statements to the effect that he favors governments that spend money at his establishments increase the likelihood that government patrons will choose Trump establishments in the hopes of winning influence. *See, e.g., id.* ¶ 96 (alleging that the President publicly stated that he "very much" likes and "get[s] along great with" foreign officials who do business with him). Without the benefit of discovery, the Plaintiffs need not go further to establish causation for the purposes of Article III.

### 3. Redressability

**\*12** Both Judge Walker's dissent and the Fourth Circuit's *In re Trump* opinion deny that any injunctive relief can be fashioned that would help Plaintiffs' predicament. *See In re Trump*, 928 F.3d at 376; *infra* ("[T]here is no allegation that [the requested relief] would cause diplomatic patrons to book at other establishments."). The Fourth Circuit expressed the view that "even if government officials were patronizing [the President's] Hotel to curry [his] favor, there is no reason to conclude that they would cease doing so were the President enjoined from receiving income from the Hotel ... [given that] the Hotel would still be publicly associated with the President, would still bear his name, and would still financially benefit members of his family." *In re Trump*, 928 F.3d at 376. Accordingly, the Fourth Circuit found that "the likelihood that an injunction ... would not cause government officials to cease patronizing the Hotel demonstrates a lack of redressability." *Id.*

Again, we disagree. Where customers favor a defendant's product or service over that of a plaintiff because of that defendant's violation of law, which is often the case in trademark infringement, unfair competition, or antitrust cases, the mere possibility that customers might continue to favor the defendant's product or service after a court enjoins the violation does not defeat Article III standing. If it did, such claims could never be heard before Article III courts.

Plaintiffs' requested remedy need only remove from the equation the *improper* competitive advantage arising from the possibility that, by patronizing Trump establishments, government officials can earn favor from the President. "[C]ommon sense and basic economics" indicate that the elimination of any illegal competitive advantage that motivated government officials to give more business to the Trump establishments will cause at least some to

2019 WL 4383205

cease to give preference to those businesses, thereby redressing the claimed injury. *Nat. Res. Def. Council, 894 F.3d at 104*.

Moreover, the Fourth Circuit's suggestion that, notwithstanding a court's grant of the requested relief, some government officials would likely continue to patronize Trump establishments to curry the President's favor is besides the point. *In re Trump, 928 F.3d at 376*. The Supreme Court made clear in *Mass. v. EPA* that a remedy that "will not by itself reverse" the alleged injury would still satisfy the redressability requirement if it "reduced [that injury] to some extent." *549 U.S. at 525–26* (emphasis omitted); *see also Larson, 456 U.S. at 243 n.15* ("[A plaintiff] need not show that a favorable decision will relieve his *every* injury.").

We see no justification for the assertion of Judge Walker and the Fourth Circuit that no injunction can be fashioned that would diminish the plaintiffs' injury. *See In re Trump*, 928 F.3d 376–77; *infra*. Injunctive relief could be fashioned along many different lines that would adequately reduce the incentive for government officials to patronize Trump establishments in the hope of currying favor with the President.[12]

[12]    For example, a court could bar the Trump establishments from selling services to foreign and domestic governments during the President's tenure in office, which would fully redress Plaintiffs' injury. A court could require the President to establish a blind trust or otherwise prevent him from receiving information about government patronage of his establishments, which could indicate to government officials that patronizing those establishments is no longer an effective way to earn Presidential favor. A court could require public disclosure of the President's private business dealings with government officials through the Trump establishments, which may discourage Presidential action that appears to improperly reward such patronage. *Cf. Buckley v. Valeo, 424 U.S. 1, 67 (1976)* (noting the tendency of disclosure requirements to "avoid the appearance of corruption by exposing [information] to the light of publicity").

*4. Relevance of the Purpose of the Emoluments Clauses*

**\*13** Judge Walker also concludes that the "Emoluments Clauses ... were never designed to, and nor do they, directly regulate the marketplace or the market player as it

functions in the marketplace," and draws the inference that a plaintiff who seeks to enjoin a violation of the Emoluments Clauses cannot establish standing to sue if that plaintiff's injury is competitive in nature. *See infra*. This appears to confuse the question whether the Complaint sufficiently states a cause of action with the question of Article III standing. In *Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 125–28 (2014)*, Justice Scalia's majority opinion clarified that the question "whether [a plaintiff] has a cause of action" is separate and distinct from the issue of whether the case "presents a case or controversy that is properly within federal courts' Article III jurisdiction." Neither this court, nor the Supreme Court (nor any other) has ruled that a competitive injury-in-fact, fairly traceable to the challenged action and likely redressable by the requested relief, fails to confer Article III standing unless the claims are based on a law specifically designed to regulate competition. Consideration of the purposes of the clauses may be relevant to whether the Complaint states an actionable claim, or whether a particular plaintiff is within the law's "zone of interests," *see infra*, but are not relevant to whether the Plaintiffs have met the three elements that form the "irreducible constitutional minimum of standing." *Lujan, 504 U.S. at 560*.

We therefore conclude that Plaintiffs have satisfied the Article III requirements of traceability and redressability.

ii. Zone of Interests

The district court also erred in dismissing the Complaint on the theory that Plaintiffs' injuries fall outside the "zone of interests" of the Emoluments Clauses. This is for two reasons. First, the zone of interests test does not, as the district court believed, implicate the court's subject matter jurisdiction. Further, the Supreme Court's precedents make clear that Plaintiffs' injuries are not outside the zone of interests of the Emoluments Clauses.

Turning first to the question whether zone of interests is a test of Article III standing, the Supreme Court has recently clarified that it is not. In *Lexmark Int'l Inc. v. Static Control Components*, the Supreme Court, while acknowledging that past decisions had characterized the zone of interests test as part of a " 'prudential' branch of standing," reconsidered the question and clarified both that the "prudential" label is a misnomer and that the test does not implicate Article III standing. *572 U.S. 118, 126–27 (2014)*. Rather, the Court explained that the test asks whether the plaintiff "has a cause of action under the [law]" on the basis of the facts alleged. *Id. at 128*. The

Court emphasized that the test is not "jurisdictional" because "the absence of a valid ... cause of action does not implicate subject-matter jurisdiction." _Id. at 128 n.4_ (internal quotation marks omitted). In _Bank of America v. City of Miami_, 137 S.Ct. 1296 (2017), the Court reaffirmed that the zone of interests test asks whether the complaint states an actionable claim under a statute (and not whether the plaintiff has standing and the court has subject matter jurisdiction). The _City of Miami_ majority reiterated that the Article III standing requirements are injury, causation, and redressability, and reinforced _Lexmark_'s essential point that the zone of interests question is "whether the statute grants the plaintiff the cause of action that he asserts." _Id. at 1302_.

Accordingly, while it had previously been appropriate to consider whether plaintiffs fall within the zone of interests in deciding whether a plaintiff has standing and the court has subject matter jurisdiction, the Supreme Court has unambiguously rejected that approach. The district court thus misconstrued the nature of the zone of interests doctrine.

The district court's analysis erred on the merits as well. Every Supreme Court decision construing the zone of interests test as it pertains to competitors' suits supports the view that Plaintiffs satisfy the zone of interests test. Without exception, the Court has held that a plaintiff who sues to enforce a law that limits the activity of a competitor satisfies the zone of interests test even though the limiting law was not motivated by an intention to protect entities such as plaintiffs from competition. _See Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co._, 522 U.S. 479, 495–96 (1998) (_NCUA_) ("[Defendants argue] that there is no evidence that Congress ... was at all concerned with the competitive interests of commercial banks [such as plaintiffs], or indeed at all concerned with competition .... The difficulty with this argument is that similar arguments were made unsuccessfully in [every case construing the zone of interests of a statute vis-à-vis a plaintiff competitor]."). After _Lexmark_, consistent with the longstanding view that the test is "not meant to be especially demanding," _Clarke v. Sec. Indus. Ass'n_, 479 U.S. 388, 399 (1987), the Court reaffirmed that plaintiffs who allege secondary economic injuries due to conduct that violates a limiting law can satisfy the zone of interests test, notwithstanding that the statute violated was not intended to protect against the type of injury suffered by the plaintiffs. _City of Miami_, 137 S.Ct. at 1304–05 (finding that a municipality fell within the zone of interests of the Fair Housing Act where it alleges an injury due to discriminatory lending causing an increase in foreclosures, which allegedly cause decreased tax revenues and increased expenditures to remedy blight).

*14 The line of cases supporting Plaintiffs' satisfaction of the zone of interests test stretches back to _Ass'n of Data Processing Orgs., Inc. v. Camp_, 397 U.S. 150 (1970) (_Data Processing_). In _Data Processing_, plaintiffs were sellers of data-processing services. _Id. at 151_. They sued to set aside a ruling of the Comptroller of the Currency, which allowed national banks to offer data-processing services to other banks and bank customers. _Id._ The complaint, alleging a violation of the Administrative Procedure Act, asserted that the Comptroller's rule inflicted a competitive injury on the plaintiffs by allowing banks to exceed the "legitimate scope of [bank] activities," as dictated by the National Bank Act and § 4 of the Bank Service Corporation Act. _Id. at 157; see also id. at 155_ ("No bank service corporation may engage in any activity other than the performance of bank services for banks."). The Court did not even consider whether the purpose of the statutory restriction was to protect competitors. Despite noting that the statutes did not "in terms protect a specified group" from competition, the Court found the zone of interests test satisfied because "§ 4 arguably brings a competitor within the zone of interests protected by it." _Id. at 156–57_. The Court reasoned that the "general policy [of the statute]" of limiting banks' activities "is apparent" and permitted the claim to proceed because plaintiffs' "[financial] interests are directly affected by a broad or narrow interpretation of the Acts." _Id. at 157_. The Court concluded that plaintiffs were within the zone of interests because a party alleging a financial injury is a "reliable private attorney general to litigate the issues of the public interest ...." _Id. at 154; see also Arnold Tours, Inc. v. Camp_, 400 U.S. 45, 46 (1971) (clarifying that "_Data Processing_ ... did not rely on any legislative history showing that Congress desired to protect data processors" and finding plaintiff travel agencies who competed with banks are "arguably ... within the zone of interests" of a limiting law despite the fact that Congress had not contemplated protecting their competitive interests) (internal quotation marks omitted).

The Court's next major zone of interests case, _Investment Company Institute v. Camp_, 401 U.S. 617 (1971) (_ICI_), is especially pertinent because the purpose of the statute involved there was similar in relevant respects to that of the Emoluments Clauses. The plaintiffs were investment companies that sought to enjoin a regulation promulgated by the Comptroller of the Currency which permitted banks to operate mutual funds. _Id. at 618–19_. Plaintiffs argued that the ruling violated § 21 of the Glass-Steagall Act, which made it unlawful "[f]or any person, firm, [or] corporation ... engaged in the business of issuing ... securities, to engage at the same time to any extent whatever in the business of receiving deposits." 12 U.S.C.

§ 378(a). Discussing the purpose of Glass-Steagall, the Court concluded that "Congress [ ] had in mind ... [the] hazards that arise when a commercial bank *goes beyond the business of acting as fiduciary* or managing agent and enters the investment banking business ... by establishing an affiliate to hold and sell particular investments." *ICI,* 401 U.S. at 630 (emphasis added). The Court found that Congress's purpose in enacting § 21 was to prevent corruption of the banking function and impairment of the ability of banks to function impartially. *Id.* at 630–34; *cf. CREW,* 276 F. Supp. 3d at 187 (describing the purpose of the Emoluments Clauses as protecting uncorrupted, impartial, and independent governance). Notwithstanding that the intention of § 21 was to protect systemic integrity and was not even arguably intended to benefit competitors, the Court nonetheless found that the investment company plaintiffs were within its zone of interests. *ICI,* 401 U.S. at 621 ("There can be no real question ... of the [plaintiff investment companies'] standing in the light of the *Data Processing* case."). The dissent argued that plaintiffs fell outside the zone of interests because "the Glass–Steagall Act [did not] evidence *any congressional concern for ... freedom from competition*". *Id.* at 640 (Harlan, J., dissenting) (emphasis added). The majority of the Court rejected that argument without discussion. *See also Clarke,* 479 U.S. at 399–400 (1987) ("[T]here need be *no indication* of congressional purpose to benefit the would-be plaintiff.") (emphasis added).

*NCUA* also recognized competitor injury as within the zone of interests of the law that was allegedly violated, notwithstanding that the law was not intended to protect the plaintiffs in their competitor role. 522 U.S. 479. The plaintiffs were banks that challenged a revision in the interpretation of § 109 of the Federal Credit Union Act ("FCUA") by its administering agency, the National Credit Union Administration ("NCUA"). *Id.* at 483. Section 109 restricted federal credit union membership to "groups" that had a "common bond of occupation or association." 12 U.S.C. § 1759(b). The revision that the plaintiffs challenged extended membership eligibility to groups that lacked a single common bond between all members, if the credit union comprised multiple distinct employer sub-groups within which all members had a common bond. *NCUA,* 522 U.S. at 484. The plaintiffs contended that the NCUA's revised interpretation was contrary to the requirements of the Act. *Id.* at 483. The defendants sought dismissal of the suit on the ground that the competitive injury alleged by the plaintiff banks was outside the zone of interests sought to be protected by Congress in enacting the FCUA. The Supreme Court rejected defendants' argument, explaining that "[a]s competitors of federal credit unions, [the plaintiff banks]

certainly have an interest in limiting the markets that federal credit unions can serve, and the NCUA's interpretation has affected that interest by allowing federal credit unions to increase their customer base." *Id.* at 493–94. In response to defendants' argument that the plaintiffs' injuries were outside the FCUA's zone of interests because "banks were simply not in the picture" when the relevant statute was drafted, the Court dismissed it as "irrelevant." *Id.* at 496, 499.

**\*15** As stated above, the Supreme Court recently reaffirmed substantially the same position post-*Lexmark*. In *City of Miami*, the Court found that a plaintiff alleging an economic injury due to allegedly unlawful conduct was within the zone of interests of the law that regulated the conduct in question. 137 S.Ct. at 1304–05. The City had brought an action against housing lenders, alleging they had violated the Fair Housing Act ("FHA") by issuing risky mortgages on unfavorable terms to minority customers. *Id.* at 1301. The City claimed to have suffered economic injury from lost tax revenue and increased municipal expenses due to higher incidence of mortgage foreclosure and increased demand for services to remedy the resulting urban blight. *Id.* at 1302. The district court had dismissed the suit under Rule 12(b)(6) for failure to state a claim on the ground that "the harms alleged, being economic and not discriminatory, fell outside the zone of interests the FHA protects." *Id.* The Supreme Court rejected that position. It ruled that the City's "financial injuries fall within the zone of interests that the FHA protects."*Id.* at 1304. The Supreme Court reasoned that, notwithstanding the absence of any indication that the FHA was intended to protect municipal budgets, it was "highly relevant" that the lenders' conduct allegedly "diminish[ed] the City's property-tax revenue and increas[ed] demand for municipal services." *Id*. Thus, consistent with the longstanding view that a plaintiff's economic injury usually makes her a "reliable private attorney general to litigate the issues of the public interest," *Data Processing,* 397 U.S. at 154, the Supreme Court found the City's economic injuries to be within the zone of interests of the FHA. *See also Bennett,* 520 U.S. at 161 (finding that plaintiff ranchers who asserted an economic injury from a new water management plan adopted by the Secretary of the Interior fell within the zone of interests of the Endangered Species Act "notwithstanding that the interests they seek to vindicate are *economic rather than environmental*") (emphasis added); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1075 (D.C. Cir. 1998) ("[The zone of interests] analysis focuses ... on *those who in practice can be expected to police the interests* that the [law] protects.") (emphasis added).

While most cases addressing whether the plaintiff's injury is outside the zone of interests of the law alleged to be violated have concerned the zone of interests of a *statute*, and this suit alleges violations of the *Constitution*, we can see no reason why the reasoning of the precedents reviewed above are not equally applicable here. The one instance in which the Supreme Court has ruled on an argument resembling a zone of interests challenge to a Constitutional provision is consistent with the above precedents and suggests that our Plaintiffs satisfy the test. In *Wyoming v. Oklahoma*, 502 U.S. 437 (1992), Wyoming brought suit against Oklahoma within the original jurisdiction of the Supreme Court, alleging that Oklahoma violated the Dormant Commerce Clause by passing a statute requiring that 10% of the coal used by coal-fired Oklahoma producers of electric power be mined in Oklahoma. Wyoming did not mine or sell coal. *Id.* at 442. The only injury Wyoming claimed as a result of the Oklahoma statue was a diminution in its tax revenues because Wyoming coal producers, which paid taxes to Wyoming, suffered diminution in the volume of coal they sold to Oklahoma producers of electric power. *Id.* at 447–48. Oklahoma sought to have the case dismissed on the ground that the tax alleged by Wyoming was too remote from the Dormant Commerce Clause's purposes as well as too insignificant. *See id.* at 448, 455. The Court rejected Oklahoma's arguments and granted summary judgment in favor of Wyoming. *Id.* at 461.

The Supreme Court ruled that Wyoming's loss of tax revenue caused by Oklahoma's alleged violation of the Dormant Commerce Clause was a proper basis for Wyoming's suit, notwithstanding that its loss of tax revenue was remote from the purposes of the Dormant Commerce Clause. *See id.* at 448–50. The majority did not explicitly discuss the zone of interests test, but in upholding Wyoming's standing, it rejected the argument in Justice Scalia's dissent that Wyoming fell outside the zone of interests.[13] To the extent it considered whether the alleged injury was too remote from the activity proscribed by the Dormant Commerce Clause, it did so as part of its analysis of the injury and causation requirements of Article III. *Id.* at 448–49 (concluding that the alleged diminution in revenues was "directly linked" to the allegedly unlawful tax); *see also Bond v. United States*, 564 U.S. 211, 218 (2011) (explaining, in holding that an individual prosecuted under federal law has standing to bring a Tenth Amendment claim, that "[i]f ... the person alleging injury is remote from the zone of interests a [law] protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries"); *INS v. Chadha*, 462 U.S. 919, 935–36 (1983) (holding that individual may challenge a

"legislative veto" on separation-of-powers grounds).

[13]   Puzzlingly, the district court cited a passage from Justice Scalia's dissenting opinion in *Wyoming* seemingly as though it were the holding of the case and without recognizing that the Court's majority opinion implicitly rejected Justice Scalia's argument. Justice Scalia wrote in his dissent that the test is "*more* strictly applied when a plaintiff is proceeding under a constitutional ... provision instead of the generous review provisions of the APA." *Wyoming*, 502 U.S. at 469 (Scalia, J., dissenting) (emphasis in original). The majority did not explicitly discuss this argument, but in upholding Wyoming's standing, it evidently rejected Justice Scalia's contention.

**\*16** Thus, while the district court may be correct that "[n]othing in the text or history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition[,]" *CREW*, 276 F. Supp. 3d at 187, these precedents make clear that the zone of interests test does not require the plaintiff to be an intended beneficiary of the law in question. Plaintiffs who are injured by the defendant's alleged violation of a limiting law may sue to enforce the limitation under the longstanding zone of interests test the Court has articulated.

### iii. "Prudential Considerations"—Political Question and Ripeness

Plaintiffs also challenge the district court's dismissal of their Foreign Emoluments Clause claim on two further grounds: (i) that it presents a nonjusticiable political question, and (ii) that the issues it raises are not ripe for adjudication. The district court described these as "prudential reasons" for dismissing the claim. *CREW*, 276 F. Supp. 3d at 193–95. These grounds were not argued by the President in his motion to dismiss, and the Department of Justice, acting as counsel to the President, does not defend them in this appeal.[14] We do not find the district court's reasoning persuasive.

[14]   Notwithstanding that the President neither sought nor defends these aspects of the district court's ruling, we discuss them because of the obligation of federal courts to consider whether they have subject matter jurisdiction to adjudicate a dispute. *Thompson v. County of Franklin*, 15 F.3d 245, 248 (2d Cir. 1994).

For both rulings, the district court relied on the fact that the Foreign Emoluments Clause bars the receipt of

emoluments "without the Consent of Congress[.]" U.S. Const, art. I, § 9, cl. 8. For its non-justiciability ruling, the court reasoned that, as Congress is "the only political branch with the power to consent to violations of the Foreign Emoluments Clause, Congress is the appropriate body to determine whether, and to what extent, [the President's] conduct unlawfully infringes on that power." CREW, 276 F. Supp. 3d at 193. According to the district court's reasoning, the courts can never adjudicate whether the Clause has been violated because a suit alleging such a violation will always present a non-justiciable political question. We respectfully disagree and find Plaintiffs' arguments in rebuttal more persuasive.

The prohibition stated in the constitutional text renders the President's receipt of "emoluments" unlawful, unless Congress consents to it. In the undisputed absence of Congressional consent, the President has violated this provision of the Constitution, if, as charged by the Complaint, he has accepted what the Constitution describes as "emoluments." The federal courts have the responsibility to resolve "Cases and Controversies" arising under the Constitution and laws of the United States. That responsibility entails finding the facts and interpreting the Constitution and laws. It is not affected by the Constitution's grant of authority to Congress to authorize the President to receive emoluments where Congress has not exercised that authority. The mere possibility that Congress *might* grant consent does not render the dispute non-justiciable. The district court's reasoning treated the Clause's authorization to Congress as if it said, "Congress alone shall have the authority to determine whether the President acts in violation of this Clause." It says nothing like that.

Furthermore, while challenges to complaints alleging the unconstitutionality of conduct that the Constitution gives Congress the power to authorize are relatively infrequent, they are not unprecedented. When such challenges have arisen, the federal courts, including the Supreme Court, have adjudicated them. *See, e.g.,* C&A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383 (1994) (Dormant Commerce Clause); Cuyler v. Adams, 449 U.S. 433 (1981) (Compact Clause).

**\*17** The district court also concluded that the dispute was not ripe for review. It reached that conclusion in reliance on the prospect of future Congressional action and on the reasoning of Justice Powell's concurrence in the Supreme Court's order of dismissal in Goldwater v. Carter, 444 U.S. 996 (1979).

*Goldwater* was a dispute over the Constitution's allocation of governmental power between two of the

branches of our federal government. President Carter, in the exercise of his constitutional authority to conduct the foreign relations of the United States, and coincident with his recognition of the People's Republic of China as the "sole government of China," announced an intention to abrogate a mutual defense treaty made in a previous administration with the Taiwanese government of the "Republic of China." Goldwater v. Carter, 617 F.2d 697, 700–01 (D.C. Cir. 1979), *vacated by* 444 U.S. 996. The Constitution empowers the President to make treaties and requires Senatorial consent before the treaties become effective; however, it says nothing about whether Senatorial consent is required to abrogate a treaty. Individual Members of Congress, who disagreed with President Carter's decision to abrogate the treaty, brought suit for declaratory and injunctive relief, contending that the President lacked authority to abrogate the treaty unilaterally without congressional consent.

Four Justices, through Justice Rehnquist's concurrence accompanying an order granting certiorari, vacating the judgment below, and remanding, voted to dismiss the suit on the ground that it raised a non-justiciable political question. Goldwater, 444 U.S. at 1002 (Rehnquist, J., concurring). Justice Rehnquist explained his view that the suit was non-justiciable "because it involves the authority of the President in the conduct of our country's foreign relations and the extent to which the Senate or the Congress is authorized to negate the action of the President." *Id.*

The main thrust of Justice Powell's concurrence was to disagree with Justice Rehnquist's conclusion that such a dispute over the Constitution's allocation of governmental power is nonjusticiable. Id. at 996 (Powell, J., concurring). Justice Powell pointed to the need for a Supreme Court decision to break an otherwise paralyzing governmental stalemate. *Id.* Nonetheless, Justice Powell agreed with the decision to dismiss the action—not because it was nonjusticiable, but rather because it was unripe, as the disputing branches had not yet reached the "impasse" that would justify their resorting to the courts to interpret the Constitution and break the stalemate. He emphasized the importance of not "encourag[ing] small groups or even individual Members of Congress to seek judicial resolution of issues before the normal political process has the opportunity to resolve the conflict." *Id.*

The differences between this case and *Goldwater* are such that *Goldwater* does not provide useful guidance for resolving this dispute. The *Goldwater* litigation arose from a dispute over the allocation of Constitutional powers to two competing branches of government. The Congressional plaintiffs took the position that, by

unilaterally abrogating a treaty, which had become effective by virtue of the Senate's exercise of consent, the President was acting illegally and in so doing, was undermining the Constitutional authority of the Senate. This interbranch clash in claims of governmental authority seemed to Justice Powell to offer a likelihood of ripening into either a political resolution or a need for adjudication to break a governmental impasse. The circumstances of this case are very different. There is no interbranch clash in claims of Constitutional authority in this case.[15] The Presidential conduct that is challenged by this suit is the President's private conduct. There is no claim on the part of the Congress, or any of its members, that the President's private conduct of his business affairs usurps power allocated to Congress by the Constitution. While the Constitution empowers Congress to legitimize a President's otherwise unlawful conduct, the President's conduct absent Congressional authorization does not usurp or challenge a Congressional prerogative. In fact, it is not members of Congress who are complaining. In this circumstance, in which Congress's defense of its Constitutional power is not at issue, there is no reason to expect or await either the impasse or the political resolution that Justice Powell saw as the justification for waiting in *Goldwater*. If the challenged conduct falls within what the Constitution describes as the receipt of "emoluments," the conduct is prohibited by the Constitution in the absence of congressional consent—and unlike in *Goldwater*, it is likely simply to continue to occur without a court ruling. This would not be as the result of a "political resolution," but simply because of the absence of an adjudicator to tell the President whether his conduct is, or is not, permitted by the Constitution he serves.

[15]   Members of Congress have brought a separate action against President Trump, alleging violations of the Foreign Emoluments Clause, which is currently pending. *Blumenthal v. Trump*, 382 F. Supp. 3d 77 (D.D.C. 2019).

**\*18** We therefore think the district court misconstrued Justice Powell's *Goldwater* concurrence in believing that it provided "particularly instructive" guidelines for the resolution of this case. *CREW*, 276 F. Supp. 3d at 194. Justice Powell's reasoning does not justify deferring adjudication to await a ripening that will not happen.

C. CONCLUSION

For the foregoing reasons, the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

Judge WALKER dissents in a separate opinion.

JOHN M. WALKER, JR., Circuit Judge, dissenting:

I would affirm the district court. The remaining plaintiffs in this case have failed to specify that any actual injury was caused by the President's alleged violation of the Emoluments Clauses, or how this Court could redress such an injury. None of this matters, they say, because the competitor standing doctrine allows us to ignore these pleading failures and to find standing anyway. I disagree and would hold that the complaint fails to sufficiently allege Article III standing.

Invoking constitutional provisions never directly litigated in the 230-year history of our Republic prior to the Trump presidency, the plaintiffs in this case claim that the President has inflicted competitive injury on their businesses by maintaining ownership over the Trump Organization's high-end hotels and restaurants and accepting the business of foreign and state official clientele in contravention of both the Foreign Emoluments Clause[1] and the Domestic Emoluments Clause.[2] The plaintiffs, who are owners of other high-end hotels and restaurants in New York City and Washington, D.C.,[3] allege that their businesses have suffered because foreign and state government officials want what only the Trump-owned establishments can offer: "access to, influence on, and the good will of the President of the United States."[4]

[1]   "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. 1, § 9, cl. 8.

[2]   "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7.

3    Only two plaintiffs remain in the appeal: Eric Goode and ROC United. Goode is the owner of "several celebrated hotels, restaurants, bars, and event spaces in New York," which include the Maritime Hotel, the Bowery Hotel, the Ludlow Hotel, the Jane Hotel, and the Park, Waverly Inn, and Gemma restaurants. Compl. ¶ 228. ROC United is a nonprofit organization that advocates for wages and working conditions for restaurant workers; it is made up of restaurant members and restaurant-employee members. **[A66]** The complaint alleges that several of ROC United's restaurant members compete directly with the Trump International Hotel & Tower in New York, the Trump International Hotel Washington, D.C., and the restaurants inside the Trump Tower and Trump World Tower located in New York City. **[A67]** A declaration from an industry expert submitted by the plaintiffs names several restaurants associated with ROC United that compete directly with Trump-owned properties. In New York City, these establishments include: The Modern, Gramercy Tavern, Craft, and Riverpark. **[A312–15]** In Washington, D.C., the ROC United competitor restaurants are: the Riggsby, Minibar, Jaleo, Casolare Ristorante, and Zaytinya. **[A319–22]**

4    Compl. ¶ 150.

**\*19** As this case comes to us now, it is about constitutional standing, not the precise meaning of the Emoluments Clauses. The meaning of the Clauses may be addressed elsewhere in due course, but even in their unresolved state, a few (largely uncontroversial) observations about the Clauses are in order. First, nothing in the plain text of either Emoluments Clause addresses competition in the marketplace or the conduct of business competitors generally. And neither can the Clauses be considered sweeping anti-corruption provisions. Facially, the Foreign Emoluments Clause concerns only the receipt of "emoluments" from foreign governments or their officials by those "holding any Office of Profit or Trust" on behalf of the United States and the Domestic Emoluments Clause only prohibits the President from receiving "emoluments" beyond the salary of the office from "the United States, or any or them." Neither Clause addresses the receipt of benefits (whether or not they are "emoluments") by the President from members of the public, private businesses, or private parties who seek government favors.5 Thus neither competition nor ordinary corruption are targeted by the Clauses or lie anywhere near the heart of this case.

5    *See* U.S. Const. art. I, § 9, cl. 8; art. II, § 1, cl. 7.

What is meant by the term "emolument" in the Emoluments Clauses has yet to be determined by any federal court. Regardless of whether the Emoluments Clauses encompass, as the plaintiffs have urged, anything of value,6 or whether the Clauses capture a narrower range of exchanges,7 the text and historical meaning plainly do not evidence concern for protecting fair competition in the marketplace.

6    *See* Appellants' Br. at 6–7; *see also* Norman L. Eisen, Richard Painter & Laurence H. Tribe, Brookings, *The Emoluments Clause: Its Text, Meaning, and Application to Donald J. Trump* 11 (Dec. 16, 2016), https://www.brookings.edu/wpcontent/uploads/2016/12/gs_121616_emoluments-clause1.pdf (arguing that the Emoluments Clause warrants the "broadest possible construction to the payments it encompasses") and thus "unquestionably reaches any situation in which a federal officeholder receives money, items of value, or services from a foreign state"); Zephyr Teachout, Opinion, *Trump's Foreign Business Ties May Violate the Constitution*, N.Y. Times, Nov. 17, 2016, https://www.nytimes.com/roomfordebate/2016/11/17/would-trumps-foreign-business-ties-be-constitutional/trumps-foreign-business-ties-may-violate-the-constitution.

7    *See* Amandeep S. Grewel, *The Foreign Emoluments Clause and the Chief Executive*, 102 Minn. L. Rev. 639, 641–42 (2017) (arguing that the Foreign Emoluments Clause covers only "office-related compensation"); *see also* Robert G. Natelson, *The Original Meaning of "Emoluments" in the Constitution*, 52 Ga. L. Rev. 1 (2017) (arguing that "emolument[s] in the Constitution meant compensation with financial value, received by reason of public office"); Eugene Kontorovich, Opinion, *Did George Washington Take 'Emoluments'?*, Wall St. J., Apr. 17, 2017, http://www.wsj.com/articles/did-george-washington-take-emoluments-1492123033 (arguing that George's Washington's private business dealings while in office cast doubt on whether President Trump's business holdings violate the Foreign Emoluments Clause).

Of course, none of these observations foreclose the possibility (however slim) that parties may pursue a private right of action (should such a right be recognized) to remedy commercial harms wrought by violations of the Emoluments Clauses or exclude the prospect that the Clauses as applied to a particular case could somehow affect market competition. Neither clause on its face, however, gives any indication that it is concerned with maintaining competition, or that it protects a right enforceable in the manner the plaintiffs have chosen to pursue.

Finally, this case is deeply political and thus finds itself in an area where federal courts ought to tread lightly. President Trump was democratically elected by the American people—and he was elected with his business holdings and brand prominence in full view. What's more, it is evident from the text of the Emoluments Clauses that they pertain to questions of separation of powers and, in particular, the relationship between the President and the Congress. Whether the courts should properly play any role pertaining to that relationship in the context of the Clauses will have to be determined in the future.

## I.

**\*20** Whatever the resolution of these various background questions, only one issue is before us now: have the plaintiffs sufficiently alleged constitutional standing to challenge the President's alleged violations of the Emoluments Clauses? The tripartite test for standing under Article III is well known: "an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."[8] A plaintiff's obligation to meet this test is an immovable feature of our constitutional structure; constitutional standing is a "bedrock requirement" and "an irreducible minimum" without which there is no case or controversy under Article III of the Constitution.[9] And, the standing inquiry is "especially rigorous" when the dispute implicates, as it does here, the separation of powers.[10]

[8]  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[9]  *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 472 (1982); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009) (articulating that Article III's "Cases" and "Controversies" requirement is a "fundamental limitation" and is "founded in concern about the proper—and properly limited—role of courts in a democratic society" (internal quotation marks and citations omitted)).

[10]  *Clapper*, 568 U.S. at 408 (internal quotation marks omitted).

The plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing constitutional standing.[11] At the pleading stage, "the plaintiff must 'clearly ... allege facts demonstrating' each element."[12] The "reviewing court[ ] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."[13]

[11]  *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016).

[12]  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

[13]  *Warth*, 422 U.S. at 501.

Here the pleadings do not particularize any direct injury actually caused by violations of the Emoluments Clauses, much less how such injury might actually be redressed by the courts. Rather, the plaintiffs (and the majority) rely entirely on a shortcut known as the competitor standing doctrine. This doctrine allows a competitor-plaintiff the presumption of injury in fact, traceability, and redressability when the plaintiff is almost sure to suffer a competitive injury as a matter of "economic logic."[14]

[14]  *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008).

The question of whether the competitor standing doctrine finds any traction in private suits brought under the Emoluments Clauses was recently addressed in *In re Donald J. Trump* by the Fourth Circuit, the first circuit to do so.[15] In that case, the District of Columbia and the State of Maryland sued the President alleging that he violated the Emoluments Clauses and that, among other injuries, those violations harmed their proprietary interests as businesses competing with the Trump Organization.[16] The Fourth Circuit held, correctly in my view, that the plaintiffs could not invoke the competitor standing doctrine to achieve Article III standing.[17]

[15]  *In re Donald J. Trump*, 928 F.3d 360, 363, 366 (4th Cir. 2019).

[16]  *Id.* at 363.

[17]    *Id.* at 377.

*Injury in fact.* The competitor standing doctrine "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors."[18] The doctrine allows plaintiffs to proceed if the economically logical cause and effect between a government action and increased competition is strong enough to support an inference of injury in fact to the competitor, "even though empirical analysis might conceivably have provided a higher level of certainty."[19] Of course, this doctrinal exception does not excuse the plaintiff from satisfying all three Article III standing requirements; all it does is exempt the plaintiff from showing an actual or imminent injury when the alleged harm arises in a market context where the actual injury may be difficult to demonstrate but is almost sure to occur.[20] It bears repeating that the plaintiffs here rely on the competitor standing doctrine because they cannot show (and have not alleged) that they have suffered any particularized injury caused by the violations they allege.

[18]    *Canadian Lumber*, 517 F.3d at 1332 (citing *Clinton v. City of New York*, 524 U.S. 417, 433 (1998)).

[19]    *Canadian Lumber*, 517 F.3d at 1333.

[20]    *See, e.g.*, *El Paso Nat. Gas Co. v. F.E.R.C.*, 50 F.3d 23, 27 (D.C. Cir. 1995); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 825–26 (9th Cir. 2011).

**\*21** Well-established precedent gives a competitor standing plaintiff latitude to allege competitive injury, but the competitive injury pleading exception, based as it is on economic logic, cannot be universally applied to every competitor. "[T]o establish an injury as a competitor a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit."[21] Other courts have correctly indicated that the plaintiff must be a "direct competitor[ ]."[22] The plaintiff must also show "an actual or imminent increase in competition, which increase [the court] recognize[s] will almost certainly cause an injury in fact."[23]

[21]    *In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1029 (2d Cir. 1989); **[JON (diss.), ALK, RJC]***see also* *Ctr. for Reproductive Law & Policy v. Bush*, 304 F.3d 183, 197 (2d Cir. 2002). **[JMcL, PNL, SS]**

[22]    *TrafficSchool*, 653 F.3d at 826; *see also* *Adams v. Watson*, 10 F.3d 915, 922 (1st Cir. 1993) (noting that the Supreme Court's competitor standing cases "are all premised on a plaintiff's *status* as a *direct competitor*" (emphasis in original)).

[23]    *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010); *see also* *Inv. Co. Inst. v. F.D.I.C.*, 815 F.2d 1540, 1543 (D.C. Cir. 1987) (competitor standing satisfied when increased competition " 'plainly threatens' economic injury").

Taken in isolation, the phrase from Second Circuit precedent—injury is shown if the plaintiff "competes in the same arena"[24]—can be read to suggest that a minimal allegation of direct competition is sufficient. In light of this seemingly low injury-in-fact bar, the majority opinion maintains that the plaintiffs have met this standard.[25] I agree with the majority that our prior cases are capable of this broad reading, but after the Supreme Court's decision in *Already, LLC v. Nike, Inc.*,[26] and upon close examination of the kinds of cases that have applied the competitor standing doctrine, it is more than evident to me that the doctrine does not, and should not, reach this case.

[24]    *USCC*, 885 F.2d at 1029.

[25]    *See* Maj. Op. 18.

[26]    568 U.S. 85 (2013).

In *Already*, the plaintiff, a shoe company, sought to challenge one of Nike's trademarks even after Nike issued a broad covenant promising not to pursue trademark claims against potentially infringing Already products and any future similar products manufactured by Already.[27] The Court rejected the theory that Already had standing to challenge the validity of Nike's trademark simply because it was Nike's competitor: "Taken to its logical conclusion, the theory seems to be that a market participant is injured

2019 WL 4383205

for Article III purposes whenever a competitor benefits from something allegedly unlawful—whether a trademark, the awarding of a contract, a landlord-tenant arrangement, or so on. We have never accepted such a boundless theory of standing."[28]

[27]    *Id.* at 88–89.

[28]    *Id.* at 99.

Already's theory of competitive injury was that the continued existence of Nike's allegedly unlawful mark, notwithstanding Nike's covenant with Already, deterred investment in its company, thereby placing Already at a competitive disadvantage.[29] Already argued that a large company like Nike used its allegedly invalid trademark to "bully small innovators" and that Nike's broad covenant not to sue could not "eradicate" the market effect of a "registered but invalid mark."[30] Thus Already's theory of competitor standing did not turn on whether Already planned to create a shoe to compete with a particular Nike shoe not covered by the covenant not to sue,[31] but was instead a broader claim about competitive injury. Already's allegations of Nike's intimidation tactics, if true, would have had a negative competitive impact on Already's business. Nike's allegedly unlawful conduct, in other words, would have placed Already on an unlevel playing field.

[29]    *Id.* at 97–99; *see also* Br. for Petitioner, *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) (No. 11-982), 2012 WL 3613367 at *33–34.

[30]    *Already*, 568 U.S. at 99, 98.

[31]    *See* Maj. Op. 20–21.

**\*22** In rejecting Already's claim that this type of competitive injury was sufficient to establish Article III standing, the Supreme Court was quite clear that such a "boundless theory" of competitor standing is unacceptable under Article III.[32] Not every competitive injury—even though a competitor's allegedly unlawful actions may in fact skew the competitive field to the plaintiff's disadvantage—gives a competitor standing to challenge that action.

[32]    *Already*, 568 U.S. at 99.

The plaintiffs' claim in this case is very much like the competitor standing claim in *Already*. Already and Nike were competitors (albeit mismatched in size) in the athletic-shoe market.[33] Already's theory of competitive standing was that Nike's allegedly invalid trademark deterred investment in Already and thus improperly chilled competition in that market. In this case, the plaintiffs claim similarly that the President's alleged constitutional violations are unlawfully skewing the competitive environment to his advantage.

[33]    *Id.* at 88.

The majority distinguishes *Already* on the basis that the plaintiffs here compete with the Trump-owned properties for identical consumers.[34] But that is the wrong inquiry, and in any case does not distinguish this case from *Already*. Already and Nike competed for at least some identical consumers, "in the same arena";[35] otherwise, there would have been no competitor issue in the case. Competitors, by definition, are always seeking to attract buyers who want the same goods or services. It is necessary rather to ask whether that competition is such that the harm will likely occur, as a matter of economic logic, from the violation of law alleged. Here, there is no logical connection between the President's alleged receipt of emoluments and the competitive success of the Trump-owned businesses. With or without the President's receipt of "emoluments," there are myriad reasons why a non-Trump establishment would face the same competition.

[34]    Maj. Op. 20–21.

[35]    *USCC*, 885 F.2d at 1029.

Moreover, it cannot be the case that, every time a competitor achieves some benefit through allegedly unlawful conduct that has no direct relationship to competition, competing businesses have standing to challenge that unlawful action simply by virtue of their status as a direct competitor.[36] Any number of potential illegal actions by a business could cause its rivals to face stiffer competition without giving rise to Article III standing. Take the example of an owner of a high-end restaurant in a competitive marketplace who fraudulently applies for and receives a bank loan from an FDIC-insured bank, or fraudulently applies for and receives a large tax refund. The restaurant's illegally obtained funds

might allow it to achieve a market benefit available to no other competitor: the restaurant is able to hire a superior chef and undercut competitors on menu pricing. As a result, that restaurant's law-abiding competitors find themselves facing increased competition. But do the restaurant's competitors have competitor standing to hold the restaurant liable for its unlawful action simply because they "compete[ ] in the same arena"?[32] As the Supreme Court made clear in *Already*, the answer is no. The economic logic necessary for competitor standing is measured between the violation and the competitive harm, and in the hiring of the chef that economic logic is non-existent. Such is the situation here. The mere fact of competition is insufficient. Otherwise, courts would have to entertain every claim by a competitor in which the defendant received some unlawful benefit—a benefit unrelated to competition—simply because that benefit could have an effect on competition.

36    *See In re Donald J. Trump*, 928 F.3d at 377 ("At bottom, the [plaintiffs'] are left to rest on the theory that so long as a plaintiff competes in the same market as a defendant and the defendant enjoys an unlawful advantage, the requirements for Article III standing are met.").

37    *USCC*, 885 F.2d at 1029.

**\*23** All of this leads me to question the expansive scope of our circuit's earlier precedent. To say that all a competitive injury requires is a showing that the plaintiff "competes in the same arena" conflicts with *Already*'s admonition that a market participant has not suffered constitutionally significant injury "whenever a competitor benefits from something allegedly unlawful."[38] Our formulation of this standing theory needs to be construed in light of the Supreme Court's limitations in *Already*. At any rate, even if our precedents required us to conclude that plaintiffs sufficiently alleged a competitive injury in fact, I have little doubt that they fail to satisfy the remaining, indispensable Article III requirements of traceability and redressability.

38    *Already*, 568 U.S. at 99.

*Traceability.* For there to be Article III standing, the plaintiffs must plausibly allege that their injury is "*fairly traceable* to the challenged action of the defendant."[39] Under the competitor-standing doctrine, courts have typically found that traceability flows readily from a competitive injury.[40] In these cases causation logically follows given the nature of the violation: if the violation

would necessarily harm the plaintiff's competitive opportunities, then an unlawful edge to a competitor logically connects to that violation.[41]

39    *Lujan*, 504 U.S. at 560 (emphasis added) (internal quotation marks omitted).

40    *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 212 (D.C. Cir. 2013) (finding that causation and redressability are "easily satisfied" in a competitor standing case); *New World Radio, Inc. v. F.C.C.*, 294 F.3d 164, 172 (D.C. Cir. 2002) (noting that, in "garden variety competitor standing cases" the "chain of causation" is "firmly rooted in the basic law of economics" (internal quotation marks omitted)).

41    *See Sherley*, 610 F.3d at 72 (competitive injury caused when "agencies lift regulatory restriction on [the plaintiff's] competitors or otherwise allow increased competition against them" (internal citation and quotation marks omitted)).

But, again, this case is no ordinary competitor standing case. The Emoluments Clauses do not regulate business or market activity *as* business or market activity, nor would their violation as a general matter be expected to affect competition.[42] Conventional competitor standing cases do not present difficult traceability questions precisely because the allegedly unlawful action is directed at markets or market behavior, and thus the connection between a market-affecting action and a market effect is tight. The Emoluments Clauses were never intended to regulate market behavior, and thus economic logic is absent.

42    *See infra* Part II.

The recognition that traffic increased at Trump-owned establishments following President Trump's election is not enough to show traceability. The plaintiffs must allege, beyond pure speculation, that the unlawful acceptance of emoluments from foreign and state government officials—not just the popularity of Trump-owned establishments for a myriad of reasons—is causing the plaintiffs' lost opportunity to compete on equal footing.[43] The plaintiffs have not plausibly alleged that the desire to confer a relatively modest[44] financial benefit on the President is the driving force behind increased competition.[45] And this must be plausibly alleged because it stands to reason that diplomats who patronize high-end hotels and restaurants do not make their choices solely

based on profit distribution, but as people with wide-ranging tastes and varying interests. The plaintiffs' and the President's establishments exist in a virtual sea of luxury hotels and restaurants[46] in which many different factors influence decision making and freely affect competition. There are simply too many variables at play (name recognition, boasting rights, better food, better service, more comfortable beds, reputation for quality, location close to the seats of power, to name a few)[47] to allow the plaintiffs to rest solely on the bare assertion that the President's acceptance of emoluments has caused them competitive injury.

[43]  In *Schulz v. Williams*, we held that traceability was satisfied as long as the challenged action (a district court injunction, in that case) "could have caused [the plaintiffs'] injury." [44 F.3d 48, 53 (2d Cir. 1994)](link). But the bar is not as low, *see* Maj. Op. at 24, as this isolated language suggests. In *Schulz*, there was no speculation that the district court's injunction caused the plaintiffs' alleged electoral injury because there was no other action to which the asserted injury could have been traced. *Schulz* does not stand for the proposition that any action that theoretically "could have" caused the plaintiffs' injury will suffice. At this stage, the plaintiffs must allege a plausible causal route, not merely a possible one.

[44]  The Trump Organization claims it donated approximately $150,000 in profit from foreign-government business to the U.S. Treasury in 2016 and approximately $191,000 in 2017 to offset financial gains to the President. Rebecca Ballhaus, *Trump Organization Details Level of Profits from Foreign Governments*, Wall St. J., Feb. 25, 2019, https://www.wsj.com/articles/trump-organization-details-level-of-profitsfrom-foreign-governments-11551116974. This is an infinitesimal amount in relation to the President's reported net worth of $3 billion in 2019. Shahien Nasiripour & Caleb Melby, *Trump's Net Worth Rises to $3 Billion Despite Business Setbacks*, Bloomberg, June 12, 2019, https://www.bloomberg.com/news/articles/2019-06-12/trump-s-net-worth-rises-to-3-billion-despite-business-setbacks. Of course, these specific amounts remain untested and unconfirmed.

[45]  *See* [In re Donald J. Trump, 928 F.3d at 375](link) ("To begin, the District and Maryland's theory of proprietary harm hinges on the conclusion that government customers are patronizing the Hotel *because the Hotel distributes profits or dividendsto the Preside*nt, rather than due to any of the Hotel's other characteristics. Such a conclusion, however, requires speculation into the subjective motives of independent actors who are not

before the court, undermining a finding of causation." (emphasis in original) (citing *[Clapper, 568 U.S. at 413](link)*).

[46]  The plaintiffs' establishments, it should be noted, represent only a few of the many upscale restaurants and hotels located in New York City and Washington, D.C. By a rough count, there are approximately 115 five-star hotels in New York City and 47 in Washington D.C.. *See* Five Star Alliance, https://www.fivestaralliance.com. And when this lawsuit was filed in 2017, there were 77 Michelin star restaurants in New York City and 12 in Washington D.C. *See Michelin Guide 2017: New York's Best Restaurants*, Michelin Travel, https://travelguide.michelin.com/reportage/michelin-guide-2017-new-yorks-best-restaurants; *Michelin Guide Washington 2017: 12 Restaurants Earn Stars*, Michelin Travel, https://travelguide.michelin.com/north-america/united-states/districtcolumbia/washington-dc/reportage/michelin-guide-washington-2017. This count does not include the numerous high-end restaurants—like the ROC United restaurants Craft, Riverpark, Casolare Ristorante, and Zaytinya—that are not Michelin-starred. None of these other establishments have joined in this lawsuit to account for any possible competitive deprivation.

[47]  *See* [In re Donald J. Trump, 928 F.3d at 376](link) ("And, even if government officials were patronizing the [Trump International] Hotel to curry the President's favor, there is no reason to conclude that they would cease doing so were the President enjoined from receiving income from the Hotel. After all, the Hotel would still be publicly associated with the President, would still bear his name, and would still financially benefit members of his family. In short, the link between government officials' patronage of the Hotel and the Hotel's payment of profits or dividends to the President himself is simply too attenuated.").

**\*24** On this point, the majority criticizes the district court for an error it did not make: requiring the plaintiffs to "dispel alternative possible explanations" for their asserted injury.[48] Of course, the majority is correct that a plaintiff need not disprove alternative causal routes, but the district court required of the plaintiffs no such thing. The district court instead listed factors that may influence whether a diplomatic patron will or will not frequent a Trump-owned property—"service, quality, location, price, and other factors related to individual preference"[49]—to illustrate why the causal chain in this case is speculative.

48    Maj. Op. 22–23.

49    *Citizens for Responsibility & Ethics in Washington v. Trump*, 276 F. Supp. 3d 174, 185–86 (S.D.N.Y. 2017).

That the plaintiffs are not required to disprove alternative causation does not cure that they failed to plausibly allege *any* causal chain. I agree with the majority that "allegations of fact must plausibly support a 'substantial likelihood' that the plaintiff's injury was the consequence of the defendant's allegedly unlawful actions."[49] A review of the complaint, however, reveals few (if any) specific allegations that diplomatic patrons are motivated by the desire to confer emoluments on the President.[51] The most that is plausibly alleged is that Trump-owned properties attract diplomatic clientele, and that the President has publicly sought and encouraged such patronage.[52] But these allegations fall short of plausibly alleging (or permitting a reasonably plausible inference) that increased competition is caused by the President's acceptance of emoluments.

50    Maj. Op. 22 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1974)).

51    And, as the Fourth Circuit points out, "there is a distinct possibility ... that certain government officials might *avoid* patronizing the [Trump International] Hotel because of the President's association with it."*In re Donald J. Trump*, 2019 928 F.3d at 376.

52    Compl. ¶¶ 56, 58–87, 109, 196–97, 199–203, 206–11, 230–33.

The plaintiffs rely on a Washington Post article in which diplomats are quoted stating that they and their colleagues will favor Trump-owned properties.[53] None of these statements reveal a specific motivation to confer a financial benefit on President Trump. They indicate nothing more than that the primary motivator is Trump-brand loyalty. The plaintiffs' strongest argument cites a line from that same article: "In interviews with a dozen diplomats ... some said spending money at Trump's hotel is an easy, friendly gesture to the new president."[54] This allegation is too scant to satisfy plaintiffs' burden to affirmatively plead that their competitive injury is traceable to the President's acceptance of emoluments.[55]

53    Appellants' Br. 38 ("Believe me, all the delegations will go there.") ("Why wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' ").

54    Appellants' Reply Br. 12 (quoting Jonathan O'Connell & Mary Jordan, *For foreign diplomats, Trump hotel is place to be*, Wash. Post, Nov. 18, 2016).

55    In my view, this is the case even after we accept the plaintiffs' (highly debatable) broad definition of emoluments.

Even if a government official were actually motivated to "enrich[ ]"[56] the President by staying at a Trump-owned hotel, the plaintiffs must plausibly allege that it is the acceptance of emoluments that is unlawfully distorting competition. The plaintiffs must affirmatively allege that conferring a direct benefit on the President makes a material difference when placed alongside all of the other reasons for patronizing Trump properties. Without allegations to that effect, the causal chain remains too speculative. To be sure, the plaintiffs need not disprove all alternative causal routes, but the plaintiffs still remain obligated to plead a casual chain that rises above speculation.[57] This they have not done.

56    Maj. Op. 19, 21.

57    *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 44 (1976) ("[U]nadorned speculation will not suffice to invoke the federal judicial power.").

**\*25***Redressability*. Finally, the plaintiffs must show that it is "likely ... that the injury will be redressed by a favorable decision."[58] Like traceability, redressability frequently follows closely on the heels of a competitive injury in fact, but it is still a distinct component of Article III standing and must be plausibly alleged.

58    *Lujan*, 504 U.S. at 561 (internal quotation marks omitted).

Wholly absent from the complaint are any plausible, non-conclusory allegations that the sought-after remedy will lessen the plaintiffs' competitive injury.[59] At the point in the complaint at which the reader might expect to be told how the remedy sought would redress the competitive

injury, the reader is left empty-handed. The plaintiffs simply request that the court issue a declaratory judgment that broadly defines the Emoluments Clauses as the plaintiffs would like,[60] and ask for "[i]njunctive relief, enjoining [the President] from violating the Foreign and Domestic Emoluments Clauses, as construed by this Court, and requiring [the President] to release financial records sufficient to confirm that [he] is not engaging in any further transactions that would violate the Emoluments Clauses."[61] As for how this relief will remedy the plaintiffs' competitive injury, the complaint only asserts in conclusory fashion that "the declaratory and injunctive relief ... would provide a remedy for the many injuries described above."[62]

[59]   *Iqbal*, 556 U.S. at 678.

[60]   The plaintiffs request, among other things, that "Emolument ... of any kind whatever" under the Foreign Emoluments Clause be defined to "cover anything of value," and "any other Emolument" in the Domestic Emoluments Clause be defined to encompass "monetary and non-monetary payments or transactions, transactions granting special treatment, and transactions above marginal cost ...." They ask the court to declare that the President's conduct violates both provisions. *See* Compl. VI(a).

[61]   Compl. VI(b). One suspects that obtaining the President's financial records may be the true reason for this lawsuit.

[62]   Compl. ¶¶ 239; 243; *see also* Compl. ¶ 242.

It comes as no surprise that the pleadings are insufficient as to redressability because they do not connect the relief requested to any effect on competition. The amicus brief by former national-security officials, relied upon by the plaintiffs,[63] cuts in the opposite direction from the argument that the plaintiffs use it to support. The brief highlights the plaintiffs' redressability problem, pointing out the obvious: "our adversaries and even our allies seek every advantage that is available on the international stage."[64] The various articles and statements cited by the plaintiffs demonstrate that diplomats choose to patronize Trump-owned properties for a variety of reasons—and most likely several reasons at the same time. None of them single out the conferral of emoluments. But, more to the point, there is no allegation that removing any one of the many possible incentives would cause diplomatic

patrons to book at other establishments. To the contrary, as the former national-security officials point out, officials are likely to continue to seek "every advantage"—and continue to book at Trump-owned properties.

[63]   *See* Appellants' Reply Br. 12–13 (citing Br. of Former Nat'l Sec. Officials 21).

[64]   Br. of Former Nat'l Sec. Officials 21.

**\*26** It is evident that the complaint fails to adequately plead redressability because it is virtually impossible to plausibly connect the purported cause of the plaintiffs' alleged harm to the remedy they claim to seek (but have not specified in the complaint)—an improved competitive environment. Even if "the mere possibility that customers might continue to favor the defendant's product or service after a court enjoins the violation does not defeat Article III standing,"[65] plaintiffs here have not particularized any causal connection between the alleged violation of the Emoluments Clauses and their market disadvantage. When plaintiffs come before a court unable to specify how the relief they seek will redress their injury, "one must wonder why they came to the court for relief in the first place."[66] In any event, the fact that the plaintiffs plainly fail to do so in the complaint is telling and is itself sufficient to defeat standing.

[65]   Maj. Op. 42.

[66]   *In re Donald J. Trump*, 928 F.3d at 377.

## II.

As I have already noted, that the application of the competitor standing doctrine in this case will not satisfy the requirements of Article III standing is not surprising given the absence of economic logic between the violation alleged (the transgression of the Emoluments Clauses) and harm to the plaintiffs (competitive disadvantage). The nature of the cases in this area merits further elaboration. Only in certain categories has the economic logic been tight enough for courts to permit competitor-plaintiffs to shortcut the usual requirement of

pleading injury in fact, traceability, and redressability with particularity. These cases fall generally into three categories: agency cases, election cases, and unfair competition cases. It is only within these three categories that the cases relied upon by the plaintiffs (and the majority) to support their competitive standing theory can be found. In each of these three categories, the challenged governmental action or non-action is directed at parties in their capacity as a market player. This emoluments case, by contrast, fits into none of these three categories, and it is not analogous to any of them.

*Agency cases.* The competitor standing doctrine originated with agency cases. The first of these cases before the Supreme Court, *Investment Company Institute v. Camp*, involved banking regulations that allowed new institutions to enter certain financial sectors.[67]

[67]   *See Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1970) (investment companies had standing to challenge the regulation of national banks); *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 403 (1987) (competitor brokerage trade association had standing to sue over banking regulations); *Nat. Credit Union Admin. v. First Nat. Bank & Trust Co.*, 522 U.S. 479, 488 (1998) (banks and bankers association had standing to sue over credit union regulations).

Following that decision, competitor standing cases premised on a challenge to agency action have become common.[68] In *Adams v. Watson*, the First Circuit held that out-of-state milk producers had competitive standing to challenge state dairy regulations.[69] In *Canadian Lumber Trade Alliance v. United States*, the Federal Circuit determined that Canadian wheat producers could employ competitor standing to challenge United States customs regulations designed to aid American wheat producers.[70] The D.C. Circuit, in *Sherley v. Sebelius,* held that adult stem cell researchers had competitive standing to challenge new regulations authorizing the National Institutes of Health to fund embryonic stem cell research.[71] I could go on.

[68]   Some cases in this category could fall under the broader heading of "governmental action." *See Clinton v. City of New York*, 524 U.S. 417, 432–33 (1998) (farmers' cooperative had competitor standing to challenge the President's line item veto of a bill provision that would have benefitted the cooperative).

[69]   *Adams*, 10 F.3d at 920, 925.

[70]   *Canadian Lumber*, 517 F.3d at 1332.

[71]   *Sherley*, 610 F.3d at 73.

*27 In the agency context, where the government regulators are effectively choosing winners and losers in the marketplaces that they regulate, affording the plaintiff the presumption of injury, traceability, and redressability makes sense. There is no doubt, for example, that when the government allows a commercial bank to operate in a sector previously occupied only by investment firms,[72] the investment firms will suffer negative competitive effects because more actors occupy the field. In these cases, the challenged government action is directed at a *particular marketplace* with the aim of regulating one or more of the players in *that market* in some way. The government's decision to act in a way that gives a boost to some players in that market or allows a new player to enter it, will, as a matter of *economic logic*, be to the detriment of others.

[72]   *See, e.g.*, *Camp*, 401 U.S. at 620.

*Election cases.* Competitor standing cases in the Second Circuit have arisen in the election context. In *Fulani v. League of Women Voters Education Fund*, the plaintiff, a presidential candidate, alleged that the League of Women Voters violated its tax-exempt status by hosting a primary debate that imposed certain admission requirements on the debate candidates, thereby causing the plaintiff-candidate a competitive injury when she was excluded from the debate.[73] We held that she had competitor standing to challenge the League's tax-exempt status.[74] The plaintiff in *Fulani* alleged that a law (aimed at preventing *political* abuse of an organization's tax-exempt status in the political marketplace) caused a competitive injury to her *political* candidacy which plainly would be redressed if she were permitted to debate. Her injury and its causation and redressability were self-evident as a matter of logic.

[73]   *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 624 (2d Cir. 1989). **[EVG, RJC, *LWP*]**

[74]   *Id.* at 626.

Likewise, *Schulz v. Williams* involved an action by the Libertarian Party to enjoin the operation of a New York election law that had blocked its candidates from getting

on the state ballot.[75] The district judge granted the Libertarian Party an injunction. The competitor-intervenor Conservative Party appealed on the basis that the district court's injunction improperly placed Libertarian candidates on the ballot and thereby siphoned votes away from it.[76] We held that the intervenor-Conservative Party had standing to challenge the election law ruling that had allegedly caused it an electoral injury.[77]

[75]   *Schulz*, 44 F.3d at 51–52.

[76]   *Id.* at 52–53.

[77]   *Id.* at 53.

Finally, in *In re U.S. Catholic Conference*, pro-choice advocates had competitive standing to challenge the tax-exempt status of the Catholic Church on the grounds that the Catholic Church had unlawfully engaged in partisan activities by campaigning for pro-life causes.[78] By logic parallel to the agency cases, in each election case the competitor-plaintiff sought to challenge election-related action that allegedly caused an obvious and direct negative impact on the plaintiffs' own political activities.

[78]   *USCC*, 885 F.2d at 1022.

*Unfair competition cases.* The third context in which the competitor standing doctrine has arisen is in unfair competition claims.[79] Courts routinely recognize constitutional standing for competitors seeking to redress antitrust injury.[80] Suits by competitors brought under the Lanham Act are also commonly allowed based on competitor standing. In *TrafficSchool.com, Inc. v. Edriver, Inc.*, both parties ran online traffic-school courses in the same market. The plaintiff alleged that the defendant had engaged in false advertising in violation of Lanham Act and state unfair competition laws—a violation, unlike that here, that directly relates to competition.[81] The Ninth Circuit determined the competitor-plaintiff had standing because they were direct competitors and "[s]ales gained by one are thus likely to come at the other's expense."[82] This case exemplifies those cases in which, as a matter of economic logic, a competitor had standing to challenge a rival's noncompliance with laws plainly designed to regulate their competition in the common marketplace.

[79]   *See TrafficSchool*, 653 F.3d at 825–26.

[80]   *See, e.g., NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007) (en banc) (recognizing Article III standing for a plaintiff allegedly injured by a competitor's antitrust violations). The plaintiffs suggest that standing for competitors in these cases supports their broad proposition that "courts have upheld Article III standing when the illegal acts of private parties increase or distorted competition against a plaintiff" and evinces the doctrine's application in "many other contexts." Appellants' Br. 28–29. But the plaintiffs miss the thread that ties all three categories of cases together: economic logic. The same economic logic that connects agency, election, and unfair competition competitor standing cases is absent in this case.

[81]   *Id.* at 824.

[82]   *Id.* at 825.

*28 * * *

These are the three broad categories of cases in which courts have extended to plaintiffs a presumption of competitive injury based on common-sense market logic. The cases in each of these three categories deal with challenged regulations, laws, and actions that were directed at market players *in their role as market players*, which is the key determinant that may warrant utilization of the competitor standing exception. These cases stand for the proposition that competitive injury in fact, together with causation and redressability, can be presumed when the plaintiff can point to some government action or inaction that *directly* regulates the conduct of a market player operating in the same market. In other words, plaintiffs in these cases were afforded competitor standing when they asserted a competitive injury as a result of an unlawful activity that was itself directly related to, and intended to regulate, the commercial or political marketplace.

The case before us is markedly different. The competitor standing suit against the President has little in common with these three categories of cases. Even accepting the plaintiffs' broad construction of the Emoluments Clauses, the Clauses were never designed to, and nor do they, directly regulate the marketplace or the market player as it functions in the marketplace. The Emoluments Clauses have never been characterized as market-oriented, no case has ever stretched the competitor standing exception this far, and, as is evident from the Supreme Court's decision

2019 WL 4383205

in *Already*, such a stretch goes further than the competitor-standing pleading exception can bear.

In sum, because the plaintiffs lack standing to challenge the President's alleged acceptance of emoluments under either traditional standing principles or the competitor standing doctrine, I respectfully dissent.

**All Citations**

--- F.3d ----, 2019 WL 4383205

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.