UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                   :

PEN AMERICAN CENTER, INC.,         :

                          Plaintiff,   :

                                   :       18 Civ. 9433 (LGS)

            -against-        :

                                   :      <u>OPINION & ORDER</u>

DONALD J. TRUMP,           :

                       Defendant.  :

                                   :

------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Pen American Center, Inc. ("PEN America") seeks a declaratory judgment and injunctive relief against Defendant, President Donald J. Trump, for his alleged suppression of media free speech.  Defendant moves to dismiss the Amended Complaint (the "Complaint") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that Plaintiff lacks standing, the Complaint fails to state a claim and the Court lacks the authority to enjoin Defendant.  For the reasons below, the motion is granted in part and denied in part.  Specifically, claims for declaratory relief, based on Defendant's practices of (i) revoking or threatening to revoke White House press credentials and (ii) revoking or threatening to revoke national security clearances, may proceed.  Injunctive relief is improper.  For all other allegations, Plaintiff lacks standing.

## I.    BACKGROUND

       The following facts are drawn from the Complaint and accepted as true for purposes of this motion only.  *See Hu v. City of New Yor*k, 927 F.3d 81, 88 (2d Cir 2019).

       PEN America is a nonprofit association of writers, literary and media professionals, which defends the free speech rights of journalists in the United States and abroad.  Among other

things, it "monitors the government's interactions with writers and journalists and produces informational content related to its advocacy work."  Its advocacy and research depend "heavily on the quality reporting" in the press.  PEN America members include journalists for the *Washington Post*, Cable News Network ("CNN") and National Broadcasting Company ("NBC"), who report on Defendant's Administration -- for example, Jim Acosta of CNN.

The Complaint alleges that, since assuming office, Defendant has engaged in a "campaign of intimidation against critical reporting."  Defendant has used "the power and authority of the United States government" "to take retaliatory actions and [make] credible public threats" against reporters who are critical of his Administration.  Defendant's motivation is to punish and chill critical press, and he has succeeded in doing so.  According to a survey of PEN America members, thirty-one percent have avoided publishing on certain topics due to concern that Defendant will retaliate against them.  One percent have been fired or laid off and two percent demoted, replaced or denied an assignment as a result of Defendant's actions, and four percent have been asked to revise a piece before publication out of concern about Defendant's reaction.  Fifty-two percent believe public criticism of his Administration would put them at risk.

The Complaint alleges five sets of retaliatory acts and threats by Defendant against critical press: (i) his revocation or threats to revoke the White House press credentials of the White House press corps, or otherwise barring their access to press conferences, (ii) revocation or threats to revoke government officials' security clearances, due to the officials' critical commentary about Defendant in the press, (iii) threats to revoke television stations' broadcast licenses, (iv) issuance of an executive order directing the United States Postal Service ("USPS") to consider raising postal rates, which would impact Amazon.com's ("Amazon's") shipping

costs, and in turn, Jeff Bezos, the main shareholder of both Amazon and the *Washington Post*, and (v) a directive to the Department of Justice ("DOJ") to challenge the Time Warner-AT&T merger, out of hostility toward Time Warner's subsidiary CNN, and other regulatory and investigatory threats aimed at internet companies. These actions, according to the Complaint, have chilled the speech of reporters and contributors to the press, who fear that Defendant will retaliate against them for any critical positions they take on Defendant.

A.     **Barring Access to the White House Press Corps**

Defendant has repeatedly barred the access of the White House press corps to press conferences and the White House entirely, after members speak or report critically about Defendant. The press corps are reporters stationed at the White House who cover the President and his Administration. To report from the White House, Air Force One and other locations where the President and his staff meet with the press, press corps members must have White House press credentials.

On February 24, 2017, the White House Press Secretary ("Press Secretary") held an off-camera session in his office, allowing only a select group of reporters to attend, and denying access to CNN, *The New York Times*, *Politico*, *The Guardian* and the British Broadcasting Corporation ("BBC"). On July 25, 2018, the Press Secretary barred a CNN reporter from a White House press event, after Defendant deemed an earlier question the reporter had asked "inappropriate." In November 2018, Defendant threatened to revoke the press credentials of reporters who failed to show him "respect." On the social media platform Twitter, Defendant has posed rhetorically whether to "[t]ake away credentials" of "Network News" because its coverage of the Administration is "negative (Fake)."

Defendant has specifically targeted PEN America member and CNN White House press

corps reporter, Jim Acosta.  On December 12, 2017, the Press Secretary told Mr. Acosta that he would be banned from future White House press sessions if he posed questions during a particular session.  Later, at a different press session, Mr. Acosta asked the President critical questions about the Administration's U.S.-Mexico border activity, leading Defendant to call Mr. Acosta a "rude, terrible person" who "shouldn't be working for CNN."  The Press Secretary subsequently stripped Mr. Acosta's press credentials on November 7, 2018.  The White House falsely claimed it did so because Mr. Acosta had breached decorum and placed his hands on a White House intern who had tried to take away a microphone.  Six days later, on November 13, 2018, Mr. Acosta obtained a preliminary injunction against Defendant and White House staff, which temporarily restored his press credentials.  On November 19, 2018, the parties the lawsuit, and Mr. Acosta has maintained his press credentials since.

On the day of the settlement, the Press Secretary e-mailed the entire White House press corps, outlining rules of conduct.  If "unprofessional behavior occurs" or if "a court should decide that explicit rules are required to regulate [the] conduct" of the press corps in the White House or Air Force One, the White House would adopt further rules.  The e-mail expressly stated the rules of conduct were a response to the "behavior Mr. Acosta displayed at the November 7, 2018 press conference" and the "position taken by CNN."

### B.      Revocation of Security Clearances

Defendant has threatened to revoke or has revoked the security clearances of former government officials who comment critically about Defendant in the press.  Security clearances are typically stripped only for cause by the federal agency that originally issued the clearance. Former officials maintain security clearances to continue advising successors and assisting the federal government as needed.

4

On July 23, 2018, the Press Secretary announced that Defendant was considering revoking the security clearances of six former high-level national security officials, citing their critical commentary about Defendant in the press.  Shortly before the announcement, four of the officials had spoken to the press, in their capacity as regular media contributors.  On August 15, 2018, Defendant revoked the clearance of one official, former Central Intelligence Agency Director and MSNBC contributor John Brennan.

### C.    Threats to Revoke Broadcast Licenses

On Twitter, Defendant has questioned whether to challenge or revoke the broadcast licenses of networks whose reporting he dislikes.  On October 11, 2017, Defendant tweeted: "With all of the Fake News coming out of NBC and the Networks, at what point is it appropriate to challenge their License? Bad for country!"  Later that day, he tweeted that the networks' "licenses must be challenged and, if appropriate, revoked."  On December 16, 2018, Defendant suggested that NBC and other networks' coverage "[s]hould be tested in courts," because the networks "[o]nly defame & belittle! Collusion?"

### D.    Postal Rates Executive Order

Defendant allegedly retaliated against the *Washington Post* through the publication's owner, Jeff Bezos, and Mr. Bezos' e-commerce company, Amazon.  On April 12, 2018, Defendant issued an executive order, directing the USPS to examine its "unsustainable financial path" and to consider raising the "pricing of the package delivery market."  The USPS' proposals for new shipping rates, published in October and December 2018, risked increasing Amazon's delivery costs significantly.

For over a year before the executive order, Defendant was hostile toward the *Washington Post*, Amazon and Mr. Bezos, all of which he associates.  Defendant's tweets use the moniker

"Amazon Washington Post" or "#AmazonWashingtonPost."  After critical reporting by the *Washington Post*, Defendant called the newspaper a "lobbyist" and "weapon" for Mr. Bezos, and threatened to raise Amazon's shipping rates.  His tweets in March and April 2018 again threatened to raise postal rates.  The Complaint alleges that, but for Defendant's "expressed intent to punish" the *Washington Post*, he would not have issued the April 2018 USPS executive order.

### E.    DOJ Challenge to Time Warner-AT&T Merger

Defendant regularly disparages CNN as "fake news" on social media and in public appearances.  In retaliation for CNN's critical coverage, Defendant allegedly directed the DOJ to block a proposed vertical merger between AT&T and Time Warner, the parent of CNN. Defendant and his advisers discussed in 2017 how a lawsuit could create leverage over CNN.  In November 2017, the DOJ filed an antitrust lawsuit against the merger, even though the DOJ had not brought a challenge to vertical mergers in decades.  The DOJ lost at trial in June 2018.

The Complaint alleges that the DOJ lawsuit is one instance in a pattern by Defendant of threatening companies he disfavors with federal regulation or investigation.  In August 2018, Defendant directed a White House economic advisor to consider regulating Google, after Defendant tweeted that Google's search engine disproportionately steered users to negative press about the Administration.  Defendant also directed law enforcement, antitrust regulators and the Attorney General to look into investigating social media companies, allegedly "to influence the flow of information to the public" about Defendant and the Administration, on the companies' platforms.

## II.      LEGAL STANDARDS

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of

subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate

it," including when a "plaintiff lacks constitutional standing to bring the action." *Cortlandt St.*

*Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal

citation omitted).   "The plaintiff bears the burden of alleging facts that affirmatively and

plausibly suggest that it has standing." *Id.* at 417 (internal quotation marks omitted); *accord*

*Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).   "[A]t the pleading stage, all

facts averred by the plaintiffs must be taken as true for purposes of the standing inquiry."

*Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 142 (2d Cir. 2000); *accord Vullo*

*v. Office of Comptroller of Currency*, 378 F. Supp. 3d 271, 282 (S.D.N.Y. 2019) ("In evaluating

a plaintiffs showing of standing, a court must accept as true all material facts alleged in the

complaint and draw all reasonable inferences in the plaintiff's favor.")   Whether the Court has

subject matter jurisdiction is resolved first before the sufficiency of the Complaint is considered.

*See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 156 (2d Cir. 2013) ("Normally, in

cases involving the issue of Article III subject matter jurisdiction, this issue would have to be

addressed first.").

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id.*   On a Rule 12(b)(6) motion, "all factual allegations in the

complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015).

## III.    DISCUSSION

### A.    Standing

Plaintiff has constitutional standing to pursue First Amendment claims against Defendant's practice of (i) selectively barring access to the White House press corps, including by revoking or threatening to revoke press credentials, due to hostility to the reporters' speech (the "Press Corps Claim"), and (ii) revoking or threatening to revoke the security clearances of former government officials whose commentary he dislikes (the "Security Clearance Claim"). As explained below, Plaintiff does not have standing to challenge Defendant's alleged threats to revoke broadcast licenses, the executive order on postal rates, the directive to challenge the AT&T-Time Warner merger or regulatory threats against internet companies.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies" under Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (*quoting Raines v. Byrd*, 521 U.S. 811, 818 (1997)). The doctrine of standing enforces this limitation by identifying the "category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Id.*; *see Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009) (A plaintiff must "'allege[] such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction.") (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). To establish standing, a plaintiff must plead: "(1) 'an injury in fact' to 'a legally protected interest' that is both '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,' (2) 'a causal connection between the injury and the conduct

8

complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'"  *Crupar-Weinmann v. Paris Baguette Am., Inc*., 861 F.3d 76, 79 (2d Cir. 2017) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61).  Where, as here, Plaintiff is an entity, standing may be established either (i) directly, based on an injury to the entity itself, *i.e.* organizational standing, or (ii) in the organization's representative capacity, based on the injuries to its members, *i.e.* associational standing.  *See Warth*, 422 U.S at 511; *Fair Hous. Justice Ctr., Inc. v. Cuomo*, No. 18 Civ. 3196, 2019 WL 4805550, at *6 (S.D.N.Y. Sept. 30, 2019).  Plaintiff argues that it has standing under both theories.

As a preliminary matter, Plaintiff's standing with respect to each set of retaliatory acts or threats must be addressed separately.  Plaintiff argues, to the contrary, that it is challenging Defendant's "ongoing informal policy of threatening and retaliating against the press through a variety of regulatory tools."  *See* Opp'n Br., Dkt. No. 48, at 2.  Therefore, the relevant question for standing, according to Plaintiff, is whether this *overall policy* has injured Plaintiff, not whether each set of challenged actions has. The challenged actions are merely illustrative of the overall policy.  This argument is unpersuasive.  "[S]tanding is not dispensed with in gross. . . . Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."  *See Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (internal quotation marks and alteration omitted); *accord Kiryas Joel All. v. Vill. of Kiryas Joel*, 495 F. App'x 183, 189 (2d Cir. 2012) (summary order).  The Complaint does not allege the operation of a single policy, but rather Defendant's "*variety* of retaliatory acts," listing each one separately by bullet point.  The acts are moreover distinct, because they employ different modes of regulation against different groups of people or entities -- *i.e.* the press credentials of journalists, security clearances

9

of government officials, the merger of two private corporations, an executive order to the postal service and threatened regulation of internet companies.  Accordingly, Plaintiff's standing to challenge each of these government actions is discussed in turn.

### 1.    Associational Standing

Plaintiff has associational standing with respect to the Press Corps Claim, but not the other challenged conduct.  To establish associational standing, a plaintiff must allege that: "(a) [an organization's] members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *accord Am. Psychiatric Ass'n v. Anthem Health Plans*, Inc., 821 F.3d 352, 362 (2d Cir. 2016).  Unless "*all* the members of an organization are affected by the challenged activity," Plaintiff must name at least one of its "affected members" to establish associational standing at the pleading stage. *Summers*, 555 U.S. at 498-99; *see Equal Vote Am. Corp. v. Cong*., 397 F. Supp. 3d 503, 509 (S.D.N.Y. 2019); *Art & Antique Dealers League of Am., Inc. v. Seggos*, No. 18 Civ. 2504, 2019 WL 416330, at *2 (S.D.N.Y. Feb. 1, 2019) (A "plaintiff asserting associational standing must make specific allegations establishing that at least one identified member had suffered or would suffer harm . . . .  [An organization's mere] assertion that there is a probability that some of those members are threatened with concrete injury will not suffice.") (internal citations and quotation marks omitted).  Defendant challenges two elements of associational standing -- the first and third prongs of the *Hunt* test, including the *Summers* naming requirement.

### a)    Press Corps Claim

Plaintiff has satisfied the two disputed elements for associational standing: the Complaint

pleads that at least one named member has individual standing and that no individual members are required to participate in the Press Corps Claim.  Because the Complaint does not allege that the challenged conduct has affected all PEN America members-- in fact, it alleges the opposite -- Plaintiff is required to identify at least one affected member by name.[1]

Regarding the naming requirement, the Complaint has named Mr. Acosta, who satisfies the three-pronged test for individual standing.   Defendant's retaliatory actions and threats have injured Mr. Acosta in two ways: (i) Mr. Acosta's own speech has been chilled, and (ii) Mr. Acosta's right to receive the speech of his press corps colleagues has been impeded, because their speech has been chilled.  These are classic First Amendment injuries.  *See Laird v. Tatum*, 408 U.S. 1, 13-14  (1972) (stating that, although claims of a "subjective chill" are insufficient, "a claim of specific present objective harm or a threat of specific future harm" to a speaker, with the effect of chilling speech, is sufficient for First Amendment standing); *accord Davis v New York State Bd. of Elections*, 689 Fed. App'x 665, 669 (2d Cir. 2017) (summary order); *see also Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756-57 (1976) ("[W]here a speaker exists," the First Amendment "necessarily protects the right to receive" the speech) (internal quotation marks omitted); *accord Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017).

The Complaint alleges that Mr. Acosta and the press corps have suffered an "objective harm [and] a threat of a specific future harm," *Laird*, 408 U.S. at 13-14, and that Mr. Acosta's

---

[1] Plaintiff relies on *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144-45 (2d Cir. 2006), to argue that Plaintiff need not name an injured member at the pleading stage for associational standing.  This Court follows the later directive of the Supreme Court in *Summers v. Earth Island Inst.,* 555 U.S. 488, 498-99 (2009), which provides the opposite.

resulting speech and receipt-of-information injuries are concrete, actual and particularized.

Defendant has made an example of Mr. Acosta, by stripping his press credentials after he asked

Defendant critical questions about the Administration, barring Mr. Acosta from the venue

necessary to perform his job and directing the Press Secretary to warn other reporters that they

would face similar consequences as Mr. Acosta.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714

F.3d 682, 689 (2d Cir. 2013) ("A plaintiff must allege something more than an abstract,

subjective fear that his rights are chilled . . . but a real and imminent fear of such chilling is

enough" based on the objective circumstances); *Bordell v. Gen. Elec. Co*., 922 F.2d 1057, 1061

(2d Cir. 1991) (a chilling injury is established through "objective evidence" that  "challenged

conduct has deterred [a speaker] from engaging in protected activity").  The allegations

furthermore suggest that Defendant punished Mr. Acosta publicly *in order* to chill his speech and

the press corps'.  In demonstrating that Defendant would in fact punish reporters who spoke

critically, Defendant made his threats of future punishment more credible, and consequently,

effective.  The speech injuries are furthermore particular to Mr. Acosta.  As a member of the

press corps, and as a reporter specially targeted by Defendant, Mr. Acosta is uniquely vulnerable

to Defendant's threats.  He also has a unique interest in hearing the questions and discussion of

his press corps colleagues with Defendant, which facilitate Mr. Acosta's own reporting.[2]

  The allegations also establish a causal connection between the injuries and the challenged

_____

[2] Defendant argues, to the contrary, that Mr. Acosta has no injury-in-fact because his press
credentials were restored in November 2018.  But this argument misunderstands the nature of the
asserted injuries.  Although loss of credentials may be injurious, Plaintiff has alleged instead that
"speech [itself] has been adversely affected," *i.e.* the injury of an *ongoing* chilling of speech and
corollary *ongoing* interference with receipt of information.  *See Dorsett v. Cty. of Nassau*, 732
F.3d 157, 160 (2d Cir. 2013) ("Plaintiff has standing if he can show *either* that his speech has
been adversely affected by the government retaliation or that he has suffered some other concrete
harm," like loss of credentials.)

conduct. It is plain that the injuries trace to Defendant's actions. A favorable ruling furthermore will likely redress the practice. The Complaint explicitly pleads, quoting from the Press Secretary's e-mail, that Defendant and his staff are ready to heed a court decision on proper rules of conduct for governing the White House press corps.

Second, individual PEN America members need not participate in the Press Corps Claim, therefore satisfying the other disputed element of associational standing. Plaintiff seeks a declaratory ruling, and if appropriate, an injunction, against Defendant's practice of banning the press corps for speech critical of Defendant and his Administration. The requested relief targets the practice overall, rather than redresses the harm to particular PEN America members. No individualized proof as to the fact and extent of injury is required. "[W]here the organization seeks a purely legal ruling" or an injunction "without requesting that the federal court award individualized relief to its member, the *Hunt* test may be satisfied." *See Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quoting *Warth*, 422 U.S. at 515-16).

#### b)        Remaining Claims

Plaintiff does not have associational standing for the other allegations -- Defendant's revocation of security clearances, threats to revoke broadcast licenses, the postal rates executive order or the challenge to the AT&T-Time Warner merger and regulatory threats to internet companies -- because the Complaint does not identify any PEN America member who has standing to bring these claims. The only member named period is Mr. Acosta. But Mr. Acosta does not have a sufficient "personal stake" in these allegations to confer standing. *Summers,* 555 U.S. at 493.

Mr. Acosta is many steps removed from each of the challenged actions, and any purported injury to him is far too speculative. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398,

410 (2013) (A "theory of standing, which relies on a highly attenuated chain of possibilities,"
fails to establish that the "injury must be certainly impending"); *accord Robinson v. Sessions*,
721 F. App'x 20, 24 (2d Cir. 2018) (summary order).  Defendant's remarks about revoking
broadcast licenses are Twitter vitriol, posed as questions ("Collusion?" "At what point is it
appropriate to challenge their License?"), and refer vaguely to "the Networks," not to CNN
where Mr. Acosta works.  The injury to Mr. Acosta due to the AT&T-Time Warner antitrust
lawsuit is similarly speculative, because the lawsuit targets only CNN's *parent*.  Likewise, the
postal rates executive order, security clearance revocations and regulatory threats to Google and
social media companies have no direct bearing on Mr. Acosta.

To the extent Plaintiff argues that Mr. Acosta has experienced a receipt-of-information
injury because these challenged actions have chilled media speech generally, the Complaint fails
to plead how this injury is particularized to Mr. Acosta.  Even assuming the actions did chill
media speech, Mr. Acosta is similarly situated to all journalists and the public at large, in being
deprived of this speech.  *See Warth*, 422 U.S. at 499 ("[W]hen the asserted harm is a
'generalized grievance' shared in substantially equal measure by all or a large class of citizens,
that harm alone normally does not warrant exercise of jurisdiction."); *accord Kerven v. United
States*, No. 19 Civ. 722, 2020 WL 628748, at *1 (2d Cir. Feb. 11, 2020) (summary order).  In
any case, the Complaint fails to plead how these challenged actions -- except the security
clearance allegations discussed below -- objectively chilled media speech.

## 2.        Direct Organizational Standing

Plaintiff has direct organizational standing to bring the Press Corps Claim and the
Security Clearance Claim, but not the remaining claims.  An organization has "standing in its
own right to seek judicial relief from injury to itself," *Warth*, 422 U.S. at 511, where the

organization "meet[s] the same standing test that applies to individuals," *i.e.* the organization has

an injury-in-fact fairly traceable to a defendant's conduct and likely redressable by a favorable

court decision. *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286,

294 (2d Cir. 2012) (internal quotation marks omitted); *accord Make the Rd. New York v.*

*Cuccinelli*, No. 19 Civ. 7993, 2019 WL 5484638, at *4 (S.D.N.Y. Oct. 11, 2019). Plaintiff

advances two theories of direct injury: that Defendant's actions have injured (i) its

"organizational right to receive speech" and (ii) have forced Plaintiff to divert money away from

its core activities. Only the first theory is successful as to the Press Corps Claim and Security

Clearance Claim.

### a) Receipt-of-Information Injury

An organization's right to receive information is impaired when it is unable to hear from

a speaker who is willing to speak, but who has been obstructed by government action. *See*

*Virginia,* 425 U.S. at 756-57 (1976) ("[W]here a speaker exists," the First Amendment

"necessarily protects the right to receive" the speech of an organizational plaintiff) (internal

quotation marks omitted); *accord Kass v. City of New York*, 864 F.3d 200, 207 (2d Cir. 2017);

*Student Members of Same v. Rumsfeld*, 321 F. Supp. 2d 388, 395 (D. Conn. 2004) ("To

demonstrate an injury to their First Amendment rights sufficient to confer jurisdiction, [the

organization] must demonstrate that, but for the challenged order, [the speaker] is willing to

share information prohibited by the [challenged] order.") "This right is an inherent corollary of

the rights of free speech and press," because it both "follows ineluctably from the sender's First

Amendment right to send" speech and is a "necessary predicate to the recipient's meaningful

exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees*

*Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).

With respect to the Security Clearance Claim, Plaintiff has a receipt-of-information injury because Defendant's actions plausibly chilled the speech of the six government officials named in the Complaint.  After four of these officials spoke critically about Defendant in the media, the Press Secretary announced that Defendant was considering revoking the six officials' security clearances, expressly citing their media commentary.  Defendant ultimately revoked the security clearance of one official, an allegedly unprecedented action by a President.  The officials are otherwise frequent and willing speakers in the media.  The Complaint has plausibly alleged therefore that Defendant's retaliation and threats of further retaliation against these officials have objectively chilled the volume or quality of their media speech.  Plaintiff's right to receive the speech has in turn been impaired.[3]

Plaintiff's injury is particularized.  *See Spokeo Inc.*, 136 S.Ct. at 1548 (For an injury to be particularized, "it must affect the plaintiff in a personal and individual way."); *United States v.*

---

[3] Defendant argues that the Complaint does not allege an injury because it "has not identified any specific source from which its receipt of information has actually been disrupted" or that "any particular speaker has actually been chilled."  But as discussed, the Complaint identifies the six government officials whose security clearances are under threat.  It explains why the clearances are valuable and necessary for their continued service as government advisors.  It also explains that these officials are willing speakers.  Therefore, Defendant's threats to revoke their security clearances present an objective harm and threat of future harm -- specifically, to the officials' professions and reputation -- which plausibly impede their free speech.  *See Meese v. Keene*, 481 U.S. 465, 473, 475 (1987) (finding speech injury to public official where a regulation created a "Hobson's choice of foregoing . . . exposition of [the official's] own views or suffering an injury to his reputation" and his ability to "practice his profession"); *accord Davis*, 689 F. App'x at 669.  A speech injury occurs when the free flow of speech is impeded, and does not require complete elimination of speech.  *See Bordell*, 922 F.2d at 1061 (a chilling injury is shown through "objective evidence" that "challenged conduct has deterred" speech).  However, Defendant is correct that Plaintiff does not plead a receipt-of-information injury as to the hypothetical speech of "Plaintiff's members and other contributors to the press—particularly those who hold security clearances [other than the identified government officials]."  This allegation is too speculative, concerns a vague class of unidentified individuals, and fails to explain how Defendant's targeting particular officials has injured these individuals.

*Richardson*, 418 U.S. 166, 179-80 (1974) (The plaintiff "must have a personal stake in the outcome" and must assert "something more than generalized grievances.") (internal quotation marks omitted).  Plaintiff is an organization that, among other things, engages in advocacy for freedom of the press, monitors the government's impact on the press, and publishes research and analysis on these issues.  Plaintiff's sources of information include these former government officials, who provide unique and expert insight on the Administration.  Loss of these official's speech is therefore not a generalized grievance and affects Plaintiff's operations directly.  *See Knight First Amendment Inst. at Columbia Univ. v. Trump,* 302 F. Supp. 3d 541, 563 (S.D.N.Y. 2018) (quoting *Lujan*, 504 U.S. at 563) (holding that a free speech rights nonprofit suffered a particularized receipt-of-information injury when President Trump blocked Twitter users and impeded the flow of online conversations, which the nonprofit otherwise followed), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *reh'g en banc denied*, No. 18 Civ. 1691 (2d Cir. March 23, 2020).  This injury is indisputably traceable to Defendant's actions.  The allegations that Defendant and his staff will be responsive to court orders suggest that a favorable ruling would deter Defendant from retaliating or threatening to retaliate against the officials' speech.

Similarly, Plaintiff has organizational standing as to the Press Corps Claim.  Defendant's actions have plausibly chilled the White House press corps' speech, the questions they ask Defendant and the reporting they consequently are able to publish.  The chilling impedes Plaintiff's right to receive information.  Since PEN America monitors how government interacts with press, and its own members are in the White House press corps, Plaintiff has a particular interest in receiving and monitoring this speech.  As discussed in Section III.A.1, the injury traces to Defendant's actions and is redressable by a favorable court order.

Plaintiff has failed to assert a receipt-of-information injury as to the remaining claims.

17

The chain of causation linking (1) the challenged actions, (2) the injury to media speech and (3) the injury to Plaintiff's right to receive the speech is too speculative. *See Clapper*, 568 U.S. at 410. Regarding broadcast licenses, the Complaint fails to allege how Defendant's three tweets, questioning whether he can revoke broadcast licenses of "the Networks," has objectively chilled media speech. Likewise, Defendant's directives regarding USPS postal rates, the AT&T-Time Warner antitrust lawsuit and the regulation of internet companies impact the press even more tenuously. That a *proposal* of higher postal rates may affect Amazon, which in turn may affect Mr. Bezos, which in turn may affect the *Washington Post,* and then finally the news Plaintiff receives is too hypothetical. Similarly, the Complaint does not allege how a highly technical antitrust trial affects the speech of one of the parties' subsidiaries, CNN. Nor is it clear how Defendant's frustration toward a search engine and social media platforms, on which users share news stories, would impact the content of the news stories or Plaintiff's ability to seek out news stories itself. Although the Complaint presents survey results from Plaintiff's members showing that Defendant has deterred some of the members' reporting, the results are not specifically connected to the challenged actions here.

### b)        Diversion-of-Resources Injury

Plaintiff's main theory of direct injury -- that it has been injured because Defendant has "forced [Plaintiff] to divert significant resources previously dedicated to advocating for expression overseas to responding to Defendant's actions at home" -- is unpersuasive for all remaining claims. An organization is injured when there is a "perceptible impairment of [the] organization's activities" due to the challenged conduct, *see Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)), but the injury must be "far more than simply a setback to the organization's abstract social interests." *Havens*

*Realty Corp.*, 455 U.S. at 379 (citing *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972)).  The impairment may come in the form of an organization being "force[d to] divert money from its other current activities to advance its established organizational interests" or where an organization has to spend "money to combat activity that harms its organization's [sic] core activities."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017) (internal quotation marks omitted).  Plaintiff's argument fails because Defendant's challenged activities have not impeded Plaintiff's core activities, but have refocused and perhaps enlarged them.

The Complaint alleges that Plaintiff has increased spending on domestic advocacy, including by establishing a Washington, D.C. office, commissioning a study, publishing frequent reports and organizing events to protest Defendant's impact on free speech and press.  But the principle in *Havens Realty* and cases following is that an organization is injured if it has been forced to spend money addressing roadblocks to its "core activities."  *See Centro*, 868 F.3d at 111.  PEN America's "primary mission" and "bedrock work" are to "defend the liberties that make creative expression possible," "*both* internationally and in the United States" (emphasis added).  Accordingly, a core activity of PEN America *is* to advocate for and monitor the free speech rights of journalists in the United States, not just abroad.  Its increased domestic expenditures are not a diversion of money away from its core activities, but actually constitute the core activities.  Simply because Plaintiff may have adjusted the relative amounts of money it spends on domestic and international core activities does not establish an injury.  *See Make the Rd. New York*, 2019 WL 5484638, at *4 ("Courts have distinguished between cases where a defendant's conduct forced a plaintiff to divert its resources and provide *new* services, therefore giving rise to organizational standing, and cases where a plaintiff was *already* providing the

services at issue and therefore failed to allege any injury.") (collecting cases).

B.    **Sufficiency of Claims**

The Complaint plausibly states the Press Corps Claim and Security Clearance Claim. Plaintiff pursues each claim under two First Amendment theories: the bar against government threats that chill free speech and the bar against retaliatory government acts that punish speech. Both theories are viable.

Regarding unconstitutional threats, "[w]here the comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim can be stated." *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983); *accord Lynch v. Ackley*, 811 F.3d 569, 581 (2d Cir. 2016). "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam); *accord Richardson v. Pratcher*, 48 F. Supp. 3d 651, 669 (S.D.N.Y. 2014).

Regarding the separate theory of First Amendment retaliation, a plaintiff must allege: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013); *accord Komatsu v. City of New York*, No. 18 Civ. 3698, 2019 WL 4805904, at *4 (S.D.N.Y. Sept. 30, 2019).

The Complaint adequately pleads the Press Corps Claim. It alleges that Defendant unconstitutionally threatened the White House press corps by warning reporters that they would

be ousted from press conferences or have their press credentials revoked, if they spoke out in a way Defendant disfavored.  The threats are lent credence by the fact that Defendant has acted on them before, by revoking Mr. Acosta's credentials and barring reporters from particular press conferences.  The Press Secretary indeed e-mailed the entire press corps to inform them of new rules of conduct and to warn of further consequences, citing the incident involving Mr. Acosta. The Complaint furthermore alleges that Defendant has decision-making authority to undertake these actions.  As a result of the conduct, Plaintiff's own member's, Mr. Acosta's, speech rights have been injured.  Plaintiff has also suffered an injury to its right to receive information from the press corps.

The Press Corps Claim is also viable as a First Amendment retaliation claim.  The Complaint alleges that Defendant revoked Mr. Acosta's credentials only after a tense exchange, where Mr. Acosta asked Defendant critical questions and Defendant stated that Mr. Acosta was "rude" and should not work for CNN.  The Press Secretary's e-mail expressly stated that rules were being adopted, and other consequences might follow, due to the exchange.  These facts plausibly allege that a motivation for Defendant's actions is controlling and punishing speech he dislikes. The actions both injured Mr. Acosta's speech rights and Plaintiff's right to receive the press corps' speech.

The Security Clearance Claim is also sufficiently pleaded.  Defendant's announcement that he would review the security clearances of six former government officials followed after some officials spoke critically about Defendant in the press.  Defendant undoubtedly has authority to revoke the clearances.  Defendant has plausibly threatened that, should the officials continue to provide critical commentary in the press, their security clearances would be jeopardized and revoked.  Indeed, Defendant has already revoked Mr. Brennan's security

21

clearance, lending credence to the threat.  As a result, Plaintiff has suffered an injury to its right to receive the six officials' speech.

Similarly, Defendant's conduct gives rise to a retaliation claim. Defendant only began considering whether to revoke the security clearances *after* several officials spoke out critically about him.  These allegations evince that Defendant's motivation was to punish the officials' past speech and to deter the officials' media speech going forward.  The Complaint plausibly alleges Plaintiff's consequent receipt-of-information injury.

## C.     Injunctive Relief

The surviving claims may only proceed as claims for declaratory, and not injunctive, relief.  *See* 28 U.S.C. 2201(a) (a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided there is "a case of actual controversy within its jurisdiction"); *Knight First Amendment Inst. at Columbia Univ.*, 928 F.3d at 233-34 & 233 n.3 (affirming entry of a declaratory judgment against President Trump for a First Amendment violation).  A "District Court's grant of injunctive relief against the President himself is extraordinary and should . . . raise[] judicial eyebrows."  *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992).  It is settled precedent that courts generally have "no jurisdiction of a bill to enjoin the President in the performance of his official duties," although the Supreme Court has narrowly "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty."  *Id.* (quoting *Mississippi v. Johnson*, 4 Wall. 475, 498–99, 18 L.Ed. 437 (1867)); *accord Citizens for Responsibitliy and Ethics in Washington, et al., v. Donald J. Trump, et al.*, No. 19 Civ. 1333, 2020 WL 619959, at *9 (D.D.C. Feb. 10, 2020) ("While the question of whether the Court has the power to compel the President to perform a purely ministerial duty

may remain unsettled, the law is clear that the Court cannot issue such relief to require performance of official duties that are *not* ministerial.") (internal citation omitted); *Knight First Amendment Inst. at Columbia Univ.*, 302 F. Supp. 3d at 578.  A President's actions are "ministerial" when "nothing is left to discretion."  *Napolitano v. Flynn*, 949 F.2d 617, 622 (2d Cir. 1991); *accord Knight*, 302 F. Supp. 3d at 578.  By contrast, a President's actions "are discretionary when the official exercises professional judgment in performing the actions." *Napolitano*, 949 F.2d at 622.

Any injunction concerning the Press Corps Claim or Security Clearance Claim implicates Defendant's discretionary responsibilities, and is therefore improper.  The President has significant discretion over White House press credentials and reporters' access to the White House and Air Force One.  Indeed, the Complaint expressly alleges that Defendant has authority to adopt rules of conduct and to revoke press credentials where appropriate.  Similarly, a President has broad discretion over national security issues, including the security clearances of current and former executive officials.  *See*, *e.g.*, C*afeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 896 (1961) (the executive branch, through military officials, has "unfettered control" over revocation of a security clearances in order to "manage the internal operation of an important federal military establishment"); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 581 (2004) (Thomas, J., dissenting) (The Supreme Court "has long recognized" that the "President has *constitutional* authority to protect the national security and that this authority carries with it broad discretion").  Issuing an injunction to the President would impede his discretionary authority in these realms, and more generally, risk improper judicial encroachment on the executive branch.  The remaining claims will proceed as claims for declaratory relief only, and the application for injunctive relief is denied.

**IV.     CONCLUSION**

For the foregoing reasons, the motion to dismiss for lack of subject matter jurisdiction is GRANTED in part and DENIED in part.  The motion to dismiss for failure to state of claim is DENIED.  Plaintiff's request for oral argument is DENIED as moot.

The Clerk of Court is respectfully directed to close Dkt. Nos. 45 and 67.

SO ORDERED.

Dated: March 24, 2020
         New York, New York

                                        **LORNA G. SCHOFIELD**
                                    **UNITED STATES DISTRICT JUDGE**